# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br>        Plaintiff, <br><br> v. <br><br> HP INC. <br><br>        Defendant. | Civil Case No. 2:24-cv-00752-JRG <br> [Lead Case] |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br>        Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br>        Defendants. | Civil Case No. 2:24-cv-00746-JRG <br> [Member Case] |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br>        Plaintiff, <br><br> v. <br><br> HP INC. <br>        Defendant. | Civil Case No. 2:24-cv-00764-JRG <br> [Member Case] |

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br><br> Defendants. | Civil Case No. 2:24-cv-00765-JRG [Member Case] |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP. <br><br> Defendants. | Civil Case No. 2:24-cv-00766-JRG [Member Case] |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP. <br><br> Defendants. | Civil Case No. 2:24-cv-00753-JRG [Member Case] |

## <u>DECLARATION OF MARK LANNING REGARDING CLAIM CONSTRUCTION</u>

I declare under the penalty of perjury of the laws of the United States of America that the following is true and correct.

Dated:  September 25, 2025

*Mark R. Lanning*

Mark R. Lanning

## TABLE OF CONTENTS

I.      QUALIFICATIONS, EXPERIENCE AND EDUCATION ................................................. 1

II.     MATERIALS AND OTHER INFORMATION CONSIDERED ..................................... 4

III.    PRIOR TESTIMONY ................................................................................................. 5

IV.     COMPENSATION ..................................................................................................... 5

V.      SUMMARY OF OPINIONS ....................................................................................... 5

VI.     UNDERSTANDING OF THE LAW .......................................................................... 5

        A.      General Principles of Claim Construction ............................................. 6

        B.      Indefiniteness ........................................................................................ 7

VII.    LEVEL OF ONE OF ORDINARY SKILL IN THE ART ........................................ 8

VIII.   BACKGROUND OF THE TECHNOLOGY .......................................................... 8

        A.      The Evolution of Wi-Fi Technology and Standards ............................. 8

        B.      The IEEE 802.11ax Functionality Has Evolved from the Previous
                Standards ............................................................................................... 10

        C.      The IEEE 802.11ax-2021 Protocol Specification ............................... 11

IX.     OVERVIEW OF THE ASSERTED PATENTS ..................................................... 13

        A.      '077 Patent ............................................................................................ 13

        B.      '210 Patent ............................................................................................ 16

        C.      '281 & '595 Patents .............................................................................. 17

        D.      '163 & '597 Patents .............................................................................. 19

        E.      '035 & '879 Patents .............................................................................. 22

X.      ANALYSIS OF CERTAIN DISPUTED CLAIM TERMS ................................... 24

        A.      '077 Patent ............................................................................................ 25

                1.      "obtain[\ing] length information indicating information on
                        a duration of the non-legacy physical layer frame [after a
                        legacy signaling field], from the legacy signaling field" ......... 25

a. Claim 1 ........................................................................... 25

b. Claim 8 ........................................................................... 32

2. "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame" ........................................ 35

3. "the duration of the non-legacy physical layer frame after the legacy signaling field" ......................................... 40

B. '210 Patent ............................................................................ 45

1. "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A" ......................... 45

C. '281 Patent ............................................................................ 50

1. "obtain[\ing] information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received packet" ....................................... 50

D. '595 Patent ............................................................................ 55

1. "the total bandwidth information" ............................................ 55

a. Lack of Antecedent Basis Makes this Term Indefinite .......................................................... 56

b. Use of the Word "Total" Makes the Term Indefinite .................. 57

E. '163 & '597 Patents .............................................................. 60

1. "valid signaling field of the MAC frame" ................................ 60

F. '035 & '879 Patents .............................................................. 68

1. "set a . . . timer" ...................................................................... 68

2. "when" ..................................................................................... 75

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Curriculum Vitae of Mark Lanning |
| 2 | U.S. Patent No. 11,159,210 [WILUS_0010310-WILUS_0010340] |
| 3 | U.S. Patent No. 11,159,210 prosecution history [WILUS_0010341-WILUS_0011677] |
| 4 | U.S. Patent No. 10,313,077 [WILUS_0000650-WILUS_0000700] |
| 5 | U.S. Patent No. 10,313,077 prosecution history [WILUS_0000701-WILUS_0001129] |
| 6 | U.S. Patent No. 10,687,281 [WILUS_0001810-WILUS_0001870] |
| 7 | U.S. Patent No. 10,687,281 prosecution history [WILUS_0001871-WILUS_0003727] |
| 8 | U.S. Patent No. 11,470,595 [WILUS_0011678-WILUS_0011738] |
| 9 | U.S. Patent No. 11,470,595 prosecution history [WILUS_0011739-WILUS_0013115] |
| 10 | U.S. Patent No. 11,129,163 [WILUS_0007799-WILUS_0007866] |
| 11 | U.S. Patent No. 11,129,163 prosecution history [WILUS_0007867-WILUS_0010309] |
| 12 | U.S. Patent No. 11,700,597 [WILUS_0015827-WILUS_0015895] |
| 13 | U.S. Patent No. 11,700,597 prosecution history [WILUS_0015896-WILUS_0018337] |
| 14 | U.S. Patent No. 11,116,035 [WILUS_0005395-WILUS_0005444] |
| 15 | U.S. Patent No. 11,116,035 prosecution history [WILUS_0005445-WILUS_0006980] |
| 16 | U.S. Patent No. 11,516,879 [WILUS_0013116-WILUS_0013166] |
| 17 | U.S. Patent No. 11,516,879 prosecution history [WILUS_0013167-WILUS_0014720] |
| 18 | *Dictionary of Computing* (6th ed. 2010) [SAM-HP-CC_00000012-SAM-HP-CC_00000014] |
| 19 | *Dictionary of Computer and Internet Terms* (1st ed. 2016) [SAM-HP-CC_00000009-SAM-HP-CC_00000011] |
| 20 | *Oxford Advanced Learner's Dictionary of Current English* (9th ed. 2015) [SAM-HP-CC_00000024-SAM-HP-CC_00000026] |
| 21 | *Merriam-Webster's Advanced Learner's English Dictionary. Merriam-Webster, Incorporated* (2017) [SAM-HP-CC_00000020-SAM-HP-CC_00000023] |
| 22 | *The American Heritage Dictionary of the English Language. Houghton Mifflin Harcourt (5th ed. 2016)* [SAM-HP-CC_00000001-SAM-HP-CC_00000004] |
| 23 | *The Merriam-Webster Dictionary. Merriam-Webster, Incorporated* (2016) [SAM-HP-CC_00000015-SAM-HP-CC_00000019] |
| 24 | *Oxford School Dictionary. Oxford University Press* (2016) [SAM-HP-CC_00000027-SAM-HP-CC_00000031] |
| 25 | *WLAN MAC Frame Structure*, MathWorks, https://www.mathworks.com/help/wlan/gs/wlan-mac-frame-structure.html (last accessed Sept. 11, 2025) [SAM-HP-CC_00000039-SAM-HP-CC_00000041] |
| 26 | IEEE Std 802.11ax-2021 [WILUS_0041621-WILUS_0041716] |

iii

| Exhibit No. | Description |
|---|---|
| 27 | The Evolution of Wi-Fi Technology and Standards https://standards.ieee.org/beyond-standards/the-evolution-of-wi-fi-technology-and-standards/#:~:text=Wi%2DFi%201,rate%20at%209.6%20Gbit/s. [SAM-HP-CC_00000035-SAM-HP-CC_00000038] |
| 28 | IEEE 802.11-2012 [PRIOR_ART_00021222 at PRIOR_ART_00021700 – PRIOR_ART_00022137] |
| 29 | IEEE 802.11ac-2013 [PRIOR_ART_00002735 at PRIOR_ART_00002798 – PRIOR_ART_00002883] |
| 30 | *BSS Colouring or Spatial Reuse (802.11ax AKA WiFi 6)*, WiFi Professionals (July 4, 2019), https://www.wifi-professionals.com/2019/07/bss-colouring-or-spatial-reuse-802-11ax-aka-wifi6 [SAM-HP-CC_00000032-SAM-HP-CC_00000034] |

1.     My name Mark R. Lanning, and I submit this expert declaration regarding claim construction in the above-captioned matter.

2.     This report contains statements of my opinions formed to date and the bases and reasons for those opinions.  I may offer additional opinions based on further review of materials in this case, including opinions and/or testimony of other expert witnesses, within the guidelines of the Court.

## I.     QUALIFICATIONS, EXPERIENCE AND EDUCATION

3.     I have summarized my educational background, career history, publications, and other relevant qualifications in this section. My full curriculum vitae is attached as Exhibit 1 to this report.

4.     I am qualified by education and experience to testify as an expert in the field of telecommunications including circuit-switched networks, multiple generations of cellular networks, and packet-switched networks.  The following overview of my background pertains to my qualifications for providing expert testimony in this matter.

5.     I am currently the president of two consulting companies: Telecom Architects, Inc. and Reticle Consulting, LLC.  Telecom Architects provides consulting services to fixed and wireless telecom service providers and their equipment suppliers.  I have been President of Telecom Architects since 1999.

6.     I have over 40 years of experience working in the telecommunications industry that began in the U.S. Army Signal Corp.  My experience relevant to this case includes my work as an architect of various telecommunications systems and my work developing equipment used in telecommunications systems.  This experience includes extensive design, implementation and testing work on the wireless interface functionality (between the base station and mobile phones) for multiple generations of cellular standards.

7.      I received a B.S. in Computer Science from Southern Methodist University (SMU) in 1983.

8.      In 1983, I joined DSC, now a part of Alcatel, where I was a software development manager on the team responsible for updating DSC's PSTN (Public Switched Telephone Network) telephone switch into a Mobile Switching Center (MSC) for Motorola, which was sold as a part of their cellular product offering in the U.S. and many other countries.

9.      In 1991, I began working as a consultant to Motorola for its "SuperCell" base station product.  At the same time, I served as a consultant to British Telecom working on upgrades to its current analog cellular network, and I was one of the network architects responsible for the design and rollout of its Global System for Mobile Communications (GSM) network known as Cellnet.  Also, beginning in the early 1990s, I was responsible for implementation of the SMS service at British Telecom, including working with suppliers of the SMS Center (SMSC), Mobile Switching Centers (MSCs) and cellular phones to define and roll out the functionality that was to be provided.  I was personally involved with Nokia, Ericsson, Motorola and other equipment suppliers in this effort.

10.      Since 1995, I have also provided second generation (2G) and third generation (3G) Code Division Multiple Access ("CDMA") cellular network architecture and equipment design and implementation consulting services to companies such as Sprint, Nextel, Nokia, and Ericsson. While consulting to Nextel, which has since become part of Sprint, as one of the network architects for its iDEN network, one of my responsibilities was to define the network and mobile phone functionality required to support MMS and advanced data communications capability.

11.     Since 2006, I have provided detailed infringement and validity analysis for devices and chips that have implemented most of the IEEE 802.11 (Wi-Fi) protocol standards including: 802.11; 802.11b; 802.11a; 802.11g; 802.11n; and 802.11ac.

12.     Since 2007, I have analyzed Bluetooth functionality, designs and implementations related to smart phones, pads, watches, computers and other devices that use Bluetooth functionality to connect with these devices, for example, earpieces, headsets and music players. Specifically, I have performed detailed Bluetooth analysis on Apple iPhones, iPads, watches, Mac computers and at least Samsung's Android smart phones.

13.     In addition to my wireless communications experience listed above, for at least the past ten years, I have kept up to date my knowledge of the present-day 3G, 4G, and 5G cellular network and wireless standards and their associated equipment and protocols. I have done this through my study of each new release of these standards, technical books and trade publications as well as my experExt work in legal cases, which has involved evaluating the functionality of many different types of network equipment, mobile devices, and baseband chipsets. I have also evaluated thousands of cellular technology patents, and most of these were for cellular phone and/or base station functionality.

14.     I am a member of the Institute of Electrical and Electronics Engineers (IEEE), including the IEEE Standards Association. I am also a member of the Association for Computing Machinery (ACM). While employed at DSC, I was a member of the ANSI T1 and T1X1 standard groups responsible for the definition and standardization of the Advanced Intelligent Network (AIN) and Signaling System 7 (SS7) protocol.

15.    A detailed record of my professional qualifications, including a list of publications, awards, and professional activities, is set forth in my curriculum vitae submitted with this report as Exhibit 1.

## II.    MATERIALS AND OTHER INFORMATION CONSIDERED

16.    In preparing this declaration, I have relied upon my education, knowledge, and experience. I also have reviewed, among other things, the following materials:

- The '210 patent (Exhibit 2)
- The '210 patent prosecution history (Exhibit 3)
- The '077 patent (Exhibit 4)
- The '077 patent prosecution history (Exhibit 5)
- The '281 patent (Exhibit 6)
- The '281 patent prosecution history (Exhibit 7)
- The '595 patent (Exhibit 8)
- The '595 patent prosecution history (Exhibit 9)
- The '163 patent (Exhibit 10)
- The '163 patent prosecution history (Exhibit 11)
- The '597 patent (Exhibit 12)
- The '597 patent prosecution history (Exhibit 13)
- The '053 patent (Exhibit 14)
- The '053 patent prosecution history (Exhibit 15)
- The '879 patent (Exhibit 16)
- The '879 patent prosecution history (Exhibit 17)
- Dictionary of Computing (6th ed. 2010) (Exhibit 18)
- Dictionary of Computer and Internet Terms (1st ed. 2016) (Exhibit 19)
- Oxford Advanced Learner's Dictionary of Current English (9th ed. 2015) (Exhibit 20)
- Merriam-Webster's Advanced Learner's English Dictionary. Merriam-Webster, Incorporated (2017) (Exhibit 21)
- The American Heritage Dictionary of the English Language. Houghton Mifflin Harcourt (5th ed. 2016) (Exhibit 22)
- The Merriam-Webster Dictionary. Merriam-Webster, Incorporated (2016) (Exhibit 23)
- Oxford School Dictionary. Oxford University Press (2016) (Exhibit 24)
- WLAN MAC Frame Structure, MathWorks (Exhibit 25)
- IEEE Std 802.11ax-2021 (Exhibit 26)
- The Evolution of Wi-Fi Technology and Standards (Exhibit 27)
- IEEE 802.11-2012 (Exhibit 28)
- IEEE 802.11ac-2013 (Exhibit 29)
- BSS Colouring or Spatial Reuse (Exhibit 30)
- November 18, 2024 Plaintiff's Infringement Contentions

### III.    PRIOR TESTIMONY

17.    The cases in which I have testified as an expert at trial or by deposition within the preceding five years are as follows are listed in my CV as Exhibit 1.

### IV.    COMPENSATION

18.    For my work on this matter, I am being compensated at the rate of $550 per hour. My compensation does not depend on the outcome of the case, and I further do not have any financial or personal interest in the outcome of this case.

### V.    SUMMARY OF OPINIONS

19.    I have been asked by Defendants to provide my expert testimony and opinions regarding certain claim terms and phrases in U.S. Patent Nos. 11,159,210 ("'210 Patent"); 10,313,077 ("'077 Patent"); 10,687,281 ("'281 Patent"); 11,470,595 ("'595 Patent"); 11,129,163 ("'163 Patent"); 11,700,597 ("'597 Patent"); 11,116,035 ("'035 Patent"); 11,516,879 ("'879 Patent") (collectively, "Asserted Patents" or "asserted patents"). The Asserted Patents are directed to Wi-Fi technology.

20.    This declaration provides my opinions to date regarding certain claim terms and phrases in the Asserted Patents, although I may provide further testimony and opinions if asked to testify in court or in a deposition.  I also reserve the right to supplement or amend my opinions, as well as the bases for those opinions, if I receive any additional relevant information or if I am asked to respond to opinions offered by other experts in this case.

### VI.    UNDERSTANDING OF THE LAW

21.    I am not an attorney. I have been provided legal principles regarding claim construction noted below, and I have applied them in arriving at the opinions set forth herein.

## A.    General Principles of Claim Construction

22.    I understand that a claim term or phrase is construed according to its ordinary and accustomed meaning as understood by a person of ordinary skill in the art ("POSITA") in the context of the patent at the time of the invention.

23.    I understand that patent claims are to be construed in light of the intrinsic record of the patent, which includes the words of the claims; the specification (including the drawings) of the patent; and the prosecution history of the patent, including the cited references.  This type of evidence is referred to as "intrinsic" evidence.

