# Exhibit Jong-16

## II. Meaning of Contract

Our Civil Code does not have a provision that defines the meaning of contract. However, the provisions regarding 'formation of contract' presuppose that a contract is formed when there is an offer and a corresponding acceptance, so it can be seen that it regards as a matter of course that certain legal effects binding the parties arise from the 'meeting of minds' between the parties. However, unlike German civil law, provisions concerning contracts, such as formation of contracts, effect, and dissolution of contractual relationships, are all placed in the 'Obligations' section. Considering this layout arrangement of provisions, it can be seen that our Civil Code presupposes that contract is something that gives rise to obligational relationships. This point is clearly different from German civil law, which regulates contracts not in the obligations section but in the part concerning juristic acts. Considering the organizational layout of Civil Code provisions, it would be fair to say that the meaning of 'contract' as provided by our Civil Code is "an agreement that creates or modifies obligational relationships."

Article 1101 of the French Civil Code has a definitional provision stating that "a contract is an agreement by which one or more persons become obligated to another person or persons to give something, to do something, or not to do something." This provision not only presupposes that agreement (convention), that is, meeting of minds, constitutes the core content of contract, but also clarifies that through a contract, private law 'obligations' (obligations to give something, to do something, or not to do something) arise between the parties.[9] The French Civil Code provision that grasps contract in this way as the cause of occurrence of obligational relationships is closely connected with the Roman law tradition that explains obligation as a legal binding relationship (*vinculum iuris*) and explains the essence of obligational relationships as "binding another to give us something, to do something, or to otherwise provide some service (*ut alium nobis obstringat ad dandum aliquid vel faciendum vel praestandum*)."[10]

Of course, the modern concept of contract is based only on 'agreement' consisting of offer and acceptance, so there is clearly a difference from the concept of contract in ancient Roman law, which was based on the great principle that "a bare agreement does not create an obligation (*nuda pactio obligationem non parit*)."[11] However (although there is a difference between Roman law and French civil law regarding whether obligational relationships arise from agreement alone), the two are identical in that they grasp contract as the cause of occurrence of obligational relationships, and in that there is no room at all for conceiving of a contract unrelated to obligations.

## Ⅱ. 계약의 의미

우리 민법전은 계약의 의미를 정의하는 규정을 두고 있지 않다. 하지만 '계약의 성립'에 관한 규정들은 청약과 그에 상응하는 승낙이 있을 경우 계약이 성립함을 전제로 하고 있으므로 당사자 간 '의사의 합치'로부터 당사자들을 구속하는 일정한 법률적 효과가 생겨난다는 점을 당연한 것으로 여기고 있음을 알 수 있다. 그러나 독일 민법과는 달리 계약의 성립, 효력, 그리고 계약 관계의 해소 등 계약에 관한 규정들은 모두 '채권'편에 배치되어 있다. 이러한 조문 배치를 감안한다면, 우리 민법에서의 계약은 채권채무 관계를 생겨나게 하는 것이라는 점을 전제하고 있다고 볼 수 있다. 이점은 계약을 채권편이 아니라 법률행위에 관한 부분에서 규정하는 독일 민법과는 분명히 다르다. 민법 조문의 편제를 감안할 때 우리 민법전이 규정하는 '계약'의 의미는 "채권채무 관계를 발생 또는 변경시키는 합의"라고 보는 것이 옳을 것이다.

프랑스 민법 제1101조는 "계약은 1인 또는 수인이 다른 1인 또는 수인에게 어떤 것을 주거나, 하거나, 하지 않을 채무를 지게 되는 합의이다"라는 정의 규정을 두고 있다. 이 규정은 합의(convention), 즉 의사의 합치가 계약(contrat)의 핵심적 내용을 이룬다는 점을 전제로 할 뿐 아니라, 계약으로 인하여 당사자들 간에 사법적 '채무'(어떤 것을 주거나, 하거나, 하지 않을 채무)가 발생하게 된다는 점을 분명히 하고 있다.[9] 계약을 이처럼 채권채무 관계의 발생 원인으로 파악하는 프랑스 민법 규정은 채무를 법적인 구속관계(vinculum iuris)로 설명하면서 채권채무 관계의 본질을 "다른 이로 하여금 우리에게 무엇을 주거나, 하거나, 기타 역무를 제공하도록 구속하는 것(ut alium nobis obstringat ad dandum aliquid vel faciendum vel praestandu)"이라고 설명하는 로마법 전통과 밀접하게 연결되어 있다.[10]

물론, 현대의 계약 개념은 청약과 승낙으로 이루어지는 '합의'만을 기초로 하고 있으므로, "합의만으로는 채무가 발생하지 아니한다(nuda pactio obligationem non parit)"는 대원칙에 입각해 있던 고대 로마법에서의 계약 개념과는 분명히 차이가 있긴 하다.[11] 하지만(합의만으로 채권채무 관계가 발생하는지 여부에 대해서는 로마법과 프랑스 민법 간에는 차이가 있지만), 계약을 채권채무관계의 발생 원인으로 파악하고 있으며, 채권채무와는 무관한 계약은 아예 상정될 여지가 없다는 점에서는 양자가 동일하다.

