# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC, <br> *Plaintiff*, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., <br> *Defendant*. | CIVIL ACTION 2:24-cv-00746-JRG <br><br> JURY TRIAL DEMANDED |

**REBUTTAL EXPERT REPORT OF TODOR COOKLEV REGARDING SOURCE CODE OF WI-FI CHIP IN SAMSUNG GALAXY TAB S**

I.     INTRODUCTION ................................................................................................... 1

II.    QUALIFICATIONS ............................................................................................... 2

III.   APPLICABLE LEGAL STANDARDS ................................................................. 5

       A.    Presumption of Validity ............................................................................. 6

       B.    Anticipation ............................................................................................... 6

       C.    Obviousness ............................................................................................... 8

       D.    Public Accessibility ................................................................................. 10

IV.    DEFINITION OF PERSON OF ORDINARY SKILL IN THE ART ........................ 12

V.     BACKGROUND ................................................................................................. 13

VI.    SUMMARY OF OPINIONS ................................................................................. 16

VII.   REBUTTAL TO DR. BIMS'S AND DR. WICKER'S OBVIOUSNESS
       THEORIES BASED ON MODIFICATION OF THE WI-FI CHIPSET SOURCE
       CODE IN THE GALAXY TAB S .......................................................................... 18

       A.    The Obviousness Theories of Dr. Bims and Dr. Wicker Require Modification
             of Firmware and Hardware Source Code for the Wi-Fi Chipset in Galaxy Tab
             S .............................................................................................................. 19

       B.    No Obviousness Opinions Based on Any Review or Analysis of Broadcom
             BCM4354 or other Galaxy Tab S-Related Source Code ............................ 24

       C.    Dr. Bims and Dr. Wicker Fail to Show that the Source Code for the
             Broadcom BCM4354 Was Publicly Accessible ........................................ 25

       D.    Dr. Bims and Dr. Wicker Fail to Establish Reasonable Expectation of
             Success For Their Obviousness Theories ................................................... 31

VIII.  SUPPLEMENTATION .......................................................................................... 34

## I.    <u>INTRODUCTION</u>

1.    My name is Todor Cooklev and I have been retained by Plaintiff Wilus Institute of Standards and Technology, Inc. to provide certain opinions relevant to the claims and defenses in this patent litigation case. The Asserted Patents in this case are U.S. Patent Nos. 10,313,077 (the "'077 Patent"); 10,687,281 (the "'281 Patent"); 11,116,035 (the "'035 Patent"); 11,129,163 (the "'163 Patent"); 11,159,210 (the "'210 Patent"); 11,470,595 (the "'595 Patent"); 11,516,879 (the "'879 Patent"); 11,700,597 (the "'597 Patent").

2.    This declaration is based on information currently available to me and my personal knowledge. I am over eighteen years of age, and if called as a witness, I would and could competently testify as to the matters set forth herein.

3.    I am compensated for my work in this case at my standard hourly rate of $700 per hour.  My compensation is not dependent on the outcome of these matters or on my opinions.

4.    I have been asked to opine regarding the public accessibility (or lack thereof) of the source code for the wi-fi chipset included in the Samsung Galaxy Tab S device released in or around July 2014. More specifically, I am tasked with providing an opinion about whether the source code for the wi-fi chipset in the Galaxy Tab S would have been publicly accessible at the relevant times—e.g., the priority dates of certain patents asserted by Wilus and challenged by Samsung's experts as invalid. I understand that Samsung has provided Wilus invalidity expert reports, respectively signed by Dr. Harry Bims and Dr. Stephen Wicker, containing opinions that Wilus's

patents would have been obvious to a POSITA based on, in part, the Galaxy Tab S device.

5.    Other than the specific opinions set forth in this Report, I am offering no opinion or position regarding any of the assertions set forth in Dr. Bims's and Dr. Wicker's respective invalidity reports. In offering my opinions herein, I will refer to Dr. Bims's and Dr. Wicker's invalidity reports (which are dated January 23, 2026) respectively as the "Bims Report" (or "Bims. Rpt.") and "Wicker Report" (or "Wicker Rpt."). In this Report, unless otherwise noted, I will be citing the January 28, 2026-dated version of the Bims Report, which I understand is a "corrected version" that corrects some typographical and paragraph numbering errors that exist in the January 23 version.

6.    This Report is based on information currently available to me. I reserve the right to continue my investigation. I further reserve the right to expand, modify, update, and/or supplement my opinions as additional information becomes available to me, including in response to matters raised by Samsung and/or its expert(s), or in view of orders and findings by the Court. In the event that additional information becomes available to me, I also reserve the right to review and consider that information in further developing or refining my opinions. All opinions stated in this expert report are my own and based on my own personal knowledge and professional judgment.

## II.    QUALIFICATIONS

7.    I am currently Professor of Electrical and Computer Engineering at Purdue

University in Fort Wayne, Indiana, where I have had several faculty and administrative positions. I have received research funding from the National Science Foundation (NSF), the Defense Advanced Research Projects Agency (DARPA), the U.S. Air Force Research Laboratory, the Office of Naval Research, several major companies, and other smaller technology companies. I teach several courses related to the hardware and software architectures of wireless systems and wireless devices. I have given and occasionally continue to give seminars, tutorials, and presentations worldwide. I was inducted into the Purdue Inventors Hall of Fame (2019).

8.   I received a Ph.D. in Electrical Engineering from the Tokyo Institute of Technology in 1995. I have authored and co-authored more than 100 peer-reviewed publications. I am the author of the textbook "Modern Communications Systems: A First Course", published by the University of Michigan at the beginning of 2024. According to information compiled by the publisher, my textbook has been used at many universities in the United States and abroad.

9.   I am a named inventor on thirty-two (32) U.S. patents, most of which relate to the design of wireless communication systems. (A list of my publications and patents appears in my *curriculum vitae* attached as Exhibit 1.)

10. In addition to my academic experience, I have experience in technology and product development in the computer networking and data communications industry.   My work has been in digital signal processing, software, and integrated circuit design for communication systems, including in particular systems compliant with the IEEE 802.11 standard. I have personally participated in wi-fi chipset design

(in part to ensure compliance with relevant 802.11 standards) and have likewise personally written source code for wi-fi chipset firmware.

