# EXHIBIT AA

FRAND Objection II

TFEU Art. 102 (2) (b), (c)

a) The owner of a standard-essential patent who brings a patent infringement action seeking injunctive relief, recall, and destruction is not abusing its market power if the infringer, who has been made aware of the infringement and its willingness to license, has not unequivocally indicated that it will seek a license on fair, reasonable, and nondiscriminatory (FRAND) terms.

b) The willingness of the infringer to license, just like the willingness of the patent proprietor to license, must not be exhausted by the one-time expression of the interest in licensing or the submission of a (counter) offer. Rather, both parties are required to contribute in a manner appropriate to the situation and in accordance with the principles of good faith so that an appropriate balance of the conflicting interests can be negotiated in the form of a license agreement on FRAND terms.

c) Outside the scope of application of the succession protection under Sec. 15 (3) Patent Act, objections to which a user of the invention was entitled against the former patentee cannot be raised against the latter's successor in title. This applies in particular to the objection of patent ambush.

BGH, Judgment of November 24, 2020 - KZR 35/17 - OLG Düsseldorf
LG Düsseldorf

*English convenience translation provided by*   ARNOLD ☘ RUESS



# FEDERAL COURT OF JUSTICE

## IN THE NAME OF THE PEOPLE

## JUDGMENT

KZR 35/17

Announced on:
November 24, 2020
Other judicial clerk
as clerk of the court
office

in the litigation

SISVEL International S.A., represented by the Board of Directors, 6 Avenue Marie-Therese, Luxembourg (Luxembourg),

Plaintiff, appellant and cross-defendant,

- represented by: Prof. Dr. Rohnke and Dr. Winter, lawyers -

against

1. Haier Deutschland GmbH, represented by its Managing Director, Hewlett-Packard-Strasse 4, Bad Homburg,

2. Haier Europe Trading SRL, Avenue Charles de Gaulle 115-123, Neuily-sur-Seine (France),

Defendant, appellant and cross-appellant

- represented by: Dr. Baukelmann and Mr. Tretter, lawyers -

ECLI:DE:BGH:2020:241120UKZR35.17.0

*English convenience translation provided by* ARNOLD RUESS

At the hearing on November 24, 2020, the Cartel Panel of the Federal Court of Justice (Bundesgerichtshof) ruled in favor of the company by the presiding judge Prof. Dr. Meier-Beck, the judges Prof. Dr. Kirchhoff and Dr. Tolkmitt, and the judges Dr. Rombach and Dr. Linder:

> On appeal and with rejection of the cross-appeal, the judgment of the 15th Civil Senate of the Düsseldorf Higher Regional Court of March 30, 2017 is set aside on the issue of costs and insofar as the Court of Appeal found against the plaintiff.
>
> The appeal of the defendant against the judgment of the 4a Civil Chamber of the Düsseldorf Regional Court of November 3, 2015 is dismissed in its entirety.
>
> The costs of the appeals are ordered to be borne by the defendants.

By law

Facts:

1     Since October 1, 2012, the applicant has been the registered owner in the register of the Patent and Trademark Office of the German part of the European patent 1 264 504 (patent in suit), which was filed by XXX on February 23, 2001, claiming the priority of Finnish applications dated February 24 and March 24, 2000. The (grant of the patent-in-suit was published on September 12, 2009.

2    Patent claim 17 was given the following wording in the opposition proceedings:

> "A communications device of a cellular radio system, comprising means (514, 605) for detecting a failure in a radio connection, said radio connection having a plurality of active radio bearer belonging to a radio resource control connection, characterized in that it comprises means (511, 515, 605) for determining a first expiry time for a period during which the re-establishment of the lost radio connection in respect of said radio bearers which are used to provide a service or services of a first category is allowable; and means (511, 515, 605) for determining a second expiry time for a period during which the re-establishment of the lost radio connection in respect of said radio bearers which are used to provide a service or services of a second category is allowable, said second category of services being different to said first category of services and said second expiry time being different to said first expiry time."

3    The action for revocation brought against the patent-in-suit by the defendants, among others, was unsuccessful (BGH, judgment of April 28, 2020 - X ZR 35/18, juris).

4    The defendants belong to the Haier Group. First by letter dated December 20, 2012,the plaintiff informed the defendants' parent companies, Qingdao Haier Telecom Co. Ltd. and Qingdao Haier Electronics Co. Ltd. ("Haier") that it was offering to license on fair, reasonable, and non-discriminatory ("FRAND") terms a number of patent families essential to various telecommunications standards and used by various mobile handsets manufactured by Haier; the listing attached to the letter also included the patent-in-suit. Subsequently, discussions took place between Haier and the plaintiff, but no license agreement was concluded.

5    The first defendant sells cell phones and tablets in Germany, while the second defendant is the Group's European sales company. In September 2014, it offered cell phones and tablets at the International Consumer Electronics Fair in Berlin. The cell phones and tablets challenged by the plaintiff support UMTS (Universal Mobile Telecommunications System) and comply with the 3GPP TS 25.331 standard, for which the European Telecommunication Standard Institute (ETSI) is responsible. On April 10, 2013, the plaintiff submitted a declaration of commitment to ETSI, which can

be seen in detail in Annex AR 3, according to which it was prepared to license the patent-in-suit on FRAND terms, among other things.

6    The plaintiff regards the offering of the challenged cell phones and tablets as an infringement of its rights under the patent in suit. It has filed a claim against the defendants for injunctive relief, information, invoicing, and a declaration of its obligation to pay damages, and against the first defendant for destruction and recall. The district court sentenced the defendants as requested.

7    On appeal by the defendant, the Court of Appeal partially amended the judgment of the Regional Court and dismissed the action as currently unfounded with regard to the claims for injunctive relief, destruction and recall, as well as the claims for information and accounting, insofar as information on costs and profits was requested. The Court of Appeal dismissed the further appeal.

8    In its appeal, which was allowed by the Court of Appeal, the plaintiff seeks the restoration of the judgment of the Regional Court. In their cross-appeal, the defendants seek to have the action dismissed in its entirety.

<u>Reasons for Decision:</u>

9    The plaintiff's admissible appeal leads to the restoration of the judgment of the Regional Court; the defendant's cross-appeal is unsuccessful.

10    I. The court of appeal did not err in law in assuming that the defendants made use of the technical teaching of the asserted patent claim 17 by offering and selling the challenged mobile devices and thus infringed the patent in suit.

11    1. The patent in suit relates to the restoration of a broken radio connection between a handset and the base station in a cellular communication system (mobile radio network).

12    a) According to the patent-in-suit, such second and third generation radio systems support real time [RT] services and non-realtime [NRT] services. Such services provide the user with the ability to transmit information of a particular type, such as voice, images, or other data. Real-time services are used for applications where interruptions or delays in the connection of just a few seconds would be perceived as disruptive; examples include the transmission of voice or video. In contrast, non-real-time services are used for applications where longer interruptions are acceptable, such as the transmission of e-mails or the downloading of files (Par. 3, Par. 9).

13    According to the description of the patent-in-suit, most systems known in the prior art were designed to quickly restore an interrupted radio connection between the terminal and the base station.

14    The patent in suit explains this using the example of ETSI's 3GPP specifications for radio resource control (RRC) connections. These stipulate that a re-establishment timer is started when the mobile terminal has detected the loss of the radio link. The value of the expiration time to which the timer is set can range from 0 to 4095 seconds and is communicated to the mobile station by the radio network controller (RNC) with a specific control message. If, within the expiration time, the mobile station determines that it is in a service area, i.e., an area where radio link restoration is possible, the timer is stopped and a message is sent initiating radio link restoration. On the other hand, if the specified time expires before the mobile is in a service area, it enters an RRC idle mode in which active communication with the base station is not possible. The wide range of possible values between zero seconds and more than one hour makes it possible to set the value taking into account the time sensitivity of the service for which the radio bearers of the current radio link are used (par. 5 to 7, par. 37).

15    According to the patent in suit, this prior art takes insufficient account of the differences between the types of service, such as those between real-time services and non-real-time services, if active radio carriers are used for both real-time services and non-real-time services at the time the radio link is disrupted. In such a case, the set expiration time for at least one of the services is not appropriate.

16    b) Against this background, the patent in suit is based on the task of making it possible to take better account of the different requirements of different types of service in the event of a loss of a mobile connection between a mobile station and a network node (BGH, judgment of April 28, 2020 - X ZR 35/18, juris, marginal no. 10).

17    c) To solve this problem, the patent-in-suit proposes in claim 17 a device, the features of which can be structured as follows (partially deviating structure in the judgment of the X. Civil Senate of the Federal Court of Justice in the nullity proceedings and in the appeal court [italics] in square brackets. Civil Senate of the Federal Court of Justice in the nullity proceedings and the Court of Appeal [italics] in square brackets):

    1.    Communication device for a cellular radio system. [17.1]

    2.    The communication device includes means for detecting a failure of a radio link, [17.1a]

        2.1.    wherein the radio link comprises a plurality of active radio carriers, [17.2].

        2.2.    belonging to a radio resource control link. [17.2]

    3.    The communication device includes means (511, 515, 605) for determining a first expiration time [17.3].

        3.1.    for a period of time, [17.3].

        3.2.    during which the restoration of the lost radio communication in relation to the radio bearers used for services of a first category used *[3.2],* is permissible. [17.3, 3.1]

*English convenience translation provided by*    ARNOLD RUESS

4.      The communication device comprises means (511, 515, 605) for determining a second expiration time different from the first [17.4, 17.6; 5].

    4.1.    for a period of time, [17.4].

    4.2.    during which the restoration of the lost radio link is allowed with respect to the radio bearers used for services of a second category, different from the first [5]. [17.4, 17.5, 4.1; *4.2]*

18    The task according to the invention is thus essentially solved by determining two different expiry times for two different categories of services. This makes it possible, for example, to permit restoration of the radio link only within a relatively short period for time-sensitive services and to determine a longer period for less time-sensitive services.

19    Figure 2a shows a communication situation making use of one embodiment of the invention: During the time 201 a radio connection is established between the base station (left side) and the mobile station (right site). In the point in time 203 the loss of a radio connection is recognized. Then the two timers in the mobile station are started. The first timer is set to a relatively short expiry time until the point in time 206 and which typically amounts to only a few seconds (para. 33). The second timer is set to a longer expiry time reaching to point in time 208 and which can amount minutes (para. 34).



