**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC.<br>Plaintiff,<br>v.<br>HP INC.<br>Defendant. | Case No. 2:24-cv-00752-JRG-RSP<br>[Lead Case]<br><br>Case No. 2:24-cv-00764-JRG-RSP<br>[Member Case]<br><br>**JURY TRIAL DEMANDED** |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC.<br>Plaintiff,<br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>SAMSUNG ELECTRONICS AMERICA, INC.<br><br>Defendants. | Case No. 2:24-cv-00746-JRG-RSP<br>[Member Case]<br><br>Case No. 2:24-cv-00765-JRG-RSP<br>[Member Case] |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC.<br>Plaintiff,<br>v.<br>ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP.<br><br>Defendants. | Case No. 2:24-cv-00766-JRG-RSP<br>[Member Case]<br><br>Case No. 2:24-cv-00753-JRG-RSP<br>[Member Case] |

**WILUS'S OPPOSITION TO SAMSUNG'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE NONJOINDER OF A JOINT INVENTOR FOR THE '035 AND '879 PATENTS**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................................1

II.  RESPONSE TO STATEMENT OF ISSUES TO BE DECIDED ..............................................1

III.  WILUS'S STATEMENT OF UNDISPUTED MATERIAL FACTS .........................................2

    A.  The IEEE Standards Process .................................................................................2

    B.  Wilus's Independent Development ........................................................................3

IV.  WILUS'S RESPONSE TO SAMSUNG'S STATEMENT OF "UNDISPUTED" MATERIAL FACTS ("RSSUMF") .........................................................................................5

    A.  '035 / '879 Patents and Inventors.........................................................................5

    B.  IEEE and Task Group AX.....................................................................................5

    C.  Laurent Cariou's Submission ...............................................................................6

    D.  Wilus's Inventive Contribution ............................................................................7

V.  LEGAL STANDARDS.............................................................................................................8

VI.  ARGUMENT.............................................................................................................................10

    A.  Genuine Disputes of Material Fact Exist as to Whether Cariou Contributed in a Significant Manner to the Conception of the Claimed Invention ......................10

    B.  Genuine Disputes of Material Fact Exist as to Whether Any Contribution by Cariou Was Insignificant When Measured Against the Claimed Invention...................11

    C.  Genuine Disputes of Material Fact Exist as to Whether Cariou's Alleged Contribution Reflects Only Well-Known Concepts in the Field ..............................................12

    D.  Genuine Disputes of Material Fact Exist as to Whether the Parties Engaged in the Collaborative Conception Required for Joint Inventorship ................................13

VII.  CONCLUSION ........................................................................................................................15

████████████████████

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................8

*Eli Lilly & Co. v. Aradigm Corp.*,
376 F.3d 1352 (Fed. Cir. 2004) ......................................................................... 9, 11

*Hess v. Advanced Cardiovascular Sys., Inc.*,
106 F.3d 976 (Fed. Cir. 1997) .................................................................9, 11, 12, 13

*Hip, Inc. v. Hormel Foods Corp.*,
66 F.4th 1346 (Fed. Cir. 2023) ...............................................................................9

In *University of Utah v. Max-Planck-Gesellschaft*,
134 F. SUPP. 3D 576 (D. MASS. 2015).................................................................16

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
973 F.2d 911 (Fed. Cir. 1992) .................................................................9, 13, 14, 15

*Nartron Corp. v. Schukra U.S.A. Inc.*,
558 F.3d 1352 (Fed. Cir. 2009) ..................................................................... 9, 12, 13

Pannu v. Iolab Corp.,
155 F.3d 1344 (Fed. Cir. 1998) ......................................................................... 9, 10

Plastipak Packaging, Inc. v. Premium Waters, Inc.,
55 F.4th 1332 (Fed. Cir. 2022) .......................................................................10, 11, 16

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................8

| Exhibit | Description |
|---|---|
| A | Excerpts from the deposition transcript of Dr. Woojin Ahn, dated January 15, 2026 |
| B | Excerpts from the corrected expert report of Erik de la Iglesia regarding Validity, dated February 19, 2026 |
| C | WO 2016/112146, with International Publication Date of July 14, 2016, obtained from https://worldwide.espacenet.com/patent/ on March 16, 2025 |

████████████████████████████████

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| IEEE | Institute of Electrical and Electronics Engineers |
| TGax | Task Group AX |
| MU | Multi User |
| EDCA | Enhanced Distributed Channel Access |

████████████████████████████████████████████████████

## I.    INTRODUCTION

Samsung asks this Court to rewrite the inventorship of the '035 and '879 patents based on routine standards-body discussions rather than evidence of actual conception. But inventorship turns on who conceived the invention as claimed, and a party seeking to alter the inventorship of an issued patent bears a heavy burden to prove that claim by clear and convincing evidence.

