# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> HP INC. <br><br> Defendant. | Civil Case No. 2:24-cv-00752-JRG [Lead Case] <br><br> JURY TRIAL DEMANDED |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br> Defendants. | Civil Case No. 2:24-cv-00746-JRG [Member Case] <br><br> JURY TRIAL DEMANDED |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br> Defendants. | Civil Case No. 2:24-cv-00765-JRG [Member Case] <br><br> JURY TRIAL DEMANDED |

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP. <br><br> Defendants. | Civil Case No. 2:24-cv-00766-JRG [Member Case] <br><br> JURY TRIAL DEMANDED |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP. <br><br> Defendants. | Civil Case No. 2:24-cv-00753-JRG-RSP [Member Case] <br><br> JURY TRIAL DEMANDED |

**REBUTTAL EXPERT REPORT OF PROF. STEPHEN B. WICKER, PH.D.**

Dated: February 13, 2026

_____

Dr. Stephen B. Wicker

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND AND QUALIFICATIONS ...................................................... 1

III.    COMPENSATION .............................................................................................. 2

IV.     MATERIALS CONSIDERED ........................................................................... 2

V.      UNDERSTANDING OF THE LAW, RELEVANT LEGAL PRINCIPLES.................... 3

        A.      LEVEL OF A PERSON HAVING ORDINARY SKILL IN THE ART .............. 3

        B.      INFRINGEMENT................................................................................. 3

        C.      ESSENTIALITY.................................................................................. 6

        D.      NON-INFRINGING ALTERNATIVES .............................................. 6

VI.     TECHNOLOGY BACKGROUND ..................................................................... 7

VII.    ACCUSED PRODUCTS .................................................................................... 7

VIII.   SUMMARY OF OPINIONS ............................................................................. 13

IX.     OPINION CONCERNING THE '163/'597 PATENT ........................................ 15

        A.      Mr. de la Iglesia's Improper Reliance on IEEE 802.11ax-2021
                Specification ........................................................................................ 15

                1.      Limitations [1c] of the '163 Patent; [1c], [9a]-[9b] of the '597
                        Patent : "[not to use]/[not using] a Basic Service Set (BSS) color
                        [indicated by the PPDU] when signaling information indicates that
                        an operation based on the BSS color is not allowed . . . ." ....................... 17

                2.      Limitations [2pre] of the '163 Patent; [2pre] of the '597 Patent:
                        "wherein the processor is configured not to set an Intra-BSS
                        Network Allocation Vector (NAV) by using the BSS color
                        indicated by a signaling field of the PPDU when the signaling
                        informatio indicates that the operation based on the BSS color is
                        not allowed." ...................................................................................... 19

                3.      Claim 3 of the '163 Patent: "not to use the TXOP Duration field
                        for setting the Intra-BSS NAV or the Basic NAV when the

wireless communication terminal gets a valid signaling field of the MAC frame" .................................................................................................... 20

4.      Claim 4 of the '163 Patent; Claims 4, 12 of the '597 Patent: "signal[ing] that the operation based on the BSS color is not allowed when the wireless communication terminal recognizes that a BSS color collision has occurred . . . ."................................................... 21

5.      Claim 5 of the '163 Patent and '597 Patent: "determine[ing] that BSS color collision has occurred based on address fields of a medium access control (MAC) frame" ...................................................... 23

B.      Mr. de la Iglesia's Improper Reliance on Wi-Fi Certified 6 Test Plan ................ 25

1.      Limitations [1c] of the '163 Patent; [1c], [9a]-[9b] of the '597 Patent : "[not to use]/[not using] a Basic Service Set (BSS) color [indicated by the PPDU] when signaling information indicates that an operation based on the BSS color is not allowed . . .." ........................ 25

C.      Mr. de la Iglesia's Improper Reliance on Technical Documents .......................... 33

1.      Samsung Documents ................................................................................. 34

2.      Qualcomm Documents .............................................................................. 43

3.      MediaTek Documents ............................................................................... 49

4.      Broadcom .................................................................................................. 51

D.      The Accused Products' Source Code Shows the Accused Products Do Not Infringe .............................................................................................................. 52

1.      Samsung Source Code Shows That the Accused Products Do Not Infringe the '163 and '597 Patents ............................................................ 52

