# Exhibit 1

IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> VS. <br><br> HP, INC., <br><br> Defendants. <br> _____ | ) ) ) ) ) ) ) ) ) ) ) ) No. 2:24-cv-00752-JRG-RSP (Lead Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> VS. <br><br> SAMSUNG ELECTRONICS CO., LTD., and SUMSUNG ELECTRONICS AMERICA, INC., <br><br> Defendant. <br> _____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) No. 2:24-cv-00746-JRG-RSP (Member Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> VS. <br><br> SAMSUNG ELECTRONICS CO., LTD., and SUMSUNG ELECTRONICS AMERICA, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) No. 2:24-cv-00765-JRG-RSP (Member Case) |



MAGNA
LEGAL SERVICES

Page 2

IN THE UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

WILUS INSTITUTE OF                )
STANDARDS AND TECHNOLOGY,          )
INC.,                              )
                                   )
   Plaintiff,                      )
                                   )
        VS.                        )   No. 2:24-cv-00752-
                                   )        JRG-RSP
HP, INC.,                          )        (Lead Case)
                                   )
   Defendants.                     )
_____)

REMOTE VIDEOGRAPHED

DEPOSITION OF HARRY BIMS, Ph.D.

CALIFORNIA

FRIDAY, FEBRUARY 20, 2026

Reported by:     LAURA A. RUTHERFORD, RPR
                 CSR No. 9266

Job No. 1488085



Page 31

Q.    BY MR. RUBIN:    Were you able to download that?

A.    Yes.

Q.    So what were the paragraphs in this report that you are -- doing this analysis of product announcements in response to?

(Mr. Tsuie joins.)

Q.    BY MR. RUBIN:    Sorry.    Are you looking at the document now?

A.    Yeah.    I'm looking at his response to my report, because it was in there that I triggered my additional research.

Q.    And this was -- I assume this was the Section 7, "Public Availability"?

A.    Yes, near the latter part of the document.

Q.    All right.

I take it there's not a specific opinion by Mr. Nikolich about announcements of products; right?

A.    He was making opinions in his report related to whether or not it would be possible for a non-voting member of 802.11 to have had any knowledge of any of drafts to 802.11ax.

So in my research, the draft 0.5 of 802.11ax was published in September of 2016.    By



Page 35

was 802.11ax compliant; however, when you look at the 802.11ax development, the letter ballot for .11ax draft 1.0 failed in November.  The next meeting was two months later in January.

So there's not a whole lot of time to develop a chip and release it into the market, you know, by February announcement if there were later drafts that had all kinds of changes to them.

But to me, it's -- it's -- it was -- important information to consider, you know, if I were to, you know, opine on this as evidence that people outside of the voting membership were aware of the content of 802.11ax drafts, including draft 0.5 and 1.0, which were uploaded only within a few months of the announcement.

Q.    Based on your experience developing wireless chips that are based on IEEE standards, how long would you expect a company like Broadcom or Qualcomm to develop a chip that's compliant with a new version of an IEEE standard?

You know, how long would have to pass between when a standard or draft of a standard is available to when the company would actually have a chip implementing that standard?

A.    So I can't speak to the development cycles


MAGNA
LEGAL SERVICES

Page 36

of each chip vendor in particular.  But what I can say is that it is typical for chip vendors to announce compliant devices before the publication of the actual standard, whether it's .11a, .11ac, .11ax, .11be, .11bn.

Chip vendors will, because they are trying to be first to the market, will announce compliant chips before the standards development process has completed.

Q.    Do you think that if Qualcomm is announcing a chip in February of 2017, that they have been working to develop that chip for many months before that announcement?

A.    Well, again, you know, I have not collected enough evidence to render an opinion on what I have been talking about.  So at this time, I really can't offer an opinion, to answer your question, without having done enough diligence to research the evidence.

That's just the data point that I have found, but I have -- again, I've not completed enough work to render opinions.

Q.    Do you think it's likely that Qualcomm could have started with a draft of 802.11ax that was first made available to the Working Group members in



Page 37

November of 2016, and by February of 2017, had already had a chip that was based specifically on that draft ready to announce?

MR. TALEBI:  Objection to the form.

THE WITNESS:  Yeah.  Your question is a little curious, because drafts usually build on previous drafts.

So, for example, draft 0.5, was uploaded in September of 2016.  And then draft 1.0 was an evolution of draft 0.5 that was submitted for letter ballot.

In November of -- by November of 2016, the letter ballot process had concluded and voting members had voted on it.  So what was in draft 1.0 was an evolution of draft 0.5.

Plus there were numerous discussions in teleconferences, as well as at the 802.11 Working Group meetings about the content of draft 0.5 and draft 1.0, in which particular features were discussed through presentations.

The presentations and then votes were cast on whether or not that technology should be added to the draft.  So -- and all of that was publicly available.

