# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> HP INC. <br><br> Defendant. | Civil Case No. 2:24-cv-00752-JRG [Lead Case] <br><br> JURY TRIAL DEMANDED |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br> Defendants. | Civil Case No. 2:24-cv-00746-JRG [Member Case] <br><br> JURY TRIAL DEMANDED |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br> Defendants. | Civil Case No. 2:24-cv-00765-JRG [Member Case] <br><br> JURY TRIAL DEMANDED |

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC.,<br><br>Plaintiff,<br><br>v.<br><br>ASKEY COMPUTER CORP.,<br>ASKEY INTERNATIONAL CORP.<br><br>Defendants. | Civil Case No. 2:24-cv-00766-JRG<br>[Member Case]<br><br>JURY TRIAL DEMANDED |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC.,<br><br>Plaintiff,<br><br>v.<br><br>ASKEY COMPUTER CORP.,<br>ASKEY INTERNATIONAL CORP.<br><br>Defendants. | Civil Case No. 2:24-cv-00753-JRG-RSP<br>[Member Case]<br><br>JURY TRIAL DEMANDED |

**CORRECTED OPENING EXPERT REPORT OF DAVID DJAVAHERIAN**

Dated: January 27, 2026

David Djavaherian

████████████████████████████████

## TABLE OF CONTENTS

**Page**

I.  QUALIFICATIONS AND EXPERIENCE ........................................................................ 1

II.  MY DUTIES AS AN EXPERT WITNESS .................................................................... 2

III.  BACKGROUND ON STANDARD SETTING AND STANDARD ESSENTIAL
      PATENTS (SEPS) ................................................................................................... 2

IV.  WILUS'S COMMITMENTS TO THE IEEE ................................................................. 8

V.  COMMON NEGOTIATION PRACTICES (AND PITFALLS) FOR SEP LICENSING 12

VI.  SUMMARY OF NEGOTIATIONS AND OFFERS ........................................................ 15

VII.  EVALUATING THE PARTIES' CONDUCT FROM THE PERSPECTIVE OF
       INDUSTRY LICENSING PRACTICE ...................................................................... 19

VIII.  CONCLUSION ...................................................................................................... 26

36.     One key issue raised by competition agencies in permitting pools, despite the competition law concerns, is that pools must remain *optional* for a licensee. That is, bi-lateral SEP licensing *outside of the pool* must remain a viable and realistic option for licensees that – for whatever reason (e.g., due to a dispute about rates or otherwise) – might not choose to take a pool license.[10] As such, pool members would not be expected to use individual member portfolios to force pool licensing through coercive pricing, injunctions, or similar tactics. In other words, not only must a bilateral license be available, but the SEP holder must be willing to engage in good faith negotiations aimed at entering into a bilateral license on RAND terms.[11]

## IV.     WILUS'S COMMITMENTS TO THE IEEE

37.     SEPs for the IEEE 802.11 Wi-Fi standard are generally subject to IEEE's Patent Policy, as contained in the IEEE Standards Board Bylaws ("Bylaws").[12] The IEEE's Bylaws recognize that standards may adopt patented or unpatented solutions.

38.     As part of the standards development process, IEEE participants are required to promptly identify any holders of potentially essential patent claims of which the participant is aware.[13] Any person or entity holding potentially Essential Patent Claims will then declare its

---

Dep't of Justice, Antitrust Div. (Jun. 26, 1997), https://www.justice.gov/atr/response-trustees-columbia-university-fujitsu-limited-general-instrument-corp-lucent.

[10] US Dep't of Justice and Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* (April 2007), at 71-72.

[11] *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) (noting that "the IEEE and the ITU agreements anticipate that the parties will negotiate towards a RAND license" and that "any offer by [the SEP holder] (be it an initial offer or an offer during a back-and-forth negotiation) must comport with the implied duty of good faith and fair dealing inherent in every contract").