24.    I understand that the Federal Circuit has emphasized that the context of any disputed term within the claim language itself is of primary importance.  Additionally, I understand that a POSITA is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

25.    I understand that, in addition to the claims and specification, a court should also consider the prosecution history. It is my understanding that the prosecution history provides evidence of how the patentee and the examiner viewed the patent, and that the public has a right to rely on the patent applicant's remarks made during prosecution in determining the scope of the claimed invention. Where the specification describes a claim term broadly, arguments and amendments made during prosecution may require a narrower interpretation. For example, I understand that an applicant may disclaim claim scope by amending claims in response to a rejection, or making specific arguments distinguishing the claimed invention over cited prior art.

26.    I have been informed that the Court may consider additional evidence, in certain circumstances, which is outside the patent and prosecution history.  This type of evidence is known as "extrinsic" evidence.   Extrinsic evidence can include expert opinion (including opinions regarding what a POSITA would have known or understood and what a POSITA would not be

6

able to ascertain), dictionaries, treatises, and testimony. However, while extrinsic evidence can shed useful light on the relevant art, I understand that it is less significant than the intrinsic record in determining the legally operative meaning of claim language. Extrinsic evidence can be useful to, for example, provide background on the technology at issue, explain how an invention works, ensure that the Court's understanding of the technical aspects of the patent is consistent with that of a POSITA, or establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.

27.    I understand that in certain instances a patentee may act as its own lexicographer so as to set forth a definition of a claim term other than its plain and ordinary meaning. However, I further understand that to do so it is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments. Instead, the patentee must clearly express an intent to redefine the term.

28.    I understand that a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.

**B.    Indefiniteness**

29.    I understand that a patent must include one or more claims that particularly point out and distinctly claim the subject matter regarded as the invention. I understand that a claim term, and hence a claim where it appears, is indefinite, if it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention when viewed in light of the intrinsic evidence.

30.    I understand that a claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions.

## VII.    LEVEL OF ONE OF ORDINARY SKILL IN THE ART

31.    In my opinion, a person of ordinary skill in the field of art of the asserted patents (POSITA) would have had a Bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least three years of experience in the research, design or development of wireless communication devices, systems, and/or networks, or the equivalent, as of 2015-2017 timeframe.   Increased educational experience can make up for less work experience, and vice versa.

32.    In view of my education and experience, I am very familiar with the level of relevant knowledge about the technology at issue that a POSITA would have possessed during the relevant timeframe.   As an engineer experienced in the design and implementation of many different types of communication networks, I am very familiar with, have a high level of understanding of, and conducted research, design, and development in the technological field pertinent to the Asserted Patents (wireless communication devices, systems, and/or networks) during the relevant time period.

## VIII.    BACKGROUND OF THE TECHNOLOGY

### A.    The Evolution of Wi-Fi Technology and Standards

33.    The IEEE Standards Association (IEEE SA) has defined the evolution of Wi-Fi technology releases that are based on the IEEE 802.11 series of wireless connectivity standards. Ex. 27 (The Evolution of Wi-Fi Technology and Standards).

34.    The IEEE SA provides the following timeline for 802.11 releases and follows with a description of the key functionality and characteristics for each version.



Ex. 27 at p. 2.

35.    The IEEE SA's description for the 802.11 to 802.11ac releases is below, followed by a separate section describing 802.11ax.

## *IEEE Standards for Wi-Fi*

Along the way, a naming convention was developed by the Wi-Fi Alliance ("Wi-Fi #") to help the general public better distinguish between various IEEE 802.11 implementations:

- **IEEE 802.11™** is the pioneering 2.4 GHz Wi-Fi standard mentioned above from 1997, and it is still referred to by that nomenclature. This standard and its subsequent amendments are the basis for Wi-Fi wireless networks and represent the world's most widely used wireless computer networking protocols.

- **IEEE 802.11b™** was introduced to the market in 1999 with Apple's announcement. It also operated at 2.4 GHz, but to reduce interference from microwave ovens, cordless phones, baby monitors, and other sources, and to achieve higher data rates, it incorporated modulation schemes called direct-sequence spread spectrum/complementary code keying (DSSS/CCK). IEEE 802.11b enabled wireless communications at distances of ~38m indoors and ~140m outdoors.

- **IEEE 802.11a™** also introduced in 1999, was the successor to IEEE 802.11b. It was the first Wi-Fi specification to feature a multi-carrier modulation scheme (OFDM) to support high data rates. It supported 5 GHz operation, and its 20 MHz bandwidth supported multiple data rates.

- **IEEE 802.11g™** was introduced in 2003. It allowed for faster data rates of up to 54 Mbit/s in the same 2.4 GHz frequency band as IEEE 802.11b, thanks to an OFDM multi-carrier modulation scheme and other enhancements. This was appealing to mass market users, as 2.4 GHz devices were less expensive than 5 GHz devices.

- **IEEE 802.11n™, or Wi-Fi 4**, was introduced in 2009 to support the 2.4 GHz and 5GHz frequency bands, with up to 600 Mbit/s data rates, multiple channels within each frequency band, and other features. IEEE 802.11n data throughputs enabled the use of WLAN networks in place of wired networks, a significant feature enabling new use cases and reduced operational costs for end users and IT organizations.

- **IEEE 802.11ac™, or Wi-Fi 5**, was introduced in 2013 to support data rates at up to 3.5 Gbit/s, with still-greater bandwidth, additional channels, better modulation, and other features. It was the first Wi-Fi standard to enable the use of multiple input/multiple output (MIMO) technology so that multiple antennas could be used on both sending and receiving devices to reduce errors and boost speed.

36.     An important concept used by the IEEE in defining each subsequent version of the Wi-Fi standard was to use as much of the existing functionality and/or concepts as possible in one or more of the previous versions and to ensure, whenever possible, that the devices operating with the new version of the standard would be backward compatible and support the legacy functionality of the previous versions of the standard, so the legacy devices would still be able to interoperate with a Wi-Fi Access Point (AP) and other devices that have been upgraded to the latest release.

37.     In other works, the IEEE standards group does not start each new release of the 802.11 standard with a blank sheet of paper (known as the Greenfield model).  Instead, much of the functionality defined in one or more previous releases is used and only the functions that require modification to achieve the objectives of the new release are added and or changed.

**B.     The IEEE 802.11ax Functionality Has Evolved from the Previous Standards**

38.     The IEEE 802.11ax protocol standard, which is also referred to as the Sixth Generation of Wi-Fi standards, abbreviated as Wi-Fi 6,[1] uses many of the concepts of the earlier releases.  For example, 802.11ax uses: (1) an enhanced form of MIMO method that was defined in 802.11n; (2) the high-density modulation methods of 64 QAM and 128 QAM defined respectively by the 802.11n and 802.11ac versions, and adds the 1024 QAM method; (3) the Orthogonal Frequency Division Multiplexing (OFDM) multicarrier modulation concepts used by the 802.11a and 11g, and has added Orthogonal Frequency Division Multiple Access (OFDMA)-based scheduling; (4) the 20 MHz, 40 MHz, 80 MHz, and 160 MHz frequency bandwidths defined by the earlier versions and has added the capability of allocating smaller chucks of bandwidth to

---

[1] Wi-Fi 6 is a label for the 802.11ax standard assigned by the Wi Fi Alliance to represent it is the sixth generation of Wi Fi.

devices using the concepts of OFDMA subchannels; and (5) supports both the 2.4 GHz band and 5 GHz band defined by the earlier versions.

### C.    The IEEE 802.11ax-2021 Protocol Specification

39.    The IEEE 802.11ax Protocol Specification has been defined by the IEEE as "IEEE Std 802.11ax-2021."  This standard replaced the "Amendment to IEEE Std 802.11-2020)."  This standard is titled "Part 11: Wireless LAN Medium Access Control (MAC) and Physical Layer (PHY) Specifications.  Amendment 1: Enhancements for High-Efficiency WLAN" by the IEEE Computer Society.  Ex. 26 (IEEE Std 802.11ax-2021), Title Page.

40.    Description of the OFDMA Functionality Added in 802.11ax StandardOFDMA-based scheduling should not be confused with the OFDM multicarrier modulation used by the 802.11a and 802.11g standards.  The OFDMA functionality provided by 802.11ax is similar to the OFDMA scheduling functions used in 4G LTE cellular systems because it supports simultaneous and contention-free uplink and downlink transmissions from multiple stations within a respective signal transmit opportunity (TXOP).

41.    Generally described, OFDMA is able to define the frequency bands to be used for transmissions between the AP and stations on a LAN using a much smaller granularity than the 20 MHz, 40 MHz, 80 MHz, or 160 MHz channel bandwidths defined by the earlier standards.  These smaller bands are defined as individual groups of subcarriers that are allocated to the clients on a per-PPDU basis.  The different group sizes are referred to as Resource Units (RU).  The IEEE 802.11ax standard provides the following description and illustrations comparing the difference between OFDM and OFDMA operation.

11

**27.3.1.2 OFDMA**

OFDMA is an OFDM-based multiple access scheme where different subsets of subcarriers are allocated to different users, and this scheme allows simultaneous data transmission to or from one or more users. In OFDMA, users are allocated different subsets of subcarriers that can change from one PPDU to the next. The difference between OFDM and OFDMA is illustrated in Figure 27-4. Similar to OFDM, OFDMA employs multiple subcarriers, but the subcarriers are divided into several groups where each group is referred to as an RU. With OFDMA, different transmit powers may be applied to different RUs.



**Figure 27-4—Illustration of OFDM and OFDMA concepts**

Ex. 26 (IEEE Std 802.11ax-2021) at p. 497.

42.    Section 27.3.2 of the IEEE 802.11ax Specification describes how an OFDM symbol is constructed of subcarriers, the number of subcarriers that are allocated to provide the PPDU bandwidth and the different subcarrier types.  It also defines the different sizes of RUs that can be allocated for uplink and downlink transmissions with "[t]he RUs defined for DL and UL transmission are as follows: 26-tone RU, 52-tone RU, 106-tone RU, 242-tone RU, 484-tone RU, 996-tone RU, and 2x996-tone RU."  Ex. 26 (IEEE Std 802.11ax-2021) at p. 498.  Thus, the more tones that are allocated to a client, the more bandwidth it can use for a transmission.

43.    Table 27-6 shown below defines the maximum number of RUs that are available for each channel width.

12

**Table 27-6—Maximum number of RUs for each channel width**

| RU type | CBW20 | CBW40 | CBW80 | CBW80+80 and CBW160 |
|---------|-------|-------|-------|---------------------|
| 26-tone RU | 9 | 18 | 37 | 74 |
| 52-tone RU | 4 | 8 | 16 | 32 |
| 106-tone RU | 2 | 4 | 8 | 16 |
| 242-tone RU | 1 | 2 | 4 | 8 |
| 484-tone RU | N/A | 1 | 2 | 4 |
| 996-tone RU | N/A | N/A | 1 | 2 |
| 2×996 tone RU | N/A | N/A | N/A | 1 |

Ex. 26 (IEEE Std 802.11ax-2021) at p. 499.

44.    The purported inventions claimed by each of the Asserted Patents are described in the sections below for each patent.

## IX.    OVERVIEW OF THE ASSERTED PATENTS

### A.    '077 Patent

45.    The '077 patent, titled "Wireless communication method and wireless communication terminal for coexistence with legacy wireless communication terminal," issued on June 4, 2019, and is a continuation of PCT/KR2016/006976, filed on June 29, 2016.  Wilus asserts that the '077 patent claims priority to Korean Patent Application Nos. 10-2015-0092525 (the "'525 application"), filed on June 29, 2015 and 10-2015-0117434 (the "'434 application"), filed on August 20, 2015.  The named inventors are Geonjung Ko, Jinsam Kwak, and Juhyung Son.

46.    The '077 patent is directed to a technique for coexistence among legacy and non-legacy wireless communication terminals, e.g., a terminal and method for receiving a non-legacy physical layer frame which includes signaling information decodable by a legacy wireless communication terminal, and determining the number of symbols of data of the non-legacy physical layer frame.  Ex. 4 ('077 patent) at 1:20-25, 2:65-5:35, 11:3-41.

13

47.    The '077 patent discloses a packet extension field "which is a padding of the non-legacy physical layer frame." *Id*. at 3:40-42, 4:57-59.  The '077 patent describes that "a wireless communication terminal receiving a non-legacy physical layer frame *may be confused* whether the signal transmitting the non-legacy physical layer frame is a symbol of data or a padding according to a packet extension."  *Id*. at 30:42-55.  The '077 patent further describes:

> When the wireless communication terminal receiving the non-legacy physical layer frame is confused in such a way, the wireless communication terminal may signal disambiguate information that disambiguate the ambiguity on whether packet extensions of non-legacy physical layer frames are included. At this time, the information that disambiguates ambiguity on whether or not the packet extension of the non-legacy physical layer frame is included may be included in the non-legacy signaling field of the non-legacy physical layer frame. For convenience of description, information that disambiguates ambiguity on whether a packet extension is included is referred to as a PE-Disambiguity field.

*Id*. at 30:56-67.

48.    The '077 patent provides an equation for $N_{SYM}$ which is used to determine the number of data symbols in a frame and utilizes the value of the PE-Disambiguity field.

$$N_{SYM}=\left\lfloor\left(\frac{L\_LENGTH+m+3}{3}\times4-T_{HE\_PREAMBLE}\right)/T_{SYM}\right\rfloor-b_{PE\_Disambiguity}$$

$$T_{PE}=\left\lceil\frac{\left(\frac{L\_LENGTH+m+3}{3}\times4-T_{HE\_PREAMBLE}\right)-N_{SYM}\times T_{SYM}}{4}\right\rceil\times4$$

where     $\lfloor x \rfloor$          denotes the largest integer less than or equal to $x$ (flooring)

$L\_LENGTH$          is the Length field value in L-SIG

$b_{PE\_Disambiguity}$     is PE-Disambiguity field value (0 or 1)

$T_{HE\_PREAMBLE}$     is the duration of HE preamble

$T_{SYM}$           is the duration of HE symbol

*Id*. at Fig. 31; *see also id*. at Figs. 26, 29.

14

49.    The '077 patent describes that "a non-legacy wireless LAN mode may represent an IEEE 802.11ax wireless LAN mode, and a legacy wireless LAN mode may represent a wireless LAN mode such as 11a, 11g, 11n, and 11ac, i.e., a legacy, compared to the 11ax." *Id*. at 14:6-10. *See also id.* at 14:44-47 ("the legacy physical layer frame may include a physical layer frame of IEEE 802.11a/g/n/ac"; "a non-legacy physical layer frame may represent an IEEE 802.11ax physical layer frame").

50.    The '077 patent shows structures of three legacy physical layer frames and a non-legacy physical layer frame.  *Id*. at 14:41-43.



Ex. 4 ('077 patent) at Fig. 10.

51.    As depicted in Fig. 10, both legacy and non-legacy frames include a legacy preamble.  "The legacy preamble includes a legacy short training field (L-STF), a legacy long training field (L-LTF), and a legacy signal field (L-SIG)."  *Id.* at 11:62-64. This legacy preamble existed since 802.11a and continues to exist in subsequent versions of 802.11 including 11n, 11ac, and 11ax.

B.    '210 Patent

52.    The '210 patent, titled "Wireless communication method and wireless communication terminal for signaling multi-user packet," issued on October 26, 2021, and is a continuation of application No. 16/505,664, filed on July 8, 2019 (now U.S. Patent No. 10,567,047), which is a continuation of PCT/KR2018/000443, filed on January 9, 2018.  Wilus asserts that the '210 patent claims priority to Korean Patent Application Nos. 10-2017-0003147 (the "'147 application"), filed on January 9, 2017 and 10-2017-0008927 (the "'927 application"), filed on January 18, 2017.  The named inventors are Juhyung Son, Jinsam Kwak, Geonjung Ko, and Woojin Ahn.

53.    The '210 patent "relates to a wireless communication method and a wireless communication terminal for signaling a multi-user packet," *i.e.*, Multi User-Multiple Input Multiple Output (MU-MIMO) communications.  Ex. 2 ('210 patent) at Abstract.  The patent discloses that "[a]ccording to an embodiment of the present invention, a header field of a physical layer of a wireless LAN packet supporting simultaneous multi-user transmission in an indoor/outdoor environment can be efficiently configured" and that "it is possible to increase the total resource utilization rate in the contention-based channel access system and improve the performance of the wireless LAN system."  *Id*. at 4:16-19.  The terminal is configured to receive a high efficiency multi-user PHY protocol data unit (HE MU PPDU).  *See id*. at 2:59-3:36.  The preamble of the disclosed HE MU PPDU includes two high efficiency fields called the HE-SIG-A and HE-SIG-B fields.  The terminal is configured to decode the received HE MU PPDU based on the preamble.