Because the assumpsit action had its roots in the trespass action, which aimed at punishing unlawful infringements, it could not be brought in all cases where an agreement was breached, but was permitted only when the plaintiff's goods or property were damaged or there was an infringement on life or body, or when the plaintiff's own obligation under the agreement was performed but the defendant failed to perform the corresponding obligation. Due to policy considerations in the operation of the litigation system that sought to limit as much as possible the scope in which assumpsit actions were permitted, the concept of quid pro quo (consideration) came to play an important role in the development process of English contract law. The assumpsit action was not permitted merely because the defendant failed to perform what the parties had agreed upon (non-feasance), and in order to seek the other party's performance of obligation through litigation, performance of one's own corresponding obligation or an act of contribution was necessary, and this is what is called consideration. Although the reason for requiring the plaintiff's act of contribution was explained in various ways, the conclusion that there is no need for judicial proceedings of the court to intervene even for a social gift promise made orally by one party without any consideration can be evaluated as reflecting the pragmatic and realistic way of thinking of English lawyers.[34]

The assumpsit action, which was permitted as a means to punish and deal with the defendant's breach of obligation only when the plaintiff performed the counter-performance (executed consideration), had its scope of utilization expanded in the early 17th century. If the counter-performance was merely 'agreed upon,' even in cases where it had not yet been 'performed' (executory consideration), it became possible to bring an assumpsit action to obtain compensation for 'damages' incurred to the plaintiff due to the defendant's failure to perform his obligation (Slade's case, 1602).[35] The position that had been maintained for many centuries was that a so-called simple non-feasance situation, where neither party to the agreement actually performed the agreement, does not cause actionable 'damages' to either party, but in the late 16th century, a change occurred in this perception. The overall change in economic circumstances of continuous rise in prices that was observed throughout Europe at the time made it natural to assume market price increases between the time of agreement and the time of performance (the phenomenon of market price increases that continued from around 1520 to around 1640 - Price revolution - is explained as having been triggered by the massive influx of gold and silver from the New World).[36]

Assumpsit 소송은 그 뿌리가 위법한 침해에 대한 응징을 목표로 하는 Trespass 소송에 있었기 때문에 합의가 어겨진 모든 경우에 제기할 수 있었던 것은 아니고, 원고의 물건이나 재산이 손상되거나 생명, 신체에 침해가 이루어진 경우라거나, 합의에 따라 원고 자신이 부담하는 의무는 이행이 되었으나 피고가 그에 상응하는 의무를 이행하지 않는 경우에 한하여 허용되었다. 이처럼 Assumpsit 소송이 허용되는 범위를 가급적 제한하려는 소송 제도 운영상의 정책적 고려로 인하여 약인(consideration)이라는 개념이 영국 계약법의 전개 과정에서 중요한 역할을 수행하게 된다. 당사자들이 합의한 내용을 피고가 이행하지 않았다(non-feasance)는 것만으로는 Assumpsit 소송이 허용되지는 아니했고, 상대방의 의무 이행을 소송으로 구하려면 그에 상응하는 자신의 의무 이행이나 출연 행위가 필요했으며 이것이 바로 consideration 이라 불리는 것이다. 원고의 출연행위를 요구했던 이유는 여러 가지로 설명되었지만, 아무런 대가 없이 일방이 구두로 한 시혜적 증여 약속에 대하여까지 국왕 법정의 사법 절차가 개입할 필요는 없다는 결론은 영국 법조인들의 실용주의적이고 현실적인 사고방식을 반영하는 것이라고 평가할 수 있을 것이다.[34)]

원고가 반대급부를 이행한 경우(executed consideration)에만 피고의 의무 불이행을 응징하고 대처하기 위한 수단으로서 허용되었던 Assumpsit 소송은 17세기 초반에 와서는 그 활용 범위가 확대되었다. 반대급부가 '합의'되기만 하였다면 아직 '이행'되지 아니한 경우(executory consideration)에도 피고가 자신의 의무를 이행하지 않음으로 인하여 원고에게 발생한 '손해'를 배상받기 위하여 Assumpsit 소송을 제기할 수 있게 된 것이다(Slade's case, 1602).