11. My industry experience and academic research has focused largely on standards for communications systems. A standard is generally a document or set of documents adopted by a national or international committee that contains a set of rules for the functionality of equipment and systems.

12. I have contributed to the development of several major standards for communication systems. I was a voting member of the IEEE 802.11 Working Group between 1999 and 2002 and between 2005 and 2008. I have chaired committee meetings and served in other leadership roles.  Between 2006 and 2008 I was Chair of a Study Group within IEEE 802.11. In 2012 I received an award from IEEE Standards Association with the citation "for outstanding contributions to IEEE 802.11aa."

13. Between 2017 and 2025 I was Editor for Wireless and Radio Communication of the IEEE Communications Standards Magazine, which is the premier journal in the field. As a member of the Editorial Board, I coordinated the review of scholarly manuscripts submitted to the wireless and radio communications series.

14. Around 2011-2012 I attended meetings of 3GPP and contributed to technical documents in connection with the LTE-Advanced Standard.

15. As part of my record of service to the IEEE Standards Association, I was elected to the Board of Governors for one term beginning January 2021 as a Member-at-Large. The Board of Governors provides overall leadership of the IEEE Standards Association.

16. In the course of my work in both industry and in the IEEE Standards Association, I have regularly interacted with and worked with other professionals with expertise in standards development, including specifically with Broadcom's representatives to the IEEE 802.11 Working Group.

17. In my experience in industry, as a participant in IEEE 802, and as a consultant for companies engaged in litigation, I have had the opportunity to review confidential documents including source code. I have reviewed specifically the source code of various wi-fi chipset ICs, including, as relevant for this case, the software, firmware and hardware source code for certain Broadcom and Qualcomm wi-fi chipsets.

18. I have attached a current copy of my curriculum *vitae* as Exhibit 1, which includes a list of my publications.  My CV also includes a list of cases during at least the last five years in which I have signed a Protective Order, have testified as an expert either at a trial, hearing, or deposition, or have submitted statements/opinions.

19. I am qualified by education and experience to testify as an expert with respect to subject matter in the fields of protocols and standards for wireless communication, hardware and software of wireless devices, and interoperability among wireless devices.

## III.    APPLICABLE LEGAL STANDARDS

20. For the purposes of this declaration, counsel for Wilus Institute of Science and Technology, Inc., has instructed me to make the following assumptions: a "person of ordinary skill in the art" (POSITA) is a hypothetical person who is presumed to

have known and understood the relevant art at the time of the invention. Factors that may be considered in determining the level of ordinary skill in the art may include: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) how quickly innovations are made; (4) sophistication of the technology; and (5) educational level of active workers in the field. In a given case, every factor may not be present, and one or more factors may predominate. A person of ordinary skill in the art is a person of ordinary creativity. A person of ordinary skill in the art would have the capability of understanding the scientific principles applicable to the pertinent art.

### A.    Presumption of Validity

21. I understand that patents issued by the USPTO are presumed to be valid and that invalidity must be proven on a claim by claim basis by a heightened burden of proof called clear and convincing evidence. I also understand that the burden of proving invalidity can be more difficult when the asserted prior art reference(s) were before the Examiner during prosecution.

### B.    Anticipation

22. I understand that, once the claims of a patent have been properly construed, the next step in determining anticipation of a patent claim requires a comparison of the properly construed claim language to the prior art on a limitation-by-limitation basis.

23. I understand that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if all elements of the claim are disclosed in that prior

art reference. In determining whether every one of the elements of the claimed invention is found in the prior art, I understand that one should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular prior art. I also understand that the prior art reference alleged to be anticipatory must also enable one of ordinary skill in the art to make the claimed invention without undue experimentation.

24. I understand that anticipation must be found in a single reference, device, or process. In other words, anticipation does not allow an additional reference to supply a missing claim limitation. I further understand that the prior art reference must disclose all elements of the claim within the four corners of the document and must also disclose those elements arranged as in the claim. I understand that in order for an element to be considered inherently disclosed by a reference, it must necessarily, and not simply likely, be present in light of the disclosure.

25. Moreover, I understand that any differences between a prior art reference and a claimed invention invokes the question of obviousness, not anticipation. In other words, I understand it is not sufficient for a prior art reference to disclose part of a claimed invention or that it includes multiple distinct teachings that one of ordinary skill in the art might somehow combine to achieve the claimed invention. The prior art reference must disclose the claimed invention without any need for combining various disclosures not directly related to each other. I further understand that an ambiguous prior art reference cannot be anticipatory.

## C.    Obviousness

26. I understand that a patent claim is invalid for obviousness if the claimed invention would have been obvious at the time of the invention to a person having ordinary skill in the art. I understand that the following factors are considered: (1) the scope and content of the prior art; (2) the differences between the art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention of the asserted patent was made; and (4) objective evidence of non- obviousness. In order to determine whether claim elements are found in the prior art, I understand that it is necessary to compare the properly construed claim language of the patent with the teachings of the prior art.

27. I understand that in order to combine prior art references to show obviousness, a person of ordinary skill in the art, without knowledge of the claimed invention, or without the use of hindsight, must have been motivated to combine the prior art by some suggestion or teaching in the prior art, the knowledge of one of skill in the art, or the nature of the problem to be solved. Where a party argues a skilled artisan would have been motivated to combine references, it must show the artisan would have had a reasonable expectation of success in doing so. It is appropriate to look to a variety of factors when evaluating reasons to combine references in an obviousness analysis, and it is important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the alleged prior art elements in the manner claimed. A patent composed of several elements is not proved obvious merely by demonstrating that each element was independently known in the prior art.

8

28. I understand that in evaluating whether patent claims are invalid as obvious, objective indicia of non-obviousness must be considered. Such objective indicia can include commercial success, long-felt but unsolved needs, copying, praise, unexpected results, industry acceptance, failure of others, and skepticism by experts. I understand that there must be a sufficient nexus between the objective evidence of non-obviousness and the claimed invention.

29. Evidence of a long-felt but unresolved need can weigh in favor of non-obviousness because it is reasonable to infer that the need would not have persisted had the solution been obvious. Whether a long-felt need existed is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem. It is appropriate to look to the filing date of the challenged invention to assess the presence of a long-felt and unmet need. There must be a nexus between the claimed invention and the long-felt but unsolved need. The long-felt need should be a need created by inadequacies in the technical knowledge, not one due to business-driven market forces unrelated to technical considerations. Long-felt need does not require that others tried and failed to meet that need.