Fig. 2a

20    With respect to a radio bearer used for a real-time service, efforts to re-establish the radio link are abandoned as soon as the first expiration time has elapsed, i.e., when time point 206 is reached. In contrast, with respect to a radio bearer used for a non-

real-time service, such attempts are not abandoned until the time 208 is reached. If the mobile device is already back in the service area before reaching time point 206, the radio connection is restored with all originally active radio bearers. In the interval between times 206 and 208, the radio link is restored only with respect to radio bearers for a non-real-time service (par. 46).

21    Figure 2b shows another embodiment in which the timers are connected in series (par. 40: "chaining the timers"). In this example, the second timer is activated only after time 206 has elapsed. It then runs until time 208.

22    2. The court of appeal assumed that the defendants used this technical teaching contrary to § 9 PatG and essentially justified this as follows:

23    It was only necessary for the realization of feature group 2 that the communication device had objectively suitable means by which the failure of a radio connection with several active radio bearers could be determined. The use of the device claim was to be affirmed if the features of the patent claim were realized and the attacked embodiment was objectively suitable to achieve the properties and effects according to the patent. The applicant had shown for the Haier W858 devices that it was possible - without using VoIP - to maintain an Internet connection and a telephone call simultaneously in the challenged embodiments examined by it. This necessarily requires that the devices are able to establish a radio connection with at least two active radio bearers; otherwise, they would not be able to provide two services of different categories. The defendants had not shown that the plaintiff's assertion was incorrect.

24    Feature groups 3 and 4 do not require first means for determining a first elapsed time and separate second means for determining a second elapsed time, and the elapsed time does not necessarily have to be greater than 0. By means of its test using the Haier W867 device, the plaintiff proved that the challenged embodiments recognize and implement different timers; in this respect, the plaintiff even proved the existence of two timers T314 and T315. The defendants had not substantially countered this factual argument despite judicial notice. This applies irrespective of the fact that the defendants, for their part, submitted without contradiction that XXX, as one of the largest suppliers of base stations, hard-codes the value T314 = 0 and that the Internet providers operating in Germany do not use any other values, if only because they do not want to infringe process claim 20 of the patent in suit. For one thing, XXX was not the only manufacturer of corresponding base stations, and for another, T314 = 0 was a patent-compliant expiry time that the challenged embodiments could indisputably determine. As Defendant's private expert opinion states, the time values are signaled to the terminal by the network node. Accordingly, the expiration times would be specified by the network without the manufacturer of the terminal device having any influence on the concrete design of these values. Nevertheless, the terminal devices must be objectively capable of processing the time values specified by the network. These technical conditions were confirmed in the UMTS standard. The defendants'

argument that the chips implemented in the challenged embodiments do not have "recovery timers" in their basic settings, as they are installed, offered and sold by the defendants, and that these can only be implemented externally by synchronization with a base station, disregards from a legal point of view the fact that at the time of the act of use, only the objective capability to determine an initial expiry time within the meaning of the patent in suit must be present. In this respect, the defendants mixed up the timers according to the invention and corresponding values for the expiry times; only the latter would be transmitted by the network.

25    Feature 4 required the communication device to have means to process different values for a first and a second elapsed time, if specified by the network. It was not required that different values were always and without exception sent by the network. Accordingly, the fact that the means could also process time lapse values that were set identically for both timers, even by the value T = 0 in each case, did not prevent the allegation of infringement. Even if the cited passages of the standard were to provide only optional solutions in this respect, the plaintiff had proven the literal realization of feature 4 by the challenged devices. On the basis of the test with the Haier W867 model, it could be established that the challenged embodiments were objectively capable of processing different values for the first and second expiry times.

26    3. This assessment proves to be free of legal errors.

27    a) The question of how claim 17 of the patent in suit is to be interpreted is a question of law and can be reviewed in its entirety by the appellate court (see BGH, judgment of 7. September 2004 - X ZR 255/01, BGHZ 160, 204, 212 - Bodenenseitige Vereinzelungseinrichtung; judgment of May 20, 2008 - X ZR 180/05, BGHZ 176, 311 marginal no. 19 - Tintenpatrone I; judgment of May 5, 2020 - KZR 36/17, WRP 2020, 1194 marginal no. 26 - FRAND-Einwand I). The interpretation by the Court of Appeal w this review.

28    aa) The device according to patent claim 17 serves to improve the situation described in feature group 2, in which a radio link is interrupted that has several active radio bearers that belong to a radio resource control link and are used for services of different categories (see BGH, judgment of April 28, 2020 - X ZR 35/18, juris, marginal no. 10). The simultaneous use of several radio bearers results in the necessity described in the patent in suit to allow different time periods for recovery attempts depending on the time sensitivity of the respective service in case of loss of the radio connection.

29    bb) Feature group 2 requires that the communication device has means for detecting interference with a radio link which are characterized by features 2.1 and 2.2. This means, as the court of appeal correctly assumed and without objection by the parties, that the means characterizing the communication device must be objectively suitable for detecting the interference of such radio links.

30    cc) According to feature groups 3 and 4, the communication device must include means for determining a first expiry time (feature 3) and a second expiry time (feature 4).

31    (1) The first expiry time specifies the period of time (feature 3.1) during which restoration of the lost radio link is permitted with respect to radio bearers used for services of a first category (feature 3.2), and the second expiry time specifies the period of time during which restoration of the lost radio link is permitted with respect to radio bearers used for services of a second category different from the first (feature 4.2). A time measurement in order to be able to determine whether the specified expiry time has been reached and a deactivation of the restoration option after this point in time has been reached are not required by patent claim 17, in contrast to patent claims 8 and 14 (BGH, judgment of April 28, 2020 - X ZR 35/18, juris para. 23).

32    The cross-appeal unsuccessfully complains that the court of appeal erred in law in its opinion that the respective expiry time does not necessarily have to be greater than 0. As can be seen from features 3.2 and 4.2, the time periods are to be specified during which the restoration of the lost radio link is to be permissible with regard to the radio bearers of the different categories. In such an understanding, the value 0 indicates the exclusion of the possibility of restoration. Against the background that the design of the mobile radio device according to feature groups 3 and 4 should make it possible to set the expiry time value taking into account the time sensitivity of the respective service for which the radio bearers of the current radio connection are used, it may be expedient to exclude restoration attempts from the outset in the case of particularly time-critical services. The description of the patent-in-suit confirms this function-oriented consideration by stating that it is possible to "switch off" the recovery possibility for RT carriers, i.e. to release the RT carriers immediately in case of a loss of the radio link (para. 9 line 53). This understanding is further confirmed by the description of the prior art in the patent application. According to this, the values of the T314 timer in the 3GPP specifications for RRC connections can range from 0 to 4095 seconds (para. 7). As can be seen from Table 13.1 of the cited specification (3GPP TS 25.331version 3.1.0 Release 1999, Annex NK 3 p. 254), the value 0 is an adjustable value because, in contrast to T313, the initial value is not specified as 1, but as 0.

33    However, this does not change the fact that, in addition to the value 0, it must be possible to set at least one other value for the respective category, since otherwise a determination of the expiration times by the means does not take place, but is predetermined. This range of possible values allows a flexible setting of the value taking into account the time sensitivity of the respective service (par. 5 to 7, par. 37).

34    (2) The means for determining the expiry times can be a read/write memory or a register from which the expiry times are read out, as can be seen from the description of the patent in suit (para. 49 lines 18 f.). An independent determination of the expiration times by the communication device is not required. Rather, the expiry value

storage described as an embodiment of the invention may be coupled to a signaling detector that receives signaling messages with the currently applicable expiry values from the network. However, the expiry value storage may also comprise fixed expiry time values or a number of fixed expiry time values (par. 49 lines 30 ff.).

35    (3) As the Court of Appeal correctly assumed, there is no need for separate means for determining the first and the second expiry time. Rather, these can be contained in a single functional unit (BGH, judgment of April 28, 2020 - X ZR 35/18, juris para. 45). The means must merely be objectively suitable for determining different expiry times for different categories of services. It is not mandatory that this actually takes place (BGH, judgment of April 28, 2020 - X ZR 35/18, juris marginal no. 25).

36    The protection of a product is in principle not limited to its use for a specific purpose, even if this purpose results directly from the claim. If indications of purpose, effect and function - as in this case - are part of a protective claim, they generally participate in its task of defining and thus at the same time limiting the protected subject matter, if they define the device element to which they refer as such, which must be designed in such a way that it can fulfill the relevant function (cf. BGH, judgment of May 20, 2008 - X ZR 180/05, BGHZ 176, 311 marginal no. 17 - Tintenpatrone I; BGH, WRP 2020, 1194 marginal no. 31 - FRAND-Einwand). In the case in dispute, it is sufficient if the communication device is designed in such a way that it can determine the expiration times specified in features 3 and 4 - if necessary in cooperation with the network (see above marginal no. 34).

37    It must be taken into account that two expiry times are involved, which have different significance with regard to the permissibility of restoring the interrupted radio link. The means according to feature groups 3 and 4 must therefore also have the suitability to take into account this different significance of the two expiry times - for example by the fact that not only the expiry time can be stored in a register, but also the information as to the significance of the expiry of this time period (BGH, judgment of April 28, 2020 - X ZR 35/18, juris, marginal no. 47). It is therefore necessary that the mobile station is set up in such a way that, in the event of transmission of the values, it can recognize whether it is a first or second expiry time within the meaning of the patent in suit, i.e. what significance is attached to the stored value (BGH, judgment of April 28, 2020 - X ZR 35/18, juris marginal no. 80).

38    Contrary to the opinion of the cross-appeal, the court of appeal did not misjudge this. In this respect, it required that the communication device provides objectively suitable means by means of which the failure of a radio link can be determined in such a way that restorations of this radio link can take place with regard to different service categories with different expiry times to which the radio bearers are specifically related. Contrary to the opinion of the Court of Appeal and the cross-appeal, this does not require timing and deactivation of the restoration option after this point in time has been reached in claim 17 (BGH, judgment of April 28, 2020 - X ZR 35/18, juris para. 23).

39      b) The court of appeal reached the conclusion without any error of law that the challenged embodiments realize claim 17. The realization of features 1 and 2 is rightly no longer in dispute in the appeal proceedings. The appellate court did not err in law in assuming that the challenged embodiments also have means for determining a first and second expiry time within the meaning of feature groups 3 and 4.