The summary-judgment record contains numerous disputes of material fact that preclude Samsung's theory. For instance, Wilus has evidence that the specific MU-EDCA timer design claimed in the patents—including the rules governing when the MU-EDCA parameter set begins and ends—

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████; that the earlier Cariou submission discussed only a high-level MU-EDCA concept lacking the operational rules claimed in the patents; and that any communications between Dr. Ahn and Mr. Cariou occurred in the ordinary course of TGax standards discussions rather than as part of a coordinated effort to develop the claimed design.

At a minimum, these facts create genuine disputes of material fact regarding whether Cariou contributed to the conception of the claimed invention (let alone materially), whether any alleged contribution is insignificant when measured against the full scope of the invention, whether the alleged contribution reflected only well-known concepts in the field, and whether the parties engaged in the collaborative conception required for joint inventorship. Because Samsung cannot establish these elements by ***clear and convincing evidence*** as a matter of law, its motion for summary judgment must be denied.

## II.    RESPONSE TO STATEMENT OF ISSUES TO BE DECIDED

The issues presented by Samsung's motion are whether Samsung can establish, by clear and convincing evidence, that Laurent Cariou is a joint inventor of the '035 or '879 patents and that no genuine disputes of material fact exist regarding inventorship.

1

███████████████████████████████

## III.    WILUS'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The IEEE Standards Process

1.    TGax is a standards-development working group within the IEEE 802.11 Wireless LAN Working Group responsible for developing the IEEE 802.11ax wireless networking standard. TGax meetings often included dozens or hundreds of engineers affiliated with many different organizations for the developing standard. Nikolich Decl. ¶¶8, 11–13.

2.    Participation in IEEE 802 standards development occurs through individual technical experts rather than companies as entities, although many participants are affiliated with companies that may compete in the relevant market. Participants submit written technical proposals addressing issues under consideration by the working group. *Id.* ¶¶9–13. TGax discussions frequently involve identifying potential problems with proposals, suggesting possible improvements, and evaluating how proposals might operate in practice. As part of the standards process, participants typically review submissions from others, exchange technical feedback, and independently develop and submit their own contributions addressing issues under consideration by the working group. *Id.* ¶¶17–19; Ahn Decl. ¶¶6–8; Ex. B, de la Iglesia ("DLI") Rpt. ¶¶647-48.

3.    After such discussions, it is common for the experts who submitted a proposal to return to their own internal engineering teams and develop revised proposals addressing issues raised during the meeting. Revised submissions may include additional operational rules, design choices, or specification details developed internally after the discussion. This iterative process—discussion of submissions, internal development, and revised proposals—is a normal and expected part of IEEE standards development. Nikolich Decl. ¶¶20–22; DLI Rpt. ¶647.

4.    IEEE standards development is prohibited from operating under a system of common technical direction, and participants are not supervised by a shared manager responsible for developing specific technical solutions. Instead, IEEE provides an open standards development forum in which technical ideas are discussed publicly, and individual experts present proposals and work toward consensus on the final specification. IEEE does not design the technical solutions that appear in

2

████████████████████████████████████

proposals and does not claim ownership of intellectual property embodied in those technologies. **Discussions within the working group are generally understood as part of the standards evaluation process rather than collaborative engineering directed toward jointly conceiving patentable inventions, and the detailed technical designs in proposals are typically developed independently by the proposing experts.** Nikolich Decl. ¶¶16, 24–25, 30–36; DLI Rpt. ¶¶647-48. Samsung presented no evidence that TGax participants expected to be listed as co-inventors on patents obtained by other companies that later developed their own technologies following earlier submissions. *See* DLI Rpt. ¶667; *see generally* Mot.