2.      Broadcom Source Code Shows That the Accused Products Do Not Infringe the '163 and '597 Patents ............................................................ 61

3.      Qualcomm Source Code Shows That the Accused Products Do Not Infringe the '163 and '597 Patents ............................................................ 65

4.      MediaTek Source Code Shows That the Accused Products Do Not Infringe the '163 and '597 Patents ............................................................ 76

5.      Intel Source Code Shows That the Accused Products Do Not Infringe the '163 and '597 Patents ............................................................ 83

E.  Alternative Designs Related to the '163 and '597 Patents ................................. 90

F.  Alleged Benefits Related to the '163 and '597 Patents ...................................... 94

G.  Mr. de la Iglesia's Opinion Regarding the '163 and '597 Patents....................... 98

H.  No Doctrine of Equivalents .................................................................. 98

X.  OPINION CONCERNING THE '035/'879 PATENT ...................................................... 99

A.  Prosecution History / Prosecution History Estoppel............................................ 99

B.  Mr. de la Iglesia's Improper Reliance on IEEE 802.11ax-2021 Specification ................................................................................................... 104

C.  Mr. de la Iglesia's Improper Reliance on Wi-Fi Certified 6 Test Plan............... 107

D.  Mr. de la Iglesia's Improper Reliance on Technical Documents........................ 112

1.  Samsung Document: ██████████████████████ ......................................................................... 112

2.  Broadcom Documents.......................................................................... 114

3.  Qualcomm Documents.......................................................................... 115

E.  The Accused Products' Source Code Shows the Accused Products Do Not Infringe........................................................................................................ 118

1.  Samsung Accused Products ................................................................... 118

2.  Qualcomm Accused Products ................................................................. 127

3.  MediaTek Accused Products .................................................................. 131

4.  Intel Accused Products ........................................................................ 135

5.  Broadcom Accused Products ................................................................. 140

F.  Alternative Designs Related to the '035 and '879 Patents ................................. 146

G.  Alleged Benefits Related to the '035 and '879 Patents ...................................... 150

H.  Other Mr. de la Iglesia's Opinion Regarding the '035/'879 Patents Is Flawed.......................................................................................................... 157

XI.  MR. DE LA IGLESIA'S INDIRECT INFRINGEMENT ANALYSIS FAILS ............ 157

XII.    SUPPLEMENTATION ................................................................................................. 160

███████████████████████████████████████████████
███████████████████████████████████████

## EXHIBITS/APPENDICES

**APPENDIX A** – Materials Considered

[REDACTED]

208.    As another example, IEEE 802.11-16/0396r ("Ko 0396") is entitled "Issues on BSS Color Collision" and was submitted to Task Group ax and published to IEEE Mentor on March 14, 2016. *See* PRIOR_ART_00001243 (Ko 0396); Decl. of Bims, ¶ 85. Ko 0396 lists three of the '163 and '597 patent inventors—Geonjung Ko, Juhyoung Son, and Jinsam Kwak—as authors. *See* PRIOR_ART_00001243 (Ko 0396) at 1. Ko 0396 discusses the issue of BSS color collisions and means for rectifying them. *Id*. Ko 0396 discloses that a STA may detect BSS color collisions on its own and, upon detecting such a color collision, may not use BSS color in response. *See id*. at 9-13. The method described in Ko 0396 does not practice the claims of the '163 and '597 patents because it involves a STA independently detecting a BSS color collision as opposed to the STA receiving "signaling information indicating that an operation based on the BSS color is not allowed" from an AP. *See id*. Such modifications would be minor to implement and would have little, if any, impact on the functionality and performance of networks using this alternative design.

209.    Further, the "BSS Color Disabled" functionality detailed in Section 26.17.3.3 of the IEEE 802.11ax specification is [REDACTED]

210.    Mr. de la Iglesia does not dispute that products lacking the "Disabling BSS Color" functionality detailed in Section 26.17.3.3 of the IEEE 802.11ax specification are alternative designs that do not practice the '163 and '597 patents. *See* de la Iglesia Rpt. at 130-34.