So even outside of those particular



Page 38

documents, there were lots of technical material made publicly available during 2016 that could give a company insight into the direction of the standard.

Q.    BY MR. RUBIN:  So I take it that you're drawing the inference from these product announcements that there were engineers at Qualcomm and at Broadcom that were developing these chips that were then announced based on knowledge that they had of draft standards or their communications within the IEEE 802.11ax Task Group.

But sitting here today, you don't know which specific drafts or which specific communications any of those engineers at Qualcomm or Broadcom would have been basing their work on?

A.    Well, again, I'm not drawing any inferences or rendering opinions based upon the evidence.  What triggered that inquiry was the statement from Mr. Nikolich that the draft documents could not have been disseminated to anyone other than voting members.

And based on that opinion, then I thought, well, that means that there's no way that a company could release an 802.11ax compliant document prior to the official publication of the final standard if no one outside of the voting member had any access to any


MAGNA
LEGAL SERVICES

Page 106

functionality, such as what's described in Josiam, rather than start from scratch. This update to the Galaxy Tab S would have involved simply modifying the source code for the Wi-Fi chip to make the miner changes needed to implement receiving channel nulling (puncturing) information."

Do you see that?

A.    Yes.

Q.    So according to your report, the way that a person skilled in the art would have combined the Samsung Galaxy Tab S with the teachings of the other prior art references you combine it with is by modifying the source code for the Wi-Fi chip to implement additional functionality; is that right?

MR. TALEBI:  Objection.  Form.

THE WITNESS:  Well, the Wi-Fi chip within the Samsung Galaxy Tab S is the only relevant component to receiving channel nulling (puncturing) information.  That would have to be updated.  Other components in the Samsung Galaxy Tab S would not be relevant for that feature.

Q.    BY MR. RUBIN:  And the way that a person skilled in the art would have combined the Galaxy Tab S with the other references, in your opinion, is by



Page 107

modifying the source code to the Galaxy Tab S; correct?

MR. TALEBI:  Objection.  Form.

Q.   BY MR. RUBIN:  Specifically to the Wi-Fi chip -- the source code to the Wi-Fi chip in the Galaxy Tab S?

MR. TALEBI:  Same objection.

THE WITNESS:  So what I'm saying is that a person of ordinary skill would know how to update the Wi-Fi chip in the Samsung Galaxy Tab S to incorporate the functionality of the Josiam prior art reference.

Q.   BY MR. RUBIN:  In your opinion for how that person skilled in the art would have known to update the Wi-Fi chip in the Samsung Galaxy Tab S is that they would have modified the source code to the Wi-Fi chip; correct?

MR. TALEBI:  Objection.  Form.

A.   Yes.

Q.   BY MR. RUBIN:  I just uploaded what I've designated as Exhibit 9.

(Exhibit Number was marked for identification.)

Q.   BY MR. RUBIN:  And this is a copy of a website of the ifixit, with the post titled "Where is the Wi-Fi chip on my Galaxy Tab S, 8.4 Wi-Fi."



Page 112

product; correct?

MR. TALEBI:  Objection.  Form.

THE WITNESS:  I would imagine it depends on the terms of the agreement.

Q.  BY MR. RUBIN:  Okay.

But if you or I, when this product was available for sale, had gone into a retail store and bought the Samsung Tablet, the Samsung Galaxy Tab S, there wouldn't be a copy of the source code in the box; right?

MR. TALEBI:  Objection.  Form.

THE WITNESS:  Typically, that's not the case.

Q.  BY MR. RUBIN:  And the source code is also not actually contained within the product itself.  So there's no way, from reading bits off of the -- what's stored on the device, or from looking at a microscope, there's no way to get the source code like what we see in the printouts you've analyzed in this case?

MR. TALEBI:  Objection.  Form.

THE WITNESS:  So what I would say is that, typically, source code is not bundled with the product that is shipped commercially.

Although, there have been times when I've done an analysis on a commercial product bought off



MAGNA
LEGAL SERVICES

Page 113

the shelf, in which we were able to reverse engineer the access to the hard drive on the Wi-Fi router, and identify source code files that were shipped with the product, but that is not typical.

Q.    BY MR. RUBIN:  And you haven't offered any opinions in this case that the source code files were shipped on the Samsung Galaxy Tab S device?

A.    I have no opinions on that in this case; correct.

Q.    And so you have no opinions that any person skilled in the art who was not an employee of Broadcom who had access to the source code as part of their job at Broadcom would have been able to actually obtain a copy of the source code for the Wi-Fi chip in the Galaxy Tab S and make modifications to that code; correct?

MR. TALEBI:  Objection.  Form.

THE WITNESS:  It's my understanding that if a person of ordinary skill did not have access to Broadcom source code, they would not be able to modify that source code to incorporate SIM.

Q.    BY MR. RUBIN:  And the only persons of ordinary skill in the art that you're aware of who would have had access to the source code at the point of question would have been employees of Broadcom who