[12] The specific text of the Bylaws' provisions relating to the Patent Policy (clause 6) has changed somewhat over the years. *See* IEEE-SA Standards Board Bylaws ("2007 Bylaws"), https://grouper.ieee.org/groups/pp-dialog/email/pdfPyO3I_zm6q.pdf; *see also* IEEE-SA Standards Board Bylaws ("2015 Bylaws"), https://web.archive.org/web/20150319235420/http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf; IEEE Standards Board Bylaws (in effect as of May 2025) ("2025 Bylaws"), https://standards.ieee.org/about/policies/bylaws/ (while parts of the 2025 Bylaws have changed from previous versions, the relevant patent policy language has been in place since January 1, 2023).

[13] IEEE-SA Standards Board Operations Manual, § 6.3.2, Call for patents (dated Dec. 2013), https://standards.ieee.org/wp-content/uploads/import/documents/other/sb_om.pdf; *see also* IEEE-SA Standards Board Operations Manual, § 6.3.2, Call for patents (dated Mar. 2015), https://web.archive.org/web/20150906190416/http://standards.ieee.org/develop/policies/opman/sb_om.pdf; IEEE's Understanding Patent Issue During IEEE Standards Development (dated June 27, 2023), https://standards.ieee.org/wp-content/uploads/import/documents/other/patents.pdf; IEEE's Understanding Patent Issue During IEEE Standards Development (dated 2012) https://grouper.ieee.org/groups/pp-dialog/email/pdfVpgg6oYNDw.pdf.

8

██████████████████████████████

licensing intentions (i.e., whether it is willing to license on RAND terms or not) through the IEEE Letter of Assurance ("LOA"). An IEEE licensing promise is irrevocable.

39.    Such assurances are important because the IEEE, its members and third parties must be able to rely on the commitment. If the assurance were revokable, it could not be relied on. This would risk wasting the extensive joint development efforts, sometimes spanning many years, that go into standard development and adoption of a given standard. Additionally, an SEP owner's irrevocable commitment under the IEEE Bylaws entails that the patent owner cannot revoke its commitment (either explicitly or as a practical matter based on their conduct) after a standard has been adopted, and thereafter seek to reap excessive profits by excluding some market participants or demanding exorbitant royalty rates as a result of standard adoption. SSOs, such as the IEEE, seek such irrevocable patent licensing commitments to combat hold up and ensure that a standard may be implemented by interested parties without fear of anticompetitive conduct or unfair windfall benefits to some patent holders.[14]  In other words, implementers who incorporate IEEE standards into their products typically will rely upon compliance with the IEEE Bylaws, and licensing practitioners are aware that courts treat implementers as third party beneficiaries of associated RAND licensing promises.[15]

40.    Timely disclosure of intellectual property is important to preserve the integrity of the standardization process. Regulators have long recognized the harms caused by late and non-disclosure of IPR rights during the standardization process. For example, in 1992 when addressing the creation of an IPR policy at another SSO, the European Commission stated:

> Late or Non-Disclosure of Rights: A potential source of difficulties can be identified where proprietary rights are not disclosed at all or are disclosed late in the standard-making process. In theory, an IPR holder (having been put on notice that his rights were potentially to be used in the creation of a standard), would be acting in bad faith if he claimed those rights only once the standard had been adopted, thereby forcing competitors to agree to license royalties higher than those which might have been offered at an earlier stage …. [B]ad faith could easily be demonstrated where a presumption of knowledge on the part of the rightholder can be established. It is therefore for standards-making bodies to establish procedures whereby late disclosure or non-disclosure of rights is penalized once actual or presumed knowledge can be established."[16]

41.    Like many standards-making bodies, the IEEE has developed its own procedures for ensuring adequate disclosure of potentially essential patents to standards it develops. The IEEE's Patent Policy instructs participants to notify the IEEE if they are aware that their employer

---

[14] *See generally* Pocknell & Djavaherian, *supra.*

[15] *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1033 (9th Cir. 2015).