*Id*. at Fig. 13(a).

54.    According to claims 1 and 6, "when a SIG-B compression field of the HE-SIG-A indicates full bandwidth multi User-Multiple Input Multiple Output (MU-MIMO) transmission, a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A." There are two options appearing in claims 1 and 6 based on the number of MU-MIMO users indicated: 1) "when the number of MU-MIMO users indicates two or more users, the user specific field of the HE-SIG-B includes user fields for MU-MIMO allocation;" and 2) "when the number of MU-MIMO users indicates a single user, the user specific field of the HE-SIG-B includes one user field for non-MU-MIMO allocation." *See id*. at Cls. 1, 6; *see also* 2:59-3:36.

**C.    '281 & '595 Patents**

55.    The '281 patent, titled "Wireless communication method and wireless communication terminal, which use discontinuous channel," issued on June 16, 2020, is a continuation of application No. PCT/KR2016/015297 (filed December 26, 2016).  Wilus asserts that the '281 patent claims priority to Korean Patent Application Nos. 10-2015-0186871 (filed December 24, 2015), 10-2016-0004471 (filed January 13, 2016), 10-2016-0005835 (filed January 18, 2016), 10-2016-0026683 (filed March 4, 2016), 10-2016-0030006 (filed March 13, 2016), 10-2016-0059182 (filed May 14, 2016), 10-2016-0062422 (filed May 20, 2016), and 10-2016-0083756 (filed July 1, 2016).  The named inventors are Juhyung Son, Jinsam Kwak, Geonjung

Ko, and Woojin Ahn. The '595 patent issued on October 11, 2022, is a continuation of the '281 patent, and has the same title, priority-related information, as well as the list of inventors.

56.    The '281 and '595 patents "relate[] to a wireless communication method and a wireless communication terminal which use non-contiguous channel, and more particularly, to a wireless communication method and a wireless communication terminal for efficiently signaling non-contiguous channel allocation information." Ex. 6 ('281 patent) at 1:32-37; Ex. 8 ('595 patent) at 1:34-39.

57.    The '281 patent is directed to "[t[he non-contiguous channel allocation information via at least one of a subfield of HE-SIG-A and a subfield of HE-SIG-B of the received packet." Ex. 6 ('281 patent) at 3:43-45. The patent describes three ways to signal non-contiguous channel allocation information in the preamble:

- "solely via subfield(s) of the HE-SIG-A" (*id*. at 38:53-63);

- "solely via subfield(s) of the HE-SIG-B" (*id*. at 39:17-25); or

- "via a combination of the subfield(s) of the HE-SIG-A and subfield(s) of the HE-SIG-B" (*id*. at 39:26-49)

*See also id.* at 34:27-47.

58.    According to the '281 patent, "the bandwidth field [of the HE-SIG-A] may indicate the total bandwidth information through which the PPDU is transmitted and some channel information to be punctured within the total bandwidth … [and] additional puncturing information may be indicated via the RA field of the HE-SIG-B." *Id*. at 41:36-49.

59.    For example, "when the bandwidth field indicates puncturing of the S20 channel in the total bandwidth of 160 MHz or 80+80 MHz (e.g., the second channel configuration in FIG. 33(d)), the resource unit allocation field may indicate additional puncturing the S80 channel." *Id*. at 41:66-42:4.  "Channels in which puncturing is indicated as described above are not assigned to [a] user." *Id.* at 42:5-6.

18

60. The '595 patent is directed to a center-26 tone resource unit allocation. According to the '595 patent, "[w]hen a PPDU is transmitted in a total bandwidth of 80 MHz or more, a center 26-tone RU 502 as shown in Fig. 38 (a) may additionally be used. . . . [T]he common block field of the HE-SIG-B may further include a C26 field (not illustrated) indicating whether a user is allocated to the center 26-tone RU 502. Ex. 8 ('595 patent) at 45:12-17. "The C26 field may consist of a 1-bit indicator located before or after the RA field in the common block field." *Id.* at 22:29-35.

61. The '595 patent explains that "[w]hen a PPDU is transmitted in a total bandwidth of 80 MHz or more, a center 26-tone RU 502 as shown in FIG. 38(a) may additionally be used" (*Id.* at 45:12-14):



*Id.* at Fig. 38(a).

62. "[T]he common block field of the HE-SIG-B may further include a C26 field (not illustrated) indicating whether a user is allocated to the center 26-tone RU 502. The C26 field may consist of a 1-bit indicator located before or after the RA field in the common block field." *Id.* at 45:14-19.

**D. '163 & '597 Patents**

63. The '163 patent, titled "Wireless communication method and wireless communication terminal in basic service set overlapping with another basic service set," issued on

September 21, 2021, and is a continuation of application No. PCT/KR2017/002407, which was

filed on March 6, 2017.  Ex. 10 ('163 patent) at Cover.  Wilus asserts that the '163 patent claims

priority to Korean Patent Application Nos. 10-2016-0026684 (filed on March 4, 2016), 10-2016-

0029975 (filed March 12, 2016), 10-2016-0044465 (the "'465 application") (filed April 11, 2016),

10-2016-0057597 (the "'597 application") (filed May 11, 2016), and 10-2016-0114821 (the "'821

application") (filed September 7, 2016).  The named inventors are Geonjung Ko, Juhyung Son,

Woojin Ahn, and Jinsam Kwak.  Ex. 10 at Cover.

      64.    The '597 patent issued on July 11, 2023, and is a continuation of the '163 patent.

Ex. 12 ('597 patent) at Cover.  The '597 patent lists three of the five Korean priority applications

listed on the '163 patent—the '465 application, the '597 application, and the '821 application.  Ex.

12 at Cover.  The '163 and '597 patents have the same title, lists the same inventors, and have the

same written description.

      65.    The asserted claims of the '163 and '597 patents are generally directed to

disallowing Basic Service Set (BSS) color-based operations.  Wireless stations (STAs) and access

points (APs) in communication with one another form a Basic Service Set (BSS).  Ex. 10 at 7:12-

15; Ex. 12 at 7:24-27.  In congested wireless environments, multiple sets of wireless devices (*i.e.*,

multiple BSSs) may operate in the same geographic vicinity.  In such a scenario, the BSSs are

known as Overlapping Basic Service Sets (OBSSs).  *E.g.*, Ex. 10 at 11:50-53; Ex. 12 at 11:62-65.

The figure reproduced below illustrates a sample topology involving two OBSSs.  *See* Ex. 30.



66.    In Wi-Fi, mobile devices exchange data packets known as Physical Layer Protocol Data Units (PPDUs).  Some of these PPDUs include a data field known as BSS Color, which is a numerical indicator for the BSS with which the transmitter of the PPDU is associated.  Ex. 10 at 3:3-11; Ex. 12 at 3:13-21.  A device receiving a PPDU checks the BSS Color value of the PPDU to classify the PPDU as either an intra-BSS PPDU (*i.e.*, a PPDU transmitted by another device within the same BSS) or an inter-BSS PPDU (*i.e.*, a PPDU transmitted by a device in another BSS).  *E.g.*, Ex. 10 at 11:58-61, 12:61-65; Ex. 12 at 12:3-6, 13:5-9.

67.    The '163 and '597 patents explain that BSS color is selected by an AP.  Ex. 10 at 21:28-29; Ex. 12 at 21:37-38.  Given the limited range of values available for the BSS color field, different BSSs may mistakenly be assigned the same BSS color value.  Ex. 10 at 13:4-8; Ex. 12 at 13:15-19.  In this situation—known as a BSS color collision—wireless devices can no longer use BSS color to effectively classify a PPDU as an intra- or inter-BSS PPDU.  Ex. 10 at 13:4-8, 13:26-41; Ex. 12 at 13:15-19, 13:37-52.  As a solution, the '163 and '597 patents contemplate receiving, from an access point, "signaling information indicat[ing] that an operation based on the BSS color is not allowed."  Ex. 10, Cl. 1; Ex. 12, Cl.1.  When a device receives such signaling information, it does not use BSS Color.  Ex. 10, Cl. 1; Ex. 12, Cl. 1.

68.    The '163 and '597 patents share nearly identical claims.  Both patents have a total of sixteen (16) claims, including one independent apparatus claim (claim 1) and one independent method claim (claim 9).  For both patents, method claim 9 mirrors the functionality recited in the apparatus claim 1, and otherwise does not add any additional limitations.

**E.    '035 & '879 Patents**

69.    The '035 patent, titled "Wireless communication method using enhanced distributed channel access, and wireless communication terminal using same" issued on Sep. 7, 2021, is a continuation of application No. PCT/KR2017/009841, filed on Sep. 7, 2017.  The '035 patent claims priority to Korean Patent Application No. 10-2016-0114822 filed on Sep. 7, 2016, Korean Patent Application No. 10-2016-0116877 filed on Sep. 10, 2016, Korean Patent Application No. 10-2016-0116965 filed on Sep. 12, 2016, Korean Patent Application No. 10-0117898 filed on Sep. 13, 2016, Korean Patent Application No. 10-2016-0122488 filed on Sep. 23, 2016, Korean Patent Application No. 10-2016-0147189 filed on Nov. 6, 2016, and Korean Patent Application No. 10-2017-0022227 filed on Feb. 20, 2017.  The named inventors are Geonjung Ko, Juhyung Son, Woojin Ahn, and Jinsam Kwak.  The '879 patent issued on November 29, 2022, is a continuation of the '035 patent, has the same title, claims priority to the same set of Korean application, and lists the same inventors.

70.    The '035 and '879 patents are directed to uplink multiuser (UL MU) transmissions by non-access point stations (non-AP STAs) using an alternative set of Enhanced Distributed Channel Access (EDCA) parameters.  To trigger UL MU transmissions, an access point (AP) transmits a trigger frame to the non-AP STAs.  Ex. 14 ('035 patent) at 18:10-12.  At some point after receiving the trigger frame, each non-AP STA switches the EDCA parameter set used to transmit data (i.e., various parameters used in data transmission) from the first parameter set to the second parameter set.  *See, e.g., id.* at 18:12-14.  Further, in response to receiving the trigger frame,

22

each non-AP STA transmits to the AP, a physical layer protocol data unit (PPDU). *See, e.g., id.* at 19:64-66. In some cases, a MAC protocol data unit (MPDU) that is embedded in the PPDU, can request an immediate acknowledgement from the AP. *See, e.g., id*. at 18:10-12. Alternatively, the MPDU can request a delayed or no acknowledgment from the AP. *See, e.g., id.* at 24:64-25:1.

71.    "[T]he wireless communication terminal [i.e., non-AP] applies the MU EDCA parameter and sets the MU EDCA timer, based on the immediate response to the MPDU included in the trigger-based PPDU." *See, e.g., id.* at 24:46-49. But, as noted above, "the QoS data frame [an MPDU] included in the trigger-based PPDU may not request an Ack." *See, e.g., id.* at 24:50-51. Thus, "if the QoS data frame included in the trigger-based PPDU transmitted by the wireless communication terminal does not request an ACK, the wireless communication terminal may set the MU EDCA timer ***at the time point*** at which transmission of the trigger-based PPDU ends." *See, e.g., id.* at 24:64-25:1. Alternatively, "when the QoS data frame included in the trigger-based PPDU transmitted by the wireless communication terminal does not request an ACK, the wireless communication terminal may set the MU EDCA timer when ***a predetermined time elapses after the time point*** at which transmission of the trigger-based PPDU ends." *See, e.g., id.* at 25:32-38. "[I]f the UL MU transmission of the wireless communication terminal is not scheduled for a certain period from when the MU EDCA timer is set, the wireless communication terminal may be allowed to terminate the MU EDCA parameter set application." *See, e.g., id.* at 19:56-61.

72.    The '035 and '879 patents share nearly identical claims. Both patents have a total of sixteen (16) claims, including one independent apparatus claim (claim 1) and one independent method claim (claim 8). Claims 1 and 8 of each patent are reproduced below, with the differences between the '035 and '879 patents emphasized. Note that, for both patents, method claim 8 mirrors the functionality recited in apparatus claim 1, and otherwise does not add any additional

limitations, aside from reciting a trivial step of "transmitting the data though the channel." Wilus has only asserted claims 1-5, 8-10 of each of the '035 and '879 patents.

## X.    ANALYSIS OF CERTAIN DISPUTED CLAIM TERMS

73.    The table below provides a summary of the parties' claim construction positions:

| Patent/Claim | Term | Construction Proposals |
|---|---|---|
| '077 Patent (Cl. 1) | "obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |
| '077 Patent (Cl. 8) | "obtaining length information indicating information on a duration of the non-legacy physical layer frame after a legacy signaling field, from the legacy signaling field" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |
| '077 Patent (Cls. 1, 8) | "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |
| '077 Patent (Cl. 3) | "the duration of the non-legacy physical layer frame after the legacy signaling field" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |
| '210 Patent (Cls. 1, 6) | "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |
| '281 Patent (Cls. 1, 8) | "obtain[\ing] information of an unassigned resource unit via at least one of the bandwidth field of the HE- | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |

| Patent/Claim | Term | Construction Proposals |
|---|---|---|
| | SIG-A and a subfield of HE-SIG-B of the received packet" | |
| '595 Patent (Cl. 7) | "the total bandwidth information" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite, wherein "the total bandwidth information" refers to the total bandwidth information indicated by the bandwidth field |
| '163 & '597 Patents (Cls. 3,11) | "valid signaling field of the MAC frame" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |
| '035 & '879 Patents (Cls. 1, 4, 5, 8) | "set a . . . timer" | **Defendants:** "assign a duration to a timer"<br><br>**Wilus:** Plain and ordinary meaning; no further construction necessary |
| '035 & '879 Patents (Cls. 1, 8) | "when" | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |

### A.    '077 Patent

#### 1.    "obtain[\ing] length information indicating information on a duration of the non-legacy physical layer frame [after a legacy signaling field], from the legacy signaling field"

##### a.    Claim 1

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field" (Cl. 1) | **Defendants:** Indefinite<br><br>**Wilus:** Plain and ordinary meaning; not indefinite |

74.    The phrase "obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field" appears in independent claim 1. In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention.  In particular, a POSITA would interpret the

wording "a duration of the non-legacy physical layer frame" as vague and ambiguous, open to multiple interpretations, and thus would not be able to ascertain the scope of the term in question.

75.     I start my analysis with the claim language where the contested claim term appears. I reproduce claim 1 below.

> 1. A wireless communication terminal that communicates wirelessly, the terminal comprising:
>   a transceiver; and
>   a processor,
>   wherein the processor is configured to receive a non-legacy physical layer frame by using the transceiver,
>   obtain a legacy signaling field including information decodable by a legacy wireless communication terminal from the non-legacy physical layer frame,
>   obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field,
>   obtain information other than information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame, wherein the data size transmittable by a symbol of the legacy physical layer frame is 3 octets when a data rate of the legacy physical layer frame is 6 Mbps, and
>   determine the number of symbols of data of the non-legacy physical layer frame according to a following equation,

$$N_{SYM} = \left\lfloor \left( \frac{L\_LENGTH + m + 3}{3} \times 4 - T_{HE\_PREAMBLE} \right) \middle/ T_{SYM} \right\rfloor - b_{PE\_Disambiguity}$$

where $\lfloor x \rfloor$ denotes a largest integer less than or equal to x,

L_LENGTH denotes the length information,

m denotes a value obtained by subtracting the remaining value from the data size transmittable by a symbol of the legacy physical layer frame,

$b_{PE\_Disambiguity}$ denotes a value of PE Disambiguity field,

$T_{HE\_PREAMBLE}$ denotes a duration of non-legacy preamble of the non-legacy physical layer frame,

$T_{SYM}$ denotes a duration of a symbol of the data of the non-legacy physical layer frame, wherein the PE Disambiguity field is set based on the duration of a symbol of the data of the non-legacy physical layer frame and an increment of duration to set a value of the length information based on a duration of a symbol of the legacy physical layer frame.