35) 약정의 어느 당사자도 약정을 실제로 이행하지 아니한 이른바 단순 불이행(Non-feasance) 상황은 당사자 어느 누구에게도 소구 가능한 '손해'를 끼치는 것이 아니라는 것이 여러 세기 동안 유지되어 왔던 입장이었지만, 16세기 후반에 와서는 이러한 인식에 변화가 생겼다. 당시 유럽 전역에서 관찰되었던 물가의 지속적 상승이라는 경제사정의 전반적 변화는 합의 시점과 이행기 사이의 시장 가격 앙등을 당연시 하게 만들었고(1520경부터 1640년경까지 지속된 시장 가격 상승 현상 - Price revolution - 의 원인은 신대륙으로부터 금과 은이 대량으로 유입됨으로써 촉발된 것이라고 설명된다)[36)]

The recognition that if performance is not made as agreed, one party to the contract 'loses the benefit secured through the bargain (loss of bargain)' (in short, the concept of 'expectation interest') came to be shared even among judges. In this temporal context, the English court made a decision in Slade's case (1602) to allow the assumpsit action to be used even for the purpose of protecting the economic value of the bargain. The great principle that 'expectation interest' must be compensated in cases of breach of contract was established at this time.

The English court's idea that if the parties merely make an 'agreement' in which they assume obligations to each other, the agreement itself brings 'benefit of the bargain' to at least one party, and that the benefit of the bargain (expectation interest) must be compensated when performance is not made as agreed, provides an opportunity to prescribe and understand contracts and remedies for breach of contract purely based on 'agreement.' The French lawyer Pothier (Robert Pothier: 1699-1772) systematically organized and widely disseminated the concept of contract based on 'agreement.' By explaining that "a contract contains the concurrence of wills (*concours des volontés*) of two parties, where one party promises (promettre) something to the other party and the other party accepts (accepter) the promise made to him," he presented a framework of thought that explains the conclusion of a contract as a meeting of minds formed through 'offer' and 'acceptance,' and came to form the source from which American lawyers in the 19th century came to explain contract formation through offer and acceptance.[37] Of course, since American or English lawyers do not view unilateral and gratuitous agreements without an agreement for counter-performance as actionable to seek recourse, they always grasp contracts in close connection with 'bargain.' However, the concept of contract presented by Pothier contains only the meeting of minds consisting solely of one party's promise (offer) and the other party's acceptance, and does not require so-called consideration, that is, an agreement regarding counter-performance, so the necessary connection between contract and bargain is severed. The definition of contract presented by Pothier ("a contract is an agreement in which two parties mutually or only one of the two parties binds itself to give something, to do something, or not to do something to the other party") was accommodated generally as is into the French Civil Code.[38]

합의된 대로 이행되지 아니하면 계약의 일방은 '흥정으로 확보한 이익을 잃게 된다(loss of bargain)'는 인식(요컨대, '이행이익' 개념)이 법관들 사이에까지 공유되기에 이르렀다. 이러한 시대적 맥락에서 영국 법원은 흥정의 경제적 가치를 보호하기 위한 용도로까지 Assumpsit소송을 사용할 수 있도록 하는 결정을 Slade's case(1602)에서 내리게 된다. 계약 위반의 경우 '이행이익'이 배상되어야 한다는 대원칙이 바로 이때 수립된 것이다.