30. I understand that commercial success, whether related to the patentee's practicing products or other infringing products, is relevant to obviousness because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious. Thus, the law deems evidence of (1) commercial success, and (2) a nexus between an invention and the commercial success of a product embodying that invention, probative of whether an invention

9

was nonobvious. Although sales figures coupled with market data provides stronger evidence of commercial success, sales figures alone can show commercial success. I understand that the patented invention need not be solely responsible for the commercial success. For commercial success to be relevant, the patentee must show a nexus between the success and the merits of the claimed invention. If the patentee shows that the success is tied to a specific product that embodies and is coextensive with the claimed invention, then the objective evidence is entitled to a rebuttable presumption of nexus. A limited exception to the presumption exists where the patented invention is only a component of the product to which the objective evidence is tied. When this presumption arises, the burden shifts to the other party to show that the success is due to other factors (such as unclaimed features, marketing, or preexisting market share). The presumed evidence cannot be rebutted with mere argument; evidence must be put forth.

31. I have been informed that it is impermissible to use the claimed invention itself as a blueprint for piecing together elements in the art. In other words, it is impermissible to use hindsight reconstruction to pick and choose among disclosures in the prior art to reconstruct the claimed invention.

### D.    Public Accessibility

32. I have also been instructed on the legal requirement that a given prior art reference be publicly accessible to a POSITA in order to qualify as prior art. I understand that the test for public accessibility of an asserted piece of prior art focuses on whether the reference was available to the extent that persons interested and

ordinarily skilled in the subject matter or art, exercising reasonable diligence, can

locate it. I have been further informed by counsel of several examples of how this law

is applied:

- a printed brochure provided by a company to another company under an NDA and obligation of confidentiality is not "publicly accessible."

- a student's written thesis that is stored in a college's main library amongst other student theses, which were collectively indexed using individual cards and searchable by student name, and which was orally presented only to faculty members, is not sufficiently "publicly accessible" to be prior art.

- a resident doctor's various papers describing his work on stents, which he distributed to various supervisors and medical professional colleagues and also to two companies attempting to commercialize his stent technology, even without any formal confidentiality agreement, nonetheless did not establish public accessibility because academic, professional, and industry norms indicated that the distribution of the papers was done with an expectation of confidentiality.

- a given article on file at the United States Copyright Office is not publicly accessible if its title cannot be searched for nor located by a subject matter search.

- evidence that it was "general practice" at an industry conference to distribute article abstracts is insufficient evidence of distribution of a specific abstract for purposes of public accessibility.

33. I understand that for a document to be considered a "printed publication,"

it must have been disseminated or otherwise made available in a manner that persons

interested and ordinarily skilled in the subject matter could locate it with reasonable

diligence. I understand that a document's copyright or printing date does not prove

that the document was publicly accessible as of that date. I also understand that the

mere existence of a document does not prove that the document qualifies as a prior

art "printed publication."

34. I also am informed and understand that source code which is not generally

available to the public (because it is, for example, treated by its creator as confidential

and as a trade secret) at a given time, is not "publicly accessible" to a POSITA at that given time for purposes of being prior art.

## IV.    DEFINITION OF PERSON OF ORDINARY SKILL IN THE ART

35. Samsung's experts have supplied the following definition of a POSITA in this case: "[A] POSITA would have had a Bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least three years of experience in the research, design or development of wireless communication devices, systems, and/or networks, or the equivalent, as of the 2015-2017 timeframe, which covers the earliest alleged priority dates of the Asserted Patents. Increased educational experience can make up for less work experience, and vice versa." Bims Rpt. ¶ 104. *See also* Wicker Rpt. ¶¶ 69-75 (offering similar definitions of a POSITA for various Wilus patents).

36. Based on my experience, education, and training, I met the definition of a POSITA as of any of the possible priority dates for any of the relevant patents in this case. As Dr. Bims and Dr. Wicker note in their respective reports, the possible priority dates for all of the Wilus patents at issue land within the 2015-2017 time period. By that time, I had been working on wireless communications devices (including ones designed to be compliant with various 802.11 standards) for more than 15 years and participated in various IEEE 802 Working Groups for just as long.

37.  Although my qualifications at that time far exceeded those of a POSITA, my opinions are from the perspective of a POSITA, as set forth above.

## V.     BACKGROUND

38. Considering the subject matter of this report, I provide here some background relevant to the implementation of IEEE 802.11, known commercially as wi-fi, and relevant source code.

39. Modern mobile devices include multiple processors, in particular a processor on the wi-fi chipset and an application processor. The main, user-facing operating system (such as Android or iOS) runs on the application processor. The driver software handles the communication between the wi-fi chip and the host operating system.

40. The BCM4354 chipset is a combo chip that integrates IEEE 802.11ac and Bluetooth 4.1 onto a single die. It includes the 802.11ac MAC/PHY/radio on a single silicon chip and is described as a Wi-Fi/Bluetooth system-on-chip (SoC). This SoC is a proprietary, high-performance application-specific integrated circuit (ASIC).

41. IEEE 802.11 consists of a physical layer (PHY) and medium-access control (MAC) layer. There is also a MAC layer management entity (MLME).

42. Typically, the 802.11 protocol is implemented using a hybrid approach, where Verilog (or VHDL) hardware code is used for the high-speed, time-critical functions of the PHY, and C firmware is used for the higher-level MAC and management functionality. The C firmware does not run on the application processor but runs on the processor that is part of the wi-fi chipset. The firmware manages the hardware functionality of the wi-fi chip and acts as a low-level operating system. The firmware is optimized given the characteristics of the platform.

43.  ASICs are known to achieve the lowest size, cost, and power consumption and are widely described as and known as not being reprogrammable: "As a result, with ASICs, size, cost, and power consumption are the lowest compared to all types of programmable digital hardware, but there is no flexibility." *See* T. Cooklev and A. Yagle, "Modern Communications Systems", Univ. of Michigan, 2024, at p. 193. *See also* https://en.wikipedia.org/wiki/Application-specific_integrated_circuit (Accessed on February 12, 2026), "Unlike most FPGAs, ASICs cannot be reprogrammed once fabricated".