40      aa) The finding by the Court of Appeal that the challenged embodiments must be able to implement standard values (T314 = 12 seconds; T315 = 180 seconds) to be specified by the network at least during the transition of control from one radio cell to the next (handover) is already sufficient for this. Contrary to the complaint of the cross-appeal, this finding is not based on a procedural error. The specification of the values by the network is sufficient for the realization of the characteristic for the reasons stated (marginal no. 36).

41      bb) The Court of Appeal also found that the challenged embodiments recognized and implemented different expiry times in the tests carried out by the plaintiff, in which a radio link failure was simulated and the network specified different values for T314 and T315. The cross-appeal unsuccessfully complains that the Court of Appeal based its assessment on the plaintiff's tests as a procedural error; no reasons are given in this respect (Section 564 of the German Code of Civil Procedure).

42      cc) The appeal complaining that the Court of Appeal did not find that the devices were also suitable for taking into account the different significance of the two elapsed times is also unsuccessful. On the contrary, it is clear from the findings of the Court of Appeal that the challenged terminal devices have two timers T314 and T315 and are capable of processing the time values specified by the network. This means that the values transmitted by the network are assigned to these timers, which in turn are assigned to the services addressed by the court of appeal (telephony and Internet). According to the findings of the Court of Appeal, the communication devices are furthermore, as explained (para. 38), not even required by patent claim 17, suitable for monitoring the expiry times.

43      This also corresponds to the specifications of the standard, as can be seen from the expert opinion submitted by the defendants (Annex G2). According to this, several connections can be established simultaneously in the standard, and these are divided into different categories. The standard also provides for the possibility of a terminal supporting only one bearer (radio access bearer, RAB) at a time. The categories are compared in the standard with connection-oriented and packet-oriented services. Each category is assigned a timer (Exhibit G2 p. 7). Without success, the defendants claim that the described assignment for the radio bearers is already carried out by the network in the standard ("use T314"; "use T315"); the communication device thereupon merely carries out the step of reading out and thus determining these values without in any way pursuing any meaning information or distinguishing between functions of these values. As explained, this is not important.

*English convenience translation provided by* ARNOLD RUESS

44    II. The assumption of the Court of Appeal that the claim aimed at ordering the defendant to cease and desist and to recall patent-infringing products is nevertheless unfounded as the defendant's FRAND defense currently prevails does not withstand the attacks of the appeal.

45    1 The Court of Appeal essentially stated in justification of its decision: The plaintiff has a dominant position in the market within the meaning of Article 102 TFEU. The answer to the question in dispute between the parties, whether the implementation of the standard necessarily requires the use of the patent in suit or whether the standard merely optionally provides for the implementation of the technical teaching of the patent in suit, can also be left open in this context. The use of the patent in suit was in fact inevitable, because UMTS-capable cell phones - in order to be marketable at all - had to be able to detect several radio bearers. According to the principles established by the Court of Justice of the European Union in the Huawei/ZTE case, the legal assertion of the claims for injunction, destruction and recall constituted an abuse of this dominant position. Although the plaintiff had fulfilled its obligation to notify, it had not made the defendants an offer that complied with FRAND conditions, despite the defendants' declared and continuing willingness to license.

46    However, the declaration of willingness to license had only been made about one year after the plaintiff's first notice of infringement of December 20, 2012. However, the failure of a party to take a necessary step in due time does not result in material preclusion; the step in question can in any case still be taken before the action is filed. In addition, no circumstances had subsequently come to light that would give reason to assume that the defendant's or its group's willingness to license had lapsed again in the meantime.

47    The offers made by the plaintiff constitute an evident discrimination of the defendants. With its license offers, the plaintiff treats the defendants unequally in relation to one of its licensees, a Chinese state-owned enterprise, with regard to the amount of the license fees without a valid factual reason.

48    (2) The appeal unsuccessfully challenges the Court of Appeal's affirmation of the plaintiff's status as an addressee under Article 102 TFEU.

49    a) The plaintiff is dominant on the license market relevant here. As the Senate explained in more detail in its judgment of May 5, 2020 (KZR 36/17, WRP 2020, 1194, marginal no. 54 - FRAND-Einwand) between the parties to the proceedings, the assumption of an independent license market first requires a finding that the patent is essential to a standard, i.e. that the use of the patented teaching is indispensable for the implementation of a standard (standardized by a standardization organization or enforced on the market) (BGH, judgment of 13. July 2004 - KZR 40/02, BGHZ 160, 67, 74 - Standard-Spundfass; WRP 2020, 1194 marginal no. 58 - FRAND-Einwand), so that it is generally not technically possible to circumvent the invention without losing important functions for the product market (BGH, WRP 2020, 1194 marginal no. 58 -

*English convenience translation provided by*  ARNOLD RUESS

FRAND objection; cf. ECJ, judgment of July 16, 2015 - C-170/13, WRP 2015, 2783 marginal no. 49 - Huawei/ZTE; European Commission, decision of April 29, 2014 - C (2014) 2892 marginal no. 52 - Motorola). Furthermore, a prerequisite for an independent license market is that the technical teaching corresponding to the patent and the standard cannot be substituted by another technical design of the product (BGH, WRP 2020, 1194 marginal no. 58 - FRAND objection; cf. ECJ, Sig. 2004, 1-5039 marginal no. 28 - IMS Health; BGHZ 160, 67, 74 - Standard bung barrel).

50    b) The Court of Appeal left open whether the standard relevant here provides for the implementation of the teaching of the patent in suit only as an option and whether the use of only one radio bearer corresponds to the standard. However, it stated that such a possibly existing non-patent option no longer plays a role in practice, which is why the use of the patent in suit is in any case factually unavoidable within the scope of the implementation of the requirements of the standard. This is sufficient for the assumption of an independent license market, since a mobile device that does not implement the technical teaching of the patent in suit is not competitive thereafter (see ECJ, judgment of April 29, 2004 - C-418/01, Sig. 2004, 1-5039 = WRP 2004, 717 marginal no. 29 - IMS Health; BGH, WRP 2020, 1194 marginal no. 59 f. - FRAND objection).

51    c) The Court of Appeal did not fail to recognize that, despite the legal barrier to access in such a case, there may be exceptional reasons which could preclude market dominance by the owner of the standard-essential patent (BGH, WRP 2020, 1194 marginal no. 61 et seq. - FRAND objection). However, it was unable to find any indications of this either in the submissions of the parties or in the circumstances of the case; this withstands the review under this further appeal (BGH, WRP 2020, 1194, marginal no. 62 et seq. - FRAND objection).

52    3. However, the findings of the Court of Appeal do not justify the assumption that the plaintiff abused this dominant position.

53    a) As the Senate explained in more detail in its judgment of May 5, 2020 (WRP 2020, 1194 - FRAND objection), issued between the same parties, following the case law of the European Court of Justice (WRP 2015, 1080 para. 54 et seq. - Huawei/ZTE), a dominant patent holder that has committed to a standardization organization to grant licenses on FRAND terms cannot only abuse its market power by refusing to conclude a corresponding license agreement with an infringer willing to obtain a license and by suing the infringer for injunctive relief, recall and removal of products from the distribution channels or for destruction of patent-infringing products. Rather, an abuse may also be present if the patent proprietor is to be blamed for not having made sufficient efforts to meet its special responsibility associated with the market-dominant position and to make it possible for an infringer who is in principle willing to license to conclude a license agreement on reasonable terms (BGH, WRP 2020, 1194 marginal no. 75 et seq. - FRAND objection; cf. BGH, decision of December 11, 2012 - KVR 7/12, WuW/E DE-R 3821 marginal no. 15 - Fährhafen Puttgarden II).

54    In both cases, the action is abusive because - and only because - the willing infringer has the claim that the patent proprietor contractually permits him to use the protected technical teaching on FRAND terms An abuse of the dominant position of a patent proprietor therefore does not, in principle, arise from contractual terms offered by the patent proprietor before or at the beginning of negotiations as such, which, if contractually agreed, could unfairly hinder or discriminate against the licensee. Rather, the abuse of market power follows - not unlike in cases of refusal to supply or refusal of access to an infrastructure facility of the market dominator - only from the refusal of a requested access to the invention per se or from unreasonable conditions for a requested access from which the patent proprietor is not prepared to deviate even at the end of negotiations (cf. BGH, decision of September 24, 2002, KVR 15/01, BGHZ 152, 84, 94 - Fährhafen Puttgarden I), i.e. the refusal to offer the licensee seeking the conclusion of a license agreement on FRAND terms, as a result of a negotiation process, those fair, reasonable and non-discriminatory contractual terms which the licensee can claim and to which it, for its part, is prepared to conclude with the patent proprietor.

55    b) It follows from the obligation to refrain from such misuse and the special responsibility of the dominant patentee that he must first point out the infringement of the patent in suit to the infringer if the latter is (possibly) not aware of making unlawful use of the teaching of the standard-essential patent by implementing a technical solution required by the standard (ECJ, WRP 2015, 1080 Rn. 60-62 - Huawei/ZTE; BGH, WRP 2020, 1194 Rn. 73 f. - FRAND-Einwand).

56    c) Since the FRAND commitment does not in principle change the fact that the party wishing to make use of the technical teaching of a patent must obtain a license from the patent proprietor for this purpose (ECJ, WRP 2015, 1080 para. 58 - Huawei/ZTE), further obligations of conduct on the part of the dominant patent proprietor can only arise if and when the user of the protected technical teaching expresses his intention to conclude a license agreement on FRAND terms (ECJ, WRP 2015, 1080 para. 63 - Huawei/ZTE).

57    aa) For this purpose, it is regularly not sufficient if the infringer, in response to the infringement notice, merely shows willingness to consider the conclusion of a license agreement or to enter into negotiations as to whether and under which conditions a conclusion of an agreement would be possible for him. Rather, the infringer, for its part, must clearly and unambiguously declare its willingness to conclude a license agreement with the patent proprietor on reasonable and non-discriminatory terms, and must also subsequently participate in the license negotiations in a targeted manner (BGH, WRP 2020, 1194 marginal no. 83 - FRAND objection).