5.      Those TGax discussions did not constitute joint development of the '035 and '879 inventions. DLI Rpt. ¶¶667. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

### B.      Wilus's Independent Development

6.      During the TGax process, Intel employee Laurent Cariou submitted proposals relating to MU-EDCA. **Those proposals discussed at a high level, the general concept of using two EDCA parameter sets.** Ahn Decl. ¶16. They did not include the operational details governing how MU-EDCA would function in all transmission scenarios, including the specific conditions under which the MU-EDCA timer would start or stop. *See* Dkt. No. 270, Ex. 20 at 13; Ahn Dep. 180:22-183:20. Dr. Ahn, a named inventor of the Wilus patents at issue, testified that the proposal "was from the very early stage" and ███████████████████████ Ahn Dep. 46:20–48:3. He further testified that "it wouldn't work functionally in certain situations" and that, "in order to use MU-EDCA, it has to apply in all situations, but there are certain situations that it wouldn't apply as well." Ahn Dep. 47:16–23; 36:8–22, 36:24–37:13; Ahn Decl. ¶¶17–19.

7.      ████████████████████████████████████████

████████████████████████████████████████

████████████████████████ **Wilus's solution included specific operational rules governing**

████████████████████████████████████

**the MU-EDCA timer, including when the timer should start and stop.** Ahn Dep. 180:22-183:20; Ahn Decl. ¶¶27, 30, 33-34; Dkt No. 270, Exs. 1-2. For example, the design specifies when a station switches to a second EDCA parameter set after participating in a trigger-based uplink transmission, when the timer governing that parameter set begins depending on the transmission conditions (including whether an immediate response is requested), and when the station terminates use of the second parameter set when the timer expires. *See id.* ████████████████

████████████████████████████████████

███████████████████████████ Ahn Decl. ¶¶24–27; Ahn Dep. 180:22-183:20. **Wilus's contribution is "the heart of the invention."** DLI Rpt. ¶670.

8.      Wilus subsequently submitted IEEE contribution 802.11-16/1425r2 describing the approach developed by Dr. Ahn. Dkt No. 270, Ex. 20 at 13; Ahn Dep. 48:13–18.

9.      ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

10.      Dr. Ahn testified that Wilus's submission contained material information lacking in Mr. Cariou's disclosure. He explained: "we have uploaded the submission with the items that are not in the other company's submission — with a content that is not in the other company's submission." Ahn Dep. 34:6–19; 180:22-183:20. He further testified: "In case of MU-EDCA, …it's an area that the other party is not covering that we discovered, so we developed a new submission." Ahn Dep. 34:23–35:6.

11.      Dr. Ahn interacted at arms-length with many participants in TGax, including on a limited basis with Laurent Cariou, in the ordinary course of standards discussions. Ahn Decl. ¶¶10–12. **Dr. Ahn did not collaborate with Mr. Cariou to develop the inventions claimed in the '035 and '879 patents and did not jointly conceive the technical solutions reflected in those patents with him.** *Id.* ¶¶13–14; Ahn Dep. 180:22-183:20, 173:15-174:6; DLI Rpt. ¶¶647-48, 667. Critically, Dr. Ahn testified that, before Wilus submitted its own MU-EDCA work, he did not discuss with Mr. Cariou

4

ways to improve Intel's submission: "Did you ever speak with Laurent about ways to improve this submission ... ?" "I don't think there were any discussion before we submitted our submission." Ahn Dep. 45:23–46:5, 180:22-183:20.

12.     Using two EDCA parameter sets was already known in the wireless networking field before the inventions of the Wilus patents at issue, and importantly, before the Cariou submissions on which Samsung relies. For example, a Qualcomm application filed on January 7, 2016, and published on July 14, 2016—cited on the face of the '035 and '879 patents—describes MU-operating stations using different EDCA parameter values following transmission events. *See* Ex. C ("WO 2016/112146") ¶¶[0074]–[0075]; Dkt No. 270, Exs. 1-2. This disclosure predates the Cariou IEEE submissions on which Samsung relies. *See* SSUMF 5-6. This disclosure confirms that the general concept Samsung attributes as an invention to Laurent Cariou actually just reflects previously disclosed EDCA-related concepts in the art and is not evidence that Cariou contribution in a significant way to the claimed inventions of the Wilus patents.