F.    **Alleged Benefits Related to the '163 and '597 Patents**

211.    Mr. de la Iglesia opines on purported benefits of the '163 and '597 patents in his opening report. *See* de la Iglesia Rpt. at 112-15. In my opinion, Mr. de la Iglesia severely overstates the technical benefits associated with the '163 and '597 patents. As described in greater

94

███████████████████████████████████████████████████████████

detail below, Mr. de la Iglesia improperly ascribes to the '163 and '597 patents technical benefits that in fact stem from prior art technology that was not invented by Wilus or the named inventors (*e.g.*, BSS color).  Furthermore, Mr. de la Iglesia provides **no** opinion, let alone any analysis, regarding the incremental benefits provided by the '163 and '597 patents over any of the alternative designs Samsung set forth in its interrogatory responses, despite listing Samsung's interrogatory responses among the materials he considered in forming his opinions. ████████████

████████████████████████████████████████████████████

███████████████████████████████████ he does not attempt to link those alleged performance improvements to the '163 or '597 patents.  de la Iglesia Rpt. at ¶¶190-192.  As I discuss below and in my opening report, to the extent the '163 and '597 patents relate to disabling BSS color as implemented at 802.11ax (which, in my opinion they do not and therefore are not standard essential), disabling BSS color is a narrow aspect of Wi-Fi 6 functionality and cannot be credited for much, if any, of the performance improvements between Wi-Fi 6 and Wi-Fi 5.

212.    *First*, Mr. de la Iglesia argues that the key technical benefits of the '163 and '597 patents "flow from the use of BSS color . . . ."  de la Iglesia Rpt, at 113.  Mr. de la Iglesia further argues (1) that "both Wilus and Samsung witnesses testified about the technical usefulness of BSS color identifiers in the Accused Products and Wi-Fi 6/802.11ax," (2) that "Samsung neither disputes the usefulness of BSS color to improve efficiency of WLAN communications in a crowded environment, nor is Samsung aware of any alternatives to its use," and (3) that "Samsung considered the use of BSS color and decided it was important to be specifically included in their products requirements document sent to wi-fi chip supplier."  *Id*. at 113-14.

95

█████████████████████████████████████████████████

213. Mr. de la Iglesia provides no specific evidence as to the technical benefits provided by BSS color. For example, Mr. de la Iglesia does not quantify in any way the extent to which wireless communication efficiency is improved by using BSS color. Regardless, the '163 and '597 patents are not directed to BSS color generally and, therefore, even if Mr. de la Iglesia had provided quantitative evidence of the technical benefits associated with using BSS color, these benefits could not be attributed to the '163 and '597 patents. As explained in my opening expert report regarding invalidity of the '163 and '597 patents, BSS color was well known as of the alleged priority date of the '163 and '597 patents. I hereby incorporate by reference my opening expert report's discussion of BSS color in the prior art. Indeed, BSS color was initially proposed (by non-Wilus contributors) and adopted as part of the IEEE 802.11 Working Group's Task Group ah, as is reflected in Wilus's Task Group ax technical submissions related to BSS color. Moreover, several of the named inventors of the '163 and '597 patents admitted that they did not invent BSS color. *See* Kwak Dep. Tr. at 68:17-23; Ko Dep. Tr. at 129:12-14.

214. **Second**, Mr. de la Iglesia suggests that rectifying BSS color collisions is a technical benefit of the '163 and '597 patents. *See* de la Iglesia Rpt. at 112-13. For example, Mr. de la Iglesia argues that "[w]ithout the inventions in the '163 and '597 patents, there is no feasible way to . . . efficiently resolve BSS color collisions without the use of expensive techniques such as frame retransmission or increasing transmission power." *Id*. at 113. Mr. de la Iglesia provides no specific evidence as to the technical benefits associated with rectifying BSS color collisions. *See id*. at 12-13. A BSS color collision is a rare WLAN edge case that occurs, if at all, in dense networking environments such as airports and stadiums. Therefore, even if the technical benefits associated with rectifying BSS color collisions could be wholly attributed to the '163 and '597 patents, these benefits are minor.