[16] *Commission of the European Communities*, Communication from the Commission, Intellectual Property Rights and Standardization, COM(92) 445 (Oct. 27, 1992), at §§ 4.4.1-4.4.2 (available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:51992DC0445).

may hold any patents or patent applications (patent applications are included in the IEEE's definition of "Patent Claim") that are or may be essential to the standard. In particular:

> Individuals participating in the IEEE standards development process are required to notify the IEEE of the identity of a holder of any potential Essential Patent Claims (but not the identity of the Essential Patent Claim) where (1) the individual participant is personally aware that the holder may have a potential Essential Patent Claim; (2) the holder is the participant or an entity the participant is from, employed by, or otherwise represents; and (3) the potential Essential Patent Claim is not already the subject of an Accepted Letter of Assurance. If such a participant is uncertain whether the patent is essential, the participant still shall notify the IEEE (or cause the IEEE to be notified) of the possibility because the participant is personally aware of a claim that is a *potential* Essential Patent Claim.[17]

42.     Regular and ongoing reminders of this obligation are built into the IEEE standard development processes, with the working group Chair or Chair delegate being required to make a "call for patents" during technical meetings. The call for patents requires that the Chair "inform[] the participants at a meeting that if any individuals believe that Patent Claims might be Essential Patent Claims, that fact should be made known to the entire working group and duly recorded in the minutes of the working group meeting."[18]

43.     In other words, IEEE participants are required to provide notice of the existence of potentially essential patents. IEEE materials describe in further detail how participants satisfy their duty to notify the IEEE of the existence of essential patent claims:

> An individual participant could fulfill his or her duty to the IEEE by telling the Working Group chair that his or her employer is the holder of a potential Essential Patent Claim. Alternatively, the participant could request that his or her employer submit a Letter of Assurance or otherwise notify the IEEE that it is the holder of a potential Essential Patent Claim. In the latter case, the participant fulfills his or her duty to the IEEE only if his or her employer submits a Letter of Assurance or otherwise notifies the IEEE that it is the holder of a potential Essential Patent Claim. If the employer declines to submit a Letter of Assurance or otherwise notify the IEEE, and if the participant continues to believe the employer may hold a potential Essential Patent Claim, then the participant has not fulfilled his or her duty. The participant, therefore, shall inform the IEEE of the holder of that potential Essential Patent Claim. In all cases, the duty on the participant is only to inform the IEEE of the identity of the holder of a potential Essential Patent Claim and not the patent, application, or particular claim itself. A participant does not need to respond to a call for patents if the relevant potential

---

[17] *Understanding Patent Issues During IEEE Standards Development*, IEEE, FAQ 20, available at https://standards.ieee.org/wp-content/uploads/import/documents/other/patents.pdf.
[18] IEEE Board Operations Manual (approved June 2025) 6.3.2.

Essential Patent Claim is already covered by an Accepted Letter of Assurance or request for a Letter of Assurance.[19]

44.    Under the IEEE Patent Policy, patent holders or applicants need to identify potential SEPs and submit LOAs "as soon as reasonably feasible in the standards development process," and at the very least "prior to the Standards Board's approval of the standard."[20] Companies participating in standards and standards licensing are aware that the failure to disclose patents can lead to patent unenforceability or other limitations on the subsequent ability to enforce patent rights.[21]

45.    While patent holders are expected to commit to license on RAND terms under the IEEE Patent Policy, the IEEE Patent Policy does permit patent holders to opt out of that commitment. However, if a patent holder either refuses to provide a LOA or provides one indicating it will not commit to license its patents on RAND terms, the matter "shall be referred to the Patent Committee." The Patent Committee will then "review the circumstances and make a recommendation to the IEEE SA Standards Board [(SASB)]." This information will be shared with the relevant standardization committees "who may wish to consider alternative technologies" given that the "SASB will take the fact [that there are potential patent claims without an accepted licensing commitment] into account when determining whether or not to approve a standard." In addition, even where patents are disclosed and RAND licensing commitments are provided, technical committees can consider to adopt alternative technologies that are not subject to patent claims before the standard is finalized.