Ex. 4 ('077 patent) at Cl. 1 (annotations added).[2,3]

76.      This claim requires that length information is obtained from the legacy signaling field, which is part of the non-legacy physical layer frame.  Further, this length information relates to "a duration of the non-legacy physical layer frame."  However, as recited in claim 1 and in the context of surrounding claim language, a POSITA would understand that the phrase "a duration of the non-legacy physical layer frame" is vague and ambiguous, and fails to provide clarity as to the scope of the purported invention.  In particular, it is unclear whether the claimed "duration" refers to:

- the entire non-legacy physical layer frame, or

---

[2] The other independent claim, claim 8, contains the claim term at issue, but further includes the phrase "after a legacy signaling field" to modify the meaning of duration ("a duration of the non-legacy physical layer frame after a legacy signaling field").  I address this term in the next section below (Section X.A.1.b).

[3] Furthermore, similar language appears in claim 3, which is a dependent claim of claim 1. However, claim 3 has an antecedent basis issue which I will address in Section X.A.3.

- a portion of the non-legacy physical layer frame; and

- if a portion, then it is further unclear what portion of the frame is being referred to.

77.    The claim language preceding "a duration of the non-legacy physical layer frame" in claim 1 does not resolve this issue because "obtain length information indicating information on" does not provide any clarity to the interpretation of "duration."  Moreover, the claim language following "a duration of the non-legacy physical layer frame" also does not resolve this issue.  In fact, claim 1 introduces multiple duration terms referring to different parts of a frame ("$T_{THE\_PREAMBLE}$ denotes a duration of non-legacy preamble of the non-legacy physical layer frame"; "$T_{SYM}$ denotes a duration of a symbol of the data of the non-legacy physical layer frame").

78.    Additionally, "a duration of the non-legacy physical layer frame" appears with the modifier "after a legacy signaling field" in the other independent claim, claim 8, which indicates that "a duration of the non-legacy physical layer frame" in claim 1 has a broader meaning, and further confirms my opinion that it is unclear what the claimed "duration" refers to.

79.    The patent's specification and drawings provide no further clarification on the scope of the term at dispute.  The specification describes that there are multiple durations within a non-legacy physical layer frame.  Also, adding further confusion, sometimes the specification uses "duration of the non-legacy physical layer frame" without modification, and sometimes with modification (e.g., "after the L-SIG," "after the legacy signaling field").  I reproduce relevant sections of the patent specification below.

According to an embodiment of the present invention, a wireless communication terminal that communicates wirelessly includes: a transceiver; and a processor. The processor may be configured to receive a non-legacy physical layer frame by using the transceiver and obtains a legacy signaling field including information decodable by a legacy wireless communication terminal from the non-legacy physical layer frame, obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field, obtain information other than information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame, wherein the data size transmittable by a symbol of the legacy physical layer frame is 3 octets when a data rate of the legacy physical layer frame is 6 Mbps, and determine the number of symbols of data of the non-legacy physical layer frame according to a following equation,

Ex. 4 ('077 patent) at 2:66-3:18 (annotations added).

FIG. **23** shows an equation for obtaining a transmission time of a non-legacy physical layer frame by a wireless communication terminal according to an embodiment of the present invention.

The transmission time TXTIME of the non-legacy physical layer frame is the sum of the duration of a legacy preamble $T_{L\_PREAMBLE}$, the duration of a non-legacy preamble $T_{HE\_PREAMBLE}$, the data duration of a non-legacy physical layer frame $T_{HE\_DATA}$, and the packet extension

duration of a non-legacy physical layer frame $T_{PE}$. At this time, the duration of the legacy preamble $T_{L\_PREAMBLE}$ indicates the duration to the legacy signaling field in the duration of the non-legacy physical layer frame. Also, a packet extension indicates a padding added after a Frame Check Sequence (FCS) field of a non-legacy physical layer frame or Forward Error Correction (FEC).

The data duration $T_{HE\_DATA}$ of the non-legacy physical layer frame is the product of the symbol duration $T_{HE\_SYMBOL}$ of the non-legacy physical layer frame and the number N_SYM of symbols of data of the non-legacy physical layer frame. The symbol duration $T_{HE\_SYMBOL}$ of the non-legacy physical layer frame is a value obtained by adding guard interval duration $T_{GI}$ to a signal of 12.8 us length including data excluding the symbol's guard interval cyclic prefix.

Ex. 4 ('077 patent) at 28:59-29:16 (annotations added).

Specifically, the non-legacy wireless communication terminal may set L_LENGTH based on a value obtained by dividing the duration TXTIME—$T_{L\_PREAMBLE}$ of the non-legacy physical layer frame after the L-SIG by the duration aSymbolLength of the symbol of the legacy physical layer frame. Also, as described above, in wireless communication, data is transmitted by a symbol unit, and a legacy wireless communication terminal converts the size of data represented by L_LENGTH into a symbol unit of a legacy physical layer frame to determine the duration of a physical layer frame. Therefore, the non-legacy wireless communication terminal divides the duration of the non-legacy physical layer frame after the L-SIG by the duration aSymbolLength of the legacy physical layer frame symbol and sets L_LENGTH based on the ceiling calculated value **2401**.

Ex. 4 ('077 patent) at 29:30-44 (annotations added).

A second wireless communication terminal **3203** obtains information based on the legacy signaling field (S**3205**). The second wireless communication terminal **3203** may obtain length information indicating the duration of the non-legacy physical layer frame after the legacy signaling field, from the legacy signaling field and obtain information other than the information indicating the duration of the non-legacy physical layer frame by using the value of the length information. Specifically, the second wireless communication terminal **3203** may obtain information other than information indicating the duration of a non-legacy physical layer frame through the remaining value obtained by dividing the length information by the size of data transmittable by one symbol transmitting the legacy physical layer frame.

Ex. 4 ('077 patent) at 39:52-65 (annotations added). *See also* §IX.A; Ex. 4 ('077 patent) at 2:66-5:35, 11:58-12:12, 14:3-18:12, 19:6-20:10, 28:32-40:41, Figs. 7, 9-13, 15, 16, 23-32.

80.    The patent's file history also provides no clarification with respect to the claimed scope at issue here. *See*, *generally*, Ex. 5 ('077 patent, file history).

81.    Additionally, claim 1 does not require the non-legacy or legacy physical layer frame to be in accordance with a particular communication standard. In fact, the specification discloses that "[a]lthough the present invention is described by using wireless LAN communication as an example, it is not limited thereto and may be applied to other communication systems such as cellular communication," which further exacerbates the above-discussed ambiguities. Ex. 4 ('077 patent) at 40:33-36. In an attempt to find a resolution to these ambiguities a POSITA may desire to examine physical layer frame layouts for multiple standards (e.g., wireless LAN, cellular, etc.). But this would be fruitless because as I discussed above, even the specification's own discussions with respect to 802.11 based frames do not help with resolving the ambiguities.

82.    For the reasons stated above, it is my opinion that a POSITA would not be able to ascertain the scope of the term "obtain length information indicating information on a duration of

31

the non-legacy physical layer frame, from the legacy signaling field," and thus claim 1 with reasonable certainty, rendering it indefinite.

### b.    Claim 8

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "obtaining length information indicating information on a duration of the non-legacy physical layer frame after a legacy signaling field, from the legacy signaling field" (Cl. 8) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

83.    The phrase "obtaining length information indicating information on a duration of the non-legacy physical layer frame after a legacy signaling field, from the legacy signaling field" appears in independent claim 8.  In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention. In particular, a POSITA would interpret the wording "a duration of the non-legacy physical layer frame after a legacy signaling field" as vague and ambiguous, and open to multiple interpretations, and thus would not be able to ascertain the scope of the term in question.

84.    I start my analysis with the claim language where the contested claim term appears. I reproduce claim 8 below.

> **8.** An operation method of a wireless communication terminal that communicates wirelessly, the method comprising:
>     receiving a non-legacy physical layer frame by using the transceiver,
>     obtaining a legacy signaling field including information decodable by a legacy wireless communication terminal from the non-legacy physical layer frame,
>     obtaining length information indicating information on a duration of the non-legacy physical layer frame after a legacy signaling field, from the legacy signaling field,

obtaining information other than the information on the
duration of the non-legacy physical layer frame through
a remaining value obtained by dividing the length
information by a data size transmittable by a symbol of
a legacy physical layer frame, wherein the data size
transmittable by a symbol of the legacy physical layer
frame is 3 octets when a data rate of the legacy physical
layer frame is 6 Mbps, and

determining the number of symbols of the data of the
non-legacy physical layer frame according to a follow-
ing equation,

$$N_{SYM} = \left\lfloor \left( \left( \frac{L\_LENGTH + m + 3}{3} \times 4 - T_{HE\_PREAMBLE} \right) \middle/ T_{SYM} \right) \right\rfloor - b_{PE\_Disambiguity}$$

where [x] denotes a largest integer less than or equal to x,
L_LENGTH denotes the length information,
m denotes a value obtained by subtracting the remaining
value from the data size transmittable by a symbol of
the legacy physical layer frame,
$b_{PE\_Disambiguity}$ denotes a value of PE Disambiguity field,
$T_{HE\_PREAMBLE}$ denotes a duration of non-legacy preamble
of the non-legacy physical layer frame,
$T_{SYM}$ denotes a duration of a symbol of the data of the
non-legacy physical layer frame,
wherein the PE Disambiguity field is set based on the
duration of a symbol of the data of the non-legacy
physical layer frame and an increment of duration to set
a value of the length information based on a duration of
a symbol of legacy physical layer frame.

Ex. 4 ('077 patent) at Cl. 8 (annotations added).

85.    This claim requires that the claimed "length information" is obtained "from the
legacy signaling field," which is part of the non-legacy physical layer frame.  Further, this length
information relates to "a duration of the non-legacy physical layer frame after a legacy signaling
field."  As recited in claim 8 and in the context of the surrounding claim language, a POSITA

would understand that the phrase "a duration of the non-legacy physical layer frame after a legacy signaling field" is vague and ambiguous, and fails to provide clarity as to the scope of the purported invention. As I discuss in detail below, the specification and drawings disclose multiple legacy signaling fields within the non-legacy physical layer frame. As such, a POSITA would not understand which legacy signaling field is being referred to in claim 8.

86.    Moreover, the surrounding claim language further contributes to this ambiguity. Claim 8 recites "obtaining *a legacy signaling field* … from the non-legacy physical layer frame, obtaining length information indicating information on a duration of the non-legacy physical layer frame after *a legacy signaling field*, from *the legacy signaling field*." Given the double recitation of "a legacy signaling field" in claim 8, it is unclear if there are one or multiple legacy signaling fields in the frame (and in this case, whether those signaling fields are different or not), thereby making it impossible to ascertain the scope of "a duration" as claimed.

87.    The patent's specification and drawings provide no further clarification. As discussed above for claim 1, the specification provides multiple instances of the "duration of the non-legacy physical layer frame" without modification, and sometimes with modification; and the specification describes that there are multiple durations defined within a non-legacy physical layer frame.

88.    Moreover, the specification and drawings disclose multiple legacy signaling fields within the non-legacy physical layer frame. For example, the specification describes that "[t]he L-SIG includes a total of 24-bit fields such as an L_RATE field indicating a transmission rate, an L_LENGTH field indicating a length of a physical layer frame after L_SIG, a Parity field for error checking, a Tail field, and Reserved Bits." Ex. 4 ('077 patent) at 19:49-53. An illustration of the L-SIG which depicts its multiple legacy signaling fields (e.g., length field, rate field, parity field,

tail field etc., each conveying very different information) is shown in Fig. 16. As such, it is unclear which particular legacy signaling field "after a legacy signaling field" is referring to.



Ex. 4 ('077 patent) at Fig. 16. *See also id.* at 2:66-5:35, 11:58-12:12, 14:3-18:12, 19:6-20:10, 28:32-40:41, Figs. 7, 9-13, 15, 16, 23-32.

89.     As noted above with respect to claim 1, the patent's file history also provides no clarification with respect to the claimed scope at issue here, *see, generally,* Ex. 5 ('077 patent, file history) and I understand that the patent disclaimer that broadens the reach of the claimed invention, further exacerbates the issues with the claim scope. Ex. 4 ('077 patent) at 40:33-36.

90.     For the reasons stated above, it is my opinion that a POSITA would not be able to ascertain the scope of the term "obtaining length information indicating information on a duration of the non-legacy physical layer frame after a legacy signaling field, from the legacy signaling field," and thus claim 8 with reasonable certainty.

### 2.     "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame through a remaining

**value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame"**

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame" (Cls. 1, 8) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

91.     The phrase "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame" appears in independent claims 1 and 8. In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention.  In particular, a POSITA would interpret the wording "information other than [the] information" as vague and ambiguous and thus would not be able to ascertain the scope of the term in question.

92.     I start my analysis with the claim language where the contested claim terms appear. I reproduce below relevant portions of claims 1 and 8.

> 1. A wireless communication terminal that communicates wirelessly, the terminal comprising:
>     a transceiver; and
>     a processor,
>     wherein the processor is configured to receive a non-legacy physical layer frame by using the transceiver,

obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field,

obtain information other than information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame, wherein the data size transmittable by a symbol of the legacy physical layer frame is 3 octets when a data rate of the legacy physical layer frame is 6 Mbps, and

determine the number of symbols of data of the non-legacy physical layer frame according to a following equation,

$$N_{SYM} = \left\lfloor \left( \frac{\text{L\_LENGTH} + m + 3}{3} \times 4 - T_{HE\_PREAMBLE} \right) \Big/ T_{SYM} \right\rfloor - b_{PE\_Disambiguity}$$

where $\lfloor x \rfloor$ denotes a largest integer less than or equal to x,

L_LENGTH denotes the length information,

m denotes a value obtained by subtracting the remaining value from the data size transmittable by a symbol of the legacy physical layer frame,

$b_{PE\_Disambiguity}$ denotes a value of PE Disambiguity field,

$T_{HE\_PREAMBLE}$ denotes a duration of non-legacy preamble of the non-legacy physical layer frame,

$T_{SYM}$ denotes a duration of a symbol of the data of the non-legacy physical layer frame, wherein the PE Disambiguity field is set based on the duration of a symbol of the data of the non-legacy physical layer frame and an increment of duration to set a value of the length information based on a duration of a symbol of the legacy physical layer frame.

Ex. 4 ('077 patent) at Cl. 1 (annotations added).

37

**8**. An operation method of a wireless communication terminal that communicates wirelessly, the method comprising:

receiving a non-legacy physical layer frame by using the transceiver,

obtaining a legacy signaling field including information decodable by a legacy wireless communication terminal from the non-legacy physical layer frame,

obtaining length information indicating information on a duration of the non-legacy physical layer frame after a legacy signaling field, from the legacy signaling field,

obtaining information other than the information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame, wherein the data size transmittable by a symbol of the legacy physical layer frame is 3 octets when a data rate of the legacy physical layer frame is 6 Mbps, and

determining the number of symbols of the data of the non-legacy physical layer frame according to a following equation,

$$N_{SYM} = \left\lfloor \left( \frac{L\_LENGTH + m + 3}{3} \times 4 - T_{HE\_PREAMBLE} \right) \middle/ T_{SYM} \right\rfloor - b_{PE\_Disambiguity}$$

where [x] denotes a largest integer less than or equal to x, L_LENGTH denotes the length information,

m denotes a value obtained by subtracting the remaining value from the data size transmittable by a symbol of the legacy physical layer frame,

$b_{PE\_Disambiguity}$, denotes a value of PE Disambiguity field,

$T_{HE\_PREAMBLE}$ denotes a duration of non-legacy preamble of the non-legacy physical layer frame,

$T_{SYM}$ denotes a duration of a symbol of the data of the non-legacy physical layer frame,

wherein the PE Disambiguity field is set based on the duration of a symbol of the data of the non-legacy physical layer frame and an increment of duration to set a value of the length information based on a duration of a symbol of legacy physical layer frame.

Ex. 4 ('077 patent) at Cl. 8 (annotations added).

93.    As recited in claims 1 and 8 and in the context of surrounding claim language, a POSITA would interpret the wording "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame" as vague and ambiguous, and fails to provide clarity as to the scope of the purported inventions.

94.    A POSITA would not understand what ***other information*** is sought. This other information can be anything so long as it is not "information on the duration of the non-legacy physical layer frame."