당사자들이 서로에게 의무를 부담하는 '합의'를 하기만 하면 그 합의 자체가 적어도 어느 일방에게는 '흥정의 이익'을 가져오는 것이고, 합의 된 대로 이행되지 않을 경우 흥정의 이익(이행이익)이 배상되어야 한다는 영국 법원의 발상은 계약 및 계약 위반에 대한 구제 수단을 순전히 '합의'에 터잡아 규정하고 이해하는 계기를 제공하게 된다. 프랑스의 법률가 포띠에(Robert Pothier; 1699-1772)는 '합의'에 기초한 계약 개념을 체계적으로 정리하여 널리 확산시켰다. 그는 "계약은 일방이 상대방에게 무엇을 약속하고(promettre) 상대방이 그에게 행해진 약속을 받아들이는(accepter) 두 당사자의 의사의 일치(concours des volontes)를 담고 있다"고 설명함으로써 '청약'과 '승낙'으로 형성되는 의사의 합치(meeting of minds)로써 계약의 체결을 설명하는 사고의 틀을 제시했으며, 19세기 미국의 법률가들이 계약 체결을 청약과 승낙으로 설명하게 되는 원류를 이루게 된다.[37] 물론 미국이나 영국의 법률가들은 반대급부에 대한 약정이 없는 일방적이고 시혜적인 약정은 소구 가능하다고 보지 않기 때문에 계약을 언제나 '흥정'(bargain)과 밀접히 관련지어 파악하게 된다. 그러나 포띠에가 제시한 계약 개념은 오로지 일방의 약속(청약)과 상대방의 승낙으로 이루어지는 의사의 합치만을 담고 있을 뿐 이른바 약인(consideration), 즉, 반대급부에 관한 약정을 요하지 않으므로 계약과 흥정의 필연적 관련성은 끊어지게 된다. 포띠에가 제시한 계약의 정의("계약은 두 당사자가 상호적으로 또는 둘 중 일방만이 상대방에게 무엇을 주거나, 하거나, 하지 않을 것을 약속하고 그에 구속되기로 하는 합의이다")는 프랑스 민법전에 대체로 그대로 수용되었다.[38]

Such evolution of canon law also influenced the writings of natural law theorists who emphasized human reason, such as Grotius and Pufendorf,[40] and Kant's ethical philosophy, against the background of this intellectual trend of the times, came to comprehensively reorganize the human normative system centering not on divine authority but on human free will. Savigny's theory of juristic acts, that private law rights and obligations are formed by juristic acts that are expressions of the parties' free will, must be understood in the context of this transformation of Western thought. Unlike the medieval concept of contract that had been based on the sacredness of 'promise,' Pothier laid the foundation of a voluntaristic concept of contract that focuses on the meeting of minds of the parties formed through one party's promise and the other party's acceptance, and Savigny adopted precisely this concept of contract that focused on the meeting of minds.[41]

In his work 'System of Modern Roman Law,' which began to be published in 1840, Savigny explained that free human acts are the main cause that brings about changes in legal relationships, and that what forms the core of free human acts is declaration of intention (Willenserklaerung [sic: Willenserklärung]), then completely revised the concept of contract that had been understood until then as the cause of occurrence of obligational relationships, and redefined the concept of contract to fit the theory of intention, asserting that "a contract is when multiple parties achieve unity of mind regarding a declaration of intention with content that governs their legal relationships."[42] The conventional concept of contract had as its core the point that once a contract is concluded, one party is bound by the 'obligation' to give something, to do something, or not to do something to the other party, but Savigny differed in that he severed the connection with obligation and focused on the intention of the parties who seek to govern all kinds of legal relationships including changes in real rights, and grasped such meeting of minds as being the contract itself. As already examined, this idea of Savigny continues not only in the modern German Civil Code but also in the DCFR, which was written under the influence of German scholars.

교회법의 이러한 진화는 그로티우스, 푸펜도르프 등 인간의 이성을 강조하는 자연법론자들의 저술에도 영향을 미치게 되고,[40] 칸트의 윤리철학은 이러한 시대사조를 배경으로 하여 인간의 규범체계를 신의 권위가 아니라 인간의 자유의지를 중심으로 전면적으로 개편하기에 이르게 된다. 사법적 권리의무는 당사자의 자유의사의 표현인 법률행위로 형성된다는 사비니의 법률행위 이론은 서구의 이러한 사상 변천의 맥락에서 이해되어야 한다. '약속'의 신성함에 기초해 왔던 중세의 계약 개념과는 달리 포띠에는 일방의 약속과 상대방의 승낙으로 맺어지는 당사자들의 '의사 합치'에 주목하는 의사주의적 계약개념의 초석을 놓았으며, 사비니는 바로 이처럼 의사 합치에 착안한 계약개념을 채택한 것이다.[41]