44. Most mobile devices with a wi-fi chipset employ three levels of source code: software, firmware, and hardware. The main part of the 802.11 protocol is implemented by C firmware and Verilog hardware code.

45. Verilog or VHDL (for VHSIC Hardware Description Language) programming languages are industry-standard and well-known languages for Register-Transfer Level (RTL) design. *See* B. Reidenbach, "Practical Digital Design", Purdue University Press, at p. 26.

46. C/C++ is a general-purpose[1] compiled language. "For a program to run, its source text must be processed by a compiler, producing object files, which are combined by a linker yielding an executable program. A C/C++ program typically

---

1 Although C is considered general-purpose, C firmware code on wi-fi chipsets is *not* general purpose. It interacts with the hardware, making the code specific to the vendor's platform. For example, C programs must deal with limited memory space, must access memory-mapped addresses to exchange data with peripherals, etc. Such C programs are generally not portable in the way a C program for a general-purpose x86 computer is. Further, developing such C programs that are tightly coupled to the hardware platform requires knowledge of proprietary details about the hardware platform. Generally, firmware code cannot be ported to and run on a laptop computer, or even on a different wi-fi chipset.

consists of many source code files (usually simply called *source files*)." *See* Bjarne Stroustrup, "The C++ Programming Language," Addison-Wesley, 2013, at p. 38. .

47. At compile time the developer must know and specify some key characteristics of the target platform, including the size of certain data types, endianness, etc. There are usually compiler flags to utilize platform-specific capabilities. Certain details about the platform must also be provided to the linker. For example, the linker must know the exact memory map of the target device to determine where to place code and initialized/uninitialized) data. For example, the developer needs to specify which addresses correspond to non-volatile memory (Flash/ROM) and which correspond to read/write memory (RAM).

48. The RTL code for a given chipset IC is written to describe data transmitted between registers on the integrated circuit and the operations performed on that data. In simple terms, a "register" is a circuit that stores binary data (a sequence of bits, i.e., a sequence of 0s and 1s). A typical integrated circuit like the BCM4354 contains registers that are used to pass data between various components within the chipset and to perform calculations upon that data.

49. Verilog and VHDL code (and RTL code generally) are written to generate a specific hardware component layout design. Consequently, modifying the RTL code is equivalent to the design of a new chip. *See also* https://en.wikipedia.org/wiki/Verilog ("Hardware description languages such as Verilog use software-like syntax, but unlike software programming languages they model physical hardware, including concurrent operation, signal timing, and

electrical behavior.").

50. In other words, the Verilog or VHDL code written for a given chipset is unique to the specific hardware configuration of the chipset—it cannot be changed without also changing the hardware design. This is because RTL code is not compiled into object code binaries like with, say, C—RTL code instead is transformed into the physical layout of the hardware. As a result, RTL code is not considered "firmware" but is nonetheless "source code" for an IC.

## VI. SUMMARY OF OPINIONS

51. I submit this expert report having reviewed publicly available materials about the Galaxy Tab S as well as its constituent components, including specifically the Broadcom BCM4354 wi-fi chipset. I have also reviewed redacted versions of Dr. Bims's and Dr. Wicker's invalidity reports, particularly their opinions involving the modification of source code of the wi-fi chipset of the Galaxy Tab S product.

52. I have also reviewed the Asserted Patents in this case, which are U.S. Patent Nos. 10,313,077 (the "'077 Patent"); 10,687,281 (the "'281 Patent"); 11,116,035 (the "'035 Patent"); 11,129,163 (the "'163 Patent"); 11,159,210 (the "'210 Patent"); 11,470,595 (the "'595 Patent"); 11,516,879 (the "'879 Patent"); 11,700,597 (the "'597 Patent"). I reviewed the Asserted Patents principally to confirm and understand the nature of the technology at issue in this case—which is wireless networking and, specifically, wireless networking techniques and systems within the context of IEEE 802.11ax wi-fi standard.

53. Although I have reviewed wi-fi-related patents in numerous cases, and

have offered opinions whether those wi-fi patents were infringed or invalid, in this matter I am not offering opinions about the Asserted Patents as to their invalidity, infringement, or technologically beneficial value, except as set forth below. Rather, as I explained above and further below, my assignment in this case pertains to whether one could reasonably conclude that the source code for the on the wi-fi chipset in the Galaxy Samsung Tab S product is publicly available and, is therefore prior art to any of the Asserted Patents. I also comment on other closely related issues affecting whether Dr. Wicker and Dr. Bims have established with clear and convincing evidence that the Galaxy Tab S product could have been modified as they suggest by a POSITA.

54. As I further explain below, it is a general rule in the industry for consumer electronics devices such as smartphones and tablets that the firmware and hardware source code is treated as highly confidential and basically never shared outside of the company that owns that source code—which in most cases is the same company that designs and sells the IC for integration into the final assembled consumer device. The same is true for the wi-fi firmware loaded onto the wi-fi chipsets that are found in consumer electronics devices today.

55. The firmware and hardware source code for the wi-fi chipset in the Samsung Galaxy Tab S (2014), the Broadcom BCM4354 chipset, was not publicly accessible by a general member of the interested public at any of the possible priority dates of the Asserted Patents between 2015 and 2017. At all relevant times (and even today), the core code for the BCM4354 continues to be confidential, closed source, and

not publicly accessible to anyone other than individuals allowed by Broadcom to have access (such as, for example, certain Broadcom employees). Thus, as a result, a POSITA, with no special access to Broadcom's trade secret material, would not have had access at any point in time to the firmware source code for the BCM4354 to modify in the manner that Dr. Bims and Dr. Wickers may suggest. More simply, the confidential source code for BCM4354 was not prior art because it has never been publicly accessible by a person of ordinary skill in the art.