58    (1) Not different from cases of negotiated access to an infrastructure facility, only the willingness of the user of the invention to place the access to the protected technical solution, which he has already obtained on his own authority through the patent infringement, on a licensing contractual basis for the future can justify the requirement

*English convenience translation provided by*    ARNOLD RUESS

for the dominant patent proprietor to make an offer to the user to this end, to explain this offer in a manner and level of detail appropriate to the circumstances of the individual case, and to engage in a negotiation about this offer and, if necessary, a counteroffer by the infringer, This cooperation is the indispensable counterpart to requiring the patentee to accept the infringement of the patent-in-suit as long as the infringer on his part makes the efforts that are required and possible and reasonable under the given circumstances to conclude a license agreement on FRAND terms in order to be able to continue to use the patented teaching on this basis (cf. High Court of England and Wales [J. Birss], judgment of 5 April 2017, [2017] EWHC 711 [Pat] para 562).

59    (2) The (mutual) willingness to license is not only of fundamental importance because the patent proprietor only has to grant a FRAND license to a user of the invention who is willing to do so and can only grant such a license at all. It is also indispensable because an appropriate result balancing the conflicting interests of both parties can usually only be achieved as the result of a negotiation process in which these interests are articulated and discussed in order to achieve a fair and appropriate balance of interests desired by both parties. The requirements for the conduct of the patent proprietor and the conduct of the user of the invention are mutually dependent. Since the standard of review is what a reasonable party interested in the successful conclusion of the negotiations in a manner that is in the interests of both parties would do to promote this goal at a particular stage of the negotiations, the individual requirements to be met cannot be defined in general terms.

60    If one party initially fails to cooperate as required in the conclusion of a license agreement on FRAND terms, this is generally to its detriment. Depending on the circumstances, the party may be required to compensate for any omissions as far as possible. This is in line with the usual practice of persons interested in concluding a contract who, in the event of a delayed reaction to a corresponding offer to negotiate, must normally expect that the other party is no longer interested in concluding a contract.

61    In the case of a standard-essential patent, lower requirements do not result from the fact that the patent proprietor, who has submitted a declaration of willingness to license, has only limited means of exerting pressure by enforcing the property right by taking legal action if necessary (BGH, WRP 2020, 1194 marginal no. 64 - FRAND objection) and is dependent on concluding license agreements for the economic exploitation of his patent. On the contrary, the patent infringer may not exploit this structural disadvantage for the purpose of "patent hold-out" (cf. BGH, WRP 2020, 1194 marginal no. 64 - FRAND objection) without exposing himself to the accusation of dishonest conduct. Otherwise, the restriction of the enforceability of the patent by legal action for the purpose of avoiding an abuse of market power would lead to another distortion of the conditions of competition in that the patent infringer could obtain an unjustified advantage over such competitors who have to seek a license

in due time and therefore have to pay the appropriate remuneration for the use of standard-essential patents.

62    (3) If the user who has been made aware of the infringement has failed over a longer period of time to express his interest in a license agreement on FRAND terms, he must therefore be expected to make additional efforts to help ensure that, notwithstanding this failure, a corresponding license agreement can be concluded as soon as possible.

63    bb) Contrary to the view of the defendant, these requirements regarding the patent infringer's willingness to license are in line with Article 102 TFEU and its interpretation in the case law of the European Court of Justice (WRP 2015, 1080, para. 71 - Huawei/ZTE); they also do not require resubmission.

64    (1) As the Court of Justice has held, the patent proprietor who has made a FRAND declaration does not in principle abuse his dominant position by bringing an action for an injunction or for the recall of infringing products if, before bringing the action, he has given the required infringement notice, has submitted to the infringer - after the latter has in turn expressed his will to conclude a license agreement on FRAND terms - has made a concrete offer of a license on such terms, indicating in particular the license fee and the way in which it is to be calculated, and the infringer, although continuing to use the protected technical teaching, does not respond to this offer with diligence, in accordance with accepted business practices and in accordance with the requirements of good faith, which in particular prohibits it from pursuing delaying tactics in its response (ECJ, WRP 2015, 1080 para. 71 - Huawei/ZTE). Furthermore, the Court of Justice has deemed the infringer to be obliged to ensure the patent proprietor's claims under the license agreement to be concluded by providing adequate security as of the time when the patent proprietor has rejected a counteroffer made by it (ECJ, WRP 2015, 1080 marginal no. 67- Huawei/ZTE).

65    (2) The Court of Justice of the European Union thus emphasizes the mutual obligation to engage in a constructive exchange aimed at achieving a fair balance of the interests involved (ECJ, WRP 2015, 1080 para. 55 - Huawei/ZTE; cf. BGHZ 152, 84, 97 - Fährhafen Puttgarden I). Due account must be taken of the particular legal and factual circumstances of the specific case (ECJ, WRP 2015, 1080 marginal no. 56 - Huawei/ZTE). This means that compliance with the "negotiation program" outlined by the European Court of Justice is regularly sufficient to exclude a violation of the prohibition of abuse and thus the objection of an abusive filing of a lawsuit. Accordingly, the Court's answer to the questions referred for a preliminary ruling negatively defines the conditions for denying an abuse of market power. However, since the affirmation or denial of an abuse always requires a consideration of all circumstances of the case and a weighing of the mutual interests, special circumstances may also justify stricter or less stringent conduct obligations (cf. High Court of England and Wales [J. Birss], Judgment of April 5, 2017, [2017] EWHC 711 [Pat] para. 744; UK Supreme Court [Lords Reed, Hodge, Lady Black, Lords Briggs, Sales], Judgment of August 26, 2020,

*English convenience translation provided by* ARNOLD RUESS

[2020] UKSC 37 para. 152 et seq.; Gerechtshof Den Haag, GRUR Int. 2020, 174, 176 para. 4.14). In this respect, the examination of a FRAND objection is no different from other cases of abuse of a dominant position.

66    (3) Without success, the defendants argue that the fact that the Court of Justice of the European Union requires a concrete written license offer by the patent proprietor *after* the patent infringer has expressed its will to conclude a license agreement on FRAND terms (WRP 2015, 1080 para. 71 – Huawei/ZTE, emphasis by the Senate) precludes an understanding of the obligation to declare willingness to license as a kind of permanent condition or continuing act. This loses sight of the fact that the abuse of market power in cases of the kind at hand arises from the refusal of the dominant company to fulfill the claim of a company from the opposite side of the market for lawful access to the invention and to grant a license on FRAND terms for this purpose (ECJ, WRP 2015, 1080 para. 53 - Huawei/ZTE). It is the abusive character of this refusal that can be held against the actionable claim under the patent (ECJ, WRP 2015, 1080 para. 54 - Huawei/ZTE). An abusive refusal by the dominant patentee necessarily presupposes a continuing demand by the infringer for the conclusion of a contract on FRAND terms and its willingness to cooperate in the conclusion of such a contract, without which a "refusal" by the patentee would be futile.

67    For this willingness to license, it is not sufficient that a serious and final refusal of the patent infringer to conclude an agreement on FRAND terms cannot be determined. For this ignores the principle, also emphasized by the European Court of Justice, that the party wishing to make use of the technical teaching must obtain a license to do so (ECJ, WRP 2015, 1080 para. 58 - Huawei/ZTE). However, the patent infringer has already obtained access to the use of the invention, for which he owes an appropriate fee, on his own authority and thus - at least initially - free of charge, so that delaying the resolution of the conflict of interest by concluding a contract obliging him to pay consideration, unlike in the case of claims for supply or access to an infrastructure facility, does not favor the market dominator but the market opponent. The "delaying tactic", which the infringer may not engage in and which, as the European Court of Justice has expressly stated (WRP 2015, 1080, para. 71 - Huawei/ZTE), excludes an abuse of the dominant position, therefore typically consists precisely in not simply rejecting a license agreement on FRAND terms, but ostensibly striving for it, but pushing back the finding of an appropriate solution in detail or at least postponing it as long as possible.

68    (4) Contrary to the view of the defendant, the declaration of willingness to license is thus not a "mere gateway" for the start of the actual negotiations, also according to the case law of the European Court of Justice. Rather, the continued willingness to license is an indispensable prerequisite for successful license negotiations and thus also for the accusation of abuse of market power against the patent holder in the event of their failure. This is also clear from the context of the Huawei/ZTE decision. The guidelines formulated by the Union Court are based on a proposal by Advocate General Wathelet. This was based on the assumption that an abuse can only be

considered against a patent infringer who is objectively ready, willing and able to enter into a FRAND license agreement (see Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13, juris paras. 74-75, 80). The Advocate General did not consider a mere willingness to negotiate sufficient by ZTE following a press release of the European Commission of December 21, 2012 (IP/12/1448), nor did he necessarily require an unconditional offer to conclude a license agreement within the meaning of the Orange Book decision of the Senate (judgment of 6. May 2009 - KZR 39/06, BGHZ 180, 312 marginal no. 29) (see Opinion of Advocate General Wathelet of November 20, 2014 - C-170/13, juris footnote 19). Incidentally, this is also in line with the Commission's view in a decision preceding the decision of the Union Court of Justice, in which the Commission expresses that the patent proprietor may seek and enforce an injunction against a potential licensee if the latter is unwilling to enter into a FRAND agreement (decision of 29 April 2014, COM[2014]2892 final para. 427 [c]). Such an objective willingness to conclude a FRAND license agreement is regularly demonstrated, according to the business practices recognized in all areas of economic life and also emphasized by the European Court of Justice as decisive, by the active promotion of negotiations oriented towards the common goal of a successful conclusion. The negotiation steps of parties interested in concluding a contract build on each other. A duty to promote therefore always exists if and insofar as, according to business practice and the principles of good faith, the next negotiating step is to be expected (cf. on Section 203 of the German Civil Code in the event of negotiations "falling asleep": BGH, judgment of November 8, 2016 - VI ZR 594/15, NJW 2017, 949 marginal no. 16 with further ref.).

69    cc) A willingness to license understood in this way is not dispensable, but retains its meaning even if the patent proprietor has submitted a license offer to the infringer (different view Kühnen, Hdb. Patentverletzung, 13th ed., ch. E marginal no. 394 et seqq.; Landgericht Düsseldorf, order of November 26, 2020 - 4c 0 17/19, juris marginal no. 37).