## IV.    WILUS'S RESPONSE TO SAMSUNG'S STATEMENT OF "UNDISPUTED" MATERIAL FACTS[1] ("RSSUMF")

### A.      '035 / '879 Patents and Inventors

1.      Wilus does not dispute that the '035 and '879 patents list Woojin Ahn, Juhyung Son, Geonjung Ko, and Jinsam Kwak as inventors and claim priority to the KR '822 application. Wilus disputes any implication that the listed inventors are incomplete or incorrect. WSUMF ¶¶7–10; Ahn Decl. ¶¶19–27.

### B.      IEEE and Task Group AX

2.      Wilus does not dispute that TGax developed the IEEE 802.11ax standard and that Wilus representatives attended TGax meetings. Wilus disputes any implication that participation in TGax meetings constitutes collaboration directed toward the joint conception of patentable inventions.

---

[1] To the extent Wilus does not expressly dispute a particular assertion, that should not be construed as an admission. Wilus incorporates by reference its Statement of Undisputed Material Facts as if fully set forth herein.

████████████████████████████████████████

TGax is an open standards-development forum in which individual experts affiliated with competing companies generally present proposals, debate technical approaches, and independently develop their own submissions. WSUMF ¶¶1–5; Nikolich Decl. ¶¶9–16.

3.       Wilus does not dispute that Dr. Ahn used the term "collaboration" when describing certain aspects of the TGax standards process. He clarified that he meant the routine technical discussion typical of standards meetings, not joint invention. Ahn Decl. ¶9. He testified that "there was no collaboration in making of the technology itself." Ahn Dep. 37:14–22; WSUMF ¶5. Wilus further disputes this paragraph for the reasons stated in RSSUMF ¶2.

### C.    Laurent Cariou's Submission

4.       Wilus does not dispute that Laurent Cariou was an Intel employee and a TGax participant. Wilus disputes any implication that Mr. Cariou conceived the inventions claimed in the '035 or '879 patents.

5.       Wilus does not dispute that Mr. Cariou submitted IEEE document 802.11-16/0998r0 discussing MU-EDCA generally but disputes Samsung's characterization that it disclosed the inventions claimed in the patents. The proposal discussed only a general concept and lacked critical operational details necessary for the design to function across all transmission scenarios. WSUMF ¶6. Furthermore, EDCA parameters—including the use of different parameter settings—were already known in the field, including in Qualcomm prior art cited on the face of the patents. WSUMF ¶12.

6.       Wilus does not dispute that Mr. Cariou submitted IEEE document 802.11-16/1180 proposing draft specification text related to MU-EDCA. As to the remainder of Samsung's statements, Wilus disputes them for the reasons stated in RSSUMF ¶5.

7.       ████████████████████████████████████████████████████ Wilus does dispute Samsung's characterization of Dr. Ahn's testimony. Dr. Ahn did not talk to Mr. Cariou about Cariou 998 itself. Ahn Dep. 45:17-22. Dr. Ahn further testified that the earlier proposal was "from the very early stage" and contained "gaps," including situations where the proposed design would not function properly. WSUMF ¶6; Ahn Dep. 46:20–48:3. Critically, Dr. Ahn testified that, before Wilus submitted

6

[REDACTED]

its own MU-EDCA work, he did not discuss with Mr. Cariou ways to improve Intel's submission: "Did you ever speak with Laurent about ways to improve this submission … ?" "I don't think there were any discussion before we submitted our submission." Ahn Dep. 45:23–46:5. Also, the more accurate description is not that Mr. Cariou "led the project," but rather that he "led the preparation of the spec text." Ahn Dep. 120:16-20.

8.    [REDACTED]

9.    Samsung incorrectly states that Wilus filed its first priority application on September 12, 2016. The patents instead claim priority to KR 10-2016-0114822 filed September 7, 2016, five days earlier. Dkt. No. 270, Exs. 1, 2, 17. Furthermore, as explained in WSUMF ¶¶7–11, Wilus independently developed its disclosure, addressing issues not resolved in earlier TGax proposals.

### D.    Wilus's Inventive Contribution

10.    Wilus does not dispute that [REDACTED] WSUMF ¶¶6–7; Ahn Decl. ¶¶16–22.

11.    Wilus does not dispute that Dr. Ahn submitted IEEE contribution 802.11-16/1425 describing the Wilus approach. Wilus disputes Samsung's characterization that the submission merely implemented earlier proposals. As reflected in WSUMF ¶¶7–8, the Wilus submission introduced specific operational rules governing the MU-EDCA timer, including when the timer should start and stop—details not disclosed in earlier proposals. Dr. Ahn testified that the earlier proposal would not

███████████████████████████████████████████

function properly in certain scenarios, confirming that Wilus addressed technical issues that had not been resolved in earlier TGax discussions. WSUMF ¶¶6–7.