96

█████████

215.    But, more importantly, Mr. de la Iglesia fails to consider that there are other means, besides those claimed in the '163 and '597 patents, for rectifying BSS color collisions.  For example, as described above, Ko 0396—a document authored by several of the '163 and '597 patent named inventors and submitted to Task Group ax—describes a method of rectifying BSS color collisions whereby a STA itself detects BSS color collisions and uses other means of classifying PPDUs in response. *See* PRIOR_ART_00001243 (Ko 0396) at 9-13.  The technique described in Ko 0396 does not practice the '163 and '597 patents' clams because it does not involve receiving "signaling information indicating that an operation based on the BSS color is not allowed" from an AP. *See id*.  I hereby incorporate my discussion of additional alternative designs about and in my opening report.   Mr. de la Iglesia's analysis regarding technical benefits of the '163 and '597 patents is fatally flawed because it shows that he is unaware of alternative means for rectifying BSS color collisions aside from simply retransmitting frames and/or increasing transmission power. *See* de la Iglesia Rpt. at 113 ("Without the inventions of the '163 and '597 patents, ***there is no feasible way to . . . efficiently resolve BSS color collisions without the use of expensive techniques such as frame retransmission or increasing transmission power***.").  Mr. de la Iglesia's failure to consider alternative techniques—including those proposed by the named inventors—undermines his conclusions regarding the technical benefits of the '163 and '597 patents.



217. Lastly, I understand that Mr. de la Iglesia did not conduct any testing of the '163 and '597 patent features himself to support his opinion on benefits. Likewise, Mr. de la Iglesia did not provide any results or data related to testing by others that would support such benefits.

## G. Mr. de la Iglesia's Opinion Regarding the '163 and '597 Patents

218. Mr. de la Iglesia opines on the disclosure of the '163 and '597 patents. de la Iglesia Rpt. 44-47. In describing the invention in the '163 and '597 patents, Mr. de la Iglesia states "[d]ue to color collisions, operations based on BSS colors are no longer allowed since BSS colors cannot be reliably used to perform these operations." *Id*. at 46. Then, Mr. de la Iglesia states "[t]he color based operations are nevertheless still performed, and are instead performed by employing parameters different from the BSS color, e.g. MAC address or other RXVECTOR parameters." *Id*. at 46-47. To the extent Mr. de la Iglesia is arguing the claims require "color based operations are nevertheless still performed, and are instead performed by employing parameters different from the BSS color," I disagree. This is an additional limitation that is not mentioned anywhere in the claims.

## H. No Doctrine of Equivalents

219. Mr. de la Iglesia provides no theory of infringement based on doctrine of equivalents (for any claim element). Indeed, his Appendix D, which includes his element-by-element analysis for the 035/879 patents, mentions none of the following terms: "equivalence," "equivalents," "way," "result," or "insubstantial." *See generally* App. D. The Appendix uses the

sufficient that the expiration of a timer is merely the condition for the terminating the application of a second parameter set; the time at which the timer expires must be the time at which the terminating the application of a second parameter set occurs.    Thus, Mr. de la Iglesia's analysis engaged in a belated claim construction argument and applied the wrong legal construction of the term "when."

353.    In fact, Mr. de la Iglesia in the previous paragraph suggested that terminating the application of the second parameter set at the time of the timer's expiration is the "point" of the '035/879 patents. *See* de la Iglesia Rep. 138 ("But the **point** of these patents is that the timer is used by the device **to decide when** to terminate the application of the second parameter set—this is plain from the patents themselves—so if, as Samsung says, one wanted to terminate the application of the second parameter set "before" the timer expires, how would Samsung propose the hypothetical device do that? And what would be the purpose of the timer at all if it is not meaningfully used?").    Given that the timing of the second parameter set's termination is the "point," Mr. de la Iglesia's argument that the term "when" is merely conditional and does not impose a temporal limitation further lacks merit.

354.    In sum, there were acceptable and available alternative designs to the '035 and '879 patents.

### G.    Alleged Benefits Related to the '035 and '879 Patents

355.    Mr. de la Iglesia opines on certain purported benefits of the '035/879 patents but incorrectly presumes that "[t]here were no suitable non-infringing alternatives ("NIAs") available to Samsung that offered these benefits." de la Iglesia Rep. at 106.  I disagree, and I incorporate my discussion with respect to alternate designs here. *See* § XI.F.  Furthermore, Mr. de la Iglesia provides **no** opinion, let alone any analysis, regarding the incremental benefits provided by

the '035/'879 patent over many of the non-infringing alternatives Samsung has set forth in its interrogatory responses, even though he lists them as having been considered in forming his opinion.