46.    In this case, Wilus has submitted two LOAs to the IEEE. One, submitted in 2021, is specific to 802.11ax.[22] The second, submitted in 2022, identifies the full 802.11 standard (e.g., prior and future versions of the 802.11 standard, not just 802.11ax).[23] Such commitments, which have been posted on the IEEE website, are viewed and relied upon by licensing practitioners as binding and irrevocable promises pursuant to the IEEE Patent Policy. Indeed, courts have acknowledged that the obligations under SSO patent policies, including the IEEE Patent Policy, are enforceable contractual obligations.[24] It is well understood in the industry that implementers

---

[19] *Understanding Patent Issues During IEEE Standards Development*, IEEE, FAQ 29, available at https://standards.ieee.org/wp-content/uploads/import/documents/other/patents.pdf.

[20] It is noteworthy that this language was added to the IEEE policy in 2007, in the wake of investigations by competition authorities into Rambus and Dell for failures to disclose essential patents during the standard setting process. *See generally* Anne Layne-Farrar, *Proactive or reactive? An empirical assessment of IPR policy revisions in the wake of antitrust actions*, The Antitrust Bulletin: Vol. 59, No. 2, Summer 2014, at 396-97.

[21] *See Core Wireless Licensing S.A.R.L. v. Apple Inc.,* 899 F.3d 1356 (Fed. Cir. 2018); *see also, e.g., Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013); *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011).

[22] WILUS_0030063.

[23] WILUS_0030059.

[24] *See, e.g., Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030-37 (9th Cir. 2015).

of these industry standards, such as Samsung, have regularly been permitted to enforce those contractual obligations as third-party beneficiaries.[25]

47.    I understand that Sisvel has accepted that it has an obligation to abide by Wilus's obligations under the IEEE's Patent Policy when it is negotiating on behalf of Wilus.[26]

## V.    COMMON NEGOTIATION PRACTICES (AND PITFALLS) FOR SEP LICENSING

48.    Although the objectives of RAND licensing are well documented historically, they have frequently proven difficult to achieve in practice. Patent owners and prospective licensees will often have very different views on what will constitute RAND terms in a given situation. These differences of opinion are sometimes resolved through negotiation, but sometimes cannot be resolved despite good faith efforts to do so.

49.    In my experience, it is common for SEP holders to represent to prospective licensees that they operate their SEP licensing according to a "program." This gives the impression of some degree of consistency and structure to the licensing activity of the SEP holder if that representation is taken at face value. As part of such "licensing programs," an SEP holder will typically have a "program rate" or "rack rate" which they may or may not make public. In Wilus's case, its publicly announced (via its licensing agent, Sisvel) "standard rate" for Wi-Fi 6 products other than enterprise access points is EUR 0.13–0.17 (or about $0.15–$0.20).[27]

50.    Such "program rates" effectively represent the maximum amount demanded and which might in theory be paid, for example, if the licensee/payor did not negotiate or did not have sufficient sales at issue. It is a unilateral rate announced by the SEP holder, not a bi-laterally accepted rate resulting from RAND negotiations. Indeed, Wilus's licensing agent Sisvel confirmed that the rate initially offered to Samsung for Wilus's Wi-Fi 6 portfolio was drawn from an agreement between Wilus and Sisvel.[28] It is in the SEP holder's interests and makes sense as a negotiation strategy to set a "high" program rate, as this allows more latitude to negotiate to a lower price that is still high relative to the value of the portfolio/what is actually RAND, and to offer purported "discounts" relative to the program rate, but which still result in a high price when viewed objectively. Setting very high nominal prices which are not often paid in practice (except perhaps by the most obliging and unsophisticated buyers, or buyers under threat of injunction or related litigation) and in practice selling at markdowns on the nominal rate can serve as simply a sales tactics to initiate a process for haggling over price.

---

[25] *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1033 (9th Cir. 2015).
[26] *See* 2025-12-17 Deposition of David Muus at 129:4-131:17; *see also* WILUS_0025091.
[27] *Wilus portfolio*, Sisvel, https://www.sisvel.com/licensing-programmes/Wi-Fi/wilus-portfolio/#tab-licence-terms.
[28] 2025-12-17 Deposition of David Muus at 256:13-257:12.