95.    The requirement that this ***other information*** is obtained "through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame" does not provide clarity as to the meaning of "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame."  The use of the word "through" amplifies the vagueness and ambiguity.  While the "through a remaining value" language provides a partial way in obtaining this other information, it does not suggest, much less define, what this other information is.  This passage also implies that there could be additional (albeit, unknown) steps in obtaining this other information.  Indeed, as written, "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame" is not the remaining value itself, because such an interpretation would make "obtain[\ing] information other than [the] information" aspect surplusage.

96.    Moreover, it is unclear whether the terminal has to obtain a remaining value as claimed ("…through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame") in order to infringe, making the scope even more ambiguous.

97.     The patent's specification and drawings provide no further clarification. The specification parrots the "information other than" language without providing any clarity to its meaning. *See*, *e.g.*, Ex. 4 ('077 Patent) at 2:66-5:35, 34:5-13, 34:27-39, 34:40-36:12, 36:13-37:51, Figs. 28-31. *See also id.* at 11:58-12:12, 14:3-18:12, 19:6-20:10, 28:32-40:41, Figs. 7, 9-13, 15, 16, 23-32.  The patent's file history provides no clarification either. *See*, *generally*, Ex. 5 ('077 patent, file history).

98.     For the reasons stated above, it is my opinion that a POSITA would not be able to ascertain the scope of the term "obtain[\ing] information other than [the] information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame," and thus claims 1 and 8 with reasonable certainty.

### 3.     "the duration of the non-legacy physical layer frame after the legacy signaling field"

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "the duration of the non-legacy physical layer frame after the legacy signaling field" (Cl. 3) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

99.     The phrase "the duration of the non-legacy physical layer frame after the legacy signaling field" appears in dependent claim 3.  In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention.  Specifically, "the duration of the non-legacy physical layer frame after the legacy signaling field" lacks antecedent basis, and it is unclear whether it refers to a similar limitation recited earlier, in the independent claim.  As such, a POSITA reading the claims in light of the specification at the time of the claimed invention would not have been able to ascertain the scope of the claims with reasonable certainty.

100.    I start my analysis with the claim language where the contested claim term appears.

I reproduce below relevant portions of claim 3.

> **1.** A wireless communication terminal that communicates wirelessly, the terminal comprising:
> a transceiver; and
> a processor,
> wherein the processor is configured to receive a non-legacy physical layer frame by using the transceiver,
> obtain a legacy signaling field including information decodable by a legacy wireless communication terminal from the non-legacy physical layer frame,
> obtain length information indicating information on a duration of the non-legacy physical layer frame, from the legacy signaling field,
> obtain information other than information on the duration of the non-legacy physical layer frame through a remaining value obtained by dividing the length information by a data size transmittable by a symbol of a legacy physical layer frame, wherein the data size transmittable by a symbol of the legacy physical layer frame is 3 octets when a data rate of the legacy physical layer frame is 6 Mbps, and

determine the number of symbols of data of the non-legacy physical layer frame according to a following equation,

$$N_{SYM} = \left\lfloor \left( \frac{\text{L\_LENGTH} + m + 3}{3} \times 4 - T_{HE\_PREAMBLE} \right) \middle/ T_{SYM} \right\rfloor - b_{PE\_Disambiguity}$$

where $\lfloor x \rfloor$ denotes a largest integer less than or equal to x,
L_LENGTH denotes the length information,
m denotes a value obtained by subtracting the remaining value from the data size transmittable by a symbol of the legacy physical layer frame,
$b_{PE\_Disambiguity}$ denotes a value of PE Disambiguity field,
$T_{HE\_PREAMBLE}$ denotes a duration of non-legacy preamble of the non-legacy physical layer frame,
$T_{SYM}$ denotes a duration of a symbol of the data of the non-legacy physical layer frame, wherein the PE Disambiguity field is set based on the duration of a symbol of the data of the non-legacy physical layer frame and an increment of duration to set a value of the length information based on a duration of a symbol of the legacy physical layer frame.

**3**. The wireless communication terminal of claim **1**, wherein the increment of duration is a value obtained by multiplying a difference between a value obtained by performing a ceiling operation on a value obtained by dividing the duration of the non-legacy physical layer frame after the legacy signaling field by the duration of a symbol of the legacy physical layer frame and the value obtained by dividing the duration of the non-legacy physical layer frame after the legacy signaling field by the duration of a symbol of the legacy physical layer frame by the duration of a symbol of the legacy physical layer frame.

Ex. 4 ('077 patent) at Cls. 1, 3 (annotations added).

101.    Claim 1 contains the phrase "obtain length information indicating information on *a duration of the non-legacy physical layer frame*, from the legacy signaling field." Here, the expression "from the legacy signaling field" relates to the verb "obtain" and does not qualify the

42

phrase "a duration of the non-legacy physical layer frame." Otherwise, there is no "after the legacy signaling field" language present in claim 1.

102.     Claim 3 then contains the phrase at dispute, "the duration of the non-legacy physical layer frame after the legacy signaling field," wherein the addition of the modifier "after the legacy signaling field" in comparison to the language of claim 1, creates ambiguity. It is unclear whether "the duration of the non-legacy physical layer frame after the legacy signaling field":

- refers to the previously recited "duration of the non-legacy physical layer frame" in claim 1,

- refers to a duration that is different from "a duration of the non-legacy physical layer frame" recited in claim 1, or

- is supposed to narrow the meaning of "duration of the non-legacy physical layer frame" in claim 1.

103.     A POSITA reviewing claim 3 would be left uncertain about its scope. For example, if "the duration of the non-legacy physical layer frame after the legacy signaling field" is intended to be synonymous with "the duration of the non-legacy physical layer frame," then why add the modifier "after the legacy signaling field" which creates a distinction. Alternatively, if "the duration of the non-legacy physical layer frame after the legacy signaling field" refers to something narrower or different, then why use "the."

104.     Finally, to the extent the phrase at issue is an attempt to narrow the scope of the term "duration of the non-legacy physical layer frame" with the phrase "after the legacy signaling field," a POSITA would interpret the wording "duration of the non-legacy physical layer frame after a legacy signaling field" as vague and ambiguous as I explained above in Section X.A.1 for claim 8.

105.    In sum, there is no clear introduction or linkage in the claim to resolve this. This creates genuine uncertainty about the metes and bounds of the claim because a POSITA could not determine with reasonable certainty what duration is used in claim 3.

106.    The patent's specification and drawings provide no further clarification. As discussed above for claim 1 in Section X.A.1 ("obtain[\ing] length information indicating information on a duration of the non-legacy physical layer frame [after a legacy signaling field], from the legacy signaling field"), the specification provides multiple instances of the "duration of the non-legacy physical layer frame" without modification, and sometimes with modification (e.g., "after the L-SIG," "after the legacy signaling field"); and the specification describes that there are multiple durations defined within a non-legacy physical layer frame. *See*, *e.g.*, Ex. 4 ('077 Patent) at 2:66-5:35, 11:58-12:12, 14:3-18:12, 19:6-20:10, 28:32-40:41, Figs. 7, 9-13, 15, 16, 23-32.

107.    The patent's file history also provides no clarification with respect to the claimed scope at issue here. *See*, *generally*, Ex. 5 ('077 patent, file history).

108.    Moreover, this lack of antecedent basis does not appear to be a clerical error. Indeed, "the duration of the non-legacy physical layer frame after the legacy signaling field" is used twice in claim 3.

109.    For the reasons stated above, it is my opinion that a POSITA would not be able to ascertain the scope of the term "the duration of the non-legacy physical layer frame after the legacy signaling field," and thus claim 3 with reasonable certainty.

### B.    '210 Patent

#### 1.    "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A"

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A" (Cls. 1, 6) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

110.    The phrase "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A" appears in independent claims 1 and 6.  In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention.  A POSITA would interpret the wording "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A" as vague and ambiguous, and thus would not be able to ascertain the scope of the term in question.

111.    I start my analysis with the claim language where the contested claim term appears. I reproduce below claims 1 and 6.

> 1. A wireless communication terminal, the terminal com-
> prising:
>    a communication unit; and
>    a processor configured to process signals transmitted and
>       received through the communication unit,
>    wherein the processor is configured to:
>    receive, through the communication unit, a high efficiency
>       multi-user PHY protocol data unit (HE MU PPDU),
>    wherein a preamble of the HE MU PPDU includes high
>       efficiency signal A field (HE-SIG-A) and high effi-
>       ciency signal B field (HE-SIG-B), and
>    decode the received HE MU PPDU based on information
>       obtained from the preamble,

45

wherein when a SIG-B compression field of the HE-SIG-A indicates full bandwidth multi User-Multiple Input Multiple Output(MU-MIMO) transmission, a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A,

wherein when the number of MU-MIMO users indicates two or more users, the user specific field of the HE-SIG-B includes user fields for MU-MIMO allocation, and

wherein when the number of MU-MIMO users indicates a single user, the user specific field of the HE-SIG-B includes one user field for non-MU-MIMO allocation.

**6**. A wireless communication method of a wireless communication terminal, the method comprising:

receiving a high efficiency multi-user PHY protocol data unit (HE MU PPDU), wherein a preamble of the HE MU PPDU includes high efficiency signal A field (HE-SIG-A) and high efficiency signal B field (HE-SIG-B); and

decode the received HE MU PPDU based on information obtained from the preamble, wherein when a SIG-B compression field of the HE-SIG-A indicates full bandwidth multi User-Multiple Input Multiple Output (MU-MIMO) transmission, a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A,,

wherein when the number of MU-MIMO users indicates two or more users, the user specific field of the HE-SIG-B includes user fields for MU-MIMO allocation, and

wherein when the number of MU-MIMO users indicates a single user, the user specific field of the HE-SIG-B includes one user field for non-MU-MIMO allocation.

Ex. 2 ('210 patent) at Cls. 1, 6 (annotations added).

112.    As recited in claims 1 and 6 and in the context of surrounding claim language, a POSITA reviewing the claims would be left uncertain about their scope. Introduced in the claims by way of a wherein clause, the claim term "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield

of the HE-SIG-A" fails to provide clarity as to the scope of the purported invention. There is no clear-cut indication of the scope of the subject matter covered by the claims. The claim term appears to merely state a result obtained ("a format … is identified"). A POSITA would not know from the claim term what structure or steps are encompassed by the claims.

113. In more detail, claim 1 is directed to a wireless communication terminal, and as such it is an apparatus claim. Claim 1 recites two structural components: "a communication unit" and "a processor." Claim 1 further recites that "the processor is configured to: receive …, and decode …" The term "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A" is a result obtained ("a format … is identified"). It is unclear who or what obtains this result. The term is not part of "the processor is configured to: ..." language. Moreover, this term does not describe a capability of the terminal, and it does not provide structural support to either the communication unit or the processor. Additionally, I note that, after its introduction, the "format" is not referred to in the remaining language of claim 1. It is unclear whether the terminal has to identify, or have a capability to identify a format in order for the claim to be infringed. This creates genuine uncertainty about the metes and bounds of the claim because a POSITA could not determine with reasonable certainty what is required by claim 1.

114. The same term appears in claim 6 which is directed to a wireless communication method of a wireless communication terminal. Claim 6 recites two steps: "receiving" and "decode." As discussed above, the claim term is a result obtained ("a format … is identified"). It is unclear who or what obtains this result. The term is not recited as part of either the "receiving" or "decode" steps or as its own step. Moreover, after its introduction, the "format" is not referred to in the remaining language of claim 6. This creates genuine uncertainty about the metes and

47

bounds of the claim because a POSITA could not determine with reasonable certainty what is required by claim 6.

115. The patent's specification and drawings provide no clarification. Relevant portions of the patent's specification and drawings include Fig. 13 which "illustrates a configuration of an HE-SIG-B field according to an embodiment of the present invention." *See generally*, Ex. 2 ('210 patent) at 19:38-22:37. *See also* Figs. 13(a), 13(d)-1, 13(d)-2. The specification describes Figs. 13(d)-1 and 13(d)-2 as illustrating a different "subfield configuration" of a HE-SIG-B for single user and multiple user cases respectively.

> FIGS. **13**(*d*)-**1** and **13**(*d*)-**2** illustrate embodiments of the subfield configuration of the user field of the HE-SIG-B, respectively. FIG. **13**(*d*)-**1** illustrates a user field for an OFDMA transmission, and FIG. **13**(*d*)-**2** illustrates a user field for a MU-MIMO transmission. Each user field indicates a receiver AID of the corresponding resource unit. Exceptionally, when the HE MU PPDU is used for an uplink transmission, the user field may indicate a transmitter AID. When one user is allocated to one resource unit (i.e., non-MU-MIMO allocation), the user field includes a number of space time streams (NSTS) field, a TxBF field, an MCS field, a DCM field and a coding field as illustrated in FIG. **13**(*d*)-**1**. On the other hand, when a plurality of users are allocated to one resource unit (i.e., MU-MIMO allocation), the user field includes a spatial configuration field (SCF), an MCS field, a DCM field, and a coding field as illustrated in FIG. **13**(*d*)-**2**. Each STA that receives a PPDU through an MU-MIMO allocation should identify the location and number of spatial streams for it in the corresponding resource unit. To this end, the user field for the MU-MIMO transmission includes a spatial configuration field (SCF).

Ex. 2 ('210 patent) at 20:33-53. In the following paragraph, the specification describes that "the user field is interpreted according to the format of" either Fig. 13(d)-1 or 13(d)-2.

48

FIG. **13**(*e*) illustrates an embodiment of the SCF of the HE-SIG-B. The SCF indicates the number of spatial streams for each STA and the total number of spatial streams in the MU-MIMO allocation. Each STA identifies the OFDMA and/or MIMO allocation of the corresponding PPDU through the RA field and identifies whether the STA receives data through the MU-MIMO allocation according to the order indicated in the user specific field. When the STA receives data through the non-MU-MIMO allocation, the user field is interpreted according to the format of FIG. **13**(*d*)-**1**. However, when the STA receives data through the MU-MIMO allocation, the user field is interpreted according to the format of FIG. **13**(*d*)-**2**. On the other hand, when the SIG-B compression field indicates the full bandwidth MU-MIMO, the RA field is not present in the HE-SIG-B. In this case, since all the STAs signaled in the user specific field receive data through the MU-MIMO allocation, the STAs interpret the user field according to the format of FIG. **13**(*d*)-**2**.

Ex. 2 ('210 patent) at 20:54-21:5.

116.    The specification does not describe the relevant decoding as including a step to identify the format.  *See, e.g.,* Ex. 2 ('210 patent) at 2:56-4:12, 22:22-37, Abstract.  In fact, the specification does not describe a step in which the format has to be identified.

117.    The patent's file history also provides no clarification.  *See, generally*, Ex. 3 ('210 patent, file history).

118.    For the reasons stated above, it is my opinion that a POSITA would not be able to ascertain the scope of the term "a format of user field(s) included in a user specific field of the HE-SIG-B is identified based on a number of MU-MIMO users indicated by a subfield of the HE-SIG-A," and thus claims 1 and 6 with reasonable certainty.

C.    '281 Patent

1.    **"obtain[\ing] information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received packet"**

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "obtain[\ing] information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received packet" (Cls. 1, 8) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

119.    The phrase "obtain[\ing] information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received packet" appears in independent claims 1 and 8 of the '281 patent.  In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention.

120.    I reproduce claims 1 and 8 below, with this term highlighted in yellow and the relevant claim language highlighted in green:

**1**. A wireless communication terminal, the terminal comprising:

a processor; and

a communication unit,

wherein the processor is configured to:

receive a wireless packet through the communication unit,

obtain bandwidth information indicated via a bandwidth field of HE-SIG-A of the received packet,

obtain information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received packet, and

decode the received packet based on the bandwidth information and the information of the unassigned resource unit,

wherein the information of the unassigned resource unit is indicated via a combination of the bandwidth field of the HE-SIG-A and a resource unit allocation field of the HE-SIG-B, and

wherein the bandwidth field of the HE-SIG-A indicates channel information to be punctured within the bandwidth, and the resource unit allocation field indicates additional puncturing information for the unassigned resource unit within the bandwidth.

**8**. A wireless communication method of a wireless communication terminal, the method comprising:

receiving a wireless packet;

obtaining bandwidth information indicated via a bandwidth field of HE-SIG-A of the received packet;

obtaining information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received packet; and

decoding the received packet based on the bandwidth information and the information of the unassigned resource unit,

wherein the information of the unassigned resource unit is indicated via a combination of the bandwidth field of the HE-SIG-A and a resource unit allocation field of the HE-SIG-B, and

wherein the bandwidth field of the HE-SIG-A indicates channel information to be punctured within the bandwidth, and the resource unit allocation field indicates additional puncturing information for the unassigned resource unit within the bandwidth.