사비니는 1840년부터 출판되기 시작된 '오늘날의 로마법 체계'라는 저술에서 인간의 자유로운 행위가 법률관계의 변화를 일으키는 주요 원인이며, 자유로운 인간 행위의 핵심을 이루는 것이 의사표시(Willenserklaerung) 라고 설명한 다음, 그때까지 채권채무발생 원인이라고 이해되어 왔던 계약개념을 전면 수정하고 계약 개념을 의사이론에 맞게 재규정하여, "계약은 복수의 당사자가 그들의 법률관계를 규율하는 내용의 의사표시에 대하여 한마음을 이루는 것"이라는 주장을 폈다.[42] 종래의 계약 개념은 계약이 체결되면 일방이 상대방에게 무엇을 주거나, 하거나, 하지 않아야 할 '채무'에 구속된다는 점이 핵심을 이루는 것이었지만, 사비니는 채무와의 관련성을 끊어버리고 물권 변동까지를 포함한 모든 종류의 '법률관계'를 규율하고자 하는 당사자들의 의사에 주목하여, 그러한 의사의 합치가 곧 계약이라고 파악했다는 점에서 차이가 있다. 사비니의 이러한 생각은 현대의 독일 민법전은 물론이고, 독일학자들의 영향 하에 집필된 DCFR에까지도 지속되고 있음은 이미 살펴본 바와 같다.

Whether a contract concluded by the parties is to be regarded as a bilateral contract depends on the specific content of the agreement, but among typical contracts under the Civil Code, sale, exchange, lease, loan for consumption with interest, employment, contract for work, and mandate for consideration (paid agency), etc., can, in principle, be regarded as bilateral contracts. When only one party to the contract bears an obligation, or when there is no reciprocity, correlation, or mutual dependency among the obligations borne by the parties, this is called a unilateral contract. Unilateral contracts are often contracts having a gratuitous nature. For example, although the parties to a loan for use each bear obligations to the other party (one party has an obligation to provide the object for the other party's use, and the other party has obligations to keep the object with the care of a good manager and to return it), since reciprocity is not recognized between them, it is regarded as a unilateral contract. Gift, gratuitous deposit, gratuitous mandate (unpaid agency), and loan for consumption without interest also fall under unilateral contracts.

"Provisions concerning bilateral contracts apply" to a burdened gift (Article 561), but this does not mean that a burdened gift is a bilateral contract. In a burdened gift, the burden is merely a condition of the gift and cannot be regarded as the 'consideration' for the gift, so a burdened gift cannot be regarded as a bilateral contract. If the burden presented as a condition by the giftor should be interpreted as being in a consideration relationship with the gift, such an agreement could not be interpreted as a gift in the first place.[68]

Meanwhile, a public promise of reward is not a contract of a gratuitous nature because reciprocal remuneration must be paid to the person who completed the act specified in the advertisement, and although it is clear that the obligations borne by the parties are in a consideration relationship, it is regarded as a unilateral contract because it is difficult to recognize reciprocity or dependency between the performances.[69]

당사자들이 체결한 계약을 쌍무계약으로 볼 것인지 여부는 약정의 구체적 내용에 달려있겠지만, 민법상 전형 계약 중 매매, 교환, 임대차, 이자부 소비대차, 고용, 도급, 유상 위임 등은 원칙적으로 쌍무계약으로 볼 수 있다. 계약의 일방만이 채무를 부담하거나, 당사자들이 부담하는 채무들 간에 대가성, 견련성, 상호의존성이 없을 경우, 이를 편무계약이라고 부른다. 편무 계약은 시혜적 성질을 가지는 계약인 경우가 많다. 예를 들어, 사용대차의 당사자들은 각각 상대방에게 채무를 부담하긴 하지만(일방은 목적물을 상대방이 사용하도록 제공할 채무가 있고, 상대방은 그 목적물을 선량한 관리자의 주의를 기울여 보관할 의무, 반환할 의무 등이 있다), 이들 간에 대가성이 인정되지 않으므로 편무계약으로 본다. 증여, 무상 임치, 무상 위임, 무이자 소비대차 등도 편무계약에 해당한다. 부담부 증여에는 "쌍무계약에 관한 규정을 적용"하지만(제561조), 그렇다고 해서 부담부 증여가 쌍무계약인 것은 아니다. 부담부 증여에서 부담은 증여의 '조건'일 뿐, 증여의 '대가'라고 볼 수는 없으므로 부담부 증여를 쌍무계약이라고 볼 수는 없다. 만일 증여자가 조건으로 내세운 부담이 증여와 대가 관계에 있는 것으로 해석해야 할 성질의 것이라면, 그러한 약정은 애초에 증여로 해석될 수 없을 것이다.[68]

한편, 현상 광고는 광고에 정한 행위를 완료한 자에게 대가적 보수가 지급되어야 하므로 시혜적 성질의 계약이 아니며, 당사자들이 부담하는 의무들이 대가 관계에 있음은 분명하지만, 급부들 간의 상환성이나 의존성이 인정되기 어렵기 때문에 이를 편무 계약으로 본다.[69]