## VII.  REBUTTAL TO DR. BIMS'S AND DR. WICKER'S OBVIOUSNESS THEORIES BASED ON MODIFICATION OF THE WI-FI CHIPSET SOURCE CODE IN THE GALAXY TAB S

56. To begin, as Samsung's experts say, the Galaxy Tab S is a tablet product which was released by Samsung in the United States in 2014. *See, e.g.*, "Samsung introduces Galaxy Tab S, a Super AMOLED tablet", https://news.samsung.com/global/samsung-introduces-galaxy-tab-s-a-super-amoled-tablet (June 13, 2014) (accessed Feb. 11, 2026). The Tab S was released in "two sizes: 8.4-inch and 10.5-inch." *Id.*

57. The Galaxy Tab S provided wi-fi functionality via a Broadcom wi-fi chipset, model BCM4354. Though neither Dr. Bims nor Dr. Wicker acknowledge this fact, it is a fact nonetheless as shown through the countless publicly-available resources from product device teardowns (where the "BCM4354" model number can be seen printed on the wi-fi IC soldered to the motherboard in detailed photographs) to vendors selling replacement BCM4354 parts. *See,* *e.g.*, https://www.ifixit.com/Answers/View/357876/Where+is+the+wifi+chip+on+my

+Galaxy+tab+S+8.4+wifi (showing photograph identifying BCM4354KKUBG chipset for Galaxy Tab S), https://www.walmart.com/ip/Replacement-WiFi-Bluetooth-IC-Chip-Compatible-For-Samsung-Tab-S-10-5-T805C-BCM4354KKUBG/2045317312 (selling "Replacement WiFi Bluetooth IC Chip Compatible For Samsung Tab S 10.5" (T805C) (BCM4354KKUBG)").

58. The Broadcom BCM4354 is a chip designed by Broadcom that became available around the beginning in 2013. *See* https://docs.broadcom.com/doc/25-years-of-wi-fi-infographic (showing in 2013, "Broadcom introduced industry's first 802.11ac Wi-Fi 2x2 MIMO/BT4.1 combo chip: BCM4354").

59. With this factual context in mind, I turn to the issues in the Bims and Wicker Reports for which I am offering opinions.

**A.   The Obviousness Theories of Dr. Bims and Dr. Wicker Require Modification of Firmware and Hardware Source Code for the Wi-Fi Chipset in Galaxy Tab S**

60. First, the Bims Report contains numerous grounds for invalidity against the Asserted Patents, almost all of which require that a POSITA have found it obvious to modify the wi-fi chipset firmware on the Galaxy Tab S. *See, e.g.*, Bims Rpt. ¶¶ 367 ("This update to the Galaxy Tab S would have involved simply ***modifying the source code for the Wi-Fi chip*** to make the minor changes needed to implement the NSYM equation") (addressing '077 patent obviousness combinations), 371 (same), 540 ("This update to the Galaxy Tab S would have involved simply ***modifying the source code for the Wi-Fi chip*** to make the minor changes needed to implement receiving channel nulling (puncturing) information.") (addressing '281 patent obviousness

19

combinations), 597 (same), 764 ("This update to the Galaxy Tab S would have involved simply ***modifying the source code for the Wi-Fi chip*** to make the minor changes needed to implement signaling center-26 tone resource unit allocation as taught by 802.11ac and by Lee 664.") (addressing '595 patent obviousness combinations), 828 (same), 879 (same), 1027 ("This update to the Galaxy Tab S would have involved simply ***modifying the source code for the Wi-Fi chip*** to make the minor changes needed to implement Verma 310's transmission and reception of a compression indicator to determine whether a common field in a subsequent signal is present or absent.") (addressing the '210 patent obviousness combinations), 1031 (same), 1079 (same).

61. Thus, as a fundamental predicate, all of Dr. Bims's obviousness opinions at issue involve the POSITA having ***access*** to the "source code for the Wi-Fi chip" and ***modifying*** it in view of various publications.

62. Similarly, the Wicker Report likewise contains numerous grounds for invalidity against the Asserted Patents, all of which also require that a POSITA have access to the source code of the wi-fi chip in the Galaxy Tab S. *See* Wicker Rpt. ¶¶ 191 ("Galaxy Tab S was an IEEE 802.11-based device. See, e.g., PRIOR_ART_00001931. The source code is the only certain way to determine whether a particular IEEE 802.11 feature, for instance a feature of IEEE 802.11ac-2013 and 802.11-2012, is implemented in a device."), 240 ("As a result, a POSITA would have understood that Zhou 663's teachings could be easily integrated into the existing Galaxy Tab S networking stack"), 242 ("The Galaxy Tab S is a commercial product, and a POSITA would have

recognized that a market advantage could be achieved by altering the Galaxy Tab S to employ Zhou 663's "OBSS reuse"/spatial reuse teachings to increase the Galaxy Tab S's networking efficiency."), 243 ("A POSITA would have had a reasonable expectation of success in making this combination because Galaxy Tab S includes a configurable processor and Zhou 663's teachings include simple logic that could be readily implemented in software."), 246 ("As a result, a POSITA would have understood that Noh 485's teachings could be easily integrated into the existing Galaxy Tab S networking stack alongside the teachings of Zhou 663."), 248 ("The Galaxy Tab S is a commercial product, and a POSITA would have recognized that a market advantage could be achieved by altering the Galaxy Tab S to employ Noh 485's dual NAV teachings alongside Zhou 663's "OBSS reuse"/spatial reuse teachings to increase the Galaxy Tab S's networking efficiency."), 249 ("A POSITA would have had a reasonable expectation of success in making this combination because Galaxy Tab S includes a configurable processor and Noh 485's teachings include simple logic that could be readily implemented in software alongside the teachings of Zhou 663."), 252 ("A POSITA would have further realized that the Galaxy Tab S, Zhou 663, and Itagaki 817 are technologically complementary—the Galaxy Tab S includes a Wi-Fi chipset and firmware and MAC and PHY layer technologies are disclosed in Zhou 663 (i.e., spatial reuse techniques) and Itagaki 817 (i.e., BSS color collision detection).") ("As a result, a POSITA would have understood that Itagaki 817's teachings could be easily integrated into the existing Galaxy Tab S networking stack alongside the teachings of Zhou 663."), 254 ("The Galaxy Tab S is a commercial product, and a