70    (1) The offer, with which the patent proprietor fulfills his special responsibility as market dominator to make it possible for the user of the invention to conclude a license agreement on FRAND terms, is not the end point but the starting point of the license negotiations. At least in a complex situation, as is typically the case in the licensing of standard-essential patents, it is regularly not obvious which contractual terms in the specific case (cf. Gerechtshof Den Haag, GRUR Int. 2020, 174, 179 para. 4.34) meet the requirements for an appropriate balance of interests and at the same time do not violate the prohibition of discrimination under antitrust law. Moreover, as a general rule, there is not *one* license agreement satisfying FRAND conditions, but a range of possible reasonable solutions (cf. High Court of England and Wales [J. Birss], Judgment of October 23, 2018, [2018] EWCA Civ 2344, GRUR Int. 2019, 357, para. 121; OLG Karlsruhe, GRUR 2020, 166, para. 95; cf. on Section 19 (4) No. 4 GWB aF BGHZ 152, 84, 96 - Fährhafen Puttgarden I). As a rule, the patent proprietor is only able to take into account any legitimate interests of the user once he is aware of them.

71    It is therefore precisely the task of the negotiations to produce a fair and reasonable final result and, to this end, to articulate the mutual interests and to put forward for discussion factual and legal aspects which, from the point of view of at least one party to the negotiations, may be of significance for this result (cf. Communication of the European Commission of 29 November 2017 on the EU's handling of standard-essential patents, COM[2017] 712 final, p. 7). It is therefore incumbent on the user of the invention to check the offer of the patent proprietor as to whether its content requires further information from the patent proprietor and whether and, if so, to what extent the structure of the offer or individual provisions thereof, in particular the property rights to be covered by the agreement and the amount and method of calculation of the license fee, (possibly) do not comply with FRAND conditions from his point of view. If necessary, he is required to submit a counteroffer; however, whether this is the case also depends on the individual case and is also governed in this respect by customary and recognized business practices and the principles of good faith. In particular, in the case of a license offer of the patent proprietor which obviously does not comply with FRAND conditions and which, when assessed objectively, is not meant seriously and thus appears as a refusal to conclude a license agreement on FRAND conditions (cf. BGHZ 152, 84, 92 - Fährhafen Puffgarden I), it may suffice as a reaction of a user of the invention who seriously seeks a license to explain the reason why the offer obviously does not comply with FRAND conditions. It is decisive from which reaction the user of the invention may assume that the conclusion of a license agreement on FRAND terms - provided that the patent proprietor is willing to do so - can be properly promoted.

72    (2) If the patent proprietor has made a (at least essentially complete) contractual offer to the user of the invention despite the latter's unwillingness to license the invention, the user must therefore deal with this offer in such a way as to indicate that he is now pursuing the goal of reaching a mutually equitable result as soon as possible. For this purpose, it is not important whether and to what extent the content of the contractual offer of the patent proprietor already complies in every respect with the requirements of the contract to be concluded for fair, reasonable and non-discriminatory conditions of use of the contractual property rights.

73    (a) If the patent proprietor were obliged to always immediately submit an offer that anticipates the appropriate and mutually beneficial outcome of license agreement negotiations, there would be no need for negotiations and also no counter-offer by the user who does not want to accept the patent proprietor's offer.

74    (b) Even more serious is the consideration that the content of a complex license agreement cannot be reviewed, either outside of court proceedings or in court proceedings, in the abstract, as it were, to determine whether all contractual terms and conditions satisfy the requirements for a fair, reasonable and non-discriminatory structuring of the use of the contractual property rights. Rather, this can regularly only be assessed if the party that does not want to accept a contractual term proposed by the other party, or at least does not want to accept it without further do, asserts those

aspects that, from the point of view of this party, speak against the appropriateness of the contractual term or make this appropriateness appear at least doubtful, and if the other party then either takes these concerns into account by amending or supplementing its proposal or explains why, from its point of view, the concerns do not prevail (cf. BGHZ 152, 84, 97 - Fährhafen Puttgarden I). It is obvious that arguments and counter-arguments are determined by the conflicting interests of the parties, one of which wants to achieve the highest possible remuneration for the use of the contract rights and the other wants to pay the lowest possible remuneration for this. Precisely for this reason, however, a negotiation process is required at the end of which there is an appropriate balance of interests sought by both sides. Even if the efforts of the parties to find an amicable solution nevertheless ultimately fail, these can, since they provide indications as to which interests are to be taken into account in detail and how they are to be weighted, form the basis of a court decision, if necessary, as to the extent to which the conflicting views represented on the individual points in dispute are compatible with the requirement to license on FRAND terms (see BGHZ 152, 84, 97 - Fährhafen Puttgarden I).

75    (c) Since regularly only the effort of both parties to find a fair balance of interests can lead to a contract with FRAND conditions, especially in cases where - at least until then - an offer of the patent proprietor exists despite the lack of willingness to license, the will and the declared willingness of the infringer are not dispensable to reach and contribute to a fair and reasonable conflict resolution. The consideration that the patent proprietor is "not in need of protection" because it is possible for him without further ado to submit a FRAND-compliant license offer, which only - if it is indeed fair, reasonable and non-discriminatory - triggers further behavioral obligations of the infringer (according to Kühnen, Hdb. Patentverletzung, chap. E marginal no. 396), already fails because of this dependence of the FRAND-compliance of a certain contract content on the result of the negotiation process.

76    Moreover, it again fails to recognize that even an offer that does not comply with FRAND conditions as *such does* not constitute an abuse of the dominant position of the patent proprietor, which rather consists in refusing or making it impossible for the infringer to negotiate and conclude a FRAND license agreement that is in line with the interests articulated in the negotiation process (and instead to enforce the patent or one of the patents to be licensed by taking legal action).

77    dd) These requirements are also in line with Union law as interpreted by the Court of Justice in Huawei v. ZTE and do not require resubmission. Accordingly, it is incumbent on the infringer to respond to the patent proprietor's offer with diligence, in accordance with accepted business practices in the field and in good faith, which is to be determined on the basis of objective aspects and implies, inter alia, that no delaying tactics are pursued (ECJ, WRP 2015, 1080 para. 65 - Huawei/ZTE). The assessment of whether a delaying tactic is being pursued, which is to be made on the basis of objective aspects, is thus also to be made on the basis of the infringer's reaction to the offer, and is thus not limited to the declaration of the desire to license. This is also

appropriate. The declaration of a wish to license or of the willingness to negotiate does not say anything about whether this declaration is meant seriously. Rather, it may also be the result of a delaying tactic on the part of the patent user (cf. BGH, WRP 2020, 1194 marginal no. 82 - FRAND objection), which may not be accepted in order to protect the patent proprietor and the competition between the patent users. Therefore, also according to the case law of the European Court of Justice, the further conduct of the infringer must be taken into account. According to this, a delaying tactic can be considered in particular - but not exclusively - if the patent user does not react to the patent proprietor's explanations within a reasonable period of time, in particular if he rejects the patent proprietor's offer but nevertheless fails (although this can be expected according to the concrete circumstances of the individual case in accordance with customary practice and the requirements of good faith, cf. para. 71) to make a concrete counter-offer in writing within a short period of time that complies with FRAND conditions. This is the reason why - as the Union Court of Justice has expressly stated - the patent infringer cannot rely in this case on the abusive character of an action for injunction or recall (ECJ, WRP 2015, 1080 para. 66 - Huawei/ZTE) and that the same applies if the infringer continues to use the patent despite rejection of its counter-offer, but fails to provide adequate security in accordance with accepted practice in the relevant field (ECJ, WRP 2015, 1080 para. 67 - Huawei/ZTE).

78    Under which further circumstances not mentioned by the European Court of Justice a lack of willingness to license on the part of the patent infringer exists is a question of the individual case, the assessment of which is incumbent on the national courts (see ECJ, judgment of 20 May 2010 - C -160/09, [2010] ECR 1-4591 para. 24 - Ioannis Katsivardas/Nikolaos Tsitsikas; ECJ, WRP 2015, 1080 para. 70 - Huawei/ZTE; Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13, juris para. 76; UK Supreme Court, Judgment of 26 August 2020, [2020] UKSC 37 para. 157) and is in principle the task of the judge of fact.

79    ee) Whether, according to these standards, the patent proprietor's action for injunction, recall or destruction is abusive may have to be assessed differently for different points in time.

80    (1) Whether the filing of an action constitutes an abuse of the dominant position of the patent proprietor because it serves to enforce a refusal to license against a company willing to license is to be assessed according to the actual circumstances at the time the action is filed. If the infringer's willingness to license is already lacking at this point in time, the concrete conditions offered by the patent proprietor for a license agreement at this point in time are irrelevant.

81    (2) If the filing of the action is not abusive, the further pursuit of the claims and thus also the defense of a first-instance judgment already obtained - as in the case in dispute - against the infringer's appeal may nevertheless be abusive.

82    The claim of the user of the technical teaching of the invention against the market-dominating patent proprietor for licensing on FRAND terms remains with the latter - up to the limit of forfeiture - even if he does not initially assert it because he is not prepared to conclude a license agreement on FRAND terms He can therefore in principle also assert it subsequently.

83    However, this does not necessarily mean that the infringer can also raise a defense to this licensing claim against the injunctive relief already asserted by way of action or already awarded in the first instance. Rather, it is decisive whether the patent proprietor acts abusively with regard to the subsequently declared willingness to license by pursuing the claims in suit. This requires careful examination in each individual case. The longer the infringer has initially waited with the assertion of his licensing claim, the higher the requirements are to be placed on his cooperation in bringing about a license agreement on FRAND terms, as explained (para. 60).

84    d) Accordingly, the Court of Appeal did not err in law in assuming that the plaintiff was not charged with an abuse of its dominant position because it had not sufficiently informed the defendants about the infringement of the patent in suit and its willingness to license it on FRAND terms. As the Senate justified in more detail in its judgment of May 5, 2020, the letter of December 20, 2012 and two further letters from 2013 satisfied the requirements to be placed on an infringement notice (BGH, WRP 2020, 1194 marginal no. 86 et seq. - FRAND objection).

85    e) On the other hand, the Court of Appeal's assumption that the plaintiff abused its dominant position because it did not offer the defendants or their parent companies (hereinafter also: Haier) a license agreement on FRAND terms despite having previously declared its willingness to license, and that the contractual terms offered to Haier were discriminatory, does not withstand review by the Court of Appeal.