12.     Wilus does not dispute Dr. Ahn's testimony.

13.     Wilus does not dispute that its interrogatory response explains that ████████████████ ███████████████████████████████████████████████████████████ ████████████████████. The earlier submissions lacked details regarding how MU-EDCA parameters would operate in certain scenarios, including when a timer should start or stop. Within Wilus, Dr. Ahn ██████████████████████████████████ presented that approach to TGax in IEEE contribution 16/1425r2. WSUMF ¶¶6–8; Ahn Decl. ¶¶16–23. Wilus disputes any implication that this evidence demonstrates joint inventorship with Mr. Cariou. Rather, the record reflects that the specific operational design—including the timer conditions reflected in the asserted claims—was ████████████████. *Id.*

14.     Wilus does not dispute that Dr. Ahn ████████████████████████████ ██████████. As Dr. Ahn explained, "[t]here was no collaboration in making of the technology itself." Ahn Dep. 37:14–22. Such discussions reflect the ordinary standards-development process in which engineers review proposals, exchange technical feedback, and evaluate potential approaches to the developing standard. As explained in WSUMF ¶¶1–5, TGax participants represented competing companies and generally independently developed their own technical proposals within an open standards forum. These types of discussions generally do not involve jointly conceiving patentable inventions and do not establish joint inventorship.

## V.    LEGAL STANDARDS

Issued patents are presumed valid, including the presumption that the named inventors are correct. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997). A party seeking to add or remove an inventor must prove incorrect inventorship by **clear and convincing evidence**. *Hess*, 106 F.3d at 980; *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). Courts apply this demanding standard because inventorship challenges frequently rely on reconstructions of discussions that may be incomplete or self-serving. *See Hess*, 106 F.3d at 980.

8

The Federal Circuit has articulated three requirements for joint inventorship: the individual must "(1) contribute in some significant manner to the conception … of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, **and** (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998) (emphasis added). "[T]he failure to meet any one factor is dispositive on the question of inventorship." *Hip, Inc. v. Hormel Foods Corp.*, 66 F.4th 1346, 1350 (Fed. Cir. 2023).

"A contribution of information in the prior art cannot give rise to joint inventorship because it is not a contribution to conception." *Eli Lilly*, 376 F.3d at 1362. "One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor." *See Nartron Corp. v. Schukra U.S.A. Inc.*, 558 F.3d 1352, 1356–57 (Fed. Cir. 2009).

Joint inventorship also requires some element of **joint behavior** directed toward the conception of the claimed invention. *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992). By contrast, "[i]ndividuals cannot be joint inventors if they are completely ignorant of what each other has done until years after their individual independent efforts." *Id.*

Where the evidence supports multiple plausible accounts of how an invention arose, the clear-and-convincing burden cannot be satisfied as a matter of law. *See Vanderbilt*, 601 F.3d at 1305–06. Summary judgment is further inappropriate where genuine disputes of material fact remain concerning conception of the claimed invention, the existence and scope of any collaborative inventive activity, or whether the alleged contribution was merely an expression of prior art or general knowledge in the field. *See, e.g.*, *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1340–44 (Fed. Cir. 2022) (holding that disputed facts concerning alleged co-inventor contributions precluded summary judgment).

9

██████████████████████████████████████████████

## VI.    ARGUMENT

### A.    Genuine Disputes of Material Fact Exist as to Whether Cariou Contributed in a Significant Manner to the Conception of the Claimed Invention

To establish joint inventorship, Samsung must show that Mr. Cariou "contribute[d] in some significant manner to the conception" of the claimed invention. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998). Samsung cannot make that showing here. The record demonstrates that the specific design claimed in the '035 and '879 patents—including the operational rules governing when the MU-EDCA timer begins and ends—was conceived and developed independently within Wilus. WSUMF ¶¶7–11.