356.   Even Mr. de la Iglesia characterizes the purported invention of the '035/879 patents as being related to the micro-timing of when to "set" the MU EDCA Timer. *See* de la Iglesia Rep. at 119 (quoting Dr. Son's testimony that "

" and Dr. Ahn's testimony "

").

However, ignoring his own characterization of the purported invention of the '035/'879 patents, Mr. de la Iglesia's subsequent analysis improperly assumes that the benefit from the entire MU EDCA feature is attributable to the '035/'879 patents.

357.   In fact, Wilus and its inventors' contributions are even narrower than Mr. de la Iglesia's suggests.  As I have discussed in my opening report with respect to the inventorship, which I incorporate by reference here, Wilus's primary inventor Dr. Ahn admitted that

*See* Opening Rep. § VIII.J. Further, IEEE submissions support Dr. Ahn's admission

In fact, even concept of "setting" the MU EDCA Timer with respect to the TB PPDU (e.g., "setting" when an immediate response was received) was also known.

151

Because Mr. de la Iglesia's subsequent analysis proceeds by assuming the benefit from the entire MU EDCA feature is attributable to the '035/'879 patents, he failed to consider—and has no opinion on—the incremental benefit, if any, from distinguishing when the MU EDCA Timer is "set" depending on whether the TB PPDU request or not request an immediate response.

358.

152



WILUS_0052458 at 82; *see also* de la Iglesia Rep. at 120 (citing WILUS_0052458).

359.

360.

Again, these are general MU EDCA benefits, not benefits that arise from the micro-timing of the MU EDCA Timer.

153



361.    Moreover, Mr. de la Iglesia does not appear to have reviewed the underlying papers (ref4, ref5) and instead adopts Wilus's promotional material at face value, without analysis or explanation. My understanding is that Wilus failed to produce these references, and Mr. de la Iglesia's "Materials Considered" list does not include them. See WILUS_0052458 at 511.

WILUS_0052458 at 511.

362.    I have.  Ref 4 titled "Impact of MU EDCA channel access on IEEE 802.11ax WLANs" is *silent* with respect to starting the MU EDCA Timer at different times based on whether TB PPDU request or does not request an immediate response. SAMSUNG_WILUS_00208297.

363.    Ref 5 titled "Novel Multi-AP Coordinated Transmission Scheme for 7th Generation WLAN 802.11be" and authored by the primary inventor of the 035/879 patents is also silent on such a feature.  SAMSUNG_WILUS_00208278.  In fact, Dr. Ahn's overview of how MU EDCA scheme works omits the key invention of the '035/879 patent, merely stating that "***When a station successfully transmits UL data for an access category in response to a TF, the station sets its EDCA parameters to the values of the MU EDCA parameter set for the corresponding access***

154

*category*." *Id.* at 208281 There is no mention of distinguishing the start time of an MU EDCA Timer, let alone distinguishing it based on whether a TB PPDU requests or does not request an immediate response. Given that this is a paper by the primary inventor of the '035/'879 patent, it is curious that he does not mention the key feature of his own patents, the '035/'879 patents, in his analysis of MU EDCA performance. But I am not surprised because such a distinction makes no observable impact and is not a source of any performance benefit. Furthermore, I note that Ref5 relates to a proposed scheme for IEEE 802.11be. The proposed scheme involves features that are not implemented in 802.11ax, and Mr. de la Iglesia has not shown that the Accused Products implements the proposed scheme. Thus, any performance-related analysis in Ref5 is simply inapplicable.

364. By treating these general benefits of MU EDCA parameters as benefits of the asserted invention, Dr. de la Iglesia fails to consider the incremental contribution, if any, of the asserted claims. The benefits he identifies arise from MU EDCA invented by the 802.11ax task group—work that Wilus and the named inventor acknowledge was not theirs.

365. To the extent Wilus continues to argue that these benefits arise from the asserted claims, that position only underscores that additional individuals—such as Qualcomm's task-group members who actually designed many of these MU EDCA behaviors—should have been listed as inventors. If the benefits truly arise from MU EDCA mechanisms contributed by Qualcomm engineers, then those engineers must be credited.