Ex. 6 ('281 patent) at Cls. 1, 8 (annotations added).

121.    As seen above, the claims first recite the term "a subfield of HE-SIG-B" in the "obtain[/ing]" limitation (highlighted in yellow), and later the "wherein" clause (highlighted in green) recites the term "a resource unit allocation field of the HE-SIG-B." Ex. 6 ('281 patent) at Cls. 1, 8.

122.    The "subfield of HE-SIG-B" and the "resource unit allocation field of the HE-SIG-B" cannot be the same thing because the claim language recites them as two different terms, and thus they must have different scopes.

123.    Further, the specification distinguishes these two terms by reciting each numerous times.

124.    For example, the specification discloses "subfield of HE-SIG-B" at e.g., Ex. 6 ('281 patent) at Abstract ("obtains information of an unassigned resource unit via at least one of the bandwidth field of the HE-SIG-A and *a subfield of HE-SIG-B* of the received packet"), 3:43-45 ("The non-contiguous channel allocation information may be indicated via at least one of a subfield of HE-SIG-A and *a subfield of HE-SIG-B* of the received packet."), 34:58-61 ("If the bandwidth field indicates a predetermined non-contiguous channel bandwidth, additional allocation information of the non-contiguous channel may be indicated via *a subfield of the HE-SIG-B*."), 38:47-50 ("According to the embodiment of the present invention, the non-contiguous channel allocation information may be indicated via any one of subfield(s) of the HE-SIG-A, *subfield(s) of the HE-SIG-B*, and a combination thereof."), *see also* 39:16-42.

125.    The specification also discloses "a resource unit allocation field of the HE-SIG-B" at e.g., Ex. 6 ('281 patent) at 3:56-58 ("The non-contiguous channel allocation information may be indicated through a predetermined index of *a resource unit allocation field of the HE-SIG-*

52

*B*."); 3:65-4:3 ("The non-contiguous channel allocation information may be obtained through resource unit arrangement information indicated by the *resource unit allocation field of the HE-SIG-B* and a Null STA ID contained in a user field corresponding to a specific resource unit in the resource unit arrangement."); 4:7-10 ("The non-contiguous channel allocation information may be indicated via a combination of a bandwidth field of the HE-SIG-A and a *resource unit allocation field of the HE-SIG-B*."); 20:49-52 ("[I]n the compression mode in which the *resource unit allocation field of the HE-SIG-B* is omitted, information on the number of MU-MIMO users may be indicated through a specific subfield of the HE-SIG-A.").

126.    In addition, a POSITA would understand that "subfield of HE-SIG-B" and "a resource unit allocation field of the HE-SIG-B" are different things based on the usage of the words *field* and *subfield* in the art.  First, a POSITA would know that a *field* is a higher-level structural element which may contain one or more *subfields*.  This notion is supported by technical usage at the time.  *See* Ex. 28 (IEEE 802.11-2012) at "Section 8. Frame formats," pp. 380-817; Ex. 29 (IEEE 802.11ac-2013) at "Section 8.  Frame formats," pp. 33-117.  Therefore, "subfield of HE-SIG-B" and "a resource unit allocation field of the HE-SIG-B" are not the same.  Second, the term "subfield of HE-SIG-B" indicates that the *subfield* is a direct subdivision of the HE-SIG-B itself. Because the "resource unit allocation field of the HE-SIG-B" is itself a *field*, it is a peer to other *fields* in the HE-SIG-B, not a container that defines "subfields of HE-SIG-B."  Thus, a "subfield of HE-SIG-B" cannot be the same as "a resource unit allocation field of the HE-SIG-B."

127.    As explained below, the use of these two separate terms in the claims creates an internal inconsistency that renders the term at issue indefinite.

128.    The claims recite:

53

obtain[/ing] information of an unassigned resource unit *via* **at least one of** the
bandwidth field of the HE-SIG-A and a subfield of HE-SIG-B of the received
packet.

Ex. 6 ('281 patent) at Cls. 1, 8 (emphasis added).

129.    The use of the disjunctive phrase ***"via at least one of"*** indicates to a POSITA that
"information of an unassigned resource unit" to be obtained via either (i) "the bandwidth field of
the HE-SIG-A" alone, or (ii) a "subfield of HE-SIG-B" alone, or (iii) both.

130.    However, the later recited "wherein" clause renders the claim ambiguous:

wherein the information of the unassigned resource unit is indicated ***via a
combination of*** the bandwidth field of the HE-SIG-A and a resource unit
allocation field of the HE-SIG-B.

Ex. 6 ('281 patent) at Cls. 1, 8 (emphasis added).

131.    A POSITA would understand that "the information of the unassigned resource unit"
is *obtained* from what is *indicated* in the "wherein" clause, i.e., "***via a combination of*** the
bandwidth field of the HE-SIG-A and a resource unit allocation field of the HE-SIG-B."  But the
use of "***a combination of***" in the wherein clause contradicts the use of ***"via at least one of"*** earlier
in the claims.  The use of the conjunctive phrase ***"via a combination of"*** indicates to a POSITA
that "information of the unassigned resource unit" must be indicated via "the bandwidth field of
the HE-SIG-A—in combination with the "resource unit allocation field of the HE-SIG-B."  In
other words, ***"the bandwidth field of the HE-SIG-A"*** is always needed to indicate and obtain the
"information of the unassigned resource unit."  Thus, the option (ii) above—using a "subfield of
HE-SIG-B" alone—cannot be practiced, making the term "subfield of HE-SIG-B" superfluous.
Therefore, this term is indefinite to a POSITA.

132.    The prosecution history of the '281 patent sheds some light as to how this internal
inconsistency came about.  In response to the Examiner's rejection based on prior art, the applicant

54

amended the claims to add the "wherein" clause that introduced the internal inconsistency in the claims:

> Although the Applicant respectfully disagrees with the Examiner, solely to expedite prosecution of the present application and allowance of the claims, claim 1 is amended to add "*wherein the information of the unassigned resource unit is indicated via a combination of the bandwidth field of the HE-SIG-A and a resource unit allocation field of the HE-SIG-B, and wherein the bandwidth field of the HE-SIG-A indicates channel information to be punctured within the bandwidth, and the resource unit allocation field indicates additional puncturing information for the unassigned resource unit within the bandwidth*".

Ex. 7 ('281 patent prosecution history), Applicant Arguments/Remarks made in Amendment (Dec. 27, 2019) at pp. 8-12 (annotations added). It appears the applicant, in trying to distinguish the claim from prior art, inadvertently imported language that is logically incongruent with the limitation that comes before it in the claim.

133. For the reasons above, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention.

### D.    '595 Patent

#### 1.    "the total bandwidth information"

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "the total bandwidth information" (Cl. 7) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite, wherein "the total bandwidth information" refers to the total bandwidth information indicated by the bandwidth field |

134. The phrase "the total bandwidth information" appears in independent claim 7 of the '595 patent. In my opinion, this term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention. The term "the total bandwidth information" lacks proper antecedent basis in the claim and further a POSITA would interpret the

word "total" as vague and ambiguous, and open to multiple interpretations, and thus would not be able to ascertain the scope of the term in question.

135.    I reproduce claim 7 below, with this term highlighted:

> 7. A wireless communication method of a wireless communication terminal, the method comprising:
> receiving a wireless packet including an high efficiency (HE)-signal (SIG)-A and HE-SIG-B;
> obtaining bandwidth information indicated via a bandwidth field included in the HE-SIG-A;
> obtaining information of an unassigned resource unit via at least one subfield included in the HE-SIG-B,
>
> wherein the bandwidth field is related to bandwidth over which the received wireless packet is transmitted, and
> wherein the bandwidth field of HE-SIG-A is used to obtain the information of the unassigned resource unit; and
> decoding a data of the received wireless packet based on the total bandwidth information and the information of the unassigned resource unit,
> wherein the unassigned resource unit is explicitly indicated with the information of the unassigned resource unit based on the bandwidth field and the at least one subfield, and
> wherein the information of the unassigned resource unit includes information of a C26 field indicating whether a user is allocated to a center 26-tone resource unit of 80 MHz upon the bandwidth related to a transmission of the received wireless packet indicated by the bandwidth field being 80 MH or more, not 20 MHz or 40 MHz.

Ex. 8 ('595 patent) at Cl. 7 (annotations added).

### a.    Lack of Antecedent Basis Makes this Term Indefinite

136.    The term "the total bandwidth information" is introduced for the first time in the "decoding" step in independent method Claim 7—"decoding a data of the received wireless packet based on *the total bandwidth information* and the information of the unassigned resource unit"—using the definite article "the," implying a prior reference. However, there is no explicit antecedent introduction of "a total bandwidth information" anywhere in Claim 7.

56

137.    Earlier in Claim 7, the method recites "obtaining **bandwidth information** indicated via a bandwidth field included in the HE-SIG-A." This limitation discloses **"bandwidth information,"** but not **"total bandwidth information."** The addition of the qualifier "total" later in the claim creates ambiguity: it is unclear whether **"the total bandwidth information"** refers to the previously mentioned **"bandwidth information,"** a subset or superset thereof, or some other unspecified bandwidth-related data.

138.    A POSITA reviewing the claim would be left uncertain about its scope. For instance, if **"the total bandwidth information"** is intended to be synonymous with the **"bandwidth information"** obtained from the HE-SIG-A field, why introduce the modifier "total" which indicates a distinction. Alternatively, if **"total bandwidth information"** refers to something broader or different, there is no clear introduction or linkage in the claim to resolve this. The claim does not specify how or from where **"the total bandwidth information"** is obtained, exacerbating the uncertainty.

139.    This lack of antecedent basis is not a mere clerical error; it creates genuine uncertainty about the metes and bounds of the claim because A POSITA could not determine with reasonable certainty what data is used in the "decoding" step. Therefore, this term is indefinite.

### b.    Use of the Word "Total" Makes the Term Indefinite

140.    Aside from the antecedent basis issue, the modifier "total" in "the total bandwidth information" introduces vagueness, as it is not defined in the claim or specification in a way that provides objective boundaries for a POSITA. In the context of wireless communications under IEEE 802.11 (Wi-Fi), which the patent addresses through HE-SIG-A and HE-SIG-B fields, bandwidth can refer to various concepts such as channel bandwidth (*e.g.*, 20 MHz, 40 MHz, 80 MHz), aggregated bandwidth in multi-channel transmissions, or effective bandwidth in discontinuous (non-contiguous) channels.

141.    This vagueness is compounded by the earlier recitation of "bandwidth information" without the "total" qualifier, suggesting "total" adds a distinct meaning, yet no criteria are provided to distinguish it. A POSITA would be uncertain how to interpret "total" in scenarios involving discontinuous channels, where the "total" bandwidth might ambiguously refer to the cumulative allocated bandwidth (excluding gaps) or the overall frequency range (including gaps). For example, in an 80 MHz transmission with non-contiguous segments, does "total" mean 80 MHz as the nominal bandwidth, or the actual used bandwidth after accounting for unassigned resource units?

142.    The specification uses "total bandwidth" in phrases like "transmitted in a total bandwidth of 80MHz or more," but this does not define "total" objectively—it merely exemplifies thresholds (*e.g.*, for including a C26 field) without clarifying the term's boundaries in variable or discontinuous setups. The '595 patent's prosecution history also provides no clarification. *See, generally*, Ex. 9 ('595 patent, file history).

143.    Without an explicit definition or objective standard in the specification (*e.g.*, a formula for calculating "total" or examples delineating its scope across embodiments), "total" functions as an undefined term of degree or qualifier, leaving the claim's scope open to interpretation, rendering the claim indefinite.

144.    The indefiniteness of "total bandwidth information" is further evidenced by the prosecution history of related '281 patent, which shares a common specification with the '595 patent (as a continuation or related application). During prosecution of the '281 patent (Application No. 16/016,520), the USPTO Examiner rejected the independent claims under 35 U.S.C. § 112(b) for indefiniteness, stating:

58

**4.     Claims 1 – 18 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite** for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention. The independent claims recite "total bandwidth information". While this is discussed in the Specification, it is not defined; it is unclear what is encompassed by this phrase. The claim is therefore indefinite, and rejected.

Ex. 7 ('281 patent prosecution history), Office Action dated September 27, 2019, p. 3 (annotations added).

145.    To overcome this rejection, the applicant "amended [the claims] to delete the term 'total' in 'total bandwidth information." *Id.* at December 27, 2019 Applicant's Response. The applicants action confirms that the term was deemed indefinite and required excision for allowance.  The '595 patent, despite being related, reintroduces this problematic term without resolving the underlying ambiguity identified by the Examiner.

146.    Plaintiff argues that "the total bandwidth information" should be given its plain and ordinary meaning, "wherein it refers to the total bandwidth information indicated by the bandwidth field."  Plaintiff's purported clarification fails. The claim recites "obtain ***bandwidth information*** indicated ***via a bandwidth field*** of HE-SIG-A of the received packet."  Because the bandwidth field already indicates the claimed "bandwidth information," it cannot also indicate the "total bandwidth information field" (as Plaintiff proposes).  The "bandwidth information" and "the total bandwidth information" are different claim terms, indicating different scope. Therefore, the bandwidth field cannot indicate both.

147.    As explained above, a POSITA would not know the scope of this term with reasonable certainly.  This term is thus indefinite.

E.    '163 & '597 Patents

1.    "valid signaling field of the MAC frame"

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "valid signaling field of the MAC frame" (Cls. 3, 11) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

148.    The phrase "valid signaling field of the MAC frame" appears in claims 3 and 11 of the '163 and '597 patents.  In my opinion, it is indefinite because, when read in the context of the specification and the prosecution history, the term fails to inform a POSITA about the scope of the alleged invention with reasonable certainty.

149.    Claim 3 of the '163 and '597 patents depends on claims 1 and 2 (and claim 11 is dependent on claims 9 and 10).  I reproduce the relevant language of claim 3 below:

> **3.** The wireless communication terminal of claim **2**, wherein the PPDU includes a TXOP Duration field in the signaling field of the PPDU and a medium access control (MAC) frame which includes a duration field,
>     wherein the TXOP Duration field indicates information used for setting the Intra-BSS NAV and the Basic NAV,
>     wherein the duration field indicates information used for setting the Intra-BSS NAV and the Basic NAV,
>     wherein the processor is configured not to use the TXOP Duration field for setting the Intra-BSS NAV or the Basic NAV when the wireless communication terminal gets a valid signaling field of the MAC frame.

Ex. 10 ('163 patent) at Cl. 3 (annotations added); *see also id.* at Cl. 11; Ex. 12 ('597 patent), Cls. 3, 11.

150.    The word "valid" in the '163 and '597 patents' claims is an adjective.  Ex. 10 ('163 patent) at Cls. 3, 11; Ex. 12 ('597 patent) at Cls. 3, 11.  A POSITA would understand that the adjective "valid" implies that the noun it modifies (here, "signaling field of the MAC frame") comports with a set of rules or criteria.  *E.g.*, Ex. 18 at SAM-HP-CC_00000014 (defining "valid"

60

as "correct, ***according to a set of rules***." (emphasis added); Ex. 19 at 543 (defining "valid" as "[p]ertaining to syntax, a file (or other syntactical entity) ***which satisfies syntax rules***." (emphasis added)). Further, a POSITA would understand that rules for "validity" of a piece of data are different from rules relating to the use of said data—"validity" implies correctness, use of proper syntax, and related concepts, such as technical compatibility with a given system. *E.g.*, Ex. 18 at SAM-HP-CC_00000014; Ex. 19 at 543; Ex. 20 at 1729 (defining "valid" as "(computing) that is accepted by the system: a valid password.").

151.    In the '163 and '597 patent claims, the word "valid" modifies the noun "signaling field." Ex. 10 ('163 patent) at Cls. 3, 11; Ex. 12 ('597 patent) at Cls. 3, 11. To practice claims 3 and 11 of the '163 and '597 patents, an apparatus must be configured to take different actions based on whether a received "signaling field of the MAC frame" is "valid." Specifically, when the apparatus receives a "valid signaling field of the MAC frame," the apparatus must be configured "not to use the TXOP Duration field for setting the Intra-BSS NAV or the Basic NAV . . . ." Ex. 10 ('163 patent) at Cl. 3. Therefore, determining the scope of claims 3 and 11 of the '163 and '597 patents requires knowing the criteria by which a "signaling field of the MAC frame" is determined to be "valid."