POSITA would have recognized that a market advantage could be achieved by altering the Galaxy Tab S to employ Itagaki 685's BSS color collision detection teachings alongside Zhou 663's "OBSS reuse"/spatial reuse teachings to increase the Galaxy Tab S's networking efficiency."), 258 ("A POSITA would have further realized that the Galaxy Tab S and Asterjadhi 685 are technologically complementary— the Galaxy Tab S includes a Wi-Fi chipset and firmware and Asterjadhi 685 describes MAC and PHY layer technology (i.e., power save management techniques)."), 266 ("The Galaxy Tab S is a commercial product, and a POSITA would have recognized that a market advantage could be achieved by altering the Galaxy Tab S to employ Noh 485's dual NAV teachings alongside Asterjadhi 685's power save teachings to increase the Galaxy Tab S's networking efficiency."), 267 ("A POSITA would have had a reasonable expectation of success in making this combination because Galaxy Tab S includes a configurable processor and Noh 485's teachings include simple logic that could be readily implemented in software alongside the teachings of Asterjadhi 685."), 272 ("Third, a POSITA would have been motivated by market incentives to combine Itagaki 817 with Galaxy Tab S and Asterjadhi 685. The Galaxy Tab S is a commercial product, and a POSITA would have recognized that a market advantage could be achieved by altering the Galaxy Tab S to employ Itagaki 685's BSS color collision detection teachings alongside Asterjadhi 685's power save management teachings to increase the Galaxy Tab S's networking efficiency."), 279 ("A POSITA would therefore have had a reasonable expectation of success in using 802.11ax D1.0 to modify the Galaxy Tab S's underlying 802.11ac-based implementation, expecting

only incremental changes to the MAC/PHY behavior within a well-understood standard framework."), 281 ("A POSITA would have had a reasonable expectation of success in making this combination because Galaxy Tab S includes a configurable processor and 802.11ax D1.0's teachings include simple logic that could be readily implemented in software."), 825 ("Because Cariou 261 proposes modifying only the parameter values and switching rules, and not the fundamental EDCA architecture, a POSITA would view a Galaxy Tab S-like device as an ideal implementation target. The modification requires no unconventional hardware changes and only minimal software/firmware adjustments, making the combination both straightforward and expected.").

63. The forgoing excerpts from the Wicker Report are not exhaustive, but are illustrative of the assertions that Dr. Wicker provides regarding alleged modifications to the "configurable processor" of the "Wi-Fi chipset and firmware" of the Galaxy Tab S. In sum, Dr. Wicker's obviousness theories based on the Galaxy Tab S require modification to the "Wi-Fi chipset and firmware" of the Galaxy Tab S—which means a modification to the source code of that firmware or to the physical chipset design itself. Thus, as a fundamental predicate, all of Dr. Wicker's obviousness opinions involve the POSITA having *access* to the source code for the "Wi-Fi chipset and firmware" and *modifying* it in view of various publications.

64. However, Dr. Wicker and Dr. Bims do not address the issue of whether a POSITA had access to the Broadcom firmware and hardware source code and consequently fail to prove this at all, much less by clear and convincing evidence. The

Broadcom firmware and hardware code was not available to a POSITA.

**B.    No Obviousness Opinions Based on Any Review or Analysis of Broadcom BCM4354 or other Galaxy Tab S-Related Source Code**

65. I further note that neither Dr. Bims nor Dr. Wicker appear to have reviewed any source code for the Broadcom BCM4354 chipset or for the Galaxy Tab S more generally. In my view, this is a serious deficiency because it means that their opinions about whether and how a POSITA would modify the Broadcom BCM4354 source code are not supported by any knowledge, analysis, or evidence of the primary source—the source code that they say could and would have been modified.

66.  One would expect that, at a minimum, a testifying expert opining that the source code for a given device would have been modified in some specific manner would support their opinions by pointing to the source code, how exactly it could be modified, and why such modifications would be within the ability of an ordinarily skilled artisan for the patents at issue. Neither Dr. Bims nor Dr. Wicker appear to have taken those steps in supporting their obviousness opinions.

67. As discussed above, RTL, written in Verilog or VHDL, can be source code.

68.  As I discuss above, Verilog and VHDL code (and RTL code generally) are written to generate a specific hardware component layout design—modifying the RTL code also implies a new chip having a different physical hardware design. Any change in the RTL leads to an entirely new design, including substantial verification. This is a very expensive process,

69. Stated alternatively, even if I assume *arguendo* that the RTL code was available to and accessible by a POSITA (which was not the case at the time of the

invention and is not the case today), the RTL code developed by Broadcom that led to the physical design of the BCM4354 IC cannot be modified by a POSITA as Dr. Bims and Dr. Wicker might believe, because the *Galaxy Tab S device* (which is the primary reference of the obviousness combinations) holds no human-readable RTL code to modify in the first place.

70. In my general experience, the wi-fi chipsets of major vendors  (Broadcom, Qualcomm) implement time-critical MAC and PHY layer processing through RTL code—which is relevant because many of the Asserted Patents have claims that would be practiced at the MAC or PHY layer. Whether any of the code that Dr. Bims or Dr. Wicker says could be easily modified by a POSITA depends on whether the code is RTL code; which, of course, is determined by whether Dr. Wicker or Dr. Bims say any code-to-be-modified is RTL code. But because neither Dr. Bims nor Dr. Wicker have actually undertaken the exercise of reviewing or analyzing the source code in the first place, they have not opined based on sufficient evidence or with reasonably certainty that the wi-fi chipset "code" could be altered by a POSITA at all. A POSITA having a physical Galaxy Tab S device could not have altered the firmware running on the BCM4354 or the hardware code used in the design of the BCM4354.

**C.    Dr. Bims and Dr. Wicker Fail to Show that the Source Code for the Broadcom BCM4354 Was Publicly Accessible**

71. I now turn to public accessibility issues for the firmware and RTL source code for the Broadcom BCM4354. As a basic matter, the overall firmware source code and RTL code used for a given wi-fi chipset is, to a rule, treated in the industry as highly confidential and trade secret. Likewise, the RTL code used in IC design is also

highly confidential and trade secret. I know this to be the case not only from my general experience in industry, working on wi-fi chipset design and writing wi-fi firmware, but also from my many interactions and collaborations with other industry veterans, including (for example) senior engineers at major wi-fi chipset vendors. I know this to be the case also from my many years of reviewing wi-fi chipset source code in patent litigation cases, in which wi-fi chipset and RTL/HDL source code was always produced under strict confidentiality protections and which were frequently accompanied by highly confidential chipset technical documents describing the design and operation of those wi-fi chipsets.