86    aa) The findings of the Court of Appeal do not justify the assumption that Haier agreed to conclude a license agreement on FRAND terms.

87    (1) The Court of Appeal correctly saw that the e-mail of December 17, 2013 (AR 41 p. 3/4), i.e. almost one year after the first infringement notice, did not meet the requirements for an infringer willing to license already in terms of time. An infringer who remains silent for several months in response to the infringement notice thus regularly indicates that he is not interested in taking a license (BGH, WRP 2020, 1194 marginal no. 92 - FRAND objection). Without success, the defendants argue that the decision of the European Court of Justice does not contain any clear specifications as to the time requirements for the exchange of the mutual declarations. This is because the infringer's response to the patent proprietor's offer must be made with the due care required by the accepted commercial practices in the relevant field and in accordance with the requirements of good faith (ECJ, WRP 2015, 1080 para. 71 - Huawei/ZTE). Since the infringer's conduct must not be aimed at delaying the negotiations offered - and thus in particular their commencement - the same must apply to the reaction to the

infringement notice - and thus the declaration of willingness to license by the infringer (see Gerechtshof Den Haag, GRUR Int. 2020, 174, 176 marginal no. 4.14).

88    (2) The appeal successfully challenges the assumption of the Court of Appeal that the declaration of December 17, 2013 is nevertheless a sufficient declaration of willingness to license in terms of content. As the Senate already stated in its judgment of May 5, 2020 (BGH, WRP 2020, 1194 marginal no. 94 et seq. - FRAND-Einwand), neither this statement nor the other statements of the defendant and its parent companies found by the Court of Appeal express the will and the serious willingness of the defendant to conclude a license agreement. The Senate adheres to this after reconsideration.

89    The letter merely expresses the hope that formal negotiations will be entered into and asks for information about a prospective discount. In view of the months of silence in response to the statement of willingness to license, however, it would have been expected in the event of genuine willingness to license that Haier would now indicate that it wanted to do everything in its power to promote negotiations. As explained (paras. 60, 83), this required additional efforts to help ensure that, notwithstanding this failure, a license agreement could be concluded as soon as possible.

90    From the further content of the letter, the will of Haier to assert a licensing claim and to advance the clarification of fair, reasonable and non-discriminatory terms of a licensing can likewise not be inferred. Rather, the hesitant - and thus delaying - behavior is continued by indicating that they will not find the time to consider the matter and make a decision before the New Year (AR 41 p. 3). It is true that, in view of the upcoming turn of the year and the management's involvement with the annual reports and the plans for the new year, an initial examination may not have been possible before the turn of the year. However, an initial referral was not in question. Haier had already been informed of the plaintiff's willingness to license, the use of the patent-in-suit and the "Wireless Patent Program" by letters dated December 20, 2012, August 22, 2013 and November 11, 2013. In view of this, the plaintiff could not, on the required objective consideration, understand Haier's reference to the upcoming turn of the year and the need for examination in the sense of a serious desire to license and a willingness to promote negotiations on the content of a license agreement. In particular, it was not apparent to the plaintiff against the background of Haier's previous conduct that an audit was announced after the turn of the year for reasons other than to further delay. According to the unchallenged findings of the Court of Appeal, the defendants have also not presented objective reasons that and why it should not have been possible or reasonable for Haier to clarify the use of the portfolio patents by its mobile devices earlier.

91    (3) Without success, the Defendants argue that in the context of the other correspondence between the parties, it is remote to assume that they or their parent companies were unwilling to license. The fact that Haier was already a licensee of

various other license pools of the plaintiff at that time does not change the fact that the plaintiff could not assume, according to the objective recipient's horizon, that Haier was willing to conclude a license agreement on FRAND terms justifying the use of the technical teaching of the patent-in-suit. The fact that the license program of the plaintiff was in the market introduction phase at that time is not relevant for the understanding of Haier's statements.

92    The fact that Plaintiff still responded to the email from Haier's IP Director on that same December 17, 2013, inter alia, that it could provide the latter with further information about an "early bird discount" after receiving a non-disclosure agreement (AR 41 p. 2), and that such information was subsequently exchanged, does not justify a different view. Similarly, the meeting of the parties on February 17, 2014, in which details of the licensing program were discussed but which, according to the findings of the Court of Appeal, remained inconclusive, and the license offer of the plaintiff of August 29, 2014 (AR-B 39) are not capable of justifying the conclusion that Haier was clearly and unambiguously prepared to conclude a license agreement on FRAND terms. For in this respect, too, only an unspecified willingness to negotiate can be ascertained which, in view of the previous history, from the plaintiff's point of view appeared to be an expression of a delaying tactic on the part of Haier. In the cover letter to the offer of August 29, 2014 (AR 50), the plaintiff complains that no substantial progress has been made since February of this year, and according to the findings of the Court of Appeal, the plaintiff's offer was rejected by Haier as early as September 1, 2014 without a counteroffer.

93    (4) The Court of Appeal only examined the further letters of the IP Director of the Defendant's parent companies from the point of view of whether they would give rise to the assumption that the original willingness to enter into a license agreement had in the meantime lapsed again. The letter of January 16, 2016 (AR 51 p. 8 f.) does not show a clear declaration of willingness to conclude a license agreement on reasonable and non-discriminatory terms.

94    (a) As the Court of Appeal correctly pointed out, this already follows from the fact that it included the statement that Haier would be prepared to take a FRAND license and pay royalties if German courts finally found infringement and validity of the patent-in-suit as well as of the further European patent 852 885 asserted in the dispute decided by the Senate's judgment of May 5, 2020.

95    Such a conditional declaration of willingness to license is insufficient (BGHZ 180, 312 marginal no. 32 - Orange Book Standard; BGH, WRP 2020, 1194 marginal no. 96 - FRAND Objection). Contrary to the view of the defendant, there is also no need for further clarification by the European Court of Justice in this respect. The Court of Justice has clarified that the patent infringer remains free to challenge the validity of the patents to be licensed or to dispute their use or to reserve the right to do so in *addition to the* negotiations on the grant of licenses (ECJ, WRP 2015, 1080 marginal no. 69 - Huawei/ZTE). However, this does not change the fact that the user of a patent,

if he is not its owner, must in principle obtain a license before any use (ECJ, WRP 2015, 1080 marginal no. 59 - Huawei/ZTE), and acts at his own risk if he believes that he can waive this due to lack of validity or lack of infringement. A conditional willingness to license cannot lead to an unconditional conclusion of a contract; however, the patent holder is only obliged to do so. This does not necessarily exclude that the patent infringer reserves the right in the license agreement to question the use of the license (see also Opinion of Advocate General Wathelet of 20 November 2014 - C-170/13 Opinion No. 5).

96    b) The lack of willingness to license is also shown by the fact that the letter of January 16, 2016 contains the request that the plaintiff specify in more detail with regard to all patents in its portfolio to what extent they should be infringed. In light of the fact that the plaintiff had already named the patents belonging to the "Wireless Patent Portfolio" to Haier in a letter dated December 20, 2012, that Haier thus had more than three years to review the question of infringement and the use of the portfolio, and that the review had been announced, among other things, in a letter dated December 17, 2013, this justifies the conclusion, based on an overall assessment of all circumstances, that Haier - and thus the defendants - continued to be uninterested in reaching an agreement with the plaintiff.

97    It is true that the patent proprietor, if he does not want to license a single patent but a portfolio, must provide the infringer with sufficient information on the patents belonging to the portfolio. However, this obligation does not go beyond what the owner of a portfolio of standard-essential patents must reasonably present in contractual negotiations on a portfolio license, if a license is sought from him with which a company wants to place the use of those property rights it needs for the implementation of a standard on a secure legal basis. Similar to the infringement notice, it is sufficient to set out the nature of the respective standard-relevant functions and their implementation. Detailed technical or legal explanations of the individual patents are not required; the user of the invention must also in this respect only be enabled - if necessary with expert assistance - to form a picture of the significance and scope of the patent portfolio in relation to the standard. Further explanations are not required for this, because the patent proprietor does not have to assume, at least without concrete indications in this respect, that the licensee intends to impose restrictions on the future use of the functionalities covered and made possible by the standard. In the event of ambiguities in this respect or in other respects, honest negotiating partners can be expected to enter into a discussion (cf. BGH, WRP 2020, 1194 marginal no. 98 - FRAND-Einwand).

98    Insofar as the parties unanimously stated in the oral proceedings before the Higher Regional Court on November 17, 2016, that it is customary in the industry for the patent proprietor to submit a list of the 10 to 15 most important property rights ("Proud List") at the beginning of the negotiations, this does not change the obligation of the company willing to license to form its own picture of the standard essentiality of the property rights in the portfolio and of the extent to which it is dependent on the use of the portfolio for the lawful production of standard-compatible products. The fact that

the submission of a "Proud List" is not mandatory already follows from the fact that it typically covers only a small fraction of the patents and therefore does not enable the infringer to conduct a comprehensive examination of the portfolio.

99    The plaintiff had already fulfilled its obligation by letter dated December 20, 2012. It had enclosed a list of around 235 patents belonging to the patent portfolio. In view of Haier's announcement in the letter of December 17, 2013, that it would examine the patents, the plaintiff was entitled to assume that Haier had carried out at least a rough examination of the patent objects and the standard essentiality. As is evident from Applicant's letter of February 15, 2013 (AR 41 p. 9), this had also been communicated to Applicant again by Haier's IP Director in a telephone call on the same day. Haier informed Plaintiff by email of February 19, 2013, that the analysis was ongoing because of the large number of patents ("Involved large number of patents, still analyzing, thanks"). The fact that Haier, despite the granting of a sufficient examination period by the plaintiff, later insisted on the formal position that the plaintiff was obliged to submit "claim charts" with regard to all patents, particularly against the background that Haier had initially not responded at all to the infringement notice and the offer of a portfolio license, indicated that Haier continued to be less interested in a successful conclusion of the negotiations than in further delaying them (BGH, WRP 2020,1194 para. 98 - FRAND-Einwand), especially since the plaintiff had also referred Haier by letter of December 11, 2015 (AS 9) to its internet pages with information on which technical specifications of the standards mentioned there (indicating the respective sections) were covered by the patent families of the plaintiff's portfolio.