████████████████████████████████████████████████████████

███████████████████████████ WSUMF ¶¶6–7. Dr. Ahn testified that the earlier proposals contained functional gaps and would not operate correctly in all transmission scenarios. WSUMF ¶6. In particular, the earlier proposals lacked rules governing how the MU-EDCA timer should operate across all scenarios, including when the timer should begin and terminate. *Id.*

After identifying those deficiencies, Wilus and Dr. Ahn independently conceived a design to address them. WSUMF ¶¶7–11. That solution introduced specific operational rules governing the MU-EDCA timer, including when the timer should start and stop so that MU-EDCA would function correctly across all transmission scenarios. WSUMF ¶7. Dr. Ahn testified that if he had not developed this solution, "there would have been many instances where MU EDCA would not work or function properly." Ahn Dep. 37:9–13.

Wilus disclosed that design in IEEE contribution 802.11-16/1425r2 submitted to TGax. WSUMF ¶8. The Wilus submission introduced technical details not present in earlier proposals and addressed issues that had not previously been resolved in TGax discussions. WSUMF ¶¶6–11.

Cariou's IEEE submissions discussed only a **general MU-EDCA concept** involving the use of multiple EDCA parameter sets. WSUMF ¶6. Those submissions did not disclose the operational design claimed in the patents. In particular, they did not specify how the MU-EDCA timer should operate across all conditions or the circumstances under which the timer should start or stop. WSUMF

10

¶¶6-7. Dr. Ahn likewise testified that the early proposal was "from the very early stage" and contained functional gaps. WSUMF ¶6.

Courts routinely reject inventorship claims where the alleged co-inventor merely suggested a general concept but did not contribute to the specific design ultimately claimed in the patent. *See, e.g., Eli Lilly*, 376 F.3d at 1363–64 (evidence that scientist discussed lispro as a candidate for inhalation did not show communication of the specific claimed method); *Hess*, 106 F.3d at 980–81 (supplying materials and explaining known techniques did not amount to conception of the claimed catheter). The record shows that the operational design reflected in the asserted claims was independently developed within Wilus to address deficiencies in earlier proposals. WSUMF ¶¶6–11.

Samsung therefore cannot establish—much less by clear and convincing evidence—that Mr. Cariou contributed in a significant manner to the conception of the claimed invention. At a minimum, the record, viewed in the light most favorable to Wilus, supports Wilus's evidence that the claimed MU-EDCA timer design was conceived through Wilus's work addressing deficiencies in earlier TGax proposals. WSUMF ¶¶7–10. Because a reasonable factfinder could conclude that Mr. Cariou did not meaningfully contribute to the conception of the claimed invention, Samsung cannot meet its burden, its motion must be denied. *See, e.g.*, *Plastipak*, 55 F.4th at 1340–44.

**B.      Genuine Disputes of Material Fact Exist as to Whether Any Contribution by Cariou Was Insignificant When Measured Against the Claimed Invention**

Even if Samsung could show that Mr. Cariou contributed in a significant manner—which it did not—that would still not establish joint inventorship unless the contribution was "not insignificant in quality, when … measured against the dimension of the full invention." *Pannu*, 155 F.3d at 1351. The asserted patents do not claim the general MU-EDCA concept discussed in early TGax submissions. Instead, they claim specific operational rules governing the MU-EDCA timer, including when the timer begins and ends across all transmission scenarios. WSUMF ¶7. The record shows that Cariou's submissions did not disclose those designs and instead reflected only high-level MU-EDCA concepts that lacked the operational rules necessary for the design to function. WSUMF ¶6. By contrast, Wilus introduced the timer-based design in IEEE contribution 802.11-16/1425 after

11

identifying deficiencies in earlier proposals. WSUMF ¶¶7–11. As Wilus's expert, Mr. de la Iglesia explains, Wilus's solution is the **"heart of the invention."** DLI Rpt. ¶670. Dr. Ahn likewise testified that "[a]s far as the core invention is concerned, there [was] no collaboration at all, not even a little." Ahn Dep. 173:15-174:6. Measured against the full scope of the claimed invention, a reasonable factfinder could conclude that any contribution by Cariou was insignificant against the claimed invention. *See HIP*, 66 F.4th at 1350; *Nartron*, 558 F.3d at 1356–57.