366. Mr. de la Iglesia further asserts that "[w]ithout the inventions of the '035 and '879 patents, there is no feasible way to efficiently practice the basic concept of trigger-frame-based transmissions and the use of MU EDCA parameters required in Wi-Fi 6/802.11ax while still maintaining compatibility with legacy systems." *Id*. at 119–20. This assertion is incorrect.

155

███████████████████████████████████████████████████

███████████████████████████████████████

367.    ***First***, the timing of when the MU EDCA Timer is set has nothing to do with compatibility with legacy systems. Compatibility in mixed-mode environments is governed by PHY/MAC signaling rules—not by the internal start time of a private timer used only within HE STAs. The MU EDCA Timer's start time plays no role in legacy coexistence.

368.    ***Second***, small differences in the MU EDCA Timer's "set" time have, at most, no meaningful and often no detectable impact on a station's ability to participate efficiently in trigger-frame-based transmissions.  As I explained in my opening report, one reasonable alternative design is simply to start the MU EDCA Timer at the end of a TB PPDU regardless of whether an immediate response is requested.  In fact, Wilus unsuccessfully attempted to pursue claims directed to such a design and the patent office rejected it based on prior art by Qualcomm, Intel, Laurent Cariou, and Simon Merlin.  *See* § XI.A (discussing amendment during prosecution). This results only in a slightly longer MU EDCA period, which can be trivially offset by a lower timer value.  Any behavioral difference is negligible, and any performance impact (if any) would be insignificant and, in practice, undetectable.  I also incorporate my discussion above with respect to the non-infringing MU EDCA Timer of various vendors, which also have no observable impact (e.g., the chip's ability to become Wi-Fi 6 Certified), let alone any performance benefit.

369.    Additionally, while Mr. de la Iglesia separately opines in his report that Wi-Fi 6 provides "20-40% faster connection[s]" relative to Wi-Fi 5 and is "up to 3x faster than Wi-Fi 5" in crowded environments, he does not attempt to link those alleged performance improvements to the '035 or '879 patents.  de la Iglesia Rpt. at 190-191.  As discussed above, the only purported performance benefits Mr. de la Iglesia discusses in the context of the '035 and '879 patents are improvements attributed to MU EDCA itself, not the purported invention of the '035 and '879 patents.  Moreover, even if these patents enabled "the use of MU EDCA parameters required in

156

Wi-Fi 6/802.11ax while still maintaining compatibility with legacy systems," such a benefit would have no impact on the throughput, bandwidth, or other performance benefits of the system.  de la Iglesia Rpt. at 119-120.  Rather, that feature would simply contribute to backwards compatibility. As I discuss below and in my opening report, to the extent the '035 and '879 patents relate to such features (which, in my opinion they do not and therefore are not standard essential), those features are a narrow aspect of Wi-Fi 6 functionality unrelated to network speed, and thus cannot be credited for much, if any, of the performance improvements between Wi-Fi 6 and Wi-Fi 5.

370.    Lastly, I understand that Mr. de la Iglesia did not conduct any testing of the '035 and '879 patent features himself to support his opinion on benefits.  Likewise, Mr. de la Iglesia did not provide any results or data related to testing by others that would support such benefits.

**H.    Other Mr. de la Iglesia's Opinion Regarding the '035/'879 Patents Is Flawed**

371.    Mr. de la Iglesia opines on the disclosure of the '035/'879 patents.  de la Iglesia Rept. 41-44.  Mr. Iglesia cites to the "background art" section of the patents and suggests that the patents disclose that "[t]he inventors propose modified EDCA (Enhanced Distributed Channel Access) parameter settings for wireless communication terminals (STAs) that are triggered for multi-user uplink transmissions, with the goal of improving coexistence and reducing collisions" and that "[t]he proposed  use of EDCA parameter settings addresses and/or improves congestion issues and allows higher capacity when multiple STAs contend for channel access in high-density environments." *Id.* I disagree.  The cited portions of the patents say or suggest no such thing. As the heading suggests, this portions merely describe the state of the background technology.

**XI.    MR. DE LA IGLESIA'S INDIRECT INFRINGEMENT ANALYSIS FAILS**

372.    Mr. de la Iglesia's opening report includes a section related to indirect infringement that applies to all asserted patents.  *See* de la Iglesia Rpt. at 90-94.  In my opinion, the evidence

157