152.    A person of ordinary skill would understand that there are a variety of criteria that can be used to determine whether a given piece of data is "valid." As some nonlimiting examples, a field may be considered to be "valid" (1) when it is simply present in the received data, (2) when it is free of errors, or (3) when the value of the field is within a specified range. Each of these criteria for determining "validity" lead to drastically different claim scope for claims 3 and 11 of the '163 and '597 patents, such that a person of ordinary skill cannot reasonably determine the bounds of the invention. In light of this ambiguity, one of ordinary skill would look to the patents'

61

intrinsic records for insight into the criteria for determining whether a "signaling field of the MAC frame" is "valid."

153.    The '163 and '597 patents' claims do not provide criteria for determining whether a "signaling field of the MAC frame" is "valid."  Indeed, the phrases "valid" and "signaling field of the MAC frame" do not appear anywhere else in the '163 and '597 patents' claims.  Therefore, the '163 and '597 patents' claims do not resolve the ambiguity in the claim language "valid signaling field of the MAC frame."

154.    Like the claims, the '163 and '597 patent specifications fail to provide criteria for determining whether a "signaling field of the MAC frame" is "valid."  Indeed, the written descriptions do not use the phrase "valid signaling field of the MAC frame."  And while the word "valid" appears eight (8) times in the '163 and '597 patent specifications, none of these excerpts discuss the validity of a "signaling field of the MAC frame" or provide relevant criteria.  *See, e.g.,* Ex. 10 ('163 patent) at 14:27-40 (reciting "valid frame from the PSDU" and "valid Duration field value of the PSDU"), 14:65-15:9 (reciting "valid PSDU" and "valid signaling field of the PPDU"); *see also* Ex. 12 ('597 patent) at 14:38-51, 15:9-20.

155.    To assist in explaining the patent specifications' use of the word "valid," I will first describe the relationship between (1) Physical Layer Convergence Procedure ("PLCP") Protocol Data Units ("PPDUs"); (2) PLCP Service Data Units ("PSDUs"); (3) Media Access Control ("MAC") frames, or MAC Service Data Units ("MSDUs"); and (4) signaling fields of a MAC frame.

156.    A person of ordinary skill would understand that a PPDU is a physical layer protocol data packet that is transmitted between Wi-Fi devices.  A PPDU carries one or more PSDUs.  A PSDU carries one or more MAC frames, or MPDUs.  Lastly, a MAC frame carries

several signaling fields.  The relationship between these data structures is illustrated below.  *See also* Ex. 25 at 2.



157.   A POSITA would conclude that the use of the word "valid" in the written descriptions of the '163 and '597 patents—*i.e.*, "valid PSDU," "valid frame from the PSDU," "valid Duration field value of the PSDU," and "valid signaling field of the PPDU"— does not resolve the ambiguity related to the "valid signaling field of the MAC frame" claim language.

158.   ***First***, the patent specifications' use of the word "valid" confirms that the word is subject to several different interpretations.  For example, the patent specifications' mention of a "***valid*** Duration field value of the PSDU" indicates that a signaling field's value is what determines validity (*e.g.*, the value is within a specified range).  Ex. 10 ('163 patent) at 14:29-21; Ex. 12 ('597 patent) at 14:44-46.  On the other hand, the patent specifications' disclosures of a "***valid*** PSDU" and "***valid*** frame from the PSDU" suggest that validity is determined based on whether a given data structure is present or contains errors.  *See, e.g.*, Ex. 10 ('163 patent) at 14:27-31, 15:3-9; Ex. 12 ('597 patent) at 14:38-42, 15:14-20; *see also* Ex. 10 ('163 patent) at 24:1-3 ("In addition, the MAC frame of the CTS frame and the ACK frame may include an FCS field indicating whether the ***MAC frame includes an error***." (emphasis added); Ex. 12 ('597 patent) at 24:10-12 (same).

159.    **Second**, the '163 and '597 patent specifications do not clarify the rules by which a given "signaling field of the MAC frame" is determined to be "valid," as required by the claims.

160.    As I mentioned above, the claim term at issue ("valid signaling field of the MAC frame") is not mentioned in the '163 and '597 patent specifications.  Further, the "valid PSDU" disclosures in the '163 and '597 patent specifications are unhelpful because a "PSDU" is a different data structure than a "signaling field" of a MAC frame.  *See, e.g.*, Ex. 10 ('163 patent) at 14:65-15:9; Ex. 12 ('597 patent) at 15:9-20.  Specifically, a POSITA would understand that a PSDU carries one or more MAC frames, which themselves carry more than one signaling field, and thus a POSITA would understand that PSDU refers to a much broader set of data than a "signaling field" of a MAC frame.  Moreover, the "valid PSDU" disclosures suffer from the same ambiguity as the claims—they fail to provide any rules or criteria for determining whether a given PSDU is "valid."  Therefore, even if the "valid PSDU" disclosures in the '163 and '597 patent written descriptions are relevant to the "valid signaling field of the PSDU" claim language, they fail to resolve the ambiguity in said claim language.

161.    The "valid frame from the PSDU" disclosures in the '163 and '597 patent specifications are also unhelpful in determining the "validity" of a "signaling field of the MAC frame."  *See, e.g.*, Ex. 10 ('163 patent) at 14:27-40; Ex. 12 ('597 patent) at 14:38-51.  A POSITA would understand a "frame from the PSDU" to be a MAC frame.  A MAC frame is a broader data structure than a "signaling field of the MAC frame" (*i.e.*, a specific field within the MAC frame).  Thus, a POSITA would find the "valid frame from the PSDU" disclosures to be irrelevant to the meaning of "valid signaling field of the MAC frame" in the claims.

162.    The "valid Duration field value of the PSDU" disclosures in the '163 and '597 patent specifications are also unhelpful in determining the "validity" of a "signaling field of the

64

MAC frame." *See, e.g.*, Ex. 10 ('163 patent) at 14:27-40; Ex. 12 ('597 patent) at 14:38-51. A

POSITA would understand that a "Duration field of the PSDU" is a "signaling field" of a MAC

frame. However, a POSITA would also understand that "signaling field of the MAC frame" is

broader than "Duration field of the PSDU." In other words, while the MAC duration field is a

MAC "signaling field," a POSITA would understand that a MAC frame may, and generally does,

include other "signaling fields." *See, e.g.*, Ex. 25 at 1. The claim language of the '163 and '597

patents confirms this fact, as it refers to both the "duration field" of a "medium access control

(MAC) frame" and the "signaling field of the MAC frame," indicating the two terms have different

meanings. Therefore, the "valid Duration field value of the PSDU" disclosures provide little, if

any, insight into how to determine the "validity" of other, non-duration field signaling fields in a

MAC frame. Further, although the "valid Duration field value of the PSDU" disclosures are

relevant to the validity of at least some "signaling field[s] of the MAC frame," the specification

still fails to provide any rules or criteria for determining whether a given "Duration field value of

the PSDU" is valid.

163. The remainder of the '163 and '597 patent specifications fail to resolve the

ambiguity in the "valid signaling field of the MAC frame" claim language. For example, the '163

and '597 patent specifications use the term "signaling field" sixty-two (62) times, but each instance

refers to a signaling field of a PPDU, not a MAC frame. *E.g.*, Ex. 10 ('163 patent) at 14:41-15:9

(discussing a "valid signaling field of the PPDU"); Ex. 12 ('597 patent) at 14:38-15:20 (same). As

described above, a PPDU and a MAC frame are different data structures, and each has their own

"signaling fields." Therefore, the patent specifications related to "signaling field" fail to resolve

the ambiguity in the "valid signaling field of the MAC frame" claim language.

164.    As another example, the '163 and '597 patent specifications include a number of references to "duration fields," but nearly all of these disclosures relate to the "TXOP Duration" field.  The '163 and '597 patents' claims make clear that the "TXOP Duration field" is different from the "duration field" of the MAC frame.  Ex. 10 ('163 patent) at Cl. 3; Ex. 12 ('597 patent) at Cl. 3.  Further, the '163 and '597 patents' claims make clear that the "TXOP Duration field" is in the signaling field of the PPDU, not the signaling field of the MAC frame.  Ex. 10 ('163 patent) at Cl. 3; Ex. 12 ('597 patent) at Cl. 3.  Thus, the disclosures related to "TXOP Duration" are inapplicable and do not shed light on the proper meaning of the claim term "valid signaling field of the MAC frame."

165.    Other disclosures found in the patent specifications related to "duration fields," while arguably applicable to the "duration field" of a MAC frame, do not resolve the ambiguity in the "valid signaling field of the MAC frame" claim language for two reasons.  *E.g.*, Ex. 10 ('163 patent) at 15:10-20; Ex. 12 ('597 patent) at 15:21-31.

166.    ***First***, as described above, a POSITA would understand from the claim language and their personal knowledge that a MAC frame "signaling field" is different from a MAC frame "duration field."  Ex. 10 ('163 patent) at Cl. 3; Ex. 12 ('597 patent) Cl. 3.  More specifically, a POSITA would understand that the MAC frame "duration field" is a "signaling field," but that "signaling field" is broader and encompasses fields other than the MAC frame "duration field."  *See, e.g.*, Ex. 25 at 1.  Therefore, the disclosures related to "duration fields" do not shed light on the "validity" of other, non-duration field signaling fields in a MAC frame.

167.    ***Second***, the disclosures do not speak to the "validity" of a "duration field."  At best, the written description explains when the MAC frame duration field may be used to set an intra-BSS NAV or a Basic NAV.  For example, the '163 and '597 patent written descriptions state:

66

> When the value of the duration field of the frame identified as the Intra-BSS frame by the wireless communication terminal is larger than the value of the current Intra-BSS NAV, the wireless communication terminal may set the Intra-BSS NAV based on the value of the duration field of the frame. When the value of the Duration field of the frame in which the wireless communication terminal is not able to identify whether the frame is the Intra-BSS frame or the Inter-BSS frame is larger than the value of the current basic NAV, the wireless communication terminal may set the Basic NAV based on the Duration field value of the frame.

Ex. 10 ('163 patent) at 15:10-20; Ex. 12 ('597 patent) at 15:21-31.  One of ordinary skill would understand that rules concerning when a data field is ***used***—like the rules in the excerpt above—are different from rules concerning whether the data field is "valid."  In other words, from the perspective of a POSITA, the fact that a given MAC frame's duration field is larger or smaller than the value of the station's current "Intra-BSS NAV" or "basic NAV" does not shed light on the duration field's "validity."  Ex. 10 ('163 patent) at 15:10-20; Ex. 12 ('597 patent) at 15:21-31.  As an example, consider two overlapping BSSs—BSS1 and BSS2—and a device within BSS1 transmitting a MAC frame with a duration field.  According to the rule above, other devices within BSS1 will compare the MAC duration field to the intra-BSS NAV, and devices within BSS2 will compare the MAC duration field to the basic NAV.  *See* Ex. 10 ('163 patent) at 15:10-20; Ex. 12 ('597 patent) at 15:21-31.  The MAC duration field could be less than BSS1's intra-BSS NAV and greater than BSS2's basic NAV, or *vice versa*, at the same time.  If the rule above dictated the "validity" of the MAC frame duration field, then the duration field could be both valid and invalid at the same time—a nonsensical result from the perspective of a POSITA.  Thus, these disclosures do not relate to "validity" of a "signaling field of the MAC frame" and fail to resolve the ambiguity in the claim language.

168.    Lastly, the patents' file histories fail to provide any clarification regarding what constitutes a "valid signaling field of the MAC frame."  *See generally* Ex. 11 ('163 patent, file history); Ex. 13 ('597 patent, file history).

67

169.    For the reasons stated above, it is my opinion that one of ordinary skill in the art would not be able to ascertain the scope of the term "valid signaling field of the MAC frame" in claims 3 and 11 of the '163 and '597 patents with reasonable certainty.

**F.    '035 & '879 Patents**

**1.    "set a . . . timer"**

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "set a . . . timer"<br>(Cls. 1, 4, 5, and 8) | **Defendants:** "assign a duration to a timer." |
|  | **Wilus:** Plain and ordinary meaning; no further construction necessary |

170.    A POSITA would understand the plain and ordinary meaning of the phrase "set a . . . a timer" to mean "assign a duration to a timer."[4,5] It is my understanding that Wilus is contending that the plain and ordinary meaning encompasses starting of the timer.  But a POSITA would understand that "set[ing] a . . . timer" is distinct operation from starting the timer (e.g., by reducing the timer).  My opinion is based on how a POSITA would understand the claims in light of the claim language and the specification, and is further informed by extrinsic evidence.

171.    I reproduce the relevant claim language below:

---

[4]  A "duration" can be any value that represents a period of time (e.g., seconds, clock cycles).
[5]  Claim 8 is a method claim that contains the term at issue in the form of "setting a . . . timer" and should be interpreted as "assigning a duration to a timer."

1. A wireless communication terminal that wirelessly communicates with a base wireless communication terminal, the wireless communication terminal comprising:

a transceiver; and

a processor,

wherein the processor is configured to:

transmit, to the base wireless communication terminal, a trigger-based physical layer protocol data unit (PPDU) using the transceiver,

switch a parameter set, which is a set of parameters used for the channel access, from a first parameter set to a second parameter set based on whether the base wireless communication terminal triggers a multi-user uplink transmission participation of the wireless communication terminal,

when a MAC protocol data unit (MPDU) included in the trigger-based PPDU does not request an immediate response, set a second parameter set timer for an access category of the MPDU when the transmission of the trigger-based PPDU ends,

when the MPDU included in the trigger-based PPDU requests the immediate response, set the second parameter set timer for the access category of the MPDU for which immediate response is received,

when the second parameter set timer expires, terminate an application of the second parameter set, and

access a channel according to a priority of data to be transmitted to the base communication terminal by the wireless communication terminal and the parameter set.

**4**. The wireless communication terminal of claim **1**, wherein the processor is configured to calculate a random integer value within a contention window (CW),

set a backoff timer based on the random integer value, and

access the channel based on the back off timer and a predetermined slot time,

wherein the parameter set comprises a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW.

**5**. The wireless communication terminal of claim **1**, wherein the processor is configured to calculate a random integer value in a contention window (CW),

set a backoff timer based on the random integer value,

access the channel based on the back off timer and a predetermined slot time, and

if a value of the CW is greater than the maximum value (CWmax) of the CW according to a priority of the data to be transmitted, sets the value of the CW to the CWmax.

**6**. The wireless communication terminal of claim **1**, wherein the processor is configured to operate a plurality of queues that are classified according to an access category of data stored in a queue and performs backoff procedure of accessing a channel based on a time corresponding to a backoff timer in each of the plurality of queues, and

when there is no data stored in the queue and the backoff timer corresponding to the queue is 0, perform no operation at a slot boundary of the backoff timer,

wherein the backoff timer is set based on a random integer value calculated in a contention window (CW), and is reduced when the channel is idle for a predetermined slot time.

Ex. 14 ('035 patent) at Cls. 1, 4–6. (annotations added).

    172.    ***First,*** I start my analysis with the express language of the claims. The claims' use of the phrase "set a timer" would have been understood by a POSITA to mean "to assign a duration

to a timer." Indeed, using a timer (which typically includes adjusting a timer to some value, such as duration, starting the timer, and having the timer to run out to its expiration) is a very common technique in the general field of computer science or engineering. This operation is ordinarily employed in cases where a particular setting or configuration should remain in effect for a certain period of time, and which reverts back to another setting or configuration at the expiration of the timer. The claims generally comport with this concept. For example, claim 1 recites "switch[ing] a parameter set … from a first parameter set to a second parameter set," then "set[ting]" a timer, and later, when the timer expires, "terminat[ing] an application of the second parameter set." " then "set[ting]" a timer, and later, when the timer expires, "terminat[ing] an application of the second parameter set."