72. This is true specifically for Broadcom's wi-fi chipsets. It is common knowledge in the industry that Broadcom's wi-fi chipset source code is confidential. Over the past 15 years, inadvertent leaks of small portions of Broadcom's confidential and proprietary wi-fi source code have led to embarrassing and high-profile security vulnerability incidents.

73. The most relevant example for this case is the inadvertent leak of a small portion of Broadcom BCM4354 wi-fi firmware source code which was publicized in mid-2017 by Exodus Intelligence. Incidentally, the Broadcom BCM4354 is also the chip used in the Galaxy Tab S device that forms the foundation of the obviousness opinions of Dr. Bims and Dr. Wicker.

74. In July 2017, Exodus (a "white hat" security research company) published a high-profile report describing a catastrophic vulnerability in the BCM4354 chipset that it had been able to uncover through reverse engineering various processing and

communication steps of functionality provided by the BCM4354 using, notably, a small portion of inadvertently leaked, closed-source code owned by Broadcom. See "Broadpwn: Remotely Compromising Android and iOS via a Bug in Broadcom's Wi-Fi Chipsets," https://blog.exodusintel.com/2017/07/26/broadpwn/ (Jul. 26, 2017) (accessed Feb. 11, 2026).

75. This event and corresponding security vulnerability is known in the industry as "Broadpwn"—which, if exploited, could allow attackers to remotely seize control of another user's device and transform it into an access point which led basically most major device OEMs to immediately push OTA updates to the wi-fi chipset firmware. The vulnerability and fallout from "Broadpwn" was the subject of significant industry concern and was widely reported on by both technology outlets and wi-fi chipset OEMs themselves. *See*, *e.g.*, https://www.wired.com/story/broadpwn-wi-fi-vulnerability-ios-android/; https://www.huawei.com/en/psirt/security-advisories/2017/huawei-sa-20170727-01-broadpwn-en; https://www.silicon.co.uk/security/cyberwar/smartphones-broadpwn-bug-218635.

76. As reported by Exodus, the "Broadpwn" vulnerability was the result of the inadvertent publication of a small portion of the wi-fi chipset source code for a Broadcom wi-fi chipset used in a router. Using that relatively small piece of source code as a roadmap, the Exodus security researcher was able to reverse-engineer parts of the wi-fi chipset's functionality by comparing it with the firmware blob (binary)

code that had been (intentionally) published. As Exodus reports:

> The most convenient resource we found was the source code for the VMG-1312, a forgotten router which also uses a Broadcom chipset. While the brcmsmac driver contains code which was open-sourced by Broadcom for use with Linux, the VMG-1312 contains proprietary Broadcom closed-source code, bearing the warning "This is UNPUBLISHED PROPRIETARY SOURCE CODE of Broadcom Corporation". Apparently, the Broadcom code was published by mistake together with the rest of the VMG-1312 sources.
>
> The leaked code contains most of the key functions we find in the firmware blob, but it appears to be dated, and does not contain much of the processing code for the newer 802.11 protocols. Yet it was extremely useful during the course of this research, since the main packet handling functions have not changed much. By comparing the source code with the firmware, we were able to get a quick high-level view of the packet processing code section, which enabled us to hone in on interesting code areas and focus on the next stage: finding a suitable bug.

https://blog.exodusintel.com/2017/07/26/broadpwn/

77. Then, using reverse engineering, the Exodus researcher was able to engineer an exploit that involved overflowing a data buffer and then targeting and seizing control of memory addresses used by the Broadcom wi-fi IC. *Id.* This could then be leveraged to do a number of things, such as forcing the wi-fi IC to broadcast payloads and force nearby devices (with the same vulnerability) to do the same.

78. What the "Broadpwn" incident uniquely underscores is a reason **_why_** the source code for wi-fi chipsets is so closely guarded by the wi-fi OEMs like Broadcom and Qualcomm: if the source code for a wi-fi chipset is open-sourced or otherwise made publicly available, it can be mined for vulnerabilities which can be exploited by bad actors. This has been the case with how the industry treats RF ICs for as long as I can remember. And as the "Broadpwn" security incident shows, even a relatively small leak of confidential Broadcom source code—where the leaked code "d[id] not contain much of the processing code for the newer 802.11 protocols"—can generate

massive security risk.

79. Of course, wi-fi chip providers also have many other reasons for keeping their wi-fi chipset source code confidential. Each wi-fi chip vendor has certain competitive advantages in the market. These advantages include, *inter alia*, higher performance, lower cost, lower power consumption, etc. And each company considers its competitive advantages to be due to the source code being confidential. Consequently, each such company considers the source code as its most valuable asset and generally stores its source code using encrypted repositories to manage and audit access. Generally, companies inform their new employees of the value and confidential nature of the source code, and a POSITA would have been aware of this fact.

80. In any event, the specific source code (RTL and firmware) for the BCM4354 has never been publicly available in the way that Dr. Wicker and Dr. Bims assume. Where Broadcom-proprietary code has been leaked over the years (typically uploaded to Github), Broadcom (like many other companies) have worked to take those down via DMCA notices recorded and published by Github. These notices from Broadcom can be read in the various DMCA notices, like the one here: https://github.com/github/dmca/blob/master/2015/2015-11-09-Broadcom.md (accessed Feb. 11, 2026), and they show, among other things, confidential Broadcom source code contains a copyright section that contains the following text or some close variation thereof: "This is UNPUBLISHED PROPRIETARY SOURCE CODE of Broadcom Corporation." I note that this same point is made by the Exodus researcher

in the "Broadpwn" report pertaining to the BCM4354 chipset—i.e., that the leaked code contains this confidentiality notice.

81. As a result, at any point during between 2015 and 2017 (and at any of the particular priority dates mentioned by Dr. Wicker and Dr. Bims), a POSITA would not have had access to either the firmware or RTL source code for the Broadcom BCM4354 wi-fi chipset in the Galaxy Tab S device, and, consequently, could not have been in a position to modify that source code in the manner suggested by Samsung's experts.

82. In my experience, the source code is so valuable to the companies that not all employees have access to the source code. Generally, only those who needed access in the course of their work would have had access to the BCM4354 code base, and only to the part of the code base on which they are working. Few would have had access to the *entire* BCM4354 code base. But that code base is neither publicly accessible by a POSITA for purposes of being prior art, and nor is a POSITA defined in this case as one of the few Broadcom employees with privileged access to that code.