100    (5) To the extent that the Court of Appeal inferred from the letter of March 23, 2016 (K 51 p. 2 f.) submitted during the appeal proceedings that Haier was (still) willing to take a license, this does not follow from the content of the letter. There, the willingness to take a FRAND license is expressed, but at the same time it is pointed out that Haier's own position *remains unchanged* ("To *make a long story short, we wish to express that our position remains unchanged, namely that we am willing to conclude a FRAND license and we am of the opinion that our offer is FRAND";* Annex AR 51 p. 3). From the objective recipient's point of view, this could only be understood by the applicant as meaning that the impermissible condition expressed in the letter of January 16, 2016 was to remain in place.

101    Contrary to Defendant's view, this understanding does not contradict the explanatory content of the letter in its entirety. In response to a letter from Plaintiff dated March 17, 2016 (AR 51 p. 3 et seq.), Haier asks Plaintiff not to constantly repeat the accusation of delaying negotiations; the information provided by Plaintiff with respect to the portfolio patents not asserted in suit was insufficient. If the plaintiff provided claim charts showing at least that these patents could be standard essential, they could be included in Haier's counteroffer. Further, Haier points out that Plaintiff never explained the calculation of its proposed fee. It is true that the letter does not explicitly address the validity and patent infringement. However, there is also no reason to assume that

Haier no longer adheres to the clear statement in the letter of January 16, 2016; this applies all the more as Haier had indicated shortly before in its letter of March 7, 2016 that the infringement issue and the validity of the patent-in-suit had not yet been confirmed (AR 51 p. 4 et seq.). Rather, the plaintiff had to infer from this that additional information on the other patents of the portfolio, which Haier had not demanded in any case on the grounds of an information deficit, but merely on the grounds of an alleged obligation of the plaintiff in accordance with the principles of the judgment Huawei ./. ZTE, would not help in the absence of a legally established infringement and legal validity, and Haier was not interested in the conclusion of a license agreement, but only in bringing down the injunctive relief awarded by the District Court on the basis of alleged failures of a market-dominant company to offer a FRAND license.

102    (6) Nor did the willingness to conclude a license agreement on FRAND terms emerge from previous license agreement offers made by the first defendant on October 13, 2014 (G 4) and by both defendants on August 12, 2015 (G 19, a few weeks before the date of the oral proceedings before the Regional Court on September 29, 2015) and on September 21, 2015. It is not necessary to decide whether these offers in themselves met FRAND criteria. Because the will to seriously deal with the offers of the plaintiff, in particular its demand for a portfolio license, cannot be inferred from these offers. The subject matter of the license should only be the patent families to which the patent-in-suit and the patent-in-suit in the parallel proceedings belong. In view of the fact that Haier had time to examine the applicant's 'Wireless Standard' since receipt of the applicant's letter of December 20, 2012, and had announced such examination, inter alia, in its letter of December 17, 2013, the applicant was not entitled to take any further action. December 2013, Plaintiff could at least expect Defendants to provide substantiated factual reasons why they believed they were entitled to selectively license the very two patents-in-suit from which they were threatened with condemnation by the district court, and to deny the one worldwide portfolio license at which Plaintiff's efforts, ongoing since December 2012, were aimed. Instead, as can be seen from the letter of September 21, 2015 (G 15), the defendants continued to take the formal position, among other things, that the plaintiff could not demand licensing of the entire, seemingly arbitrarily assembled "Wireless Licensing Program" patent portfolio without first setting out for each patent how and why it should be infringed.

103    Even if one were to regard the contractual offers as a declaration of willingness to license, it would also have to be taken into account that Haier, at any rate in its letter of January 16, 2016, declared its willingness to license only subject to a condition and thus any willingness to license expressed in the meantime would in any case no longer have existed. Against this background, it is also irrelevant that a large number of further e-mails were exchanged between the parties in the period from November 2015 to April 2016 alone. For these predominantly deal with Haier's or the defendant's demands for a further specification of the patent infringement by the portfolio patents and the calculation of the license fee by the plaintiff. For the reasons explained, it cannot be inferred from this correspondence that Haier was seriously willing to license.

104   bb) An abuse of the plaintiff's dominant position through the further pursuit of the claims also does not arise with regard to the license (counter)offer (G 46), which the defendants submitted through their legal representatives on January 20, 2017 - and thus four weeks before the conclusion of the oral hearing in the appeal proceedings on February 16, 2017.

105   (1) According to the findings of the Court of Appeal, with this contractual offer, which they linked to a security deposit totaling €15,000, the defendants responded to a group and worldwide license offer submitted by the plaintiff to Haier in a letter dated December 20, 2016 (AR 63), which was preceded by an earlier offer dated December 9, 2015 (AR 51 p. 14 f.), which Haier had rejected. The Court of Appeals assumed that with the counteroffer of January 20, 2017, the defendants had reaffirmed their willingness to license. It left open whether the offer contained FRAND conditions; according to the court this was irrelevant, as the plaintiff's offer was discriminatory.

106   (2) This does not withstand review by the appellate court. Even if, as the Court of Appeal assumed, the plaintiff's offer treated Haier worse than another licensee of the plaintiff without objective justification, in particular with regard to the amount and the calculation of the license fees, this did not result in an abuse of its dominant position.

107   (a) Since neither the defendant's parent companies nor the defendant itself had by then expressed their willingness and shown the unconditional will to conclude a license agreement with the plaintiff on FRAND terms, the plaintiff did not abuse its dominant position either by bringing the action or by defending the district court judgment against the defendant's appeal. The license terms offered by the plaintiff at that time are irrelevant for this purpose, as explained (para. 56). A fortiori, the content of subsequent contractual offers is irrelevant in this respect.

108   (b) However, the established facts also do not support the assumption that, following the offer made by the defendant on January 20, 2017 shortly before the conclusion of the oral proceedings in the second instance, the further pursuit of the claims for injunctive relief, destruction and recall awarded by the Regional Court would prove to be abusive.

109   Even with this offer of a contract and the statements on this in the pleading of the same date and subsequent pleadings, the defendants have not expressed any serious willingness to license. Against the background of a lack of willingness to conclude a license agreement on FRAND terms, which had previously been shown for several years and also after the conviction on the basis of the patent in suit by the District Court, it would have been necessary, as explained (paras. 60, 83), to make increased efforts to contribute to the achievement of an appropriate solution in accordance with the requirements of good faith. Neither the contractual offer nor its explanation do justice to this.

110   (aa) The contractual offer of the Defendants - formulated independently of the text last proposed by the Plaintiff - does not provide for the Defendants' parent companies or

*English convenience translation provided by*  ARNOLD RUESS

the Haier Group as licensees, but only the Defendants themselves. According to Article 4.2, royalties are payable only for products (manufactured or) marketed by the licensees in states where a licensed patent has been granted. Patent families designated as NKO-02 to NKO-45 are listed as licensed rights. The royalty shall be calculated according to the formula R=A*B*C, where A corresponds to a royalty rate of 0.012% for each patent family, B corresponds to the number of patent families, and C corresponds to the net selling price of a licensed product, taking into account only patent families essential to the performance of the "wireless standards" defined in Art. 1.21. Art. 4.4 states "by way of clarification" that the licensees (only) *consider* patent families NKO-2, 3 (comprising the patent-in-suit of the proceedings KZR 36/17), 5 and 30 (comprising the patent-in-suit of the present proceedings) to *be* likely being essential in this sense *("consider being likely being essential'* [sic!]).

111    In their brief of January 20, 2017, the defendants essentially stated the following in support of their claim:

112    The court of appeal's opinion that there are no objections to a group-wide and worldwide portfolio per-unit license in principle must be contradicted. Since the plaintiff did not offer a group-wide license, but rather belonged to a group whose companies marketed various license programs, it could not expect licensing by the Haier group. The customary nature of group-wide licensing was disputed; in any case, the plaintiff could not rely on such a practice.

113    Although the plaintiff had not submitted patent specifications and standard documents on the submitted "Proud List", they - the defendants - had argued that the plaintiff's portfolio contained 33 standard essential patent families. "Claim Charts" had been submitted only for the 13 patent families of the applicant's "Proud List" (NKO-2, 3, 5, 11, 12, 16, 18, 19, 30, 32, 35, 36 and 44). Of these, patent families NKO-3 and 30 (containing the patent-in-suit) had been found to be potentially standard essential in light of the Court of Appeal's reasoning, with arguments for lack of standard essentiality in each case. The examination of further eleven patent families had shown that only the families NKO-2 and 5 were possibly also standard essential; this is explained in more detail. From a "Humble List" submitted by them - the defendants - it is also evident that the further patent families NKO-6, 8, 10, 13 and 26 are not standard essential.

114    The defendants elaborated on this argument in written submissions dated February 8, 2017 and February 9, 2017.

115    (bb) This reaction and the reasons given for it do not constitute, as the Senate can judge for itself according to the ascertained content of the contractual offer and in view of the lack of assessment by the Court of Appeal, in any respect a dispute with the offer of the plaintiff or an offer of its own from which an infringer willing to license could assume to thereby make a contribution appropriate to the situation and the time of the submission to the bringing about of a license agreement on FRAND terms.

116    i.        It is already sufficient for this that, notwithstanding the fact that the discussions had been held with the Haier Group since December 2013 at the latest and that the plaintiff was seeking a worldwide licensing of its patent portfolio, only the defendants were to be licensees. The listing of American, Chinese, Japanese and other non-European patents in the patent families therefore only had significance for the remote case that the defendant European sales companies of the Haier Group supplied to these countries.

117    From the objective point of view of a negotiating party interested in concluding a contract, the plaintiff was also entitled to expect that the defendants would at least provide factual reasons why they believed that such selective licensing would be in their interests. There is nothing established or recognizable that the Defendants could have a legitimate interest in a license agreement which not only, which is already likely to be far-fetched in the given factual situation, instead of a worldwide regulation for the Haier Group, which the Plaintiff had been trying in vain to obtain since December 2012, only covered the European distribution activities, but did not even include Haier as the manufacturer of the products merely distributed by the Defendants, which was in any case jointly responsible for the delivery of the challenged products to the European Union.