### C.    Genuine Disputes of Material Fact Exist as to Whether Cariou's Alleged Contribution Reflects Only Well-Known Concepts in the Field

Joint inventorship also requires that the alleged co-inventor contribute more than merely explaining well-known concepts or the state of the art. *Pannu*, 155 F.3d at 1351. In *Hess*, the alleged co-inventor merely "explain[ed] to the inventors what the then state of the art was," identified products available in the marketplace, and described how those products could be used. *See* 106 F.3d at 980–81. Because those discussions involved only well-known principles—and the inventive work was performed by others—the court held that such contributions did not amount to conception of the claimed invention. *Id.*; *see also Nartron*, 558 F.3d at 1356–58 (finding no co-inventorship where the contribution of extender already present in existing seats and in the prior art was merely the exercise of ordinary skill in the art).

The same principle applies here. The record confirms that using two EDCA parameter sets was already known in the wireless networking field before the Wilus invention and before the Cariou submissions on which Samsung relies. WSUMF ¶ 12. For example, a Qualcomm application filed and published before the Cariou IEEE submissions on which Samsung relies—and cited on the face of the asserted patents—describes MU-operating stations using different EDCA parameter values following transmission events. *Id.* That disclosure reflects preexisting EDCA channel-access concepts, not the specific operational rules later claimed in the patents. *See id.*

Against that background, Cariou's IEEE submissions at most reflect discussion of a general, high-level MU-EDCA concept grounded in known and published EDCA principles. They did not disclose the specific claimed design—most notably, the timer rules governing when the MU-EDCA

12

parameter set begins and ends across all transmission scenarios. WSUMF ¶ 6. Under *Hess* and *Nartron*, such a contribution is insufficient to establish joint inventorship: providing known concepts or existing design principles is not conception of the claimed invention. *See Hess*, 106 F.3d at 980–81; *Nartron*, 558 F.3d at 1356–58. At minimum, a reasonable factfinder could conclude that Cariou's submissions reflected only well-known EDCA parameter concepts already present in the field, while the specific operational design claimed in the patents was independently developed within Wilus.

### D. Genuine Disputes of Material Fact Exist as to Whether the Parties Engaged in the Collaborative Conception Required for Joint Inventorship

Joint inventorship requires some element of joint behavior directed toward conceiving the claimed invention. *Kimberly-Clark*, 973 F.2d at 917. In *Kimberly-Clark*, the Federal Circuit rejected a claim that additional researchers should be added as inventors even though the individuals were employees working for the same company but had not collaborated in conceiving the claimed invention. *Id.* at 913, 915-17. Joint inventorship requires some meaningful interaction between inventors—rather than merely developing related ideas in the same technical area. *Id.* Absent such interaction, individuals cannot be joint inventors. *Id.* Samsung relies on *Kimberly-Clark*'s observation that joint behavior may include "one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting." *Id.* at 917. But that language only arose in the context of employees working within the same organization, where such activity might plausibly contribute to collaborative development. It does not transform ordinary exchanges between independent actors—such as open discussions among participants in standards-setting organization—into joint inventive activity. Far from supporting Samsung's theory, *Kimberly-Clark* confirms that individuals who develop ideas independently, without collaborative conception, are not joint inventors. *See id.* at 915–17.

Samsung's theory attempts to stretch the concept of collaboration far beyond these limits by treating routine participation in an IEEE standards body as joint inventive activity. Samsung even suggests that Dr. Ahn and Mr. Cariou worked "under a common direction" simply because both participated in TGax. But Samsung offers no expert testimony—or any evidence from an IEEE official or standards expert—supporting its characterization of how the IEEE process operates.

13

The record shows the opposite. The IEEE TGax process is not a collaborative engineering effort directed toward jointly conceiving inventions. Rather, it is a standards-development forum in which engineers present independent technical proposals and evaluate competing approaches for possible inclusion in a technical standard. WSUMF ¶¶1–4. Participants typically attend TGax meetings as individual technical experts affiliated with different organizations—many of which compete directly in the marketplace—and independently determine what proposals their organizations will submit to the working group. WSUMF ¶¶1–2. Samsung has no evidence that TGax participants expected to be listed as co-inventors on patents obtained by other companies that developed their own technologies following earlier submissions. *See* DLI Rpt. ¶667. Such independence is inconsistent with joint inventorship. *See Kimberly-Clark*, 973 F.2d at 915-17 ("They cannot be totally independent of each other and be joint inventors.")