173.    Consistent with this principle, other claims reciting a "backoff timer" refer to assigning a duration value to a timer as part of the "set" operation. For example, claims 4 and 5 recite "*set* a backoff timer based on the random integer value," and claim 6 states, "[t]he backoff timer is *set* based on a random integer value calculated in a contention window (CW)." *Id.* at Cls. 4-6.[6] Those claims describe a contention window backoff procedure, where a backoff timer is assigned a random value selected between 0 and the operative CW value (which is initially the CWmin value). *See id.* at Cls. 4 & 5 ("the processor is configured to calculate a random integer value within a contention window (CW) . . . wherein the parameter set comprises a minimum value (CWmin) of the CW"); *id.* at Cl. 6 ("wherein the backoff timer is set based on a random integer value calculated in a contention window (CW)"). Then, once the backoff timer is started, it counts

---

[6] A POSITA would differentiate the steps of assigning a value to the timer, and starting the timer. Those are considered to be distinct steps in a timer operation. In the context of claims 4-6, the timer is set "based on" a value, which indicates that the timer is being assigned a value, rather than being started, for example.

down while the system attempts to transmit a packet via a channel. *See id.* at Cls. 4 & 5 ("access the channel based on the back off timer and a predetermined slot time"); *id.* at Cl. 6 ("wherein the backoff timer . . . is reduced when the channel is idle for a predetermined slot time."). If the backoff timer expires before the packet can be transmitted via the channel, the CW value is approximately doubled, and the backoff timer is assigned a new random value selected between 0 and the newly doubled CW value. This process continues until the packet is successfully transmitted or until the doubled CW value exceeds CWmax. In the latter case, the system prevents the operative CW value from exceeding CWmax. *See id.* at Cl. 5 ("if a value of the CW is greater than the maximum value (CWmax) of the CW according to a priority of the data to be transmitted, sets the value of the CW to the CWmax."). Thus, a POSITA looking at this claim langauge would understand that the operation for "set[ting] . . . a timer" refers to assigning a timer some durational value, corresponding to the length of time a certain mode or configuration is supposed to be in effect, and which ceases being active upon the timer expiration.

174. Furthermore, the claim language makes clear that the word "set" refers to the operation for "assign[ing]" a duration, which is consistent with my interpretation of the claim term at issue. For example, claim 5 recites: "if a value of the CW [Contention Window] is greater than the maximum value (CWmax) of the CW according to a priority of the data to be transmitted, [the processor] *sets* the value of the CW to the CWmax." Ex. 14 ('035 patent) at Cl. 5. A POSITA would interpret the phrase "*sets* the value of the CW to the CWmax" as assigning the value of CWmax to CW. This interpretation makes technical sense because assigning CWmax to CW when CW exceeds CWmax ensures that the CW remains at or below the "maximum value (CWmax) of the CW."

72

175.    There is nothing in the patent specification or prosecution history that alters this construction of the phrase "set a timer."

176.    Next, I turn to the extrinsic evidence which also supports my opinion on the plan and ordinary meaning of the term at issue.  Dictionary definitions from the time of the invention confirm that the plain and ordinary meaning of "set" is to put into a specified state or assign a durational value.  For example, one dictionary entry defines "set" in the context of "a clock or other device" as "to cause (a clock) to show a particular time."  Ex.41 *(Merriam-Webster's Advanced Learner's English Dictionary. Merriam-Webster, Incorporated* (2017)) [SAM-HP-CC_00000020] at 1485 [SAM-HP-CC_00000022]).  This definition is significant because it shows that "set" refers to configuring the device to a desired state—such as displaying a specific time.  Similarly, the examples provided in the dictionary, such as "I set the timer for/to twenty minutes" and "Set the oven to 350 degrees," reinforce this interpretation. In each case, "set" means assigning a value or state (e.g., 20 minutes, 350 degrees).  This usage mirrors how a POSITA would understand "set a timer" in the claims: to assign a duration to the timer without starting it.

177.    Other dictionary definitions include, for example: (1) "To put in a specified position or arrangement; place" and "To put into a specified state" Ex. 22 *(The American Heritage Dictionary of the English Language. Houghton Mifflin Harcourt* (5th ed. 2016) [SAM-HP-CC_00000001]) at 1603 [SAM-HP-CC_00000003]; (2) "place" and "arrange, adjust." Ex. 23 *(The Merriam-Webster Dictionary. Merriam-Webster, Incorporated* (2016) [SAM-HP-CC_00000015]) at 657-58 [SAM-HP-CC_00000017-18]; and (3) "to set something somewhere is to put it into position" and "to set a date or time is to arrange or fix it."  Ex. 24 *(Oxford School Dictionary. Oxford University Press* (2016) [SAM-HP-CC_00000027]) at 626 [SAM-HP-CC_00000029]. These definitions consistently convey the concept of assigning, arranging, or configuring.

178.    ***Second***, with respect to Wilus' proposed construction, I have been informed that Wilus contends that the plain and ordinary meaning of the phrase "set . . . a timer" involves starting timer that reduces or decreases the timer's duration value.  I disagree with Wilus' understanding of the plain and ordinary meaning of the term at issue.  A POSITA would recognize that that "setting" a timer (i.e., assigning a durational value to a timer) and "starting" a timer (i.e., turning on the countdown from or decrementing the set durational value) or "decreasing" a timer (i.e., the act of counting down from or decrementing the set durational value) are distinct technical concepts, as they correspond to different operations on the timer.

179.    The claims expressly support my opinion here.  For example, claim 6 recites that "the backoff timer is ***set*** based on a random integer value calculated" and further states that the timer "is ***reduced*** when the channel is idle for a predetermined slot time."  This distinction confirms that "setting" refers to the initial act of assigning a value to the timer, whereas "reducing" refers to decrementing that value after the timer has been set and started.  If "setting" inherently included starting or decrementing the timer, there would be no need for the claims to separately recite "reducing" of the timer.

180.    Similarly, the specification describes a backoff timer being "set" at a certain time, and subsequently "when the corresponding channel is idle during a predetermined slot time," the backoff timer is "***decreased***."  Ex. 14 ('035 patent) at 11:39-45 ("In the backoff procedure, the wireless communication terminal obtains a random integer value within a contention window (CW) and ***sets*** the random integer value as a backoff timer.  When the corresponding channel is idle during a predetermined slot time, the wireless communication terminal ***decreases*** the backoff timer.").  Again, if "setting" inherently included starting or decrementing the timer, which it does not, there would be no need for the claims to separately recite "decreasing" of the timer.

74

181.   There is nothing in the patent specification or prosecution history that would support Wilus' proposal. *See, generally*, Ex. 15 ('035 patent, file history); Ex. 17 ('879 patent, file history).

182.   Finally, extrinsic evidence does not support Wilus' construction. As noted above, dictionary definitions demonstrate that the verb "set" refers to configuring an object to a desired state, such as for example assigning a duration value to a timer, rather than starting or initiating an operation, such as starting a timer that was previously assigned a certain durational value.

183.   A POSITA would therefore understand the verb "set" in the context of the '035 and '879 patents to mean assigning a duration to the timer, consistent with the intrinsic evidence distinguishing "setting" from later actions such as "reducing" or "decreasing" the timer.

### 2.   "when"

| Claim Term (Claims) | Construction Proposals |
|---|---|
| "when"<br>(Cls. 1 and 8) | **Defendants:** Indefinite |
| | **Wilus:** Plain and ordinary meaning; not indefinite |

184.   The term "when" appears in claims 1 and 8. This term is indefinite because it fails to inform, with reasonable certainty, a POSITA about the scope of the alleged invention. In particular, no confident choice exists between two possible interpretations of this term.

185.   To a POSITA, the term "when," generally speaking, would have had two different meanings. First, "when" could be used temporally to mean "at the same time as." (or "at substantially the same time as). Second, "when" could be used conditionally to mean "if," "in the event that" or "provided that."

186.   The term "when" is used repeatedly throughout the claims. For many limitations in claims 1 and 8, however, the claims and the specification provide conflicting guidance as to

whether "when" imposes a **temporal** requirement or a **conditional** requirement, creating ambiguity as to the scope of the claim.

187.    I reproduce the relevant claim language below:

> **1.** A wireless communication terminal that wirelessly communicates with a base wireless communication terminal, the wireless communication terminal comprising:
> a transceiver; and
> a processor,
> wherein the processor is configured to:
> transmit, to the base wireless communication terminal, a trigger-based physical layer protocol data unit (PPDU) using the transceiver,
> switch a parameter set, which is a set of parameters used for the channel access, from a first parameter set to a second parameter set based on whether the base wireless communication terminal triggers a multi-user uplink transmission participation of the wireless communication terminal,
> when a MAC protocol data unit (MPDU) included in the trigger-based PPDU does not request an immediate response, set a second parameter set timer for an access category of the MPDU when the transmission of the trigger-based PPDU ends,
> when the MPDU included in the trigger-based PPDU requests the immediate response, set the second parameter set timer for the access category of the MPDU for which immediate response is received,
> when the second parameter set timer expires, terminate an application of the second parameter set, and
> access a channel according to a priority of data to be transmitted to the base communication terminal by the wireless communication terminal and the parameter set.

Ex. 14 ('035 patent) at Cl. 1 (annotations added).

188.    As an initial matter, both the claims and the specification use the terms "if" and "when" in the context of terminating the application of the MU EDCA parameter set, suggesting that the term "when" is being used distinctly from the term "if" and that "when" is being used to impose a temporal requirement. *See id.* at 19:56-61 ("*If* the MU EDCA parameter set application condition is not satisfied until a certain time elapses from **when** the timer is set, the wireless

communication terminal may set an MU EDCA timer for terminating the MU EDCA parameter set application. Specifically, the wireless communication terminal may set the MU EDCA timer **when** receiving the trigger information. At this time, **when** the MU EDCA parameter set application condition is not satisfied for a certain period after setting the MU EDCA timer, the wireless communication terminal may be allowed to terminate the MU EDCA parameter set application. Specifically, **if** the UL MU transmission of the wireless communication terminal is not scheduled for a certain period from **when** the MU EDCA timer is set, the wireless communication terminal may be allowed to terminate the MU EDCA parameter set application." (emphasis added)); *id.* at Cl. 5 ("**if** a value of the CW is greater than the maximum value (CWmax) of the CW according to a priority of the data to be transmitted, sets the value of the CW to the CWmax."). Thus, the specification and the claims would have suggested to a POSITA that the patent drafters knew to use the term "if" for conditional requirements and "when" for "temporal" requirements.

189.    That said, not all instances of "when" in the claim can impose a temporal requirement.  For example, doing so would require "setting a second parameter set timer**" at the same time** "the transmission of the trigger-based PPDU ends" **and at the same time** "a MAC protocol data unit (MPDU) [is] included in the trigger-based PPDU."  But a POSITA would have understood that it is impossible for "the end of the trigger-based PPDU" to occur at the same time as the time at which "a MAC protocol data unit (MPDU) [is] included in the trigger-based PPDU" because a PPDU cannot be sent until all MPDUs are included in the PPDU.

190.    In light of this, two possible interpretations exist for the first clause that use the term "when."  Under one interpretation, the clause requires "sett[ing] a second parameter set timer" **provided that** "a MAC protocol data unit (MPDU) included in the trigger-based PPDU does not

request an immediate response" *and* "the transmission of the trigger-based PPDU ends" (i.e., the transmission was successful). But this interpretation would require a POSITA to unreasonably ignore the specification's and claim's distinct use of the terms "if" and "when."

191. Alternatively, the clause could require "setting a second parameter set timer*" at the same time* "the transmission of the trigger-based PPDU ends," *provided that* "a MAC protocol data unit (MPDU) included in the trigger-based PPDU does not request an immediate response." Again, this interpretation would require a POSITA to unreasonably ignore the specification's and claim's distinct use of the terms "if" and "when." In addition, this interpretation would unreasonably require a POSITA to attribute different meanings to the different instances of the same word within *the same claim element*.

192. The specification provides conflicting guidance as to which interpretation is the correct one as it discloses embodiments that are consistent with either interpretation of the term "when" and underscoring there is no confident choice between the two. For example, the specification discloses that "if the QoS data frame included in the trigger-based PPDU transmitted by the wireless communication terminal does not request an ACK, the wireless communication terminal may set the MU EDCA timer *at the time point* at which transmission of the trigger-based PPDU ends." Ex. 14 ('035 patent) at 24:64-25:1. This disclosure suggests the first recitation of "when" in the first clause should be understood to mean "at the same time as" or *temporally*—that is, the claim requires "setting a second parameter set timer*" at the same time as* "the transmission of the trigger-based PPDU ends." But the specification also discloses an embodiment where "when the QoS data frame included in the trigger-based PPDU transmitted by the wireless communication terminal does not request an ACK, the wireless communication terminal may set the MU EDCA timer when *a predetermined time elapses after the time point* at which

transmission of the trigger-based PPDU ends." *Id.* at 25:32-38.  This disclosure suggests the first recitation of "when" in the first clause should be understood to mean "if" (i.e., *conditionally*)—that is, the claim requires "setting a second parameter set timer" *if* "a MAC protocol data unit (MPDU) included in the trigger-based PPDU does not request an immediate response."

193.    The second clause where the word "when" appears in the claim suffers from the same ambiguity.   The phrase "*when* the second parameter set timer expires, terminate an application of the second parameter set" could be interpreted in at least two ways.  First, "when" could be read *conditionally*, meaning that termination occurs if the timer expires, without specifying at specific point in time the termination must take place.  Alternatively, "when" could be read *temporally*, requiring termination to occur at the same time as the timer's expiration.  Again, the specification provides conflicting guidance with respect to this clause because it uses the same ambiguous term "when."  Some parts of the specification suggest that "when" should be interpreted *conditionally*.  For example, the specification states that "*if* the UL MU transmission of the wireless communication terminal is not scheduled for a certain period from when the MU EDCA timer is set, the wireless communication terminal *may* be allowed to terminate the MU EDCA parameter set application."  *Id.* at 19:56-61.  Thus, this disclosure suggests that expiration of the timer may serve as a *sufficient condition* for terminating the MU EDCA parameter set application, but it is not a *necessary* one.  In other words, the termination is permitted under certain circumstances following timer expiration, but the specification does not require termination to occur at the same time as the timer's expiration, suggesting the *conditional* interpretation.

194.    In contrast, other parts of specification suggest that the word "when" in the second clause of claim 1 should be interpreted *temporally*.  Figures 14 and 15 show that the parameter set reverts to the legacy parameters (i.e., the application of MU EDCA parameter set is terminated) *at*

79

*the same time as* the expiration of the MU EDCA timer.  For example,  Figure 14(c) shows the time point at which the "MU EDCA parameter set" is exited (i.e., the application of MU EDCA parameter set is terminated), which coincide with the ends "option 2" period.  The end of "option 2" period marks the expiration of the MU EDCA Timer.  *See id.* at 20:57–63 (describing that in Figure 14(c) option 2 "*expires* earlier than the expiration time set by the first MU EDCA timer option" (emphasis added)).



**FIG. 14**

195.    Similarly, Figure 15(a) shows *the time point* at which the "MU EDCA parameter set" is exited (i.e., the application of MU EDCA parameter set is terminated), which coincides with the end of the "Timer extended" period.  The end of "Timer extended" period marks the expiration of the MU EDCA Timer.  *See id.* at 21:11–24 (describing that the "previously set MU EDCA timer is" updated such that it "*expires* later than the expiration time of the previously set MU EDCA Timer" (emphasis added)).



196.    Nothing in the prosecution history provides any guidance on this issue.  *See, generally*, Ex. 15 ('035 patent, file history); Ex. 17 ('879 patent, file history).

80

197.    Dictionary definitions from the time of the invention also provide no guidance because they include both definitions.  For example, Ex. 22 (*The American Heritage Dictionary of the English Language*. Houghton Mifflin Harcourt (5th ed. 2016) [SAM-HP-CC_00000001]) at 1971 [SAM-HP-CC_00000004] defines "when" as "1. at the time that," but it also defines it as "6. Considering that; if."  *See also* Ex. 23 *(The Merriam-Webster Dictionary. Merriam-Webster, Incorporated* (2016) [SAM-HP-CC_00000015]) at 828 [SAM-HP-CC_00000019] ("when . . .1: at or during the time that . . . 3: in the event that: IF"); Ex. 21 (*Merriam-Webster's Advanced Learner's English Dictionary. Merriam-Webster, Incorporated* (2017) [SAM-HP-CC_00000020]) at 1863 [SAM-HP-CC_00000023] ("1 a: at or during the time that . . . 2a — used to say what happens, is true, or can be done in a particular situation.").

198.    These two possible interpretations impose materially different timing requirements and affect how a POSITA would perceive to be the scope of the claims.  Despite this, based on the intrinsic evidence, a POSITA could not have determined which interpretation of "when" is the correct one with a reasonable certainty.