83. As a result of their "at least three years of experience in the research, design or development of wireless communication devices, systems, and/or networks", a POSITA would have been aware that the firmware and hardware source code is proprietary. They would have known that the ROM and logic on the chip could not be modified, and the RAM can be modified only with a binary file from a trusted source. They would have known that obtaining a binary file requires proprietary information. As a result, a POSITA would not have expected success and would have

been discouraged from and would not have even attempted to make the modifications suggested by Dr. Wicker and Dr. Bims.

84. In view of the forgoing, it is therefore my opinion that neither Dr. Wicker nor Dr. Bims have established with clear and convincing evidence that a POSITA could and would have modified the Galaxy Tab S's wi-fi chipset in the manner they opine.

### D. Dr. Bims and Dr. Wicker Fail to Establish Reasonable Expectation of Success For Their Obviousness Theories

85. Putting aside the issue of public accessibility of the source code, it is also my opinion that Dr. Bims and Dr. Wicker failed to explain why a POSITA, without access to Broadcom trade secret material, would have had a reasonable expectation of success in performing the alleged modifications to that source code.

86.

87. As I explained above, a portion of the functionality that Dr. Bims and Dr. Wicker suggest a POSITA would modify may have been provided by the physical design of the wi-fi IC expressed through RTL code. This is commonly the case with other wi-fi chips with respect to their handling of lower level PHY layer data, which is likewise consistent with my experience reviewing wi-fi chipset code in other cases. Even if a POSITA had access to the RTL code (which was not and is not the case), modifying that RTL code using some software tool is not sufficient because the RTL code must be verified, usually via simulation, and then be converted into logic gates. *See* B. Reidenbach, "Practical Digital Design", Purdue University Press, at p. 27-28. Ultimately, if one changes the RTL code, the result would be a different physical

31

hardware layout and a new chip, not a "modification" of the existing chip. At least for this reason, a POSITA would not have attempted this. Neither of Samsung's experts have accounted for this scenario in any way. Neither Dr. Bims nor Dr. Wicker appear to have looked at any of the Broadcom BCM4354 source code at all—which means that they simply have not accounted for an important weakness in their obviousness theory. And consequently, they have failed to establish reasonable expectation of success. Nor could they, because modifying the RTL is equivalent to making a new chip design. The firmware source code for the Broadcom BCM4354 chip likewise presents serious complications to the simplistic theory put forth by Dr. Bims and Dr. Wicker. The "firmware" for a given wi-fi IC is the compiled binaries, stored in on-IC memory, which runs on the wi-fi chipset processor. As I discussed above, the firmware is compiled from human readable source code and cannot be easily reverse-engineered. To begin with, a significant part of the firmware is in ROM and cannot be modified at all, even by Broadcom. Dr. Bims and Dr. Wicker make no analysis if the firmware they suggest can be "easily modified" is in RAM or ROM.

88. Let's assume, purely for the sake of argument, that a POSITA, with no particular privileged access to Broadcom trade secret information, counterfactually has access to some portion of the BCM4354 firmware source code and modifies it somehow with, say, Notepad++ or some similar source code writing software. Compiling and linking that code without knowledge of certain memory addresses and other details that are specific to the Broadcom platform (and therefore proprietary information) is generally not possible. Not only could a POSITA not have produced a

binary file capable of running on the BCM4354 chip, but a POSITA would have been aware of this fact and would not have even attempted to produce such a binary file. And even if we somehow put all this aside, how does that compiled code get onto the BCM4354 in their hypothetical Galaxy Tab S device? In the ordinary situation, the firmware that is in RAM may be updated by Samsung or the telecommunications service providers using compiled binaries provided only by the wi-fi chip vendors. Put another way, wi-fi ICs need to know, and will check, that the binaries they are being flashed with come from a trusted source—and the manner for verification is done through the signing of the binaries by the vendor. Dr. Wicker and Dr. Bims have not established that the portion of the firmware that according to them can be modified is in RAM. However, in any case, the RAM firmware can only be updated by Broadcom.

89. These are basic facts any POSITA would know—that in order to actually change the firmware on a Galaxy Tab S, they need at least: (1) the confidential and proprietary firmware source code, **and** (2) the trade-secret signing certificate Broadcom maintains for the BCM4354 chipset. A POSITA would have access to neither of these pieces of information, and as a result would of course have no reasonable expectation that they could simply "modify" the BCM4354 chipset by reflashing it with modified firmware.

90. Finally, accepting for the moment that Dr. Bims and Dr. Wicker propose modifying the firmware code, those changes would also likely require changes to the physical design of the chip. For example, to the extent that the size of the PPDU

33

preamble or layout of its fields is changed, that would require changes to the size and layout of hardware registers in the chipset, which the firmware reads from and writes to. Ultimately, a modification of the RTL code triggers (and is typically done in connection with) the fabrication of an entirely new wi-fi chipset. This is beyond the capabilities of a POSITA, and Dr. Wicker and Dr. Bims do not assert otherwise.

## VIII.  **SUPPLEMENTATION**

91. I reserve the right to supplement or amend my opinions in response to opinions expressed or positions taken by Defendant's experts, or in light of any additional evidence, testimony, discovery, or other information that may be provided to me after the date of this declaration.  In addition, I reserve the right to consider and testify about issues that may be raised by Defendant's fact witnesses and experts at any hearing or in any expert reports.  I also reserve the right to modify or to supplement my opinions as a result of ongoing fact and expert discovery or testimony at trial.

92. I further reserve the right to present any tutorials regarding the background technology and terminology in connection with the opinions in this declaration, any supplemental declarations and/or expert reports that I may prepare in this case.  I reserve the right to use demonstrative exhibits and/or refer to publicly available information, including any technical publications, such as books and articles, to aid my testimony, and accordingly reserve the right to prepare exhibits and demonstrative evidence for any hearing pursuant to the schedule set by the Court.

93. I expressly reserve the right to amend or supplement my opinions in this

case when additional information is made available to me.

*    *    *

I declare under the penalty of perjury of the laws of the United States that the foregoing statements made in this declaration are true based on my own knowledge and that all opinions given are my own.


Dated:  February 13, 2026                              _/s/Todor Cooklev_____
                                                      Todor Cooklev, Ph.D.