118    In this context, it is irrelevant whether the defendants, as distributors alongside Haier, were entitled to their own licensing claim at all. In view of Haier's unwillingness to license, they could in any case not reasonably claim a license limited to their own activities, which for the plaintiff would be associated with the not remote risk of Haier circumventing its own sales companies and, if necessary, the necessity of costly enforcement of its property rights "patent for patent and land for land" (cf. UK Supreme Court [Lords Reed, Hodge, Lady Black, Lords Briggs, Sales], Judgment of August 26, 2020, [2020] UKSC 37 para. 166) and thus not only largely failed to achieve the worldwide portfolio license sought by the plaintiff, but did not even reliably protect the plaintiff from further infringements of the patent-in-suit by Haier.

119    The defendants could also not nevertheless assume that with the proposed contractual arrangement they were making the contribution required in view of the unwillingness to license at that time to bring about a license agreement on FRAND terms, which the plaintiff would either have had to accept immediately as offered or which could have served as the basis for concluding negotiations promising success in the short term.

120    This is already clear from the fact that the defendants merely invoked the fact that the plaintiff does not actively license on a group-wide basis and that the customary nature of group-wide licensing is disputed as justification for the selective licensing sought.

121    From the point of view of the defendants, there was all the more reason to state reasons as the plaintiff had already rejected a license offer made by both defendants

in a letter dated August 24, 2015 (G 21) - i.e. almost one and a half years earlier - (also a few weeks before the oral proceedings before the Regional Court) with reference to the use of the patent in suit by the entire Haier Group, inter alia because the offer did not include the entire Haier Group. The defendant's legal representatives had, according to the defendant's submission in the appeal instance (written statement of December 3, 2015, p. 7, AS 398), recommended the parent company in this context to sign the license agreement offer.

122    In contrast, the fact that Plaintiff did not offer Defendants any other portfolios or portfolios of affiliated companies, but which Defendants had not asked for in the first place, obviously could not plausibly support a return to Defendants' request for selective licensing.

123    Nor can the denial of the customary nature of a group license be regarded as a constructive contribution by a bona fide negotiating party to the license agreement negotiations in light of the fact that the Haier Group had already concluded group license agreements with the plaintiff (AR 77, 78; BU 9), as the defendants themselves have pointed out.

124    ii. That the Defendants have not expressed their willingness to compensate for the previous lack of willingness to license with the license offer is also indicated by the proposed royalty provision. Of the patent families included in the offer text, the latter recognizes only four at all as "probably" standard-essential and thus as relevant for the assessment of the royalty, whereby it must be assumed in favor of the defendants that they do not reserve the right to doubt the applicability of the royalty provision in the contract offer with respect to these patent families.

125    In this respect, it is not necessary to clarify whether, as the plaintiff believes and explained in more detail in its response to the defendant's brief of January 20, 2017, all other patent families are also essential by default. Rather, it is decisive that it is precisely the purpose of the negotiation process to clarify, using the technical and patent law expertise that is available to the parties or can be called in if necessary, which property rights and property right families are objectively required to be included in the agreement or are also only expedient - from the point of view of both parties - because they are essential for the use of the standard or, in any case, are one of several technical possibilities for its implementation. This is all the more significant in the field of information and telecommunications technology, the greater the number of patents involved, since in order to avoid disproportionately high transaction costs, both for the standard essentiality and for the validity of the property rights, estimates are typically required which take appropriate account of the necessary remaining uncertainties and are therefore made by reasonable negotiating parties where the effort and costs of further clarification would otherwise be manifestly disproportionate to the expected benefits (cf. UK Supreme Court, Judgment of 26 August 2020, [2020] UKSC 37 para. 5).

126    It can also be left open whether a contractual offer of this content, had it been made by the defendants or Haier at an early stage of the discussions, could have expressed the willingness to conclude a license agreement on FRAND terms. This is because Haier had not entered into a concrete discussion with the plaintiff about the appropriate scope of a licensing of the mobile devices manufactured by Haier and the appropriate remuneration for this. In view of this, a proposal "at the last minute", which - in line with the proposed restriction of licensing to the defendants - resolved the undiscussed issues almost entirely to the plaintiff's disadvantage, and at most left the plaintiff the future possibility of litigating further claims on this contractual basis, if necessary, could no longer express the defendants' willingness to decisively promote the conclusion of a license agreement on FRAND terms, which was necessary at that point in time. Rather, the plaintiff had to understand it as an attempt by the defendants to secure themselves with their own license agreement offer, which they could not seriously expect to be accepted, against a confirmation of the first instance conviction by the court of appeal in the event that the latter would assume that, due to the fulfillment of the plaintiff's obligations, Haier or the defendants would be obliged to submit a counter-offer to the plaintiff.

127    III. The decision of the court of appeal is also not correct for other reasons with regard to the claims for injunction, destruction and recall. The enforcement of these claims is not precluded by the objection of patent ambush, as the Court of Appeal rightly assumed.

128    1 The Court of Appeal essentially stated in justification of its decision: It could be assumed in favor of the defendant that the former owner should have disclosed the patent in suit in the standardization process, but intentionally failed to do so. It could also be left open whether the plaintiff had to accept responsibility for this conduct and whether the plaintiff's later FRAND declaration was able to cure the infringement. The legal consequence of a "patent ambush" is merely a licensing obligation on the part of the property right holder. A user is only entitled to a license to a deliberately undisclosed patent if, in the case of the required disclosure, an alternative to the patented teaching of the asserted patent would have found its way into the standard. This could not be established with an overwhelming probability by a judge of fact.

129    2. The defendant's cross-appeal is unsuccessful.

130    (a) It can be left open whether and, if so, under which further conditions it can be objected to as an abuse of a dominant position or for other reasons by an infringer if a company which, in the standardization process, in violation of the rules of the standardization organization, has not disclosed a patent application relevant for the application of the standard, enforces a patent resulting from this application or claiming its priority.

131    (b) A defense claim or a claim for a license, as the defendants would like to claim, is directed against the company which is charged with the "patent ambush" and, if

applicable, its universal successor and thus not against the plaintiff in the case in dispute. Outside the scope of application of the succession protection under Sec. 15 (3) Patent Act, objections against the former patentee cannot be raised against the new patentee. Section 404 of the German Civil Code does not apply in the context of patent assignment. This is because the right to, in and from the patent is an absolute right that knows no debtor (see RGZ 127, 197, 205; LG Mannheim, judgment of February 27, 2009 - 7 0 94/08, juris para. 106). Section 413 BGB does provide for the corresponding application of Section 404 BGB in the event of the transfer of other rights. However, Sec. 404 BGB is superseded by Sec. 15 (3) Patent Act (Palandt/Grüneberg, BGB, 79th ed., Sec. 413 (2)). Since the plaintiff's FRAND declaration of commitment ensures that the assertion of the patent in suit does not lead to a restriction of competition that is no longer acceptable under the legal system, further obligations of the plaintiff also do not arise from its special responsibility resulting from its dominant position in the market.

132    (c) Furthermore, "patent ambush" requires in any case that the decision-making process within the standardization body has been distorted by the withholding of relevant information (cf. European Commission, WuW 2010, 719 para. 29). If a patent application relevant to the standard has not been disclosed, there must at least be indications that the standard would have been formulated differently if the patent applicant had not withheld this information. The Court of Appeal did not err in law in denying such indications.

133    The cross-appeal complains unsuccessfully that the Court of Appeal wrongly considered the defendants to have a burden of proof in this respect. There is no reason to impose a secondary burden of proof on the plaintiff because the fact to be presented lies outside the scope of perception of the defendants. The assumption of a secondary burden of presentation presupposes that the party making the allegation is unable or cannot reasonably be expected to provide more detailed information, whereas the party disputing the allegation knows all the essential facts and can reasonably be expected to provide more detailed information (BGH, judgment of December 4, 2012 - VI ZR 378/11, DStR 2013, 702 marginal no. 16). With regard to the transactions relevant here, however, both parties are outsiders.

134    IV. The defendants are also obligated to pay damages to the plaintiff pursuant to Sec. 139 (2) Patent Act and must provide the plaintiff with the necessary information, which includes the accounting awarded by the District Court, so that the plaintiff can quantify its claim for damages.

135    (1) Without error of law, the Court of Appeal affirmed the fault in the form of negligence required for the claim for damages also for the period prior to the receipt of the first infringement notice of the plaintiff. As the Senate explained in more detail in its judgment of May 5, 2020 (KZR 36/17, WRP 2020, 1194, marginal no. 109 - FRAND-Einwand) between the parties to the proceedings, the obligation of the owner of a standard-essential patent to point out the infringement does not change the fact that

it is in principle the responsibility of the infringer to ascertain before commencing the manufacture or sale of a technical product that this does not infringe the property rights of third parties.

136    (2) The limitation of the amount of the plaintiff's claim for damages to that which would result according to the standard of a license analogy, as assumed by the Court of Appeal, could only be considered if the defendants could counter the plaintiff's claim for damages with their own claim for damages based on the non-fulfillment of a claim for the conclusion of a license agreement on reasonable and non-discriminatory terms. Since such a claim can only arise if the infringer demands the conclusion of a license agreement on FRAND terms from the patent proprietor (initially by expressing willingness to license) and the patent proprietor fails to respond thereto in accordance with the obligations incumbent on it due to its dominant position (BGH, WRP 2020, 1194 marginal no. 111 - FRAND objection), a limitation of the claim for damages in the dispute is completely ruled out. The defendants have not sufficiently indicated their willingness to conclude a contract on FRAND terms.

137    There is no need to refer the matter to the European Court of Justice for clarification of the questions formulated by the defendants in their brief of October 26, 2020. As stated, the Senate's requirements regarding the infringer's willingness to license are in line with Article 102 TFEU and its interpretation in the case law of the Union Court of Justice (paras. 63 et seq., 77 et seq., 87). The questions raised in this context concern the weighing of interests in individual cases that is incumbent on the courts of the Member States (see only UK Supreme Court, Judgment of 26 August 2020, [2020] UKSC 37 para. 152).

138    VI The judgment of the Court of Appeal must therefore be set aside (§ 562 ZPO). Since further findings are neither necessary nor to be expected, the Senate can decide on the merits itself and restore the judgment of the Regional Court.

Meier-Beck                         Kirchhoff                              Tolkmitt

          Rombach                              Linder

Lower courts:

Düsseldorf Regional Court, decision dated November 03, 2015 - 4a O 144/14 -

Düsseldorf Higher Regional Court, decision dated March 30, 2017 - 1-15 U 65/15 -

*English convenience translation provided by*    ARNOLD RUESS