Nor does the IEEE process generally operate under a shared engineering structure capable of producing joint conception. As IEEE expert Paul Nikolich explained, IEEE working groups do not function under common technical direction or managerial oversight directing the development of particular technical solutions. WSUMF ¶4. Instead, the standards process provides an open forum in which participants present proposals, the group critiques those proposals, and individual participants independently develop new submissions addressing issues identified during discussion. WSUMF ¶¶2–3. Samsung's suggestion that TGax participants operated like "employees of a company working together under the company's leadership" is therefore contrary to the undisputed evidence describing how the IEEE standards process actually works.

Furthermore, Dr. Ahn specifically testified that "[t]here was no collaboration in making of the technology itself," explaining that TGax discussions involved reviewing and discussing the feasibility of submissions rather than jointly developing the underlying technology. Ahn Dep. 37:14–22. He further testified that the presentation or upload of a submission to TGax did not itself constitute collaboration with other participants. Ahn Dep. 50:6–17. Engineers review one another's submissions, discuss feasibility issues, and sometimes suggest improvements as part of evaluating competing proposals. Such exchanges are a normal feature of standards development—not joint invention.

14

Samsung argues that Dr. Ahn and Mr. Cariou had an "open line of communication," but this mischaracterizes the facts. *See, e.g.*, RSSUMF ¶¶2-3, 7-8, 10-11, 14. For example, there no evidence that Dr. Ahn and Mr. Cariou jointly communicated regarding the claimed design.  Dr. Ahn testified that before Wilus's contribution, he did not discuss with Mr. Cariou ways to improve Intel's submission. Ahn Dep. 45:23–46:5 Dr. Ahn expressly explained that he did not collaborate with Mr. Cariou to develop the claimed inventions. WSUMF ¶11. ██████████████████████████

████████████████████████████████████████████████████████████████

███████████████ WSUMF ¶¶7–10. Additionally, communications **after** Wilus already submitted its proposal cannot show collaboration in developing the claimed design because the invention had already been developed and disclosed by Wilus before they occurred. *See, e.g.*, RSSUMF ¶¶8, 14. The absence of such coordinated development confirms that the engineers did not engage in the "element of joint behavior" required for joint inventorship. *See Kimberly-Clark*, 973 F.2d at 917.

Courts addressing collaborative scientific environments have likewise rejected attempts to convert technical discussion into joint inventorship. In *University of Utah v. Max-Planck-Gesellschaft*, the court held that sharing ideas and building upon one another's work in conference-like technical settings does not create joint inventorship absent evidence of collaborative conception of the claimed invention. 134 F. Supp. 3d 576, 585–89 (D. Mass. 2015). The TGax standards process closely resembles the conference-like technical setting described in *Max-Planck*. *See* 134 F. Supp. 3d 576, 585–89 (D. Mass. 2015). Treating such exchanges as joint invention would dramatically expand the doctrine of joint inventorship beyond the limits recognized by Federal Circuit precedent. Because the TGax discussions cited by Samsung reflect only the type of technical dialogue typical of standards organizations—not collaboration directed toward conceiving the claimed invention—they cannot establish the joint conception required for inventorship.

VII.    **CONCLUSION**

For the foregoing reasons, Samsung has not shown incorrect inventorship by clear and convincing evidence, and genuine disputes of material fact remain. *See, e.g.*, *Plastipak*, 55 F.4th at 1340–44.

███████████████████████████████

Dated: March 16, 2026

Respectfully submitted,

*/s/ Reza Mirzaie*

Marc Fenster
CA State Bar No. 181067
Email: mfenster@raklaw.com
Reza Mirzaie
CA State Bar No. 246953
Email: rmirzaie@raklaw.com
Dale Chang
CA State Bar No. 248657
Email: dchang@raklaw.com
Neil A. Rubin
CA State Bar No. 250761
Email: nrubin@raklaw.com
Jacob Buczko
CA State Bar No. 269408
Email: jbuczko@raklaw.com
Jonathan Ma
CA State Bar No. 312773
Email: jma@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474


Of Counsel:

Andrea L. Fair
State Bar No. 24078488
MILLER FAIR HENRY, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)
E-mail: andrea@millerfairhenry.com


**ATTORNEYS FOR PLAINTIFF**
**Wilus Institute of Standards and**
**Technology Inc**

16



*/s/ Jonathan Ma*
Jonathan Ma

## **CERTIFICATE OF SERVICE**

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on March 16, 2026, with a copy of this document via electronic mail.

*/s/ Jonathan Ma*
Jonathan Ma

1