# Exhibit 5

LG München I, Endurteil v. 08.01.2026 – 7 O 5007/25

**Titel:**

**Ausschärfung der Grundsätze zum kartellrechtlichen Zwangslizenzeinwand**

**Normenkette:**

AEUV Art. 102

**Leitsätze:**

**1. Für die Beurteilung der Lizenzwilligkeit wird es als besonders bedeutsam angesehen, ob der Lizenzsuchende eine Teilzahlung leistet. Diese Teilzahlungspflicht gilt in einer Situation, wo zwischen den Parteien unstreitig ist, dass der Lizenzsuchende eine Zahlung zu leisten hat und allein die Höhe streitig ist. Dann ist jedenfalls der zwischen den Parteien unstreitige Betrag an den Patentinhaber zu zahlen, und zwar so, dass er dauerhaft beim Patentinhaber verbleibt. Es handelt sich um eine Anzahlung auf den späteren Lizenzbetrag. Die Höhe orientiert sich an dem Angebot des Patentsuchenden und ist deshalb – wenn die Parteien über eine weltweite Lizenz verhandeln – nicht auf das Gebiet der Bundesrepublik Deutschland beschränkt.**

**2. Neben die Verpflichtung zur Zahlung eines unstreitigen Teilbetrages kann eine Verpflichtung zum Leisten einer ergänzenden Sicherheit treten kann. Wann dies der Fall ist, bestimmt sich nach dem Einzelfall und ist abhängig von der Höhe der Differenz der beiden Angebote in a.) absoluten Zahlen und b.) Prozent.**

**3. Eine Partei, die eine Ratenfestsetzung beantragt hat, hat den von dem angerufenen Gericht festgesetzten Betrag in Ergänzung zu der Teilzahlung als Sicherheit zu leisten, und zwar unabhängig davon, ob die in der anderen Jurisdiktion beklagte Partei dem Vorschlag des dortigen Gerichts zugestimmt hat, oder nicht.**

**4. Zeitnah geschlossenen Verträgen mit anderen Abnehmern, die in etwa eine gleiche Größe und ein vergleichbares Produktportfolio haben, kommt eine sehr starke Indizwirkung zu, dass die dort festgelegte Rate innerhalb des FRAND-Korridors liegt.**

**5. Dabei darf die Tatsache, dass es vor dem Vertragsschluss ein Verletzungsverfahren gab, nicht überbewertet werden. Denn es ist festzustellen, dass ein nicht unbeachtlicher Teil der Marktteilnehmer ohne den entsprechenden Druck aus einem Verletzungsverfahren nicht bereit ist, Lizenzverträge zu schließen. Insofern ist das Anstrengen einen Verletzungsverfahrens ein normaler und zu akzeptierender Teil der Verhandlungen, um eine für beide Seite passende Lizenzrate zu finden.**

**6. Es ist Sache der Klagepartei zu entscheiden, ob und ggf. welche Vergleichslizenzverträge sie vorlegen möchte, um die geltend gemachte Forderung zu belegen. Bei der Vorlage von Verträgen über eine Lump-Sum-Zahlung soll in der Regel der Betrag, die Laufzeit und die der Kalkulation zugrunde gelegte Stückzahl genannt werden. Soweit es sich um einen ersten Vertrag zwischen den Parteien handelt, sollen auch Angaben gemacht werden, wie die Vergangenheit abgegolten wurde.**

**7. Es gibt keine Verpflichtung, dass alle Verträge vorgelegt werden, die von der Klagepartei über den Lizenzgegenstand geschlossen worden sind.**

**8. Es ist davon auszugehen, dass Marktteilnehmer wissen, dass sie Lizenzen nehmen müssen. Deshalb kann grundsätzlich gefordert werden, dass Rückstellungen gebildet werden, wenn mit einer Nutzung ohne Lizenzierung begonnen wird. Anderes kann gelten, wenn bestimmte Technologien über eine lange Zeit nicht lizenziert werden oder Lizenzen im Markt nicht konsequent durchgesetzt werden. Insofern bedarf es stets konkreten Vortrags, wie sich ein Pateninhaber in der Vergangenheit verhalten hat.**

**9. Daher ist davon auszugehen, dass für die Zeit vor einer qualifizierten Zahlungsaufforderung und einer angemessenen Frist, die zur Anpassung der Verkaufspreise erforderlich ist, Lizenzzahlungen in der Regel nicht vollständig nachgefordert werden können. Je nach Dauer der Rückwirkung können aber zumutbare Teilbeträge gefordert werden. In welcher Höhe und für welche Zeiträume ist eine Frage des Einzelfalls.**

**10. Es stellt eine zulässige betriebswirtschaftliche Entscheidung eines jeden Patentinhabers dar, ob Ansprüche für die Vergangenheit geltend gemacht werden. Diese Entscheidung gilt es zu akzeptieren, solange es nicht ausnahmsweise Anhaltspunkte für einen Missbrauch gibt. Es gibt keine Vermutung, dass ein Verzicht für**

Ansprüche aus vergangenen Nutzungen allein dazu dient, eine überhöhte Zukunftsrate festzusetzen, um so Vergleichslizenzverträge mit hohen Lizenzgebühren zu schaffen.

11. Zunächst ist festzustellen, welcher Betrag für die Nutzung eines bestimmten Standards angemessen ist. Ausgehend von einer solchen Festlegung ist dann zu bestimmen, wie hoch der Anteil eines konkreten Patentinhabers an dem Standard ist.

12. Eine Kontrollberechnung über eine Top-Down-Analyse ist zumindest immer dann möglich, wenn der Patentinhaber einen erheblichen Anteil am Standard hat. Für den sehr umfangreichen Mobilfunkstandard reicht dabei zur Überzeugung der Kammer ein Anteil von einem Prozent aus. Für kleinere Standards ist ggf. ein höherer Anteil erforderlich.

13. Beim zugrunde gelegten Stückpreis dürfte zwingend auf einen Durchschnittswert für bestimmte Produktkategorien abzustellen sein. Dies bedeutet, dass für bestimmte Kategorien auf ein Produkt mittlerer Art und Güte abzustellen wäre. Denn bei den Endprodukten gibt es erhebliche Preisunterschiede, die nicht durch eine verbesserte Standard-Funktionalität begründet sind, sondern durch eine besonders attraktive Marke, eine besonders hochwertige Kamera oder besonders funktionale Software. Es wäre mit der Vorstellung eines gerechten Interessensausgleichs nicht vereinbar, wenn der Hersteller hochwertiger Markenprodukte einen höheren Preis für die gleiche Funktionalität zahlen müsste als der Hersteller günstiger oder günstigster Produkte.

**Schlagwort:**

Marktbeherrschung

**Fundstellen:**

MittdtPatA 2026, 124

GRUR-RS 2026, 791

LSK 2026, 791

## Tenor

I. Die Beklagten werden verurteilt,

1. es bei Meidung eines für jeden Fall der Zuwiderhandlung vom Gericht festzusetzenden Ordnungsgeldes bis zu EUR 250.000,00 – ersatzweise Ordnungshaft – oder Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft an den gesetzlichen Vertretern der Beklagten zu vollziehen ist, gegenüber der Klägerin jeweils zu unterlassen,

a) Drahtloskommunikationsendgeräte, die drahtlos mit einem Basis-Drahtloskommunikationsendgerät kommunizieren,

in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen und/oder zu gebrauchen und/oder zu den genannten Zwecken einzuführen und/oder zu besitzen,

wobei das Drahtloskommunikationsendgerät aufweist: einen Sendeempfänger; und einen Prozessor zum Verarbeiten eines durch den Sendeempfänger empfangenen Funksignals oder eines durch den Sendempfänger zu sendenden Funksignals,

wobei der Prozessor ausgelegt ist zum:

Senden, an das Basis-Drahtloskommunikationsendgerät, einer Auslöserbasierten Protokolldateneinheit der Bitübertragungsschicht (PPDU) unter Verwendung des Sendeempfängers, Wechseln eines Parametersatzes für verbesserten verteilten Kanalzugriff (EDCA), der ein Satz von Parametern ist, die für den Kanalzugriff verwendet werden, von einem ersten EDCA-Parametersatz zu einem zweiten EDCA-Parametersatz auf Grundlage dessen, ob das BasisDrahtloskommunikationsendgerät eine Teilnahme des Drahtloskommunikationsendgeräts an einer Mehrbenutzer-Up-link-Übertragung auslöst,

Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz auf Grundlage dessen, ob eine Antwort auf eine in der Auslöserbasierten PPDU enthaltenen MAC-Protokolldateneinheit (MPDU) empfangen wird, wenn der Zeitgeber für den zweiten EDCA-Parametersatz abläuft, Beenden einer Anwendung des zweiten EDCA-Parametersatzes, Berechnen eines zufälligen Ganzzahlwerts innerhalb eines Zugriffskonfliktfensters (CW),

Einstellen eines Backoff-Zeitgebers auf Grundlage des zufälligen Ganzzahlwerts, und Zugreifen auf einen Kanal auf Grundlage des Backoff-Zeitgebers und einer vorbestimmten Slotzeit,

wobei jeder des ersten und des zweiten EDCA-Parametersatzes einen Mindestwert (CWmin) des CW und einen Höchstwert (CWmax) des CW aufweist,

wobei der Prozessor dazu ausgelegt ist, auf Grundlage eines Antworttyps, der von der in der Auslöserbasierten PPDU enthaltenen MPDU angefordert wird, zu bestimmen, wann der Zeitgeber für den zweiten EDCA-Parametersatz eingestellt werden soll,

wobei, wenn die in der Auslöserbasierten PPDU enthaltene MPDU kein ACK anfordert, der Prozessor dazu ausgelegt ist, den Zeitgeber für den zweiten EDCA-Parametersatz einzustellen, wenn der Sendevorgang der Auslöserbasierten PPDU endet,

(unmittelbare Verletzung des Anspruchs 1 in Verbindung mit Anspruch 4 und Anspruch 5 des EP 3 512 289)

b) Drahtloskommunikationsendgeräte, Abnehmern zur Benutzung im Gebiet der Bundesrepublik Deutschland in der Bundesrepublik Deutschland anzubieten und/oder an solche zu liefern,

die dazu geeignet sind, ein Betriebsverfahren eines Drahtloskommunikationsendgeräts, das drahtlos mit einem Basis-Drahtloskommunikationsendgerät kommuniziert, durchzuführen,

wobei das Verfahren aufweist:

Senden einer Auslöserbasierten Protokolldateneinheit der Bitübertragungsschicht (PPDU) an das Basis-Drahtloskommunikationsendgerät, Wechseln eines Parametersatzes für verbesserten verteilten Kanalzugriff (EDCA), der ein Satz von Parametern ist, die für den Kanalzugriff verwendet werden, von einem ersten EDCA-Parametersatz zu einem zweiten EDCA-Parametersatz auf Grundlage dessen, ob das Basis-Drahtloskommunikationsendgerät eine Teilnahme des Drahtloskommunikationsendgeräts an einer Mehrbenutzer-Up-link-Übertragung auslöst,

Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz auf Grundlage dessen, ob die Antwort auf die in der Aus-löserbasierten PPDU enthaltenen MPDU empfangen wird;

wenn der Zeitgeber für den zweiten EDCA-Parametersatz abläuft, Beenden einer Anwendung des zweiten EDCA-Parametersatzes;

Berechnen eines zufälligen Ganzzahlwerts innerhalb eines Zugriffskonfliktfensters (CW);

Einstellen eines Backoff-Zeitgebers auf Grundlage des zufälligen Ganzzahlwerts;

Zugreifen auf einen Kanal auf Grundlage des Backoff-Zeitgebers und einer vorbestimmten Slotzeit; und Senden der Daten über den Kanal,

wobei jeder des ersten und des zweiten EDCA-Parametersatzes einen Mindestwert (CWmin) des CW und einen Höchstwert (CWmax) des CW aufweist;

(mittelbare Verletzung des Anspruchs 12 des EP 3 512 289)

2. der Klägerin in elektronischer Form, hilfsweise schriftlich darüber Auskunft zu erteilen und in einer geordneten Aufstellung unter Vorlage von Belegen, wie Rechnungen oder Lieferscheinen oder Quittungen, in elektronischer Form, hilfsweise schriftlich darüber Rechnung zu legen, unter Beifügung der Auskunft in elektronischer Form als Excel-Tabelle (xls-Datei), in welchem Umfang sie die zu Ziffer I.1. bezeichneten Handlungen seit dem 26. Februar 2022 begangen hat, und zwar unter Angabe

a) der Menge der ausgelieferten, erhaltenen oder bestellten Erzeugnisse sowie der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer sowie der bezahlten Preise,

b) der einzelnen Lieferungen, aufgeschlüsselt nach Liefermengen, -zeiten und -preisen, einschließlich der Rechnungsnummern, und den jeweiligen Typenbezeichnungen sowie den Namen und Anschriften der Abnehmer, einschließlich der Verkaufsstellen, für die die Erzeugnisse bestimmt waren,

c) der einzelnen Angebote, aufgeschlüsselt nach Angebotsmengen, -zeiten und -preisen und den jeweiligen Typenbezeichnungen sowie den Namen und Anschriften der Angebotsempfänger,

d) der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, deren Auflagenhöhe, Verbreitungszeitraum und Verbreitungsgebiet, im Falle von Internet-Werbung der Domain den Zugriffszahlen und der Schaltungszeiträume, und bei direkter Werbung, wie Rundbriefen, den Namen und Anschriften der Empfänger,

e) der nach den einzelnen Kostenfaktoren aufgeschlüsselten Gestehungskosten des erzielten Gewinns,

wobei es den Beklagten gegebenenfalls vorbehalten bleibt, die Namen und Anschriften der Angebotsempfänger und der nichtgewerblichen Abnehmer statt der Klägerin einem von dieser zu bezeichnenden und ihr gegenüber zur Verschwiegenheit verpflichteten, in der Bundesrepublik Deutschland ansässigen, vereidigten Wirtschaftsprüfer mitzuteilen, sofern die Beklagten die durch die Einschaltung des Wirtschaftsprüfers entstehenden Kosten tragen und ihn zugleich ermächtigen, der Klägerin auf Anfrage mitzuteilen, ob bestimmte Angebotsempfänger oder nichtge-werbliche Abnehmer in der erteilten Rechnungslegung enthalten sind;

3. die vorstehend unter Ziffer I.1. bezeichneten, seit dem 26. Februar 2022 in der Bundesrepublik Deutschland in Verkehr gebrachten Erzeugnisse gegenüber den gewerblichen Abnehmern unter Hinweis auf den gerichtlich festgestellten patentverletzenden Zustand der Erzeugnisse und mit der verbindlichen Zusage aus den Vertriebswegen zurückzurufen, etwaige Entgelte zu erstatten sowie notwendige Verpackungs- und Transportkosten sowie mit der Rückgabe verbundene Zoll- und Lagerkosten zu übernehmen, oder diese Erzeugnisse endgültig aus den Vertriebswegen zu entfernen, indem die Beklagten diese Erzeugnisse wieder an sich nehmen;

4. die in ihrem unmittelbaren oder mittelbaren Besitz oder in ihrem Eigentum befindlichen, vorstehend unter Ziffer I.1. bezeichneten Erzeugnisse an einen von der Klägerin zu benennenden Gerichtsvollzieher zum Zwecke der Vernichtung auf Kosten der Beklagten herauszugeben.

II. Es wird festgestellt, dass die Beklagten verpflichtet sind, der Klägerin allen Schaden zu ersetzen, der ihr sowie der SK Telecom Co., Ltd. durch die in Ziffer I.1. bezeichneten, seit dem 26. Februar 2022 begangenen Handlungen entstanden ist und noch entstehen wird.

III. Die Beklagten tragen die Kosten des Rechtsstreits.

IV. Das Urteil ist in Ziffer I.1. gegen Sicherheitsleistung in Höhe von 3.500.000,00 EUR, in Ziffer I.2 gegen Sicherheitsleistung in Höhe von 50.000,00 EUR, in Ziffern I.3 und I.4 zusammengenommen gegen Sicherheitsleistung in Höhe von 150.000,00 EUR sowie in Ziffer III. gegen Sicherheitsleistung in Höhe von 110 Prozent des jeweils zu vollstreckenden Betrags vorläufig vollstreckbar.

## Tatbestand

Die Klägerin nimmt die Beklagten wegen behaupteter Verletzung des europäischen Patents 3 512 289 B1 mit dem Titel „Drahtloskommunikationsverfahren mit verbessertem Kanalzugang und Drahtloskommunikationsendgerät damit" in Anspruch.

Die Klägerin ist gemeinsam mit der SK Telecom, Ltd. Inhaberin des am 7. September 2017 unter Inanspruchnahme der Priorität mehrerer südkoreanischer Patentanmeldungen, u.a. der KR 20160147189 vom 6. November 2016, angemeldeten europäischen Patents 3 512 289 B1 (Anlage K 01, nachfolgend: Klagepatent). Die Anmeldung wurde am 17. Juli 2019 und der Erteilungshinweis am 26. Januar 2022 veröffentlicht. Mit Schriftsatz vom 17. September 2025 (Anlage HE 1) erhob die Beklagte zu 2) Nichtigkeitsklage vor dem Bundespatentgericht (Az. 4 Ni 31/25). Der Hinweisbeschluss gemäß § 83 Abs. 1 PatG liegt noch nicht vor.

Die hier maßgeblichen Ansprüche 1, 4, 5 und 12 lauten in der Verfahrenssprache wie folgt:

„Anspruch 1:

„A wireless communication terminal (100) that wirelessly communicates with a base wireless communication terminal, the wireless communication terminal comprising:

a transceiver (120); and a processor (110) for processing a radio signal received through the transceiver (120) or a radio signal to be transmitted through the transceiver (120), wherein the processor (110) is configured to:

transmit, to the base wireless communication terminal (200), a trigger-based physical layer protocol data unit, PPDU, using the transceiver (120), switch an enhanced distributed channel access, EDCA, parameter set, which is a set of parameters used for the channel access, from a first EDCA parameter set to a second EDCA parameter set based on whether the base wireless communication terminal (200) triggers a multiuser uplink transmission participation of the wireless communication terminal (100), set a second EDCA parameter set timer based on whether a response to a MAC protocol data unit, MPDU, included in the triggerbased PPDU is received when the second EDCA parameter set timer expires, terminate an application of the second EDCA parameter set, calculate a random integer value within a contention window, CW, set a backoff timer based on the random integer value, and access a channel based on the back off timer and a predetermined slot time, wherein each of the first and second EDCA parameter sets comprises a minimum value, CWmin, of the CW and a maximum value, CWmax, of the CW."

Anspruch 4: The wireless communication terminal (100) of claim 1, wherein the processor (110) is configured to determine when to set the second EDCA parameter set timer based on a type of responding requested by the MPDU included in the triggerbased PPDU.

Anspruch 5: The wireless communication terminal (100) of claim 4, wherein when the MPDU included in the triggerbased PPDU does not request an ACK, the processor (110) is configured to set the second EDCA parameter set timer when the transmission of the triggerbased PPDU ends.

Anspruch 12: An operation method of a wireless communication terminal (100) that wirelessly communicates with a base wireless communication terminal, the method comprising:

transmitting a triggerbased physical layer protocol data unit, PPDU, to the base wireless communication terminal;

switching an enhanced distributed channel access, EDCA, parameter set, which is a set of parameters used for the channel access, from a first EDCA parameter set to a second EDCA parameter set based on whether the base wireless communication terminal triggers a multiuser uplink transmission participation of the wireless communication terminal;

setting a second EDCA parameter set timer based on whether the response to the MPDU included in the triggerbased PPDU is received; when the second EDCA parameter set timer expires, terminating an application of the second EDCA parameter set;

calculating a random integer value within a contention window, CW; setting a backoff timer based on the random integer value;

accessing a channel based on the back off timer and a predetermined slot time; and transmitting the data through the channel, wherein each of the first and second EDCA parameter sets comprises a minimum value, CWmin, of the CW and a maximum value, CWmax, of the CW."

Die Klägerin ist ein südkoreanisches Forschungs- und Entwicklungsunternehmen, das sich auf drahtlose Kommunikations- und Multimediatechnologien spezialisiert hat.

Die Beklagte zu 1) ist ein in Taiwan ansässiges Unternehmen, das Computerhardware und Unterhaltungselektronik unter der Marke „ASUS" herstellt. Die in Deutschland ansässige Beklagte zu 2) ist eine 100%-ige Tochtergesellschaft der Beklagten zu 1) und fungiert als Vertriebspartnerin und Serviceniederlassung für die Produkte der Beklagten zu 1) in Deutschland. Die ebenfalls in Deutschland ansässige Beklagte zu 3) ist eine

unabhängige Vertriebspartnerin der Beklagten zu 1) und 2), die für den Vertrieb von ASUS-Produkten in Deutschland, Frankreich, den Niederlanden und anderen europäischen Staaten verantwortlich ist.

Die Klägerin greift die ASUS-Modelle an, die den Wi-Fi-6-Standard umsetzen, unter anderem das Wi-Fi-6-kompatible Smartphone „Zenfone 11 Ultra", diverse Wi-Fi-6-kompatible Laptops wie etwa das „ASUS Zenbook S. 13", Wi-Fi-6-kompatible Mini-PCs wie etwa das „ASUS Chromebox 4" und Wi-Fi-6-kompatible All-in-One PCs wie etwa das „ASUS AiO E3 (E3402)" (im Folgenden: angegriffene Ausführungsformen).

Zwischen den Parteien ist unstreitig, dass die angegriffenen Ausführungsformen den von der IEEE verwalteten Standard „IEEE Std 802.11ax™ -2021"

(Anlage K 06) umsetzen. Dieser Standard wird unter der Bezeichnung „Wi-Fi 6" vermarktet.

Die Parteien verhandelten bislang erfolglos über eine Lizenzierung des von der Sisvel S.A. verwalteten „Wi-Fi 6 Pool", zu dem unter anderem das Klagepatent und weitere Patente der Klägerin zählen, oder alternativ über eine Lizenzierung des

„Wi-Fi 6"-Portfolios der Klägerin und der SK Telecom Ltd.

Die SK Telecom Ltd. hat ihre Schadensersatzansprüche gegen die Beklagten betreffend das Klagepatent, soweit sie bestehen, an die Klägerin abgetreten.

Die Klägerin trägt vor, die angegriffenen Ausführungsformen verletzten Anspruch 1 des Klagepatents in Verbindung mit den Ansprüchen 4 und 5 unmittelbar und wortsinngemäß, weil der Wi-Fi-6-Standard die Lehre des Klagepatents verwirkliche. Außerdem werde Anspruch 12 des Klagepatents durch das Inverkehrbringen der angegriffenen Ausführungsformen mittelbar verletzt.

Der kartellrechtliche Zwangslizenzeinwand der Beklagten verfange nicht; die Klägerin habe den Beklagten FRANDgemäße Angebote gemacht, die Beklagten seien aber nicht lizenzwillig.

Die Entgegenhaltungen der Beklagten seien nicht geeignet, den Bestand des Klagepatents in Zweifel zu ziehen, so dass eine Aussetzung des Rechtsstreits in Bezug auf die anhängige Nichtigkeitsklage ausscheide. Das Klagepatent nehme die Priorität der südkoreanischen Patentanmeldung KR 20160147189 vom 6. November 2016 wirksam in Anspruch.

Die Klägerin beantragt zuletzt,

I. die Beklagten zu verurteilen,

1. es bei Meidung eines für jeden Fall der Zuwiderhandlung vom Gericht festzusetzenden Ordnungsgeldes bis zu EUR 250.000,00 – ersatzweise Ordnungshaft – oder Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft an den gesetzlichen Vertretern der Beklagten zu vollziehen ist, gegenüber der Klägerin jeweils zu unterlassen,

a) Drahtloskommunikationsendgeräte, die drahtlos mit einem Basis-Drahtloskommunikationsendgerät kommunizieren,

in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen und/oder zu gebrauchen und/oder zu den genannten Zwecken einzuführen und/oder zu besitzen,

wobei das Drahtloskommunikationsendgerät aufweist: einen Sendeempfänger; und einen Prozessor zum Verarbeiten eines durch den Sendeempfänger empfangenen Funksignals oder eines durch den Sendempfänger zu sendenden Funksignals,

wobei der Prozessor ausgelegt ist zum:

Senden, an das Basis-Drahtloskommunikationsendgerät, einer Aus-löserbasierten Protokolldateneinheit der Bitübertragungsschicht (PPDU) unter Verwendung des Sendeempfängers, Wechseln eines Parametersatzes für verbesserten verteilten Kanalzugriff (EDCA), der ein Satz von Parametern ist, die für den Kanalzugriff verwendet

werden, von einem ersten EDCA-Parametersatz zu einem zweiten EDCA-Parametersatz auf Grundlage dessen, ob das Basis-Drahtloskommunikationsendgerät eine Teilnahme des Drahtloskommunikationsendgeräts an einer Mehrbenutzer-Up-link-Übertragung auslöst,

Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz auf Grundlage dessen, ob eine Antwort auf eine in der Auslöserbasierten PPDU enthaltenen MAC-Protokolldateneinheit (MPDU) empfangen wird, wenn der Zeitgeber für den zweiten EDCA-Parametersatz abläuft, Beenden einer Anwendung des zweiten EDCA-Parametersatzes, Berechnen eines zufälligen Ganzzahlwerts innerhalb eines Zugriffskonfliktfensters (CW),

Einstellen eines Backoff-Zeitgebers auf Grundlage des zufälligen Ganzzahlwerts, und Zugreifen auf einen Kanal auf Grundlage des Backoff-Zeitgebers und einer vorbestimmten Slotzeit,

wobei jeder des ersten und des zweiten EDCA-Parametersatzes einen Mindestwert (CWmin) des CW und einen Höchstwert (CWmax) des CW aufweist,

(unmittelbare Verletzung des Vorrichtungsanspruchs 1 des EP 3 512 289) wenn der Prozessor dazu ausgelegt ist, auf Grundlage eines Antworttyps, der von der in der Auslöserbasierten PPDU enthaltenen MPDU angefordert wird, zu bestimmen, wann der Zeitgeber für den zweiten EDCA-Parametersatz eingestellt werden soll,

(unmittelbare Verletzung des Anspruchs 1 in Verbindung mit Anspruch 4 des EP 3 512 289) wenn die in der Auslöserbasierten PPDU enthaltene MPDU kein ACK anfordert, der Prozessor dazu ausgelegt ist, den Zeitgeber für den zweiten EDCA-Parametersatz einzustellen, wenn der Sendevorgang der Auslöserbasierten PPDU endet,

(unmittelbare Verletzung des Anspruchs 1 in Verbindung mit Anspruch 4 in Verbindung mit dem Anspruch 5 des EP 3 512 289)

b) Drahtloskommunikationsendgeräte, Abnehmern zur Benutzung im Gebiet der Bundesrepublik Deutschland in der Bundesrepublik Deutschland anzubieten und/oder an solche zu liefern,

die dazu geeignet sind, ein Betriebsverfahren eines Drahtloskommunikationsendgeräts, das drahtlos mit einem Basis-Drahtloskommunikationsendgerät kommuniziert, durchzuführen,

wobei das Verfahren aufweist:

Senden einer Auslöserbasierten Protokolldateneinheit der Bitübertragungsschicht (PPDU) an das Basis-Drahtloskommunikationsendgerät, Wechseln eines Parametersatzes für verbesserten verteilten Kanalzugriff (EDCA), der ein Satz von Parametern ist, die für den Kanalzugriff verwendet werden, von einem ersten EDCA-Parametersatz zu einem zweiten EDCA-Parametersatz auf Grundlage dessen, ob das Basis-Drahtloskommunikationsendgerät eine Teilnahme des Drahtloskommunikationsendgeräts an einer Mehrbenutzer-Up-link-Übertragung auslöst,

Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz auf Grundlage dessen, ob die Antwort auf die in der Auslöser-basierten PPDU enthaltenen MPDU empfangen wird;

wenn der Zeitgeber für den zweiten EDCA-Parametersatz abläuft, Beenden einer Anwendung des zweiten EDCA-Parametersatzes;

Berechnen eines zufälligen Ganzzahlwerts innerhalb eines Zugriffskonfliktfensters (CW);

Einstellen eines Backoff-Zeitgebers auf Grundlage des zufälligen Ganzzahlwerts;

Zugreifen auf einen Kanal auf Grundlage des Backoff-Zeitgebers und einer vorbestimmten Slotzeit; und Senden der Daten über den Kanal,

wobei jeder des ersten und des zweiten EDCA-Parametersatzes einen Mindestwert (CWmin) des CW und einen Höchstwert (CWmax) des CW aufweist;

(mittelbare Verletzung des Verfahrensanspruchs 12 des EP 3 512 289)

2. der Klägerin in elektronischer Form, hilfsweise schriftlich darüber Auskunft zu erteilen und in einer geordneten Aufstellung unter Vorlage von Belegen, wie Rechnungen oder Lieferscheinen oder Quittungen, in elektronischer Form, hilfsweise schriftlich darüber Rechnung zu legen, unter Beifügung der Auskunft in elektronischer Form als Excel-Tabelle (xls-Datei), in welchem Umfang sie die zu A.I. bezeichneten Handlungen seit dem 26. Februar 2022 begangen hat, und zwar unter Angabe

a) der Menge der ausgelieferten, erhaltenen oder bestellten Erzeugnisse sowie der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer sowie der bezahlten Preise,

b) der einzelnen Lieferungen, aufgeschlüsselt nach Liefermengen, -zeiten und -preisen, einschließlich der Rechnungsnummern, und den jeweiligen Typenbezeichnungen sowie den Namen und Anschriften der Abnehmer, einschließlich der Verkaufsstellen, für die die Erzeugnisse bestimmt waren,

c) der einzelnen Angebote, aufgeschlüsselt nach Angebotsmengen, -zeiten und -preisen und den jeweiligen Typenbezeichnungen sowie den Namen und Anschriften der Angebotsempfänger,

d) der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, deren Auflagenhöhe, Verbreitungszeitraum und Verbreitungsgebiet, im Falle von Internet-Werbung der Domain den Zugriffszahlen und der Schaltungszeiträume, und bei direkter Werbung, wie Rundbriefen, den Namen und Anschriften der Empfänger,

e) der nach den einzelnen Kostenfaktoren aufgeschlüsselten Gestehungskosten des erzielten Gewinns,

wobei es den Beklagten gegebenenfalls vorbehalten bleibt, die Namen und Anschriften der Angebotsempfänger und der nichtgewerblichen Abnehmer statt der Klägerin einem von dieser zu bezeichnenden und ihr gegenüber zur Verschwiegenheit verpflichteten, in der Bundesrepublik Deutschland ansässigen, vereidigten Wirtschaftsprüfer mitzuteilen, sofern die Beklagten die durch die Einschaltung des Wirtschaftsprüfers entstehenden Kosten tragen und ihn zugleich ermächtigen, der Klägerin auf Anfrage mitzuteilen, ob bestimmte Angebotsempfänger oder nichtgewerbliche Abnehmer in der erteilten Rechnungslegung enthalten sind;

3. die vorstehend unter Ziffer A.I. bezeichneten, seit dem 26. Februar 2022 in der Bundesrepublik Deutschland in Verkehr gebrachten Erzeugnisse gegenüber den gewerblichen Abnehmern unter Hinweis auf den gerichtlich festgestellten patentverletzenden Zustand der Erzeugnisse und mit der verbindlichen Zusage aus den Vertriebswegen zurückzurufen, etwaige Entgelte zu erstatten sowie notwendige Verpackungs- und Transportkosten sowie mit der Rückgabe verbundene Zoll- und Lagerkosten zu übernehmen, oder diese Erzeugnisse endgültig aus den Vertriebswegen zu entfernen, indem die Beklagten diese Erzeugnisse wieder an sich nehmen;

4. die in ihrem unmittelbaren oder mittelbaren Besitz oder in ihrem Eigentum befindlichen, vorstehend unter Ziffer A.I. bezeichneten Erzeugnisse an einen von der Klägerin zu benennenden Gerichtsvollzieher zum Zwecke der Vernichtung auf Kosten der Beklagten herauszugeben.

II. festzustellen, dass die Beklagten verpflichtet sind, der Klägerin allen Schaden zu ersetzen, der ihr sowie der SK Telecom Co., Ltd. durch die in Ziffer I.1. bezeichneten, seit dem 26. Februar 2022 begangenen Handlungen entstanden ist und noch entstehen wird.

Die Beklagten beantragen,

I. die Klage abzuweisen,

II. hilfsweise das Verfahren bis zur rechtskräftigen Entscheidung des Nichtigkeitsverfahrens gegen den deutschen Teil des Europäischen Patents EP 3 512 289 auszusetzen.

Die Klägerin tritt dem Aussetzungsantrag entgegen.

Die Beklagten tragen vor, die angegriffene Ausführungsform verwirkliche Merkmal 4 der Ansprüche 1 und 12 nicht.

Die Beklagte erhebt den kartellrechtlichen Zwangslizenzeinwand, da die Klägerin ihr kein FRANDgemäßes Lizenzangebot gemacht habe.

Zudem meint die Beklagte, das Klagepatent sei nicht rechtsbeständig, da der geltend gemachte Patentanspruch durch den Stand der Technik neuheitsschädlich getroffen sei. In dem Kontext sei von Bedeutung, dass das Klagepatent die Priorität der südkoreanischen Patentanmeldungen nicht in Anspruch nehmen könne. Das hiesige Verletzungsverfahren sei gemäß § 148 ZPO im Hinblick auf das anhängige Nichtigkeitsverfahren auszusetzen.

Der Vortrag zu dem Kartellrechtseinwand wird im Rahmen der Entscheidungsgründe in einem nichtgeheimhaltungsbedürftigen und einem geheimhaltungsbedürftigen (und für Dritte geschwärzten) Teil wiedergegeben.

Im Übrigen wird auf die Schriftsätze der Parteien nebst Anlagen sowie das Protokoll der mündlichen Verhandlung vom 8. Januar 2026 verwiesen.

**Entscheidungsgründe**

Die zulässige Klage ist begründet. Aus der zutreffenden Auslegung des strittigen Merkmals 4 des Klagepatents (A. I.) folgt, dass der Wi-Fi-6-Standard und damit die angegriffenen Ausführungsformen von der Lehre des Klagepatents hinsichtlich aller Merkmale Gebrauch macht (A. II., III.). Der kartellrechtliche Zwangslizenzeinwand greift nicht durch (A. IV). Daraus ergeben sich die tenorierten Rechtsfolgen (A. V.). Eine Aussetzung des Verfahrens gemäß § 148 ZPO im Hinblick auf das Nichtigkeitsverfahren war aufgrund der Entgegenhaltungen nicht angezeigt (B.). Entsprechend waren die Nebenfolgen festzusetzen (C.).

A.

I.

Das Klagepatent betrifft ein Drahtloskommunikationsverfahren mit einem verbesserten Kanalzugriff sowie ein Drahtloskommunikationsendgerät, welches dieses Verfahren anwendet (Abs. [0001]).

1.Die Klagepatentschrift führt zum vorbekannten Stand der Technik aus, die drahtlose Kommunikationstechnologie erlaube es mobilen Geräten wie Laptops oder Smartphones, drahtlos mit dem Internet verbunden zu sein (Abs. [0002]). Das Institute of Electrical and Electronics Engineers (IEEE) habe unter der Anfangskennung 802.11 mehrere Standards zur drahtlosen Kommunikation unter der Bezeichnung „wireless LAN" entwickelt und kommerzialisiert, die fortlaufend im Sinne höherer Übertragungsgeschwindigkeit und höherer übertragbarer Datenmengen verbessert worden seien (Abs. [0003] ff.). Da in der Regel mehrere Endgeräte drahtlos mit einem Basisgerät kommunizierten, sei es erforderlich, vorbestimmte Kanäle zur Kommunikation zwischen Endgeräten und Basisgerät effizient zu nutzen. Konkret brauche es eine Technologie, die in der Lage sei, Bandweiten effizient zu nutzen durch die gleichzeitige Datenübertragung zwischen einer Vielzahl an Endund Basisgeräten (Abs. [0007]).

Die südkoreanische Patentschrift KR 2015 0073165 A offenbare ein Verfahren des Kanalzugriffs durch ein Endgerät, welches einen Kanalzuteilungsfaktor erhalte, auf Basis dessen es eine Zugriffsvariable auswähle und einen CW-Wert (dazu sogleich) festlege (Abs. [0008]).

Die Patentschrift WO 2016/112146 A1 offenbare eine Vorrichtung für drahtlose Kommunikation mit einem Prozessor, der die Nutzung des Kanals durch ein einzelnes Endgerät („single user frame") mit einer Nutzung des Kanals durch mehrere Endgeräte („MU communication" für „multiuser communication", dazu sogleich) kombinieren könne (Abs. [0009]).

Weiter nennt das Klagepatent die südkoreanische Patentschrift KR 2016 0045023, welche ein Verfahren und eine Vorrichtung zum Zugriff auf einen Uplink-Kanal in einem hoch effizienten WLAN beschreibe (Abs. [0010]).

Die USamerikanische Patentschrift US 2016/057657 A1 offenbare ein Verfahren zur Datenübertragung an eine Vielzahl von Endgeräten in einem WLAN (Abs. [0011]).

Zuletzt beschreibe die USamerikanische Patentschrift US 2010/150116 A1 ein Verfahren zum konkurrierenden Kanalzugriff, bei dem die EDCA-Parameter (dazu sogleich) für Gruppen von Endgeräten in einem WLAN aktualisiert würden (Abs. [0012]).

2.Das Klagepatent stellt sich vor dem Hintergrund des beschriebenen Erfordernisses einer Technologie, die in der Lage ist, Bandweiten effizient zu nutzen durch die gleichzeitige Datenübertragung zwischen einer Vielzahl an End- und Basisgeräten, die Aufgabe, ein Drahtloskommunikationsendgerät bereitzustellen, das einen verbesserten verteilten Kanalzugriff nutzt (Abs. [0013]).

3.Als Lösung stellt das Klagepatent eine Vorrichtung nach den Ansprüchen 1, 4 und 5 sowie ein Verfahren nach Anspruch 12 vor. Die von der Klägerin in Kombination geltend gemachten Ansprüche 1, 4 und 5 lassen sich wie folgt gliedern:

Anspruch 1:

1. Drahtloskommunikationsendgerät (100), das drahtlos mit einem Basis-Drahtloskommunikationsendgerät kommuniziert, wobei das Drahtloskommunikationsendgerät aufweist: einen Sendeempfänger (120); und einen Prozessor (110) zum Verarbeiten eines durch den Sendeempfänger (120) empfangenen Funksignals oder eines durch den Sendempfänger (120) zu sendenden Funksignals, wobei der Prozessor (110) ausgelegt ist zum:

2. Senden, an das Basis-Drahtloskommunikationsendgerät (200), einer Auslöserbasierten Protokolldateneinheit der Bitübertragungsschicht (PPDU) unter Verwendung des Sendeempfängers (120),

3. Wechseln eines Parametersatzes für verbesserten verteilten Kanalzugriff (EDCA), der ein Satz von Parametern ist, die für den Kanalzugriff verwendet werden, von einem ersten EDCA-Parametersatz zu einem zweiten EDCA-Parametersatz auf Grundlage dessen, ob das Basis-Drahtloskommunikationsendgerät (200) eine Teilnahme des Drahtloskommunikationsendgeräts (100) an einer Mehrbenutzer-Uplink-Übertragung auslöst,

4. Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz auf Grundlage dessen, ob eine Antwort auf eine in der Auslöserbasierten PPDU enthaltene MAC-Protokolldateneinheit (MPDU) empfangen wird,

5. wenn der Zeitgeber für den zweiten EDCA-Parametersatz abläuft, Beenden einer Anwendung des zweiten EDCA-Parametersatzes,

6. Berechnen eines zufälligen Ganzzahlwerts innerhalb eines Zugriffskonfliktfensters (CW),

7. Einstellen eines Backoff-Zeitgebers auf Grundlage des zufälligen Ganzzahlwerts, und

8. Zugreifen auf einen Kanal auf Grundlage des Backoff-Zeitgebers und einer vorbestimmten Slotzeit,

9. wobei jeder des ersten und des zweiten EDCA-Parametersatzes einen Mindestwert (CWmin) des CW und einen Höchstwert (CWmax) des CW aufweist,

Anspruch 4: Drahtloskommunikationsendgerät (100) nach Anspruch 1, wobei der Prozessor (110) dazu ausgelegt ist, auf Grundlage eines Antworttyps, der von der in der Aus-löserbasierten PPDU enthaltenen MPDU angefordert wird, zu bestimmen, wann der Zeitgeber für den zweiten EDCA-Parametersatz eingestellt werden soll.

Anspruch 5: Drahtloskommunikationsendgerät (100) nach Anspruch 4, wobei, wenn die in der Auslöserbasierten PPDU enthaltene MPDU kein ACK anfordert, der Prozessor (110) dazu ausgelegt ist, den Zeitgeber für den zweiten EDCAParametersatz einzustellen, wenn der Sendevorgang der Auslöserbasierten PPDU endet.

Anspruch 12 ist entsprechend Anspruch 1 aufgebaut und betrifft die Durchführung des entsprechenden Verfahrens.

4.Im Hinblick auf die zwischen den Parteien geführte Diskussion zur Auslegung des streitigen Merkmals 4 der Patentansprüche 1 und 12 sind die folgenden Ausführungen veranlasst. Die Kammer geht davon aus, dass es sich bei dem Fachmann um einen Hochschulingenieur der Nachrichtentechnik handelt, der über mehrjährige Berufserfahrung in der Entwicklung und Standardisierung von Kommunikationssystemen, insbesondere auch WLAN, verfügt.

a. Das Klagepatent betrifft die gleichzeitige Nutzung eines drahtlosen Kommunikationskanals für das Senden von Daten durch mehrere Endgeräte („Mehr-benutzer-Uplink-Übertragung", Merkmal 3), während herkömmlicherweise

zur gleichen Zeit nur ein Endgerät den Kanal zwischen den Endgeräten und dem Basisgerät (typischerweise einem Router) für das Senden von Daten nutzen konnte.

32    Im Stand der Technik erfolgte der Kanalzugriff auf die Weise, dass jedes Endgerät eigenständig um den Zugriff konkurrierte, indem es einen Zeitgeber („timer") mit einem gewissen CW-Wert (für „contention window") besetzte und den Zeitgeber nach Ablauf einer gewissen Zeitspanne, binnen derer der Kanal unbesetzt („idle") war („Arbitration Interframe Space", AIFS, siehe Abs. [0045], [0048]), ablaufen ließ. Nach Ablauf des AIFS und wenn darauffolgend der Zeitgeber bei Null angelangt war, durfte das Endgerät den Kanal nutzen. Im Falle einer Kollision zwischen zwei Endgeräten – wenn also ein zweites Endgerät im selben Moment den Kanal nutzen möchte – startete das erste Endgerät den Zeitgeber erneut (Abs. [0044]). Dieses Verfahren wird durch die Merkmale 6 bis 8 des Klagepatents wiedergegeben.

33    Mit dem „Enhanced Distribution Channel Access" (EDCA) wurde dieses Verfahren um die Möglichkeit der Priorisierung der zu übertragenden Daten ergänzt. Die Daten wurden dafür in vier verschiedene Kategorien („Access Categories", AC) eingeteilt. Sowohl der AIFS- als auch der CW-Wert und die mögliche Zeitspanne für die Übertragung (abgekürzt TXOP) konnten demnach verringert oder erhöht werden, je nach Priorität der zu übertragenden Daten (Abs. [0045]). Man spricht insoweit von den EDCA-Parametern. So konnten etwa Telefongespräche, die keine Unterbrechung erlauben, mit aggressiveren Parametern ausgestattet werden. Stets sendete aber nur ein Endgerät zu einem gegebenen Zeitpunkt an das Basisgerät.

34    Mit dem IEEE-Standard 802.11ax (Anlage K 06), der als Wi-Fi 6 vermarktet wird, wurde die Möglichkeit geschaffen, dass mehrere Endgeräte gleichzeitig mit dem Basisgerät kommunizieren können, und zwar sowohl im Downlink (d.h. für die Datenübertragung vom Basiszum Endgerät, insoweit war eine Mehrfachnutzung als auch schon vor Wi-Fi 6 möglich) als auch im Uplink (d.h. für die Datenübertragung vom Endzum Basisgerät). Dies wird DL MU-MIMO (downlink multiuser multiple input multiple output) und UL MU-MIMO (uplink multiuser multiple input multiple output) genannt (siehe Anlage K 06, Nr. 27.3.3) und erfolgt mittels der sogenannten OFDMA-Technologie (Orthogonal Frequency-Division Multiple Access). Dabei wird die Auswahl eines Endgeräts für den MU-MIMO-Modus und der Zeitpunkt der Übertragung in diesem Modus durch das Basisgerät bestimmt, nicht mehr eigenständig durch das jeweilige Endgerät.

35    Auch wenn ein Endgerät diesen neuen Standard unterstützt, arbeitet es aber nicht stets im MU-MIMO-Modus, sondern nimmt weiter auch am EDCA-Verfahren teil. Zudem unterstützen nicht zwingend alle Endgeräte in einem Netzwerk Wi-Fi 6, welches aber auch mit älteren Geräten zusammenarbeiten können soll (Abwärtskompatibilität). Aus diesen beiden Gründen bedarf es eines Verfahrens zur angemessenen Verteilung des Kanalzugriffs zwischen dem MU-MIMO-Modus und dem EDCA-Verfahren.

36    Dieser Aufgabe stellt sich das Klagepatent. Der Kern der Erfindung besteht darin, dass ein Endgerät, das vom Basisgerät für eine Übertragung im MU-MIMO-Modus ausgewählt wurde, nach Abschluss dieser Übertragung für eine gewisse Zeitspanne über schlechtere EDCA-Parameter verfügen soll als ein Endgerät, das nicht für eine Übertragung im MU-MIMO-Modus ausgewählt wurde. Hierum geht es bei dem von Merkmal 3 beanspruchten Wechsel von dem gewöhnlichen EDCA-Parametersatz zu einem „schlechteren"; das Merkmal nennt Letzteren den „zweiten EDCA-Parametersatz", in der Beschreibung wird er auch als „MU EDCA parameter set" bezeichnet (siehe Abs. [0048]). Denn andernfalls könnte das Endgerät, das bereits durch die Auswahl für den MU-MIMO-Modus begünstigt wurde, mit den übrigen Endgeräten auf Basis der üblichen EDCA-Parameter um den erneuten Kanalzugriff konkurrieren; stattdessen soll ein Ausgleich zugunsten der übrigen Endgeräte geschaffen werden.

37    b. Näherer Erläuterung bedarf das zwischen den Parteien streitige Merkmal 4.

38    Dieses Merkmal beansprucht das „Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz auf Grundlage dessen, ob eine Antwort auf eine in der Aus-löserbasierten PPDU enthaltene MAC-Protokolldateneinheit (MPDU) empfangen wird."

39    (1) Ausgangspunkt für das Verständnis von Merkmal 4 ist, dass das Basisgerät (also typischerweise der Router) ein Endgerät für die Mehrbenutzer-Uplink-Übertragung zu einem bestimmten Zeitpunkt auswählt. In den Worten des

Klagepatents: Das Basisgerät löst die Mehrbenutzer-Uplink-Übertragung aus („trigger", siehe Abs. [0046]). Das Endgerät sendet dann gemäß Merkmal 2 eine „auslöserbasierte PPDU". PPDU steht gemäß diesem Merkmal für „physical layer protocol data unit". Dabei handelt es sich um das Datenpaket, das vom Endgerät auf drahtlosem Weg an das Basisgerät gesendet wird. Dieses Datenpaket enthält die sogenannte MAC-Protokolldateneinheit (MPDU). Das „Einstellen des Zeitgebers für den zweiten EDCA-Parametersatz" betrifft dann die Zeitspanne, binnen derer der

„schlechtere" zweite EDCA-Parametersatz für das Endgerät gilt, das an einer Mehrbenutzer-Uplink-Übertragung teilgenommen hat. Die Bedingung für das Einstellen des Zeitgebers ist in Merkmal 4 geregelt.

(2) Die Beklagten vertreten die Auffassung, Merkmal 4 fordere den tatsächlichen Empfang einer Antwort des Basisgeräts auf den Versand der PPDU, damit der Zeitgeber für den zweiten EDCA-Parametersatz eingestellt werde. Die Beklagten begründen diese Auffassung mit dem Wortlaut des Merkmals sowie mit Fig. 16a des Klagepatents und der dazugehörigen Beschreibung in Abs. [0091].

aa. Der relevante englische Wortlaut („based on whether a response … is received") spreche dafür, dass die Einstellung des Zeitgebers davon abhänge, ob eine Antwort empfangen werde oder nicht.

bb. Dieses Verständnis werde durch Fig. 16a und den dazugehörigen Abs. [0091] gestützt (nachfolgend wird eine von den Beklagten erläuterte Abbildung von Fig. 16a, Rn 14 der Duplik entnommen, eingelichtet):



Der Wechsel vom herkömmlichen Parametersatz zum Parametersatz für Mehrnut-zer-Übertragungen erfolge also nach dem Empfang der Antwort des Basisgeräts. Dementsprechend heiße es in Abs. [0091] mit Bezug auf Fig. 16a:

„The first station STA1 receives the M-BA frame in response to the triggerbased PPDU HE TRIG PPDU from the base wireless communication terminal. When the first station STA1 completes reception of the M-BA frame, in relation to the first station STA1, the base wireless communication terminal applies the MU EDCA parameter to an AC which the M-BA frame indicates as an ACK. At this time, the first station STA1 sets the MU EDCA timer for an AC which the M-BA frame indicates as an ACK."

Dabei steht „STA1" („station") für ein Endgerät, „M-BA frame" für eine Sammelantwort und „ACK" für eine gewöhnliche Antwort des Basisgeräts auf das vom Endgerät versandte Datenpaket. „AC" steht für eine Zugriffskategorie von Daten.

(3) Diese Auslegung ist nach Auffassung der Kammer nicht überzeugend. Vielmehr beansprucht Merkmal 4 die Konstellation, dass der Zeitgeber je nachdem, ob die PPDU eine Antwort vom Basisgerät verlangt oder nicht, mit Erhalt der Antwort oder schon mit Versendung der PPDU eingestellt wird.

aa. Der Wortlaut weist nicht zwingend auf das Verständnis der Beklagten hin. Im Deutschen wie im Englischen gibt die Formulierung „auf Grundlage dessen, ob eine Antwort … empfangen wird" bzw. „based on whether a response … is received" nicht vor, dass der Zeitgeber im Fall einer Antwort eingestellt wird und im anderen nicht. Vielmehr

lässt diese Formulierung ein Verständnis zu, wonach der Zeitgeber nach unterschiedlichen Maßstäben eingestellt wird, je nachdem ob eine Antwort empfangen wurde oder nicht.

bb. Das Verständnis, wonach der Zeitgeber je nachdem, ob die PPDU eine Antwort vom Basisgerät verlangt oder nicht, mit Erhalt der Antwort oder schon mit Versendung der PPDU eingestellt wird, wird durch die Beschreibung erzeugt. Fig. 16a und die dazugehörige Beschreibung in Abs. [0091] führen demgegenüber nicht zu der von den Beklagten vertretenen Auffassung.

In Abs. [0095] wird ausgeführt, dass das Endgerät in den zuvor erläuterten Ausführungsformen (darunter der in Fig. 16a beschriebenen) den Zeitgeber unter Berücksichtigung dessen einstellen kann, welche Art der Beantwortung von der MPDU verlangt werde; das werde mit Bezug auf die Fig. 17 und 18 erläutert. Die

„Art der Beantwortung" („type of the responding") weist darauf hin, dass eine MPDU angeben kann, ob sie auf eine Antwort des Basisgeräts wartet oder nicht. Das wird in Abs. [0097] ausführlich erläutert. So wird bei Datenübertragungen, bei denen Wiederholungen Nachteile bringen (zB Audio-Streaming) auf die Anforderung einer Antwort verzichtet. Abs. [0091] nimmt also nur die Situation in den Blick, dass die MPDU eine Antwort erfordert.

Fig. 18 und der dazugehörige Abs. [102] legen hingegen ausführlich dar, dass der Zeitgeber für den zweiten EDCA-Parametersatz („MU EDCA timer") im Falle einer MPDU, die keine Antwort erfordere („does not request an ACK"), in dem Moment starten kann, in dem der Datenversand im MU-MIMO-Modus endet.

cc. Dieses Verständnis von Merkmal 4 wird auch durch die Existenz von Unteranspruch 5 gestützt. Jener erfasst die Konstellation, dass die PPDU keine Antwort anfordert und der Zeitgeber deshalb einzustellen ist, wenn der Sendevorgang der Auslöserbasierten PPDU endet. Damit muss aber diese Konstellation von Anspruch 1 umfasst sein. Das wäre sie aber auf Basis der Auffassung der Beklagten nicht.

dd. Auch die gebotene funktionale Betrachtung stützt dieses Ergebnis. Es gibt keinen Grund, weshalb der vom Klagepatent bezweckte Ausgleich zwischen den Endgeräten, je nachdem ob sie an der Mehrbenutzer-Uplink-Übertragung teilgenommen haben oder nicht, davon abhängen soll, ob die übertragenen Daten solche sind, bei denen die MPDU eine Antwort vom Basisgerät erfordert oder nicht.

ee. Das Argument der Beklagten, eine Einstellung des Zeitgebers je nachdem, welcher „Antworttyp" von der MPDU angefordert werde, sei von Anspruch 4 abgedeckt, führt zu keinem anderen Ergebnis.

Inwieweit man aus der Fassung eines Unteranspruchs auf das Verständnis des Hauptanspruchs schließen kann, ist eine Frage des Einzelfalls (BGH, X ZR 114/13, GRUR 2016, 1031 Rn. 15 – Wärmetauscher). Auch wenn der Gegenstand eines Unteranspruchs regelmäßig enger ist als der des zugrundeliegenden Hauptanspruchs, lässt sich allein aus seiner Existenz nicht zwingend ableiten, dass der Hauptanspruch einen weiteren Gegenstand erfassen muss und seine Verwirklichung auch in einer Weise möglich sein muss, die nicht gleichzeitig die Merkmale des Unteranspruchs erfüllt (BGH, X ZR 93/17, BeckRS 2019, 17249 Rn. 17 – Seitenaufprallschutz bei Kopf-Airbag).

Vorliegend gibt es im Klagepatent – wie gezeigt – keinen Anhaltspunkt dafür, dass Merkmal 4 im Sinne der Beklagten so verstanden werden soll, dass der Zeitgeber nur bei Empfang einer Antwort vom Basisgerät eingestellt werden soll.

II.

Unter Berücksichtigung der zuvor dargestellten Auslegung des zwischen den Parteien streitigen Merkmals ist eine wortsinngemäße Verwirklichung von Anspruch 1 des Klagepatents durch den Wi-Fi-6-Standard und damit auch durch die angegriffenen Ausführungsformen zu bejahen.

1.Die angegriffenen Ausführungsformen stellen jeweils im Sinne von Merkmal 1 Drahtloskommunikationsendgeräte dar, die drahtlos mit einem Basis-Drahtloskommunikationsendgerät kommunizieren. Dies wird durch Wi-Fi 6 vorausgesetzt, welches die Drahtloskommunikationsendgeräte als „High efficiency (HE) STA" bezeichnet, wobei „STA" für „station" steht.

2. Merkmal 2 ist verwirklicht, weil die Endgeräte gemäß Wi-Fi 6 an das Basis-Drahtloskommunikationsendgerät eine auslöserbasierte Protokolldateneinheit der Bitübertragungsschicht (PPDU) unter Verwendung des Sendeempfängers senden.

In Abschnitt 4.3.15a von Anlage K 06 betreffend die Komponenten der IEEE 802.11-Architektur heißt es in Bezug auf das Basis-Drahtloskommunikationsendgerät, das dort als „HE AP" („high efficiency access point") bezeichnet wird:

An HE AP sends a Trigger frame to initiate UL MU operation using UL OFDMA or UL MU-MIMO transmissions or a frame containing a TRS Control subfield to initiate UL OFDMA transmissions. The frame initiating these transmissions in the uplink direction is a triggering frame. The triggering frame identifies non-AP STAs participating in UL MU operation and assigns RUs and/or spatial streams to these STAs. Multi-STA BlockAck frames can be used by the AP to acknowledge the frames transmitted by multiple non-AP STAs. The scheduling of these Trigger frames can be set up between a non-AP STA and the AP using TWT operation to save power and reduce collisions.

Das Basis-Drahtloskommunikationsendgerät löst also mittels des Versendens eines „trigger frame" eine Mehrbenutzer-Uplink-Übertragung („UL MU-MIMO") durch das Endgerät („non-AP STA") aus.

Diese Übertragung betrifft konkret eine auslöserbasierte Protokolldateneinheit der Bitübertragungsschicht (PPDU). So heißt es in Abschnitt 9.3.1.22.1 von Anlage K 06 betreffend das „Trigger frame format" („HE TB" steht für „high efficiency triggerbased"):

A Trigger frame allocates resources for and solicits one or more HE TB PPDU transmissions. The Trigger frame also carries other information required by the responding STA to send an HE TB PPDU.

3. Wi-Fi 6 sieht auch im Sinne von Merkmal 3 das Wechseln eines Parametersatzes für verbesserten verteilten Kanalzugriff (EDCA), der ein Satz von Parametern ist, die für den Kanalzugriff verwendet werden, von einem ersten EDCA-Parametersatz zu einem zweiten EDCA-Parametersatz auf Grundlage dessen vor, ob das Basis-Drahtloskommunikationsendgerät eine Teilnahme des Drahtloskommunikationsendgeräts an einer Mehrbenutzer-Uplink-Übertragung auslöst.

So heißt es in Abschnitt 26.2.7 von Anlage K 06 unter der Überschrift „EDCA operation using MU EDCA parameters":

A non-AP HE STA that receives a Basic Trigger frame that contains a User Info field addressed to the STA shall update its CWmin[AC], CWmax[AC], AIFSN[AC], and MUEDCATimer[AC] state variables to the values contained in the dot11MUEDCATable, for all the ACs from which at least one QoS Data frame was transmitted successfully in an HE TB PPDU in response to the Trigger frame. A QoS Data frame is

Das Endgerät, das einen Auslöserahmen für die Teilnahme an einer Mehrbenut-zer-Uplink-Übertragung erhält, soll also seine EDCA-Parameter aktualisieren, namentlich den unteren und oberen CW-Wert (also die Dauer des Ablauftimers), den Arbitration Interframe Space (AIFS, also die Zeitspanne bis zum Start des Timers) und den MU EDCA Timer (also die Zeitspanne, für welche der zweite EDCA-Parametersatz gilt). All dies soll für all die Zugriffskategorien („ACs", „access categories") geschehen, für welche wenigstens ein Datenrahmen mittels der auslöserbasierten PPDU erfolgreich versendet wurde.

Vor der Aktualisierung gelten die gewöhnlichen EDCA-Parameter, wie sie bereits aus dem hergebrachten 802.11-Standard, also schon vor Wi-Fi 6, hervorgehen (siehe Anlage K 07, Abschnitt 10.2.3.2 in Verbindung mit Abschnitt 9.4.2.28).

4. Auch Merkmal 4 wird durch Wi-Fi 6 verwirklicht. Das Einstellen eines Zeitgebers für den zweiten EDCA-Parametersatz erfolgt auf Grundlage dessen, ob eine Antwort auf eine in der Auslöserbasierten PPDU enthaltene MAC-Protokolldateneinheit (MPDU) empfangen wird.

a. Die Beklagten vertreten hingegen die Auffassung, Merkmal 4 sei auch auf Basis der hier gefundenen Auslegung nicht verwirklicht, weil das Basisgerät nach dem Wi-Fi-6-Standard immer eine Antwort sende. Damit könne aber das Merkmal nicht verwirklicht sein, da es zwei verschiedene Optionen voraussetze.

(1) Die Beklagten stützen sich für ihre Auffassung auf Abschnitt 10.3.2.13.3 von Anlage K 06, in der es unter der Überschrift „Acknowledgment procedure for UL MU transmission" heißt:

An AP that receives frames from more than one STA that are part of an UL MU transmission (see 9.42.2) and that require an immediate acknowledgment (i.e., a QoS Data frame with Normal Ack or Implicit BAR ack policy or a Management frame other than an Action No Ack frame), shall send an immediate acknowledgment in either an SU PPDU (see 26.4.4.5) or an HE MU PPDU (see 26.4.4.6). The Multi-STA

Der Wi-Fi-6-Standard definiere also, dass das Basisendgerät (AP) den Erhalt von Datenrahmen durch mehr als ein Endgerät (STA), welche an einer Mehrbenutzer-Uplink-Übertragung (UL MU transmission) teilnehmen, stets entweder in Form einer SU PPDU oder in Form einer HE MU PPDU beantworten solle. Von der prinzipiellen Möglichkeit, keine Antwort anzufordern, werde kein Gebrauch gemacht. Dann werde aber das Merkmal nicht erfüllt, da es aufgrund seiner Formulierung („ob eine Antwort … empfangen wird") die Option, dass keine Antwort empfangen wird, vorsieht.

(2) Darüber hinaus sei das Merkmal auch deshalb nicht verwirklicht, weil der Start des Zeitgebers nach dem Wi-Fi-6-Standard von der jeweiligen Zugriffskategorie abhänge; es gebe also für die vier unterschiedlichen Zugriffskategorien jeweils unterschiedliche Zeitgeber. Das ergebe sich aus dem mit „EDCA operation using MU EDCA parameters" überschriebenen Abschnitt 26.2.7 von Anlage K 06:

corresponding to that AC shall be suspended until the MUEDCATimer[AC] reaches 0 or is reset to 0. The updated MUEDCATimer[AC] shall start at the end of the immediate response if the transmitted HE TB PPDU contains at least one QoS Data frame for that AC that requires immediate acknowledgment, and shall start at the end of the HE TB PPDU if the transmitted HE TB PPDU does not contain any QoS Data frames for that AC that require immediate acknowledgment.

Der Zeitgeber solle also im Anschluss an die Antwort starten, wenn die übertragene PPDU wenigstens einen Datenrahmen „dieser Zugriffskategorie" („for that AC") enthalte. Eine solche Abhängigkeit des Starts des Zeitgebers von einer bestimmten Zugriffskategorie sei von Merkmal 4 nicht umfasst.

b. Diese Interpretation des Wi-Fi-6-Standards ist nach Auffassung der Kammer nicht überzeugend.

(1) Der von den Beklagten zitierte Abschnitt 10.3.2.13.3 des WiFi-6-Standards macht deutlich, dass das Basisgerät nur dann eine Antwort („immediate acknowledgment") sendet, wenn die vom Endgerät versandten Datenrahmen eine Antwort erfordern („and that require an immediate acknowledgment"). Im Klammerzusatz wird auch noch klargestellt, dass dies „No Ack"-Datenrahmen ausschließt. Der von den Beklagten zitierte Abschnitt 26.2.7 macht dies ebenfalls deutlich: Der Zeitgeber für eine bestimmte Zugangskategorie („MUEDCATimer[AC]") soll nur dann im Anschluss an die Antwort starten, wenn die vom Endgerät versandte PPDU wenigstens einen Datenrahmen aus der Zugangskategorie enthielt, welcher eine unmittelbare Antwort erforderte. Andernfalls soll der Zeitgeber mit Beendigung des Sendens der PPDU starten.

Entgegen der Auffassung der Beklagten sieht der Wi-Fi-6-Standard auch tatsächlich Datenrahmen vor, die keine Antwort vom Basisgerät erfordern. Das folgt schon aus der im vorigen Absatz wiedergegebenen Formulierung. Denn es gäbe kein Bedürfnis dafür, die Bedingung für das Versenden einer Antwort aufzustellen, dass der Datenrahmen eine Antwort erfordert, wenn er stets eine Antwort erforderte. Darüber hinaus ergibt sich aus Abschnitt 26.5.2.4 auch konkret, dass es Konstellationen gibt, in denen der vom Endgerät versandte Datenrahmen keine Antwort erfordert:

— Otherwise, the S-MPDU shall be a QoS Data, QoS Null, or Management frame that does not solicit an immediate acknowledgment.

Eine S-MPDU ist eine einzelne, nicht aggregierte MPDU. Das Gegenteil ist die A-MPDU (aggregierte MPDU). Entgegen der Auffassung der Beklagten ist das Klagepatent nicht beschränkt auf A-MPDUs. Anspruch 1 macht keinerlei Vorgaben diesbezüglich. Die Tatsache, dass Fig. 17 und die dazugehörige Beschreibung Bezug auf A-MPDUs nimmt, kann den Anspruch nicht einschränken.

(2) Auch die Bezugnahme auf die Zugangskategorien in dem von den Beklagten zitierten Abschnitt 26.2.7 führt nicht aus der Verletzung des Merkmals heraus.

Bei dieser Bezugnahme handelt es sich nur um eine Präzisierung dergestalt, dass die Zeitgeber für die jeweiligen Zugangskategorien zu trennen sind. Jeweils handelt es sich aber um das Einstellen des Zeitgebers für den „zweiten EDCA-Parametersatz". Die weitere Unterteilung des „zweiten EDCA-Parametersatzes" je nach verwendeter Zugangskategorie – entsprechend der Unterteilung nach dem ersten EDCA-Parametersatz – wird von Merkmal 4 nicht ausgeschlossen.

5.Auch Merkmal 5 ist verwirklicht. Wenn der Zeitgeber für den zweiten EDCA-Parametersatz abläuft, wird die Anwendung des zweiten EDCA-Parametersatzes beendet.

So heißt es in Abschnitt 9.4.2.251 von Anlage K 06 unter der Überschrift „MU EDCA Parameter Set element":

In an infrastructure BSS, the MU EDCA Parameter Set element is used by the AP to control the use of EDCA by non-AP HE STAs following particular UL MU HE TB PPDU transmissions, as defined in 26.2.7. The most recent MU EDCA Parameter Set element received by a non-AP HE STA is used to update the appropriate MIB values.

Das Basisgerät (AP) nutzt also den zweiten EDCA-Parametersatz, um die Endgeräte im Anschluss an die Mehrbenutzer-Uplink-Übertragung zu steuern, wie näher in Abschnitt 26.2.7 definiert. Der Zeitgeber gibt die Zeitspanne an, binnen der die Endgeräte den zweiten EDCA-Parametersatz für die jeweilige Zugriffskategorie verwenden, wie näher in Abschnitt 26.2.7 definiert.

In Abschnitt 26.2.7 wird dann Folgendes ausgeführt:

In a non-AP HE STA, each MUEDCATimer[AC] shall uniformly count down without suspension to 0 when its value is nonzero.

Wenn der Zeitgeber auf Null heruntergelaufen ist, soll das Endgerät also seine EDCA-Parameter aktualisieren – zurück zum ersten EDCA-Parametersatz.

6.Der Wi-Fi-6-Standard verletzt auch die Merkmale 6 bis 8. Innerhalb eines Zugriffskonfliktfensters (CW) wird ein zufälliger Ganzzahlwert berechnet (Merkmal 6). Auf der Grundlage des zufälligen Ganzzahlwerts wird ein Backoff-Zeitgeber eingestellt (Merkmal 7). Auf Grundlage des Backoff-Zeitgebers und einer vorbestimmten Slotzeit wird dann auf den Kanal zugegriffen (Merkmal 8).

Das von den Merkmalen 6 bis 8 abgedeckte, dem Stand der Technik entsprechende konkurrierende Zugriffsverfahren wird im hergebrachten 802.11-Standard als „random backoff procedure" bezeichnet und wie folgt beschrieben (siehe Abschnitt 10.3.3 der Anlage K 07):

A STA desiring to initiate transfer of Data frames and/or Management frames using the DCF shall invoke the CS mechanism (see 10.3.2.1) to determine the busy/idle state of the medium. If the medium is busy, the STA shall defer until the medium is determined to be idle without interruption for a period of time equal to EIFS when the last transition to idle medium was a result of a frame detected on the medium that was not received correctly, or equal to DIFS otherwise. After this DIFS or EIFS medium idle time, the STA shall then generate a random backoff count [defined by Equation (10-1)] for an additional deferral time before transmitting, unless the backoff counter already contains a nonzero value, in which case the selection of a random number is not needed and not performed. This process minimizes collisions during contention between multiple STAs that have been deferring to the same event.

$$\text{Backoff Count} = \text{Random()} \tag{10-1}$$

where

Random() = Pseudorandom integer drawn from a uniform distribution over the interval [0,CW], where CW is an integer within the range of values of the PHY characteristics aCWmin and aCWmax, aCWmin ≤ CW ≤ aCWmax.

NOTE—It is important that designers recognize the need for statistical independence of the random number streams between STAs.

The contention window (CW) parameter shall take an initial value of aCWmin. Every STA shall maintain a STA short retry count (SSRC) as well as a STA long retry count (SLRC), both of which shall take an initial value of 0. The SSRC shall be incremented when any short retry count (SRC) associated with any MPDU with

Die in Merkmal 8 angesprochene „vorbestimmte Slotzeit" wird durch die Formulierung „until the medium is determined to be idle without interruption for a period equal to EIFS" in der dritten Zeile des ersten zitierten Absatzes abgedeckt. Sobald diese Zeitspanne abgelaufen ist, soll das Endgerät den Zeitgeber ausgehend von einem Zufallswert erzeugen („the STA shall then generate a random backoff count [defined by Equation (10-1) ] for an additional deferral time before transmitting", untere Hälfte des ersten zitierten Absatzes), wie es Merkmal 7 vorsieht. Der Zufallswert soll aus dem Intervall zwischen Null und dem Wert „CW" entnommen werden, wobei CW eine Ganzzahl („integer") darstellt, wie es Merkmal 6 vorgibt (siehe Einschub „where Random() = …" im zitierten Abschnitt).

Der Wi-Fi-6-Standard inkorporiert dieses Verfahren in Abschnitt 26.2.7 durch den Verweis auf das in Abschnitt 10.23.2.2 geregelte „EDCA backoff procedure":

The MUEDCATimer[AC] state variable is updated with the value contained in the MU EDCA Timer subfield of the MU EDCA Parameter Set element. The backoff counter maintenance corresponding to the updated state variables shall follow the rules in 10.23.2.2, except that if AIFSN[AC] is 0, then the EDCAF corresponding to that AC shall be suspended until the MUEDCATimer[AC] reaches 0 or is reset to 0. The

7.Der Wi-Fi-6-Standard verletzt auch Merkmal 9, da jeder des ersten und des zweiten EDCA-Parametersatzes einen Mindestwert (CWmin) des CW und einen Höchstwert (CWmax) des CW aufweist.

Insoweit wird nochmals der folgende Ausschnitt des Abschnitts 26.2.7 von Anlage K 06 wiedergegeben, aus dem sich die Existenz des Mindest- und des Höchstwertes für beide EDCA-Parametersätze ergibt:

A non-AP HE STA that receives a Basic Trigger frame that contains a User Info field addressed to the STA shall update its CWmin[AC], CWmax[AC], AIFSN[AC], and MUEDCATimer[AC] state variables to the values contained in the dot11MUEDCATable, for all the ACs from which at least one QoS Data frame was transmitted successfully in an HE TB PPDU in response to the Trigger frame. A QoS Data frame is transmitted successfully by the STA in an HE TB PPDU for an AC if it requires immediate acknowledgment and the STA receives an immediate acknowledgment for that frame, or if the QoS Data frame does not require immediate acknowledgment.

8.Auch die Ansprüche 4 und 5 werden durch den Wi-Fi-6-Standard verletzt.

Wie näher bereits bei der Erläuterung der Verletzung von Merkmal 4 ausgeführt (oben Rn 72), ist der Prozessor dazu ausgelegt, auf Grundlage eines Antworttyps, der von der in der Auslöserbasierten PPDU enthaltenen MPDU angefordert wird, zu bestimmen, wann der Zeitgeber für den zweiten EDCA-Parametersatz eingestellt werden soll (Anspruch 4).

An selber Stelle wurde erläutert, dass wenn die in der Auslöserbasierten PPDU enthaltene MPDU kein ACK anfordert, der Prozessor dazu ausgelegt ist, den Zeitgeber für den zweiten EDCA-Parametersatz einzustellen, wenn der Sendevorgang der Auslöserbasierten PPDU endet (Anspruch 5).

Dadurch wird auch deutlich, dass der Wi-Fi-6-Standard bereits Anspruch 1 des Klagepatents isoliert, ohne Kombination mit den Ansprüchen 4 und 5, verletzt. Diese Feststellung ist von Bedeutung für die Diskussion der Verletzung von Anspruch 12 (gleich im Anschluss), da jener wie Anspruch 1 aufgebaut ist.

III.

Auch Anspruch 12 des Klagepatents wird wortsinngemäß mittelbar verletzt.

Die angegriffenen Ausführungsformen verwirklichen beim Betrieb Anspruch 12. Sie sind damit zur Nutzung der Erfindung geeignet. Sie sind auch ein Mittel, das sich auf ein wesentliches Element der Erfindung bezieht, da sie alle anspruchsgemäßen Verfahrensschritte ausführen. Die Beklagten haben die Verletzungsformen so konstruiert und programmiert, dass sie Anspruch 12 verletzen, und sie bewerben die angegriffenen Ausführungsformen auch ausdrücklich als „Wi-Fi 6"-fähig. Sie wissen demnach, dass die angegriffenen Ausführungsformen dazu geeignet und bestimmt sind, für die Benutzung der Erfindung nach Anspruch 12 verwendet zu werden.

IV.

Der kartellrechtliche Zwangslizenzeinwand der Beklagtenpartei greift nicht durch.

1. Einleitende Zusammenfassung

Die Klägerin hat zwei verschiedene Arten der Lizenznahme angeboten: zum einen eine bilaterale Lizenz über das Wi-Fi 6-Portfolio der beiden Patentinhaberinnen Wilus und SK Telecom (nachfolgend bezeichnet als „Wilus"-Portfolio) und zum anderen eine Lizenznahme an dem Wi-Fi 6-Pool „Sisvel", in welchen die beiden Inhaberinnen des Klagepatents ihre Wi-Fi 6-Patente eingebracht haben.

Zuletzt hat die Beklagte vorrangig eine bilaterale Lizenznahme angestrebt und entsprechende Lizenzangebote vorgelegt. Die Klägerin hingegen hat stets Angebote hinsichtlich beider Lizenzierungswege unterbreitet.

Die Kartellrechtswidrigkeit des Verhaltens der Beklagtenpartei ergibt sich bereits daraus, dass die Beklagtenpartei zum einen keine Sicherheit hinterlegt hat, die sich an der letzten Lizenzforderung der Klagepartei orientiert, wie es den Anforderungen des Oberlandesgerichts München (OLG München, Urteil vom 20. März 2025, 6 U 3824/22) entspräche. Zum anderen hat die Beklagtenpartei auch den von ihr zuletzt angebotenen Lizenzbetrag nicht als nichtrückforderbare (endgültige) Vorabzahlung an die Klagepartei geleistet (Teilzahlungspflicht), so wie es in dem veröffentlichten Hinweis der Kammer vom 14. Juli 2025 (7 O 64/25 und 7 O 2750/25, GRUR-RS 2025, 19196) gefordert worden ist.

Stattdessen hat die Beklagtenpartei einen Betrag, der ihrem letzten Angebot – welches von der Klagepartei abgelehnt worden ist (tatsächlich das vorletzte Angebot) – entspricht, als Sicherheit hinterlegt. Die Hinterlegung des eigenen Angebots als Sicherheit erfüllt aber weder die vom Oberlandesgericht München noch die von der Kammer aufgestellten Anforderungen an das Verhalten eines lizenzwilligen Patentnutzers. Weshalb die Beklagtenpartei einen Betrag in benannter Höhe hinterlegt hat, erschließt sich der Kammer nicht, da das Leisten einer Sicherheit in dieser Höhe für die Beurteilung des Falles nach deutschem Recht nicht von Relevanz ist.

Unabhängig von der unzureichenden Sicherheitsleistung und der fehlenden Teilzahlung geht die Kammer davon aus, dass beide Angebote (Bilaterale Lizenz und Poollizenz) FRAND sind, wobei die Klagepartei bei beiden Angeboten das in dem jeweiligen Portfolio enthaltene Lizenzierungspotential nicht ausschöpft.

2. Der Sachverhalt (soweit keine Geheimhaltungsinteressen bestehen)

Die Klägerin ist Gründungsmitglied des Wi-Fi 6-Patentpools von Sisvel. Deshalb sind Lizenznehmer des Wi-Fi 6-Pools von Sisvel automatisch an den entsprechenden Patenten der Klägerin lizenziert. Darüber hinaus bietet die Klägerin eine Lizenzierung ihrer Patente (und der Patente von SK Telecom) im Rahmen eines bilateralen Lizenzvertrags an. Die Parteien streiten über eine Lizenz für alle Geräte, die Wi-Fi 6-fähig sind. Dabei besteht Einigkeit darüber, dass die Lizenz eine Abwärtskompatibilität beinhaltet und deshalb auch alle Patente der früheren Standards (Wi-Fi 5, Wi-Fi 4, etc.) erfasst werden sollen. Die letzten Angebote der Parteien haben nicht die Geräte umfasst, die von dem Standard Wi-Fi 7 Gebrauch machen. Diese Wi-Fi 7-fähigen Geräte sollten von den Lizenzverhandlungen vollständig ausgenommen werden. Hinsichtlich dieser Geräte sollten auch keine Patente lizenziert werden, die Wi-Fi 6 und abwärts betreffen. Vielmehr sollen diese Geräte Gegenstand einer gesonderten und späteren Vereinbarung werden.

Die Klägerin hat Angebote für eine bilaterale Lizenz vorgelegt, die geheimhaltungsbedürftig sind. Die Lizenzraten für den Sisvel Wi-Fi 6-Pool sind hingegen im Internet auf der Homepage von Sisvel veröffentlicht. Sie lauten:

Standardrate: 0,60 Euro Compliant-Rate: 0,50 Euro Enterprise-Rate: 3 Euro

Nach den Angaben der Klägerin ist die Standardrate bis zum Zeitpunkt eines Lizenzvertragsabschlusses einschlägig. Die Compliant-Rate gilt für die Zeit nach einem Vertragsschluss. Die Stückpreisrate unterscheidet nicht nach der konkreten Einheit, für welche der jeweilige Nutzungswillige den Standard nutzen möchte. Es ist also unbeachtlich, ob es sich um ein sehr günstiges technisches Produkt, wie ein Spielzeug, oder um ein teureres Produkt, wie einen Personal Computer (PC), handelt. Für die vorliegende Entscheidung sind die Voraussetzungen der Enter-prise-Rate unbeachtlich.

Die Parteien verhandelten zum Schluss über eine Laufzeit des Lizenzvertrages bis Ende 2028. Bei der bilateralen Lizenz sollte die Laufzeit ab dem 1. Januar 2021 gelten, bei der Poollizenz ab dem 1. Juni 2021. Wegen der unterschiedlichen Zeiträume, die sich durch den unterschiedlichen Beginn des Lizenzzeitraums ergeben, unterscheiden sich die Angebote hinsichtlich der zugrunde gelegten Stückzahl.

Zum Zeitpunkt des Schlusses der mündlichen Verhandlung haben beide Parteien bei ihren Berechnungen die Stückzahlen zu Grunde gelegt, welche die Klägerin in einer E-Mail vom 6. Februar 2025 genannt hat und die auf Angaben der Beklagtenpartei beruhten. Diese E-Mail liegt dem Gericht nicht vor, allerdings wurden Ausschnitte von der Beklagtenpartei vorgelegt. Beide Parteien haben bei ihren Angeboten diese Stückzahlen mit von ihnen für zutreffend gehaltenen perunit-Preisen multipliziert. Der von Klagepartei und Beklagtenpartei angesetzte durchschnittliche per-unit-Preis lag zum Schluss der mündlichen Verhandlung um einen niedrigen einstelligen Faktor auseinander (geheimhaltungsbedürftig: Faktor



).

3. Prüfungsmaßstab

Ausgangspunkt ist die Entscheidung des EuGH in der Rechtssache Huawei gegen ZTE (C-170/13, GRUR 2015, 764) in der Interpretation, die der Bundesgerichtshof in den Entscheidungen FRAND-Einwand I (KZR 36/17, GRUR 2020, 961) und FRAND-Einwand II (KZR 35/17, GRUR 2021, 585) gefunden hat. Weiter berücksichtigt die Kammer die Entscheidung des OLG München in dem Verfahren 6 U 3824/22 vom 20. März 2025.

Die Prüfung, ob der Inhaber eines standardessenziellen Patents gegenüber einem nicht lizenzierten Nutzer dieses Patents einen Unterlassungsanspruch geltend machen kann, oder ob der Nutzer dem Unterlassungsanspruch entgegensetzen kann, dass ihm keine Lizenz zu FRAND-Bedingungen angeboten worden ist, bestimmt sich in einem mehrstufigen Prüfungsverfahren. Dabei folgt der nachfolgend benannte 5. Schritt der Rechtsprechung des OLG München.

1. Schritt: Verletzungsanzeige des Patentinhabers

2. Schritt: Erklärung der Lizenzwilligkeit des Patentnutzers

3. Schritt: Abgabe eines Lizenzangebots durch den Patentinhaber

4. Schritt: Prüfung des Lizenzangebots durch den Patentnutzer; bei Nichtannahme Unterbreitung eines eigenen Angebots innerhalb kurzer Frist (fortlaufende Lizenzwilligkeit)

5. Schritt: Wenn der Patentinhaber das Angebot des Patentnutzers ablehnt, muss der Patentnutzer Sicherheitsleistung gemäß „anerkannten geschäftlichen Gepflogenheiten" leisten.

107    Nach dem Verständnis des OLG München muss im in aller Regel eine qualifizierte Sicherheit in Höhe des letzten Lizenzangebots des Patentinhabers geleistet werden – eine Ausnahme mag gelten, wenn das Angebot des Patentinhabers eindeutig und offensichtlich überzogen ist. Nach Ansicht des OLG München hat das angerufene Gericht den Kartellrechtseinwand in der Regel nicht zu prüfen, wenn keine ausreichende Sicherheit geleistet worden ist. Dann wäre der Patentnutzer im Falle einer festgestellten Verletzung (wenn das Verfahren auch im Hinblick auf ein anhängiges Nichtigkeitsverfahren nicht auszusetzen ist) auf Unterlassung zu verurteilen.

108    Die Kammer hat in ihrem veröffentlichten Hinweisbeschluss in den Verfahren 7 O 64/25 und 7 O 2750/25 (GRUR-RS 2025, 19196) zu den genauen Anforderungen Stellung genommen. Auf diese Ausführungen wird Bezug genommen. Zusammenfassend wird es für die Beurteilung der Lizenzwilligkeit als besonders bedeutsam angesehen, ob der Lizenzsuchende eine Teilzahlung leistet. Diese Teilzahlungspflicht gilt in einer Situation, wo zwischen den Parteien unstreitig ist, dass der Lizenzsuchende eine Zahlung zu leisten hat und allein die Höhe streitig ist. Dann ist jedenfalls der zwischen den Parteien unstreitige Betrag an den Patentinhaber zu zahlen, und zwar so, dass er dauerhaft beim Patentinhaber verbleibt. Es handelt sich um eine Anzahlung auf den späteren Lizenzbetrag. Die Höhe orientiert sich an dem Angebot des Patentsuchenden und ist deshalb – wenn die Parteien über eine weltweite Lizenz verhandeln – nicht auf das Gebiet der Bundesrepublik Deutschland beschränkt.

109    In Ergänzung zu dem damaligen Hinweisbeschluss führt die Kammer aus, dass neben die Verpflichtung zur Zahlung eines unstreitigen Teilbetrages eine Verpflichtung zum Leisten einer ergänzenden Sicherheit treten kann. Wann dies der Fall ist, bestimmt sich nach dem Einzelfall und ist abhängig von der Höhe der Differenz der beiden Angebote in a.) absoluten Zahlen und b.) Prozent.

110    Konkret wird eine ergänzende Sicherheit dann erforderlich sein, wenn das Angebot der Beklagtenpartei weniger als 60% der Forderung der Klagepartei beträgt und die Differenz mehr als 10 Mio. US$ ausmacht. In einem solchen Fall hat die Beklagtenpartei eine Sicherheit zu leisten, die – soweit es um eine Lump-Sum-Lizenz geht – auf den Betrag entfällt, der einem Lizenzjahr entspricht (dies bedeutet: Wenn die Klagepartei 100 für eine Dauer von 5 Jahren fordert und die Beklagtenpartei 30 bietet, dann ist ein Betrag von 30 als Teilbetrag endgültig zu bezahlen und ein weiterer Betrag von 20 als Sicherheit zu hinterlegen).

111    Etwas anderes gilt allerdings dann, wenn eine Beklagtenpartei vor einem anderen Gericht in einer anderen Jurisdiktion eine Ratenfestsetzung erwirkt hat oder erwirken möchte. Auf diesen Fall hat die Kammer bereits im Hinweis vom 14. Juli 2025 (Seite 13) hingewiesen, wo es lautet:

Nach der Rechtsprechung der Kammer muss sich die Partei, die im Ausland eine Ratenfestsetzung begehrt insofern daran festhalten lassen, dass der von ihr vorgeschlagene Betrag dann auch bereits an die Gegenseite bezahlt wird. Bislang gibt es insofern lediglich Entscheidungen, die sich mit der Auswirkung von bereits im Ausland ergangenen Entscheidungen befasst haben. Allerdings ist davon auszugehen, dass sich bereits mit entsprechender Antragsstellung entsprechende Pflichten ergeben könnten.

112    Dieses Erfordernis wird dahingehend konkretisiert, dass eine Partei, die eine Ratenfestsetzung beantragt hat, den von dem angerufenen Gericht festgesetzten Betrag in Ergänzung zu der Teilzahlung als Sicherheit zu leisten hat, und zwar unabhängig davon, ob die in der anderen Jurisdiktion beklagte Partei dem Vorschlag des dortigen Gerichts zugestimmt hat oder nicht. Als konkretes Beispiel gilt folgendes: Wenn eine Beklagtenpartei in einer Streitigkeit, bei der die Positionen der Parteien bei einer Lizenz mit einer Laufzeit von 5 Jahren bei 30 und 100 liegen und gemäß einer Entscheidung über eine Zwischenlizenz ein Betrag von 10 zum festen Verbleib und ein weiterer Betrag von 50

als Sicherheit zu leisten ist, so ist nach Ansicht der Kammer so vorzugehen, dass sich der fest zu zahlende Betrag auf 30 beläuft und sich auf Basis der Festsetzung des ausländischen Gerichts ein zusätzlicher Sicherheitsleistungsbetrag von 30 ergibt.

4. Anwendung dieser Grundsätze auf den konkreten Fall

113    Die Beklagtenpartei ist nach Ansicht des OLG München bereits deshalb nicht lizenzwillig anzusehen, weil sie keine Sicherheitsleistung in Höhe des letzten klägerischen Angebots hinterlegt hat. Dass die Beklagtenpartei eine niedrigere Sicherheitsleistung – orientiert an ihrem letzten Angebot, welches formell von der Klagepartei abgelehnt worden ist – hinterlegt hat, ist unbeachtlich. Insofern hat das OLG München keine Zweifel gelassen, welcher Betrag zu hinterlegen ist. Diese Voraussetzungen liegen nicht vor.

114    Auch nach Ansicht der Kammer ist eine Lizenzwilligkeit der Beklagtenpartei bereits aus formellen Gründen zu verneinen. Um der eigenen Lizenzwilligkeit Ausdruck zu verleihen, ist es in aller Regel erforderlich, dass der unstreitige Betrag tatsächlich an die Klagepartei bezahlt wird. Dies ist nicht geschehen, so dass sich die Frage, ob darüber hinaus noch eine Sicherheitsleistung zu bezahlen ist, in der vorliegenden Fallkonstellation nicht stellt.

5. FRAND-Beurteilung der Angebote der Klagepartei

115    Darüber hinaus ist davon auszugehen, dass sowohl das Pool-Angebot „Sisvel Wi-Fi 6", als auch das bilaterale Lizenzangebot innerhalb des zulässigen FRAND-Korridors sind. Dies ergibt sich auf Grund einer vergleichenden Top-Down-Analyse, bei der alle Annahmen zugunsten der Beklagtenpartei unterstellt worden sind. Ausgangspunkt ist dabei die konkrete Fallkonstellation, bei der ein Pool-Angebot vorliegt und das konkrete Produktportfolio der Beklagtenpartei überwiegend hochpreisige PCs und Laptops umfasst. Die Kammer geht dabei von der in zahlreichen Verfahren gewonnenen Vermutung aus, dass Pool-Angebote praktisch niemals das ihrem Patentportfolio innewohnende Lizenzierungspotential ausschöpfen.

a. Zum Lizenzgegenstand

116    Lizenzgegenstand sind sowohl beim Sisvel Wi-Fi 6-Pool als auch bei dem bilateralen Angebot jeweils Patente bezogen auf den Wi-Fi 6-Standard, einschließlich aller auf frühere Standards bezogenen Patente, um eine Abwärtskompatibilität sicherzustellen. Ob ein Gerät von der Lizenz erfasst wird, bestimmt sich nach dem besten technisch umgesetzten Wi-Fi Standard. Geräte, die Wi-Fi 7 umsetzen können, sind nicht von der Lizenz erfasst. Zur Verdeutlichung: Dies bedeutet, dass die Klägerin auch im Falle eines Lizenzschlusses hinsichtlich des Wi-Fi 6-Portfolios gegen die Wi-Fi 7-fähigen Produkte der Beklagten aus einem Wi-Fi 6-Patent vorgehen können.

b. Zur Struktur der Lizenzangebote (Einheitspreiskonzept)

117    Grundsätzlich trägt ein Lizenzierungsprogramm, welches nicht nach den zu lizenzierenden Produktkategorien unterscheidet, ein erhöhtes Risiko, als nicht FRANDgemäß eingeordnet zu werden. Denn ein verständiger Lizenzgeber berücksichtigt bei seinem Angebot die Interessen der Lizenznehmer und nimmt zur Kenntnis, dass Lizenzzahlungen über den Verkaufspreis refinanziert werden müssen. Wenn der gleiche Preis für wertige und hochpreisige Produkte genommen wird wie für günstige Produkte, kann dies ein Indiz für ein unausgewogenes Lizenzprogramm sein. Wenn die geforderten Lizenzen insgesamt sehr günstig sind, kann dies aber dahinstehen. Soweit ein Lizenznehmer verschiedene Produktkategorien in seinem Angebot hat, ist eine Gesamtbetrachtung vorzunehmen (wenn die Lizenz auch nur einheitlich angeboten wird). Es ist also nicht möglich, dass ein Angebot für eine Produktkategorie als FRAND und für eine andere Produktkategorie als nicht-FRAND angesehen wird.

c. Vergleichslizenzverträge

118    Nach Ansicht der Kammer ist die bevorzugte und genaueste Art und Weise, um zu bestimmen, ob ein Angebot des Patentinhabers im FRAND-Korridor liegt, der Vergleich mit bereits abgeschlossenen Lizenzen des Patentinhabers. Dabei gilt der Grundsatz, dass zeitnah geschlossenen Verträgen mit anderen Abnehmern, die in etwa eine gleiche Größe und ein vergleichbares Produktportfolio haben, eine sehr starke Indizwirkung zukommt, dass die dort festgelegte Rate innerhalb des FRAND-Korridors liegt.

(1) Dies gilt insbesondere dann, wenn der Vertragsschluss ohne den Druck eines Verletzungsverfahrens zustande gekommen ist. Dabei darf die Tatsache, dass es vor dem Vertragsschluss ein Verletzungsverfahren gab, das gegebenenfalls auch mit einem Urteil endete, nicht überbewertet werden. Denn es ist festzustellen, dass ein nicht unbeachtlicher Teil der Marktteilnehmer ohne den entsprechenden Druck aus einem Verletzungsverfahren nicht bereit ist, Lizenzverträge zu schließen. Insofern ist das Anstrengen einen Verletzungsverfahrens ein normaler und zu akzeptierender Teil der Verhandlungen, um eine für beide Seiten passende Lizenzrate zu finden. Ein anhängiges Verletzungsverfahren erscheint auch keine solche Drohwirkung auszustrahlen, dass unter dem dadurch entstehenden Druck freie Verhandlungen nicht mehr möglich wären.

Es obliegt dem Patentinhaber die Verträge in einem Verfahren vorzulegen, die er für das Stützen seiner Ansprüche braucht. Bei der Vorlage von Verträgen über eine Lump-Sum-Zahlung soll in der Regel der Betrag, die Laufzeit und die der Kalkulation zugrunde gelegte Stückzahl genannt werden. Soweit es sich um einen ersten Vertrag zwischen den Parteien handelt, sollen auch Angaben gemacht werden, wie die Vergangenheit abgegolten wurde.

Es gibt keine Verpflichtung, dass alle Verträge vorgelegt werden, die von der Klagepartei über den Lizenzgegenstand geschlossen worden sind. Denn die Erfahrung aus früheren Verfahren hat gezeigt, dass dies dazu führen kann, dass die Beklagtenpartei aus verschiedenen Verträgen die für sie günstigsten Argumente heraussucht und kombiniert, um so niedrige Lizenzbeträge für sich fordern zu können. Weiter hat sich gezeigt, dass nach der Vorlage von Vergleichslizenzverträgen fast immer verlangt wird, dass weitere Verträge vorgelegt werden und hinsichtlich der vorgelegten Verträge behauptet wird, dass sie nicht vergleichbar seien. Deshalb sieht es die Kammer als Sache der Klagepartei an, zu entscheiden, ob und ggf. welche Vergleichslizenzverträge sie vorlegen möchte, um die geltend gemachte Forderung zu belegen.

Die Kammer verkennt dabei nicht, dass die benannten Argumente der Beklagten durchaus zutreffend sein können und nicht per se ein Argument für einen sogenannten „Hold out" sind. Vielmehr bedarf es jeweils im Einzelfall einer wertenden Betrachtung anhand der konkreten Gesamtumstände.

(2) Hinsichtlich der – bereits angesprochenen – Abgeltung der Vergangenheit gelten folgende Grundsätze:

Bei der Bemessung der Lizenzsätze sind Nutzungen in der Vergangenheit anders zu behandeln als laufende oder zukünftige Nutzungen. Hintergrund ist, dass Hersteller von Produkten die für Lizenzzahlungen aufgewendeten Kosten dadurch refinanzieren können müssen, dass sie diese Kosten auf die Käufer bzw. Nutzer umlegen. Bei Nutzungen in der Vergangenheit ist die Refinanzierung ausgeschlossen, da die Verkäufe bereits abgeschlossen sind und die Umlage nicht mehr möglich ist. Insofern ist eine gewisse Schutzwürdigkeit gegeben, zumindest bis zu dem Zeitpunkt, wo der konkrete Patentinhaber das erste Mal eine unmissverständliche Aufforderung zur Lizenzzahlung ausgesprochen hat. Dies hat die Kammer bereits im Hinweisbeschluss vom 14. Juli 2025 dargelegt. Die folgenden Ausführungen dienen der Konkretisierung.

Es ist davon auszugehen, dass Marktteilnehmer wissen, dass sie Lizenzen nehmen müssen. Deshalb kann grundsätzlich gefordert werden, dass Rückstellungen gebildet werden, wenn mit einer Nutzung ohne Lizenzierung begonnen wird. Anderes kann gelten, wenn bestimmte Technologien über eine lange Zeit nicht lizenziert werden oder Lizenzen im Markt nicht konsequent durchgesetzt werden. Insofern bedarf es stets konkreten Vortrags, wie sich ein Pateninhaber in der Vergangenheit verhalten hat. Beispielsweise erscheint es erklärungsbedürftig, wenn ein Produkthersteller über einen langen Zeitraum ein Portfolio aufbaut, zunächst aber nicht gegen andere Hersteller vorgeht und dann nach einer Umstrukturierung gegen andere Hersteller vorgeht und dabei auch Ansprüche geltend macht, welche die anders gelebte Vergangenheit betreffen.

Dabei ist weiter davon auszugehen, dass potenzielle Lizenznehmer grundsätzlich nicht proaktiv an Lizenzgeber herantreten müssen. Denn es ist Sache der Patentinhaber, ihre Rechte durchzusetzen. Wenn so eine längere Zeit vergeht, kann zumindest für die Vergangenheit davon ausgegangen werden, dass sich ein gewisses Vertrauen entwickeln kann, dass man nicht mehr in Anspruch genommen werden wird. Das gilt zumindest dann, wenn der konkrete Patentinhaber nicht durch öffentlichkeitswirksame Handlungen (z.B. Publikationen in Fachpublikationen oder Messeauftritte) deutlich gemacht hat, dass eine Lizenzierung gewünscht ist und durchgesetzt wird. Denn in einem solchen Fall kann sich ein Patentnutzer nicht deshalb auf Vertrauensschutz berufen, weil er einer von vielen

Patentnutzern ist, die keine Lizenz nehmen, und die Kapazitäten des Patentinhabers nicht ausreichen, dass alle Patentnutzer gleichzeitig in Anspruch genommen werden. Vielmehr muss der Patentnutzer dann davon ausgehen, dass er zu gegebener Zeit auch (und auch für die Vergangenheit) in Anspruch genommen wird.

127    Um Missverständnisse zu vermeiden, sollte ein Patentinhaber deshalb eine eindeutige und unmissverständliche Zahlungsaufforderung an einen Patentnutzer richten. Ansonsten könnte er vergangener Ansprüche ganz oder zumindest teilweise verlustig gehen.

128    Die Kammer geht vor dem Hintergrund dieser Interessenlage davon aus, dass für die Zeit vor einer qualifizierten Zahlungsaufforderung und einer angemessenen Frist, die zur Anpassung der Verkaufspreise erforderlich ist, Lizenzzahlungen in der Regel nicht vollständig nachgefordert werden können. Je nach Dauer der Rückwirkung können aber zumutbare Teilbeträge gefordert werden. In welcher Höhe und für welche Zeiträume dies der Fall ist, ist eine Frage des Einzelfalls.

129    (3) Die Frage, ob Ansprüche für die Vergangenheit geltend gemacht werden können, ist zu trennen von der Frage, ob Ansprüche für die Vergangenheit geltend gemacht werden müssen. Dies ist insbesondere für die Berechnung von Vergleichslizenzverträgen von Bedeutung.

130    Die Kammer ist insofern der Ansicht, dass es eine zulässige betriebswirtschaftliche Entscheidung eines jeden Patentinhabers ist, ob Ansprüche für die Vergangenheit geltend gemacht werden. Diese Entscheidung gilt es zu akzeptieren, solange es nicht ausnahmsweise Anhaltspunkte für einen Missbrauch gibt.

131    Aus vielen Verfahren ist der Kammer bekannt, dass sich der Abschluss eines ersten Lizenzvertrages als sehr schwierig darstellt. Wenn der Patentinhaber in einer solchen Situation auf Ansprüche aus der Vergangenheit ganz oder teilweise verzichtet, so ist dies in aller Regel der Tatsache geschuldet, dass eine in die Zukunft gerichtete Geschäftsbeziehung begonnen werden soll. Es gibt keine Vermutung, dass ein Verzicht für Ansprüche aus vergangenen Nutzungen allein dazu dient, eine überhöhte Zukunftsrate festzusetzen, um so Vergleichslizenzverträge mit hohen Lizenzgebühren zu schaffen. Diese Annahme wird zwar regelmäßig in Patentverletzungsverfahren vorgetragen. Es gibt aber keine tatsächlichen Anhaltspunkte, welche dies belegen. Es erscheint aus den benannten Gründen auch fernliegend zu sein. Vielmehr erscheint die Lizenzierungsrealität eher dahin zu gehen, dass sich Patentinhaber einer so großen Zahl von nicht ohne weiteres lizenzwilligen Unternehmen gegenübersehen, dass für einen schnellen Abschluss eines Lizenzvertrages auch deutliche Zugeständnisse gemacht werden.

d. Vergleichsverträge im hiesigen Verfahren

132    Im vorliegenden Verfahren hat die Klagepartei zwar Vergleichsverträge vorgelegt, allerdings waren die Zahlbeträge geschwärzt und es fehlten jegliche Angaben zu den zu Grunde liegenden Stückzahlen. Soweit allein die perunit-Raten in den Verträgen genannt waren, so war dies nicht ausreichend, weil sich die Vergleichbarkeit dieser Verträge nicht überprüfen ließ.

e. Kontrollberechnung anhand der Top-Down-Analyse

133    Deshalb hat die Kammer eine Kontrollberechnung auf Basis einer Top-Down-Analyse vorgenommen.

(1) Grundsätzliche Erwägungen

134    Dabei versteht die Kammer den dahinterstehenden Ansatz so, dass die Frage gestellt wird, welcher Betrag für die Nutzung eines bestimmten Standards angemessen ist. Ausgehend von einer solchen Festlegung ist dann zu bestimmen, wie hoch der Anteil eines konkreten Patentinhabers an dem Standard ist. Im Einzelfall stellen sich bei einer solchen Betrachtung zahlreiche Fragen, zum Beispiel:

- Von welchem Ausgangswert ist auszugehen?

- Wie hoch ist der Wert des Standards pro Produkt? Muss dies ein fester Betrag sein oder im Verhältnis zum bestimmten Produkt bzw. der Produktkategorie (d.h. ist für die Nutzung eines bestimmten Standards je Produkt

derselbe Betrag angemessen, unabhängig davon, ob es sich um ein günstiges Mobiltelefon oder einen High-End-Laptop handelt)?

- Welchen Einfluss haben andere Standards auf einen möglichen Ausgangswert (Total Royalty Burden)?

Eine Kontrollberechnung über eine Top-Down-Analyse ist zumindest immer dann möglich, wenn der Patentinhaber einen erheblichen Anteil am Standard hat. Für den sehr umfangreichen Mobilfunkstandard reicht dabei zur Überzeugung der Kammer ein Anteil von einem Prozent aus. Für kleinere Standards ist ggf. ein höherer Anteil erforderlich. Für den vorliegenden Fall ist das erforderliche Maß überschritten.

Dabei wurden Werte, die der Kammer in anderen Verfahren vorgelegt worden sind und die realistisch erscheinen, als Grundlage genommen. Als Ausgangspunkt kommt dem Mobilfunkstandard eine besondere Bedeutung zu. Dies liegt zum einen daran, dass die vor der Kammer verhandelten Fälle in der Mehrzahl Mobilfunk betroffen haben. Darüber hinaus handelt es sich um einen Standard, der in weiten Teilen auslizenziert ist und bei dem es bereits zahlreiche Verlängerungen bestehender Lizenzverträge gegeben hat, so dass es eine hinreichende Anzahl an Verträgen gibt, bei denen sich die oft strittige Frage der Vergütung von vergangenen Nutzungen nicht stellt.

(2) Aufbau des Wi-Fi 6-Pools von Sisvel

Ausgangspunkt der Kontrollberechnung ist der Wi-Fi 6-Pool von Sisvel mit den Raten von 0,60 Euro als Standardtarif und 0,50 Euro als ermäßigtem Tarif. Laut der Webseite von Sisvel umfasst dieser Pool Patente von

- Huawei Technologies Co., Ltd.

- Mitsubishi Electric Corporation

- Orange S.A.

- Panasonic Holdings Corporation

- Koninklijke Philips N.V.

- SK Telecom Co., Ltd.

- Wilus Inc.

Nach den öffentlich verfügbaren Zahlen ist Huawei das Unternehmen mit den meisten Patenten betreffend den Wi-Fi 6-Standard, einschließlich der früheren Standards (vgl. das öffentlich zugängliche Dokument: LexisNexis, Who is Leading the Wi-Fi 6 Patent R…, vorgelegt als Anlage HE23). Die Unternehmen Panasonic, Philips, SK Telecom und Wilus sind bei den 40 Unternehmen aufgeführt, die am meisten Patente am Wi-Fi 6-Standard haben.

Aus öffentlich zugänglichen Zahlen ist ersichtlich, dass der Pool insgesamt 245 Patentfamilien und ca. 2.000 Patente umfasst. Dies entspricht den in diesem Verfahren vorgelegten und unstreitigen Zahlen.

Es ist schwierig zu bestimmen, wie hoch die Zahl der Patente bzw. Patentfamilien ist, die den Wi-Fi 6-Standard (einschließlich aller früheren Standards) ausmachen. Die öffentlich verfügbaren Zahlen schwanken stark. Es kann aber als sicher festgestellt werden, dass der Patentpool „Sisvel Wi-Fi 6" mindestens 10% am gesamten Patentvolumen umfasst. Denn es kann nicht davon ausgegangen werden, dass der Wi-Fi 6-Standard mehr als 2.450 Patentfamilien bzw. 20.000 Patente umfasst.

Laut öffentlich zugänglichen Zahlen aus dem Internet ist die Beklagtengruppe der fünftgrößte PC-Hersteller der Welt. Im Jahr 2024 wurden 17,39 Mio. PCs ausgeliefert. Andere Produktgruppen haben wohl keine große Bedeutung im Geschäft der Beklagten.

(3) Methodik der Berechnung

Die Kammer war mit zahlreichen Verfahren insbesondere aus dem Bereich Mobilfunk befasst. Dort wurde teilweise mit Sachverständigengutachten über die Frage der mit dem Mobilfunk einhergehenden Maximalbelastung (Aggregate Royalty Burden) diskutiert, also die Frage, wie viele Prozent des Stückpreises eines Produkts auf die

Lizenz zur Nutzung des Mobilfunkstandards entfallen. Dabei waren die Positionen der Patentinhaber und der Patentnutzer nicht so weit

auseinander, wie vermutet werden könnte, wenn man die beidseitigen Angebote betrachtet. Es hat sich gezeigt, dass die Position der Patentinhaber bei ca. 8% lag und die Position der Patentnutzer bei etwa 4%. Mit anderen Worten: Die Parteien waren sich einig, dass zwischen 4% und 8% des Kaufpreises eines Geräts als Lizenzgebühren für die Nutzung sämtlicher Patente aller Mobilfunkstandards angemessen sind. Damit ist aber noch nicht gesagt, dass dies auch den Bereich der FRANDgemäßen Lizenzgebühren darstellt.

143    Ausgehend von diesem Wert für den wichtigsten Standard (Mobilfunk) liegt die Gesamtbelastung für ein Mobiltelefon für alle für einen sinnvollen Betrieb erforderlichen Standards (Mobilfunk, Wi-Fi, Streaming, etc.) bei ca. 10% bis 18%.

144    Die Kammer hat bereits im Hinweisbeschluss vom 14. Juli 2025 ausgeführt, dass zwingend auf einen Durchschnittswert für bestimmte Produktkategorien abzustellen sein dürfte. Dies bedeutet, dass für bestimmte Kategorien auf ein Produkt mittlerer Art und Güte abzustellen wäre. Denn bei den Endprodukten gibt es erhebliche Preisunterschiede, die nicht durch eine verbesserte Standard-Funktionalität begründet sind, sondern durch eine besonders attraktive Marke, eine besonders hochwertige Kamera oder besonders funktionale Software. Es wäre mit der Vorstellung eines gerechten Interessensausgleichs nicht vereinbar, wenn der Hersteller hochwertiger Markenprodukte einen höheren Preis für die gleiche Funktionalität zahlen müsste als der Hersteller günstiger oder günstigster Produkte. Falls dies dazu führen würde, dass der Preis günstigster Produkte angehoben werden müsste, so wäre dies hinzunehmen.

145    Konkretisierend führt die Kammer aus, dass bei der Bestimmung der Produktkategorie teilweise eine differenzierte Betrachtung erforderlich ist. So kann es erforderlich sein, dass beispielsweise nach der maximalen Leistungsfähigkeit unterschieden werden muss (z.B. 4G- und 5G-fähige Mobiltelefone) oder nach besonders wertigen Zusatzfunktionen (Tablets/ Laptops ohne Mobilfunk (als Standard) und mit einer Mobilfunkfähigkeit (als höherpreisiges Premiumsegment).

146    Nach Ansicht der Kammer liegt der Durchschnittswert für ein Mobiltelefon mit 5G-Fähigkeit in einem Rahmen von 150 – 200 US$ (unit price), wobei dies eine Betrachtung zugunsten der Patentnutzer darstellt. Selbst wenn man also alle Annahmen (seitens der Beklagten vorgetragener niedriger ARB von 4% des Verkaufspreises und niedriger unit price) zugunsten der Patentnutzer rechnet, kommt eine gesamte Belastung von 6 US$ zustande. Der Inhaber eines Patentportfolios kann demnach selbst dann, wenn alle Annahmen im Sinne des Patentnutzers getroffen werden, für jedes Prozent, welches er am Standard hält, einen Betrag von 6 US$-Cent verlangen.

147    Dabei muss deutlich sein, dass dieser Betrag aller Wahrscheinlichkeit nach deutlich unter einem zulässigen FRAND-Betrag liegt, weil alle Zahlen zugunsten der Patentnutzer unterstellt wurden. In der gerichtlichen Praxis ist dies allein deshalb von Bedeutung, weil die meisten Inhaber großer Patentportfolios das Lizenzpotential nicht ausschöpfen. Insbesondere im Bereich des Mobilfunks erscheint es möglich zu sein, höhere Stückpreise anzunehmen, wenn die Klageparteien konkreter zu den technischen Fähigkeiten der Geräte der Patentnutzer vortrügen.

(4) Anwendung dieser Methodik auf Wi-Fi 6

148    Die Kammer versteht das Angebot der Klägerin so, dass Wi-Fi 6 und alle früheren Standards lizenziert würden. Alle Geräte, die Wi-Fi 7 fähig sind, wurden von der Lizenzierung ausgenommen. Deshalb bedarf es keiner Aufteilung eines Lizenzbetrages auf die einzelnen Standards. Falls eine Aufteilung vorgenommen werden müsste, würde die Kammer für einen sich oft deutlich verbessernden Standard wie Wi-Fi folgendes für sinnvoll halten:

Wenn ein neuer Standard eingeführt wird, dann entfallen auf diesen Standard in den ersten beiden Jahren 20%, im dritten Jahr 30% und ab dem vierten Jahr 40%. Auf die besten beiden Standards zusammen entfallen insgesamt 70% und für die restlichen Standards verbleiben insgesamt 30%.

149    Wi-Fi wird in zahlreichen Produkten verwendet. Typische Produktgruppen sind Mobiltelefone, Tablets, Laptops, Desktop-PCs und Router. Obwohl beispielsweise auch Küchengeräte und Spielzeuge von der Technik Gebrauch

machen, soll dies hier dahingestellt bleiben. Für die erstgenannten Produktgruppen geht die Kammer von folgenden Ausgangspreisen für ein durchschnittlich ausgestattetes Gerät aus:

- Mobiltelefone: 150 – 200 US$

- Tablets: 150 – 200 US$

- Laptops/Desktop-PCs 500 – 550 US$

- Router: 130 – 150 US$

150  Die Maximale Lizenzbelastung (ARB) sieht die Kammer je nach der Funktionalität und der Bedeutung von Wi-Fi für die jeweilige Produktgruppe als unterschiedlich hoch an. Die nachfolgenden Zahlen spiegeln dies wider. Dabei ist der niedrige Betrag die Belastung, die in entsprechender Anwendung der oben dargelegten Argumente von der Patentnutzerseite vertreten werden würde.

| - Mobiltelefone: | 2 – 6% |
|---|---|
| - Tablets: | 3 – 7% |
| - Laptops/Desktop-PCs | 2 – 7% |
| - Router: | 6 – 10% |

151  Ausgehend von den beiden Zahlen ergeben sich für die einzelnen Produktgruppen folgende hypothetische Maximale Lizenzbelastungen (ARB), die letztlich Extrempositionen wiedergeben und wahrscheinlich beide außerhalb eines FRAND-Korridors liegen:

- Mobiltelefone: 3 – 12 US$

- Tablets: 4,5 – 14 US$

- Laptops/Desktop-PCs 10 – 38,5 US$

- Router: 7,8 – 15 US$

152  Dies bedeutet, dass für ein Patentportfolio, das ein Prozent Anteil am Standard abdeckt, folgendes als Mindestbetrag verlangt werden kann:

- Mobiltelefone: 3 US$ Cent

- Tablets: 4,5 US$ Cent

- Laptops/Desktop-PCs 10 US$ Cent

- Router: 7,8 US$ Cent

153  Da die Klägerin keine Angaben zu dem Produktportfolio der Beklagten gemacht hat, schätzt die Kammer den Anteil der Produkte der Beklagtengruppe (die einer der größten Hersteller von PCs weltweit ist) zu ihren Gunsten so, dass 50% der Einheiten in die Produktgruppe Laptops / Desktop-PCs und 50% in die günstigste Produktgruppe (Mobiltelefone) fallen. Da wie ausgeführt der Wi-Fi 6-Pool von Sisvel mindestens 10% aller relevanten Patente abdeckt, ergibt sich bei Annahme dieser Maximalbelastung (ARB) ein Durchschnittswert von 0,65 US$ pro Gerät. Wenn man diesen Betrag in Euro umrechnet, ergibt dies 0,56 Euro. Dies liegt genau zwischen der Standardrate und der Compliant-Rate des Sisvel-Pools und ist damit als FRAND anzusehen.

154  Die Kammer verkennt nicht, dass dieses Ergebnis insbesondere deshalb zustande gekommen ist, weil die Beklagte Produkte aus einer teuren Produktgruppe produziert. Für andere Produktgruppen lässt sich dieses Ergebnis nicht ohne weiteres vertreten. Dafür wäre ein substantiierter Vortrag der Klagepartei erforderlich. Dieser lag nicht vor.

Letztlich lassen sich die gleichen Überlegungen auch auf das bilaterale Lizenzangebot übertragen. Da das genaue Angebot aber nicht öffentlich ist, wird es im folgenden geheimhaltungspflichtigen Teil behandelt werden. Im Ergebnis ist festzuhalten, dass beide Angebote der Klagepartei FRAND waren.

f. Analyse des bilateralen Angebots der Klagepartei (geheimhaltungsbedürftig)

Die Klagepartei hat mehrere Angebote für eine Poollizenz und für eine bilaterale Lizenz abgegeben.

(1) Angebot vom 7. November 2024

Es sollen die letzten drei Angebote der Klägerin betrachtet werden. Das zeitlich früheste dieser Angebote war das nachfolgend gezeigte Angebot vom 7. November 2024. Die konkreten Zahlen sind aus der Übersicht ersichtlich.

Hinsichtlich des Poolangebots ergibt sich der geltend gemachte Betrag aus folgender Berechnung:

-



Einheiten zu je 0,60 US$ =

US$

-

Einheiten zu je 0,50 US$ =

US$

- Insgesamt: US$

Ein Rabatt gegenüber der veröffentlichten Lizenzrate ist insofern gegeben, als dass statt Euro mit US-Dollar gerechnet worden ist.

Für die bilaterale Lizenz liegt der durchschnittliche Lizenzbetrag per unit bei US$ (



US$ für

Einheiten).

Bei einer Vergleichsberechnung, bei der ein in gleicher Weise berechneter Durchschnittswert auch für das Poolangebot berechnet wird (



US$ für Einheiten =



US$), ergibt sich ein Verhältnis von

zu 1.

162    Nach den unbestrittenen Angaben der Klagepartei umfasst der Sisvel-Pool insgesamt 244 Patentfamilien mit 1.864 Patenten. Der Anteil von Wilus/SKT (also der klägerischen Patente) beträgt 57 Patentfamilien mit 542 Patenten. Das Verhältnis der Patentfamilien beträgt deshalb 4,281 zu 1 und der Patente 3,439 zu 1.

163    Auf Grund der vorgelegten Zahlen kann festgestellt werden, dass die Klagepartei bei diesem Angebot weitgehend bei ihrer veröffentlichten Rate geblieben ist. Die Umstellung des Zahlbetrags von Euro in US$ stellt einen Rabatt in einer Größenordnung von ca. 10% dar (abhängig vom Wechselkurs).

(2) Vergleichslizenzverträge

164    Die Klagepartei hat zwar Vergleichslizenzverträge vorgelegt, allerdings waren diese so weit geschwärzt, dass sie keinerlei Aussagekraft haben. Es ist weder ersichtlich, welche Beträge bezahlt worden sind noch welche Stückzahl den Verträgen zugrunde gelegt worden ist. Dadurch ist eine Überprüfung weder für die Kammer noch für die Gegenseite möglich.

165    Deshalb kann anhand der von der Klagepartei vorgelegten Verträge nicht überprüft werden, ob die klägerischen Angebote FRAND sind.

(3) Plausibilitätsberechnung über die Top-Down-Analyse

166    Es wurde bereits dargelegt, dass die Poolrate des Sisvel Wi-Fi 6-Pools zumindest bei dem konkreten Produktportfolio der Beklagten innerhalb des FRAND-Korridors liegt. Aus den gleichen Gründen liegt auch das bilaterale Angebot innerhalb des FRAND-Korridors. Denn es gelten die folgenden Überlegungen:

167    Es ist davon auszugehen, dass die Anzahl der Patente der Klagepartei über 2% am gesamten Wi-Fi 6-Standard betragen, so dass die Voraussetzungen für eine Top-Down-Betrachtung gegeben sind.

168    Die Poollizenz und das bilaterale Angebot unterscheiden sich – wenn auf die Anteile der Patente im Pool abgestellt wird – in der relativen Höhe geringfügig. Dabei wird – zugunsten der Beklagten – davon ausgegangen, dass auf das Verhältnis der Patentfamilien abzustellen ist und nicht auf die reine Anzahl der Patente.

- Aus den obigen Ausführungen ergibt sich, dass ein Betrag von 0,65 US$ pro lizenziertem Gerät FRAND ist.

- Die durchschnittliche Poolrate liegt bei



US$

- Die bilaterale Lizenz liegt bei



US$. Wenn dieser Betrag mit dem Verhältnis der Patentfamilien (4,281 zu 1) multipliziert wird, beträgt der Vergleichswert



US$

169    Damit steht fest, dass beide Angebote FRAND waren.

(4) Angebot der Klägerin vom 6. Februar 2025

170    Das vorletzte Angebot der Klagepartei vom 6. Februar 2025 unterscheidet sich von dem Angebot vom 7. November 2025 in den zugrunde gelegten Stückzahlen. Die angesetzten Zahlen wurden auf Grund der Angaben der Beklagtenpartei korrigiert. Zudem haben sich die Parteien darauf geeinigt, dass sie alle Geräte, die Wi-Fi 7-fähig sind, vollkommen von der Lizenzierung herausnehmen. Es wurden deshalb folgende Zahlen zugrunde gelegt:

171    Ausgehend von diesen Zahlen hat die Klagepartei für die Poollizenz einen Betrag von



US$ und für die bilaterale Lizenz einen Betrag von



US$ gefordert.

172  Daraus ergeben sich folgende Durchschnittsstückpreise (die beim Pool höher liegen als bei der vorherigen Berechnung, weil der Anteil der in der Vergangenheit liegenden Einheiten bei dieser Berechnung höher ist):

- Poollizenz:

US$ für

Einheiten:

US$

- Bilaterale Lizenz:

US$ für

Einheiten:

US$

173  Da diese Stückpreise unter dem Betrag liegen, der bei Annahme aller Werte zugunsten der Beklagten errechnet wurde, ist auch dieses Angebot der Klageparte FRAND.

(5) Angebot der Klägerin vom 16. Dezember 2025

174  Das letzte Angebot vom 16. Dezember 2025 sah eine weitere Ermäßigung der Gebühren vor. Dort wurde von der Klagepartei angeboten:

Sisvel-Pool:

- Standard rate: 0,60 US$/ running royalty

- Compliant rate: 0,50 US$/ running royalty

Wilus:

175  Da diese Angebote unter den vorherigen Angeboten lagen, sind sie FRAND.

(6) Die Angebote der Beklagtenpartei

176  Die Beklagtenpartei hat zuletzt einen Betrag in Höhe von

US$ für die bilaterale Lizenz angeboten. Dabei hat sie ihre Berechnung auf die nicht belegte Behauptung gestützt, dass ein Konkurrent eine Rate von



US$ bezahle. Diese Rate liegt deutlich unter dem, was für vergleichbare Lizenzen gezahlt wird und ist deshalb ein Ausdruck der Unwilligkeit der Beklagtenpartei, eine Lizenz zu FRAND-Bedingungen zu nehmen.

V.

Die Beklagten bieten die angegriffenen Ausführungsformen in der Bundesrepublik Deutschland an, vertreiben sie und machen damit – soweit die Ansprüche 1, 4 und 5 des Klagepatents betroffen sind – widerrechtlich von der Lehre des Klagepatents im Sinne von § 9 S. 2 Nr. 1 PatG Gebrauch.

Darüber hinaus bieten die Beklagten die angegriffenen Ausführungsformen in der Bundesrepublik Deutschland zur Benutzung in Deutschland an, womit – wie die Beklagten wissen – das durch Anspruch 12 des Klagepatents beanspruchte Verfahren angewendet wird. Damit begehen die Beklagten auch eine mittelbare Patentverletzung im Sinne des § 10 Abs. 1 PatG.

Der Klägerin stehen mithin Ansprüche auf Unterlassung, Auskunftserteilung und Rechnungslegung, Feststellung der Schadenersatzpflicht dem Grunde nach sowie auf Rückruf aus §§ 139 Abs. 1 und 2, 140a Abs. 3, 140b PatG, 242, 259 BGB zu.

Als Mitinhaberin des Klagepatents, gemeinsam mit der SK Telecom Ltd., kann die Klägerin die Ansprüche auf Unterlassung, Rückruf und Vernichtung sowie die Ansprüche auf Auskunft und Rechnungslegung nach den Grundsätzen der Bruchteilsgemeinschaft (§§ 741 ff. BGB) im eigenen Namen geltend machen. Soweit sie Schadensersatz dem Grunde nach geltend macht, ist festzuhalten, dass die SK Telecom Ltd. ihre Ansprüche auf Schadenersatz an die Klägerin abgetreten hat.

B.

Für eine Aussetzung der Verhandlung besteht keine Veranlassung, § 148 ZPO.

I.

Nach ständiger Rechtsprechung der Kammern des Landgerichts München I (vgl. GRUR-RS 2023, 26656 Rn. 93; GRUR-RS 2019, 31034 Rn. 66; GRUR-RS 2019, 31037 Rn. 63; BeckRS 2018, 41093 Rn. 147) stellen ein Einspruch oder die Erhebung einer Nichtigkeitsklage als solche noch keinen Grund dar, den Verletzungsrechtsstreit auszusetzen, weil dies faktisch darauf hinauslaufen würde, dem Angriff auf das Klagepatent eine den Patentschutz hemmende Wirkung beizumessen. Das ist dem Gesetz jedoch fremd. Die Interessen der Parteien sind vielmehr gegeneinander abzuwägen, wobei grundsätzlich dem Interesse des Patentinhabers an der Durchsetzung seines erteilten Patents Vorrang gebührt. Die Aussetzung kommt deshalb nur dann in Betracht, wenn mit überwiegender Wahrscheinlichkeit ein Widerruf oder eine Vernichtung des Klagepatents zu erwarten ist.

Aufgrund des Vortrags der Beklagten kann nicht mit einer überwiegenden Wahrscheinlichkeit von einer Nichtigkeitserklärung des Klagepatents ausgegangen werden.

II.

Das Klagepatent nimmt jedenfalls die Priorität der südkoreanischen Patentanmeldung KR 20160147189 vom 6. November 2016 wirksam in Anspruch.

1.Die Beklagten vertreten die Auffassung, die einzige Patentanmeldung, die für eine wirksame Inanspruchnahme der Priorität in Betracht komme, sei die südkoreanische Patentanmeldung KR 20160147189 vom 6. November 2016 (Anlage HE 2 mit Maschinenübersetzung ins Englische in Anlage HE 2a, im Folgenden: Patentanmeldung '189). Allerdings könne die Klägerin auch die Priorität der Patentanmeldung '189 nicht in Anspruch nehmen, da Merkmal 4 nicht eindeutig daraus hervorgehe.

186    Anspruch 1 des Klagepatents beziehe sich nur auf die in den Fig. 16 bis 18 des Klagepatents wiedergegebenen Ausführungsformen, die man kombinieren müsse, um die Lehre des Klagepatents zu verwirklichen. Die Fig. 16 bis 18 des Klagepatents entsprächen den Fig. 6 bis 8 der Patentanmeldung '189. Allerdings gehe Merkmal 4 daraus nicht eindeutig hervor, da nicht offenbart werde, dass die Fig. 6 bis 8 kombiniert werden könnten. Namentlich enthalte die Patentanmeldung '189 keine Ansprüche und auch im Übrigen keine Verallgemeinerung der in den Fig. 6 bis 8 gezeigten Ausführungsbeispiele.

187    2.Entgegen der Auffassung der Beklagten kann die Klägerin jedenfalls die Priorität der südkoreanischen Patentanmeldung KR 20160147189 vom 6. November 2016 in Anspruch nehmen.

188    Ob eine Patentanmeldung wirksam die Priorität einer früheren Patentanmeldung in Anspruch nehmen kann, richtet sich danach, ob die frühere Patentanmeldung die von der späteren Patentanmeldung beanspruchte Erfindung offenbart. Der in diesem Kontext relevante Begriff der Offenbarung ist identisch mit dem Offenbarungsbegriff, wie er für die Neuheitsprüfung gilt; dementsprechend gilt auch hier, dass der Fachmann die im Anspruch bezeichnete technische Lehre den Ursprungsunterlagen unmittelbar und eindeutig als mögliche Ausführungsform der Erfindung entnehmen können muss, damit die Priorität wirksam in Anspruch genommen werden kann (BGH, X ZR 112/13, GRUR 2016, 50 Rn. 29 – Teilreflektierende Folie). Hierfür ist es aber nicht erforderlich, dass die Lehre den Ansprüchen der ersten Anmeldung zu entnehmen ist; vielmehr ist der Offenbarungsgehalt der ersten Anmeldung aus der Gesamtheit der Anmeldeunterlagen zu ermitteln (BGH, aaO).

189    Auf Basis dieses Maßstabs ist Merkmal 4 eindeutig offenbart durch die Patentanmeldung '189. Die Klägerin hat in der Replik eine deutsche Übersetzung der zu den Fig. 6 bis 8 der Patentanmeldung '189 zugehörigen Beschreibung vorgelegt, die eine erheblich bessere Qualität aufweist als die als Anlage HE 2a vorgelegte, lückenhafte englischsprachige Übersetzung; die Beklagten haben keine Einwände gegen die Übersetzung vorgebracht. In dieser Beschreibung wird – inhaltlich entsprechend zu den Abs. [0091], [0097] und [0102] des Klagepatents – ausgeführt, dass der Zeitgeber für den „MU-EDCA-Parametersatz" (also den zweiten EDCA-Parametersatz in der Sprache von Merkmal 4 des Klagepatents) je nachdem, ob der übertragene Datenrahmen eine Antwort vom Basisgerät erfordert oder nicht, mit Erhalt der Antwort startet oder mit der Beendigung des Sendens des Datenrahmens. Aus der Nebeneinanderstellung dieser Varianten in Text und Bild ist es für den Fachmann eindeutig, dass er die Varianten kombinieren kann.

III.

190    Keine der Entgegenhaltungen der Beklagten stehen dem Bestand des Klagepatents neuheitsschädlich entgegen. Daher übt die Kammer das ihr eingeräumte Ermessen dahingehend aus, das Verfahren nicht auszusetzen.

191    1.Für die Beurteilung, ob der Gegenstand eines Patents durch eine Vorveröffentlichung neuheitsschädlich getroffen ist, ist maßgeblich, welche technische Information dem Fachmann unmittelbar und eindeutig offenbart wird (BGH, X ZR 113/20, GRUR-RS 2022, 35280 Rn. 87 – Wundreinigungstuch).

192    2.Die Entgegenhaltung HE3 steht dem Bestand des Klagepatents nicht neuheitsschädlich entgegen.

193    Die Entgegenhaltung HE3 (Anlage HE3) ist die internationale Patentanmeldung WO 2018/073171 A1 vom 16. Oktober 2017, veröffentlicht am 26. April 2018. Sie beansprucht eine verbesserte Verwaltung von Zugriffskategorien in einem Mehr-benutzer-EDCA-Übertragungsmodus in einem drahtlosen Netzwerk.

194    Zu diesem Zweck kennt auch die HE3 den Wechsel vom herkömmlichen konkurrierenden Zugriffsmodus EDCA zu einem anderen EDCA-Modus im Mehrbenut-zer-Kontext („MU EDCA mode") und zurück, separat für jede verwendete Zugriffskategorie.

195    In der HE3 erfolgt dieser Wechsel aber nicht entsprechend Merkmal 4 auf Grundlage dessen, ob eine Antwort auf eine in der Auslöserbasierten PPDU enthaltene MAC-Protokolldateneinheit (MPDU) empfangen wird, d.h. nach der hier gefundenen Auslegung auf Grundlage dessen, ob die vom Endgerät versandte PPDU eine Antwort vom Basisgerät erfordert oder nicht. Stattdessen erfolgt der Wechsel in der HE3 im Falle der, bevorzugterweise

erfolgreichen, Übermittlung der Daten, wobei eine erfolgreiche Übermittlung durch eine Antwort des Basisgeräts signalisiert wird.

a. Die Beklagten verweisen für ihre Auffassung, dass die HE3 Merkmal 4 offenbart, darauf, dass der Zeitgeber gemäß der HE3 nach Versand der PPDU einerseits und nach Erhalt einer Antwort vom Basisgerät andererseits eingestellt werde. Das ergebe sich aus S. 35, Zeile 38, bis S. 36, Zeile 2:

> Next, once the transmission has been performed, and preferably upon successful transmission (i.e. an acknowledgment is received from the AP), step 1170 determines the new

Auf S. 25, Zeile 27 bis 36, werde weiter offenbart, dass der Zeitgeber auch bereits parallel mit der Versendung der Daten eingestellt werden könne:

> Thus, node 502 transmits AC_VI data 511 and AC_VO data 512 to the AP using the scheduled RU. The corresponding two transmitting traffic queues, AC_VI and AC_VO, thus switch to the MU EDCA mode (symbolized by white figures in black boxes), in which node 502 now uses MU EDCA parameters for each of these transmitting traffic queues. Particularly, higher values for the AIFSN parameter may be used, and optionally for the $CW_{min}$ and $CW_{min}$ parameters.
>
> In parallel, the HEMUEDCATimer 590 is launched to count down when node 502 will be allowed to switch back to the legacy EDCA mode with legacy EDCA parameters. The switch back may occur after a predetermined duration expires, i.e. when the HEMUEDCATimer reaches 0.

b. Entgegen der Auffassung der Beklagten offenbart die HE3 das Merkmal 4 nicht. Nach der in der HE3 offenbarten Erfindung kann der Zeitgeber zwar auch ohne Erhalt einer Antwort des Basisgeräts starten, wenn auch die erfolgreiche Übertragung der Daten die bevorzugte Bedingung für das Einstellen des Zeitgebers ist (das ergibt sich aus dem in Rn 197 zitierten Abschnitt und sogar mehr noch aus S. 11, Zeile 8 bis 13, wo ausschließlich die erfolgreiche Übermittlung als erforderliche Bedingung für die Einstellung des Zeitgebers genannt wird). In dem Fall, dass der Zeitgeber ohne Erhalt einer Antwort startet, liegt aber schon keine erfolgreiche Datenübertragung vor. Das ergibt sich aus dem Gegensatz zwischen „transmission" und „successful transmission". Gleichzeitig ist an keiner Stelle der HE3 die Rede von Datenpaketen, die keine Antwort erfordern. Das Fehlen einer Antwort ergibt sich also nach der HE3 nicht daraus, dass die PPDU keine Antwort angefordert hat, sondern daraus, dass die Datenübertragung fehlgeschlagen ist.

Die in Rn 198 wiedergegebene von den Beklagten zitierte Textpasse bezieht sich nicht auf die von der HE3 beanspruchte Erfindung, sondern auf den Stand der Technik (es handelt sich dabei um eine Beschreibung der Fig. 5a, welche den Stand der Technik wiedergibt, siehe S. 15, Zeile 15 f. der HE3), ohne dass insoweit mitgeteilt würde, ob dieser Stand der Technik die anderen Merkmale des Klagepatents offenbart. Selbst wenn man aber die Offenbarung der Einstellung des Zeitgebers parallel zur Versendung der Daten berücksichtigte, wäre Merkmal 4 des Klagepatents nicht neuheitsschädlich getroffen. Denn es ist etwas anderes, wenn der Zeitgeber automatisch parallel zur Versendung der Daten eingestellt wird oder ob er – wie nach Merkmal 4 des Klagepatents – nach Versendung der Daten eingestellt wird, sei es unmittelbar nach der Versendung (im Fall, dass das Datenpaket keine Antwort anfordert) oder erst nach Erhalt einer Antwort (im Fall, dass das Datenpaket eine solche Antwort anfordert).

3. Auch die Entgegenhaltung HE4 steht dem Bestand des Klagepatents nicht neuheitsschädlich entgegen.

Die Entgegenhaltung HE4 (Anlage HE4) ist der Beitrag IEEE 802.11-16/0998r3 zur IEEE 802.11ax Task Group. Der Beitrag wurde am 12. September 2016 öffentlich gemacht.

Die Beklagten räumen selbst ein, dass der Zeitgeber nach der HE4 nur eingestellt wird, wenn eine Antwort empfangen wird; andernfalls wird er nicht eingestellt. Diese Art der Abhängigkeit der Einstellung des Zeitgebers entspricht aber nicht Merkmal 4.

4.Auch die Entgegenhaltung HE5 steht dem Bestand des Klagepatents nicht neuheitsschädlich entgegen.

Die Entgegenhaltung HE5 (Anlage HE5) ist der Beitrag IEEE 802.11-16/1425r0 zur IEEE 802.11ax Task Group. Dieser wurde allerdings erst am 7. November 2016 um 09:29 Uhr „ET" veröffentlicht. Die Abkürzung „ET" steht wahrscheinlich für „Eastern Time", also die Zeit an der USamerikanischen Ostküste. Auch bei Zugrundelegung dieses Verständnisses erfolgte die Publikation der Priorität des Klagepatents nachgelagert.

5.Auch die Entgegenhaltung HE6 steht dem Bestand des Klagepatents nicht neuheitsschädlich entgegen.

Die Entgegenhaltung HE6 (Anlage HE6) beansprucht eine Anpassung der Übertragungsdauer (TXOP) für die Mehrnutzer-Uplink-Übertragung. Es handelt sich um die europäische Patentanmeldung 3 270 646 A1 vom 2. März 2017, welche die Priorität einer japanischen Patentanmeldung vom 15. Juli 2016 in Anspruch nimmt.

Wie die HE3 kennt auch die HE6 einen Wechsel zwischen zwei EDCA-Parametersätzen im Kontext der Teilnahme eines Endgeräts an einer Mehrnutzer-Uplink-Übertragung. Der Zeitgeber, welcher die Dauer des zweiten EDCA-Parametersatzes bestimmt, wird aber – wie die Beklagten selbst vortragen – auch nach der HE6 nur dann eingestellt, wenn eine Antwort vom Basisgerät empfangen wurde, andernfalls nicht. Diese Art der Abhängigkeit der Einstellung des Zeitgebers entspricht aber nicht Merkmal 4.

C.

Die Kostenentscheidung folgt aus § 91 ZPO.

Die Entscheidung über die vorläufige Vollstreckbarkeit hat ihre Grundlage in § 709 ZPO. Bei der Höhe der Sicherheitsleistung war zu berücksichtigen, dass die Sicherheitsleistung dazu dient, das Risiko abzudecken, dass entweder die Beurteilung der Verletzung in einer höheren Instanz anders ausfällt oder das Klagepatent im Nichtigkeitsverfahren vernichtet wird. In beiden Fällen müsste die Klägerin Schadensersatz für die durch die Vollstreckung entstehenden Folgen leisten. Die Höhe der Sicherheit ist deshalb grundsätzlich so zu bemessen, dass die Schäden, die die Beklagten durch die Vollstreckung eines später aufgehobenen Urteils erleiden können, abgedeckt sind (§ 717 Abs. 2 ZPO).

Im vorliegenden Fall bemisst sich die Sicherheitsleistung nicht an dem drohenden Umsatzausfall der Beklagten, sondern an den Kosten, die den Beklagten entstehen können, weil sie gegebenenfalls von der Klagepartei aus mehreren Patenten in Anspruch genommen werden müssen, bis letztlich ein Klagepatent gefunden ist, welches rechtskräftig als verletzt und rechtsbeständig angesehen wird. Für die Herleitung dieses Ansatzes wird auf das Urteil der Kammer vom 30.10.2025 (7 O 1297/25, GRUR-RS 2025, 31966) verwiesen.

Diesen zusätzlichen Aufwand hat die Kammer mit 3.500.000,00 EUR angesetzt. Ein weitergehendes Sicherungsbedürfnis der Beklagten ist nicht ersichtlich.

Hinsichtlich der Auskunfts- und Rechnungslegungspflicht war eine Sicherheitsleistung von insgesamt 50.000,00 EUR ausreichend, aber auch erforderlich.

LG München I, final part by 01/08/2026 – 7 O 5007/25

**Title:**

**Strengthening of the principles on the antitrust objection to compulsory licensing**

**Chain of standards:**

TFEU Art. 102

**Guidelines:**

**1. It is considered particularly important for the assessment of the license's willingness to grant a license whether the license seeker makes a partial payment. This partial payment obligation applies in a situation where there is no dispute between the parties that the license seeker is to make a payment and that the amount alone is in dispute. In any event, the undisputed amount between the parties must then be paid to the patent proprietor in such a way that he remains permanently with the patent proprietor. This is a deposit on the later license amount. The amount is based on the offer of the patent seeker and is therefore – if the parties negotiate a worldwide license – not limited to the territory of the Federal Republic of Germany.**

**2. In addition to the obligation to pay an undisputed portion, an obligation to provide supplementary security may arise. When this is the case is determined by the individual case and depends on the amount of the difference between the two offers in a.) absolute numbers and b.) percent.**

**3. A party which has requested the fixing of the installments shall provide as security the amount fixed by the court seised in addition to the installment, irrespective of whether or not the party in the other jurisdiction has accepted the proposal of the court in that jurisdiction.**

**4. In a timely manner, contracts with other customers of approximately the same size and a comparable product portfolio have a very strong indication that the rate set there is within the FRAND corridor.**

**5. The fact that there was an infringement procedure before the conclusion of the contract must not be overestimated. Indeed, it must be noted that, without the appropriate pressure from infringement proceedings, a not insignificant part of the market participants are not prepared to conclude license agreements. In this respect, the initiation of an infringement procedure is a normal and acceptable part of the negotiations in order to find a license rate suitable for both sides.**

**6. It is for the claimant to decide whether and, where applicable, which settlement license agreements it wishes to submit in order to substantiate the claim. When submitting contracts for a lump sum payment, the amount, duration and the number of units used in the calculation should generally be mentioned. If this is an initial contract between the parties, information should also be provided on how the past has been settled.**

**7. There is no obligation for all contracts concluded by the claimant concerning the subject matter of the license to be submitted.**

**8. Market participants are expected to know that they have to take licenses. Therefore, it can generally be required that accruals are formed if use is started without licensing. The other may apply if certain technologies are not licensed for a long time or licenses are not consistently enforced in the market. In this respect, it is always necessary to give concrete talk about how a sponsor has behaved in the past.**

**9. It must therefore be assumed that, as a rule, royalties cannot be fully recovered for the period prior to a qualifying call for payment and a reasonable period of time necessary to adjust the selling prices. Depending on the duration of the retroactive effect, however, reasonable partial amounts can be claimed. In what amount and for what periods is a question of the individual case.**

**10. It is an acceptable business decision of each patent proprietor whether claims are asserted for the past. This decision must be accepted unless there is exceptional evidence of abuse. There is no presumption that waiving claims from past uses is solely intended to set an excessive future rate in order to create comparative license agreements with high licensing fees.**

**11. First of all, it is necessary to determine what amount is appropriate for the use of a particular standard. On the basis of such a determination, the proportion of a specific patent proprietor in the standard must then be determined.**

**12. A control calculation via a top-down analysis is possible at least whenever the patent proprietor has a significant share of the standard. For the very extensive mobile communications standard, a share of one percent is sufficient to the Board's conviction. Smaller standards may require a higher percentage.**

**13. The unit price used should necessarily be based on an average value for certain product categories. This means that, for certain categories, a product of a medium nature and quality should be used. Because there are considerable price differences for the end products, which are not due to improved standard functionality, but rather due to a particularly attractive brand, a particularly high-quality camera or particularly functional software. It would not be compatible with the idea of a fair balance of interests if the manufacturer of high-quality branded products had to pay a higher price for the same functionality than the manufacturer of cheaper or cheapest products.**

**Keyword:**

Market dominance

**References:**

MittdtPatA 2026, 124

GRUR-RS 2026, 791

LSK 2026, 791

## Tenor

I. The defendants are sentenced,

1. If the court avoids a fine to be set by the court for each case of the infringement up to EUR 250,000.00 – as an alternative, in ordinary detention – or in ordinary detention up to six months, in the case of repeated infringement up to a total of two years, whereby the ordinary detention is to be carried out on the legal representatives of the defendant, to refrain from acting against the applicant in each case;

A) wireless terminals that communicate wirelessly with a base wireless terminal;

To offer, place on the market and/or use in the Federal Republic of Germany and/or to import and/or possess for the aforementioned purposes,

Wherein the wireless communications terminal device comprises: A transceiver; and a processor for processing a radio signal received by the transceiver or a radio signal to be sent by the transceiver,

Where the processor is designed for:

Send to the base wireless terminal, a physical layer trigger-based protocol data unit (PPDU) using the transceiver, switching an enhanced distributed channel access (EDCA) parameter set, which is a set of parameters used for channel access, from a first EDCA parameter set to a second EDCA parameter set based on that, whether the base wireless terminal triggers the wireless terminal to participate in a multi-user up-link transmission;

Set a timer for the second EDCA parameter set based on whether a response to a MAC protocol data unit (MPDU) contained in the trigger-based PPDU is received when the timer for the second EDCA parameter set expires, stop an application of the second EDCA parameter set, calculate a random integer value within an access conflict window (CW),

Set a backoff timer based on the random integer value, and access a channel based on the backoff timer and a predetermined slot time,

Where each of the first and second EDCA parameter sets has a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW,

Where the processor is designed to determine when to set the timer for the second EDCA parameter set based on a response type requested by the MPDU contained in the trigger-based PPDU,

Where the MPDU contained in the trigger-based PPDU does not request an ACK, the processor is designed to set the timer for the second EDCA parameter set when the trigger-based PPDU ends sending,

(Direct violation of Claim 1 in conjunction with Claim 4 and Claim 5 of the EP 3 512 289)

B) to offer and/or supply wireless terminal equipment to customers for use in the territory of the Federal Republic of Germany in the Federal Republic of Germany,

Which are capable of performing an operating method of a wireless communications terminal communicating wirelessly with a base wireless communications terminal;

Where the method has:

Sending a physical layer trigger-based protocol data unit (PPDU) to the base wireless terminal, switching an enhanced distributed channel access (EDCA) parameter set, which is a set of parameters used for channel access, from a first EDCA parameter set to a second EDCA parameter set based on that, whether the base wireless terminal triggers the wireless terminal to participate in a multi-user up-link transmission;

Set a timer for the second EDCA parameter set based on whether the response to the MPDU contained in the trigger-based PPDU is received;

When the timer for the second EDCA parameter set expires, stop an application of the second EDCA parameter set;

Calculate a random integer value within an Access Conflict Window (CW);

Set a backoff timer based on the random integer value;

Accessing a channel based on the backoff timer and a predetermined slot time; and sending the data over the channel,

Where each of the first and second EDCA parameter sets has a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW;

(Indirect violation of claim 12 of EP 3 512 289)

2. To provide the applicant with information in electronic form, in the alternative, in writing and in an orderly statement, together with supporting documents; such as invoices or delivery notes or receipts, in electronic form, or alternatively in writing, accompanied by the information in electronic form as an Excel spreadsheet (xls file), to what extent they are the ones referred to in point I.1. Has committed acts since 26 February 2022, and this is indicated

(A) the quantity of products delivered, received or ordered, and the names and addresses of manufacturers, suppliers and other previous owners, as well as the prices paid;

(B) the individual deliveries, broken down by quantity, time and price of delivery, including invoice numbers, and the respective type designations and the names and addresses of the customers, including the points of sale for which the products were intended;

(C) the individual tenders, broken down by quantity, time and price of the tender and the respective type designations, as well as the names and addresses of the recipients of the tender;

D) the advertising carried out, broken down by means of advertising, the number of circulation, the period of distribution and the area of distribution, in the case of Internet advertising of the domain, the number of access and the number of service periods, and in the case of direct advertising, such as newsletters, the names and addresses of the recipients;

(E) the cost of profit achieved, broken down by cost factor;

Where appropriate, the defendant reserves the right to disclose the names and addresses of the recipients of the offer and of non-commercial purchasers instead of the plaintiff to a sworn auditor established in the Federal Republic of Germany, to be designated by the latter and bound to secrecy to the plaintiff; provided that the defendant bears the costs incurred by the auditor and at the same time authorizes him to inform the applicant, upon request, whether certain recipients of the offer or non-commercial customers are included in the accounts issued;

3. The above mentioned in point I.1. Products placed on the market in the Federal Republic of Germany since 26 February 2022, with reference to the patent-infringing state of the products and with a binding commitment to withdraw them from the distribution channels, reimburse any charges and cover the necessary packing and transport costs, customs and storage costs associated with the return, or remove such products from distribution channels definitively by taking back those products;

4. Those in their direct or indirect possession or possession, as set out in point I.1 above. To return the products to a bailiff to be appointed by the applicant for destruction at the cost of the defendant.

II. It is established that the defendant is obliged to compensate the applicant for all damage suffered by it and SK Telecom Co., Ltd. By means of the provisions of point I.1. Acts committed since February 26, 2022 have arisen and will still arise.

III. The defendants shall bear the costs of the dispute.

IV. The judgment is in point I.1. Preliminary enforceable against a security of EUR 3,500,000.00, in Section I.2 against a security of EUR 50,000.00, in Sections I.3 and I.4 taken together against a security of EUR 150,000.00 and in Section III. against a security of 110 percent of the amount to be enforced in each case.

## The facts

**1**
The applicant claims the defendant for alleged infringement of European patent 3 512 289 B1 entitled " Wireless communication method with improved channel access and wireless communication terminal therewith".

**2**
The applicant is jointly represented by SK Telecom, Ltd. Proprietor of European patent 3 512 289 B1 filed on 7 September 2017, claiming the priority of several South Korean patent applications, including KR 20160147189 of 6 November 2016 (Annex K 01, hereinafter referred to as the patent in suit). The application was published on 17 July 2019 and the notice of grant was published on 26 January 2022. In a pleading dated 17 2 September 2025 (Annex HE 1), the defendant filed an action for annulment before the Federal Patent Court (doc. 4 Ni 31/25). The advisory decision pursuant to § 83 para. 1 PatG is not yet available.

**3**
Claims 1, 4, 5 and 12, which are relevant here, are as follows in the language of the proceedings:

" Claim 1:

" A Wireless Communication Terminal (100) that wirelessly communicates with a base Wireless Communication Terminal, the Wireless Communication Terminal comprising:

a transceiver (120); and a processor (110) for processing a radio signal received through the transceiver (120) or a radio signal to be transmitted through the transceiver (120), wherein the processor (110) is configured to:

Transmit, to the base wireless communication terminal (200), a trigger-based physical layer protocol data unit, PPDU, using the transceiver (120), switch an enhanced distributed channel access, EDCA, parameter set, which is a set of parameters used for the channel access, From a first EDCA Parameter Set to a second EDCA Parameter Set based on whether the Base Wireless Communication Terminal (200) Triggers a multiuser uplink transmission participation of the Wireless Communication Terminal (100), Set a second EDCA parameter set timer based on if a response to a MAC protocol data unit, MPDU, included in the trigger-based PPDU is received when the second EDCA parameter set timer expires, terminate an application of the second EDCA parameter set, Calculate a random integer value within a contention window, CW, Set a backoff timer based on the random integer value, and access a channel based on the back off timer and a predetermined slot time, wherein each of the first and second EDCA parameter sets comprises a minimum value, CWmin, of the CW and a maximum value, CWmax, of the CW.';

Claim 4: The wireless communication terminal (100) of claim 1, wherein the processor (110) is configured to determine when to set the second EDCA parameter set timer based on a type of responding requested by the MPDU included in the trigger-based PPDU.

Claim 5: The wireless communication terminal (100) of claim 4, wherein when the MPDU included in the trigger-based PPDU does not request an ACK, the processor (110) is configured to set the second EDCA parameter set timer when the transmission of the trigger-based PPDU ends.

Claim 12: An operation method of a wireless communication terminal (100) that wirelessly communicates with a base wireless communication terminal, the method comprising:

Transmitting a trigger-based physical layer protocol data unit, PPDU, to the base wireless communication terminal;

Switching an enhanced Distributed Channel Access, EDCA, Parameter Set, which is a set of parameters used for the Channel Access, From a first EDCA Parameter Set to a second EDCA Parameter Set based on whether the Base Wireless Communication Terminal Triggers a Multiuser Uplink Transmission Participation of the Wireless Communication Terminal;

Setting a second EDCA parameter set timer based on if the response to the MPDU included in the trigger-based PPDU is received; when the second EDCA parameter set timer expires, terminating an application of the second EDCA parameter set;

Calculating a random integer value within a contention window, CW; Setting a backoff timer based on the random integer value;

Accessing a channel based on the back off timer and a predetermined slot time; and transmitting the data through the channel, wherein each of the first and second EDCA parameter sets comprises a minimum value, CWmin, of the CW and a maximum value, CWmax, of the CW."

**4**

The plaintiff is a South Korean research and development company specializing in wireless communications and multimedia technologies.

**5**

1) is a Taiwan-based company that manufactures computer hardware and consumer electronics under the ASUS trademark. 2), a defendant resident in Germany, is a 100% subsidiary of 1) and acts as a sales partner and service branch for 1) defendant products in Germany. 3), also a German resident, is an independent distributor of 1) and 2), responsible for the distribution of ASUS products in Germany, France, the Netherlands and other European countries.

**6**

The plaintiff is attacking the ASUS models that implement the Wi-Fi 6 standard, including the Wi-Fi 6 compatible smartphone " Zenfone 11 Ultra" , various Wi-Fi 6 compatible laptops such as the " ASUS Zenbook p. 13" , Wi-Fi-6 compatible mini-PCs such as the " ASUS Chromebox 4" and Wi-Fi-6 compatible all-in-one PCs such as the " ASUS AiO E3 (E3402)" (hereinafter referred to as the "Attempted Embodiments").

**7**

It is undisputed between the parties that the contested embodiments comply with the IEEE-managed standard " IEEE Std 802.11ax™ -2021"

(Appendix K 06). This standard is marketed as " Wi-Fi 6".

**8**

The parties have so far been unsuccessful in negotiating a licensing of the " Wi-Fi 6 Pool" managed by Sisvel S.A., which includes, among other things, the plaintiff's patent and other patents, or alternatively a licensing of the

" Wi-Fi 6" portfolios of the applicant and SK Telecom Ltd.

**9**

SK Telecom Ltd. Has assigned to the plaintiff its claims for damages against the defendant concerning the patent in suit, insofar as they exist.

**10**

The plaintiff submits that the contested embodiments infringe claim 1 of the patent in connection with claims 4 and 5 directly and verbatim, because the Wi-Fi 6 standard implements the teaching of the patent in suit. In addition, claim 12 of the patent in suit was indirectly infringed by the marketing of the contested embodiments.

**11**

The defendant's objection to compulsory licensing under antitrust law was not contagious; the applicant had made FRAND-compliant offers to the defendant, but the defendants were not willing to license.

**12**

The defendant's submissions are not liable to cast doubt on the existence of the patent in suit, so that a suspension of the dispute in respect of the pending action for annulment is ruled out. The patent in suit effectively claimed the priority of the South Korean patent application KR 20160147189 of 6 November 2016.

**13**

The applicant most recently requested that:

I. order the defendants,

1. If the court avoids a fine to be set by the court for each case of the infringement up to EUR 250,000.00 – as an alternative, in ordinary detention – or in ordinary detention up to six months, in the case of repeated infringement up to a total of two years, whereby the ordinary detention is to be carried out on the legal representatives of the defendant, to refrain from acting against the applicant in each case;

A) wireless terminals that communicate wirelessly with a base wireless terminal;

To offer, place on the market and/or use in the Federal Republic of Germany and/or to import and/or possess for the aforementioned purposes,

Wherein the wireless communications terminal device comprises: A transceiver; and a processor for processing a radio signal received by the transceiver or a radio signal to be sent by the transceiver,

Where the processor is designed for:

Send to the base wireless communications terminal, a physical layer trigger-based protocol data unit (PPDU) using the transceiver, switching an enhanced distributed channel access (EDCA) parameter set, which is a set of parameters used for channel access, from a first EDCA parameter set to a second EDCA parameter set based on that, whether the base wireless terminal triggers the wireless terminal to participate in a multi-user up-link transmission;

Set a timer for the second EDCA parameter set based on whether a response to a MAC protocol data unit (MPDU) contained in the trigger-based PPDU is received when the timer for the second EDCA parameter set expires, stop an application of the second EDCA parameter set, calculate a random integer value within an access conflict window (CW),

Set a backoff timer based on the random integer value, and access a channel based on the backoff timer and a predetermined slot time,

Where each of the first and second EDCA parameter sets has a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW,

(Immediate violation of device claim 1 of EP 3 512 289) when the processor is designed to determine, based on a response type requested by the MPDU contained in the trigger-based PPDU, when the timer for the second EDCA parameter set is to be set,

(Direct violation of claim 1 in conjunction with claim 4 of EP 3 512 289) if the MPDU contained in the trigger-based PPDU does not request an ACK, the processor is designed to set the timer for the second EDCA parameter set when the sending operation of the trigger-based PPDU ends,

(Direct violation of Claim 1 in conjunction with Claim 4 in conjunction with Claim 5 of EP 3 512 289)

B) to offer and/or supply wireless terminal equipment to customers for use in the territory of the Federal Republic of Germany in the Federal Republic of Germany,

Which are capable of performing an operating method a wireless communications terminal communicating wirelessly with a base wireless communications terminal;

Where the method has:

Sending a physical layer trigger-based protocol data unit (PPDU) to the base wireless terminal, switching an enhanced distributed channel access (EDCA) parameter set, which is a set of parameters used for channel access, from a first EDCA parameter set to a second EDCA parameter set based on that, whether the base wireless terminal triggers the wireless terminal to participate in a multi-user up-link transmission;

Set a timer for the second EDCA parameter set based on whether the response to the MPDU contained in the trigger-based PPDU is received;

When the timer for the second EDCA parameter set expires, stop an application of the second EDCA parameter set;

Calculate a random integer value within an Access Conflict Window (CW);

Set a backoff timer based on the random integer value;

Accessing a channel based on the backoff timer and a predetermined slot time; and sending the data over the channel,

Where each of the first and second EDCA parameter sets has a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW;

(Indirect violation of procedural claim 12 of EP 3 512 289)

2. To provide the applicant with information in electronic form, in the alternative, in writing and in an orderly statement, together with supporting documents; such as invoices or delivery notes or receipts, in electronic form, or in writing, accompanied by the information in electronic form as an Excel spreadsheet (xls file), to what extent it has committed the acts referred to in A.I. since 26 February 2022, stating

(A) the quantity of products delivered, received or ordered, and the names and addresses of manufacturers, suppliers and other previous owners, as well as the prices paid;

(B) the individual deliveries, broken down by quantity, time and price of delivery, including invoice numbers, and the respective type designations and the names and addresses of the customers, including the points of sale for which the products were intended;

(C) the individual tenders, broken down by quantity, time and price of the tender and the respective type designations, as well as the names and addresses of the recipients of the tender;

D) the advertising carried out, broken down by means of advertising, the number of circulation, the period of distribution and the area of distribution, in the case of Internet advertising of the domain, the number of access and the number of service periods, and in the case of direct advertising, such as newsletters, the names and addresses of the recipients;

(E) the cost of profit achieved, broken down by cost factor;

Where appropriate, the defendant reserves the right to disclose the names and addresses of the recipients of the offer and of non-commercial purchasers instead of the plaintiff to a sworn auditor established in the Federal Republic of Germany, to be designated by the latter and bound to secrecy to the plaintiff; provided that the defendant bears the costs incurred by the auditor and at the same time authorizes him to inform the applicant, on request, whether certain recipients of the offer or non-commercial customers are included in the accounts issued;

3. To recall from the distribution channels the products referred to in point A.I. above and placed on the market in the Federal Republic of Germany since 26 February 2022, with reference to the patent-infringing state of the products found by the court, and with a binding commitment, reimburse any charges and cover the necessary packing and transport costs, customs and storage costs associated with the return, or remove such products from distribution channels definitively by taking back those products;

4. To return the products in their direct or indirect possession or in their possession, as referred to in point A.I. above, to a bailiff to be appointed by the applicant for destruction at the cost of the defendant.

II. declare that the defendant is obliged to compensate the applicant for all damage suffered by it and SK Telecom Co., Ltd. By means of the provisions of point I.1. Acts committed since February 26, 2022 have arisen and will still arise.

The defendants request that:

I. dismiss the action,

II. In the alternative, stay the proceedings against the German part of the European patent EP 3 512 289 pending the final decision of the nullity proceedings.

The applicant opposes the request for suspension.

**14**

The defendants claim that the contested embodiment does not realize feature 4 of claims 1 and 12.

**15**

The defendant raised the objection of compulsory licensing under antitrust law on the ground that the applicant did not make a FRAND-compliant license offer to it.

**16**

In addition, the defendant considers that the patent in suit is not legally valid, since the patent claim asserted is affected by the state of the art in a way that is detrimental to novelty. In this context, it is important that the patent in suit cannot claim the priority of South Korean patent applications. According to § 148 ZPO, the infringement proceedings in question were to be suspended with regard to the pending nullity proceedings.

**17**

The presentation of the antitrust objection is presented in a non-confidential and a non-confidential part (and blackened for third parties) within the context of the reasons for the decision.

**18**

Reference is also made to the parties' pleadings and annexes, as well as to the minutes of the oral proceedings of 8 January 2026.

**Reasons for decision**

**19**

The admissible action is well founded. It follows from the correct interpretation of the contested feature 4 of the patent in suit (A. I.) that the Wi-Fi 6 standard and thus the contested embodiments make use of the teaching of the patent in suit with regard to all features (A. II., III.). The antitrust objection to compulsory licensing does not prevail (A. IV). This results in the tendered legal consequences (A. V.). A suspension of the proceedings in accordance with § 148 ZPO with regard to the invalidity proceedings was not appropriate on the basis of the documents (b.). Accordingly, the secondary consequences had to be determined (C.).

A..

I.

**20**

The patent in suit relates to a wireless communication method with improved channel access and to a wireless communication terminal which uses this method (para. [0001]).

**21**

1.As regards the prior art, the patent in suit states that wireless communication technology allows mobile devices such as laptops or smartphones to be connected wirelessly to the Internet (para. [0002]). The Institute of Electrical and Electronics Engineers (IEEE) developed and commercialized several wireless communication standards under the name "Wireless LAN" under the initial identifier in 802.11, which were continuously improved in terms of higher transmission speed and higher transferable data volumes (para. [0003] et seq.). As several terminals usually communicate wirelessly with a base device, it is necessary to efficiently use predetermined channels for communication between terminals and base devices. Specifically,

a technology that is able to use bandwidth efficiently by simultaneously transmitting data between a large number of end and base devices is needed (para. [0007]).

The South Korean patent specification KR 2015 0073165 A discloses a method of channel access by a terminal device, which receives a channel allocation factor, on the basis of which it selects an access variable and specifies a CW value (for this purpose immediately) (para. [0008]).

Patent specification WO 2016/112146 A1 discloses a device for wireless communication with a processor that can combine the use of the channel by a single terminal device (" single user frame" ) with the use of the channel by several terminals (" MU communication" for " multi-user communication" ) (para. [0009]).

The patent also mentions the South Korean patent specification KR 2016 0045023, which describes a method and a device for accessing an uplink channel in a highly efficient WLAN (para. [0010]).

The US patent specification US 2016/057657 A1 discloses a method for data transmission to a large number of end devices in a WLAN (para. [0011]).

Finally, US patent specification US 2010/150116 A1 describes a method for competing channel access, in which the EDCA parameters are (immediately) updated for groups of terminals in a WLAN (para. [0012]).

2.The patent in suit sets itself against the background of the described requirement of a technology capable of efficiently using bandwidth by simultaneous data transmission between a large number of end and base devices, the task of providing a wireless communication terminal that uses improved distributed channel access (para. [0013]).

3.As a solution, the patent in suit presents a device according to claims 1, 4 and 5 as well as a method according to claim 12. Claims 1, 4 and 5 asserted by the applicant in combination can be divided as follows:

Claim 1:

1. Wireless communication terminal (100), which communicates wirelessly with a basic wireless communication terminal, wherein the wireless communication terminal has: A transmitter receiver (120); and a processor (110) for processing a radio signal received by the transmitter receiver (120) or a radio signal to be sent by the transmitter receiver (120), wherein the processor (110) is designed for:

2. Sending to the base wireless communications terminal (200), a physical layer (PPDU) trigger-based protocol data unit using the send receiver (120),

3. Switching a parameter set for enhanced distributed channel access (EDCA), which is a set of parameters used for channel access, from a first EDCA parameter set to a second EDCA parameter set based on whether the base wireless terminal (200) triggers the participation of the wireless communication terminal (100) in a multi-user uplink transmission;

4. Set a timer for the second EDCA parameter set based on whether a response to a MAC protocol data unit (MPDU) contained in the trigger-based PPDU is received;

5. When the timer for the second EDCA parameter set expires, stop an application of the second EDCA parameter set,

6. Calculate a random integer value within an Access Conflict Window (CW),

7. Set a backoff timer based on the random integer value, and

8. Accessing a channel based on the backoff timer and a predetermined slot time,

9. Where each of the first and second sets of EDCA parameters has a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW,

Claim 4: Wireless communication terminal (100) according to claim 1, wherein the processor (110) is designed to determine, on the basis of a response type requested by the in the trigger-based PPDU contained MPDU, when the timer for the second EDCA parameter set is to be set.

Claim 5: Wireless communication terminal (100) according to claim 4, wherein, when the MPDU contained in the trigger-based PPDU does not request an ACK, the processor (110) is designed to set the timer for the second EDCA parameter set when the transmission operation of the trigger-based PPDU ends.

Claim 12 is constructed according to claim 1 and relates to the execution of the corresponding method.

### 30

4.In view of the discussion between the parties on the interpretation of feature 4 at issue of claims 1 and 12, the following statements are made. The board assumes that the skilled person is a higher education telecommunications engineer with several years of professional experience in the development and standardization of communication systems, in particular WLAN.

### 31

A. The patent in suit relates to the simultaneous use of a wireless communication channel for sending data by several terminals (" multi-user uplink transmission", feature 3), whereas traditionally only one terminal could use the channel between the terminals and the base device (typically a router) for sending data at the same time.

### 32

In the state of the art, channel access was carried out in such a way that each terminal competed for access independently by occupying a timer (" timer" ) with a certain CW value (for " contention window" ) and the timer after a certain period of time within which the channel was unoccupied (" idle" ) (" Arbitration Interframe Space", AIFS, see para. [0045], [0048]). When the AIFS expired and the timer was then at zero, the terminal was allowed to use the channel. In the event of a collision between two terminals – that is, if a second terminal wants to use the channel at the same time – the first terminal restarted the timer (para. [0044]). This method is represented by features 6 to 8 of the patent in suit.

### 33

The Enhanced Distribution Channel Access (EDCA) adds the ability to prioritize the data to be transferred. The data was divided into four different categories (" Access Categories", AC). Both the AIFS and CW values and the possible time period for transmission (abbreviated TXOP) could therefore be reduced or increased, depending on the priority of the data to be transmitted (para. [0045]). To this extent, we are talking about the EDCA parameters. For example, telephone calls that do not allow interruption could be equipped with more aggressive parameters. However, only one end device sent to the base device at a given time.

### 34

The IEEE standard 802.11ax (Annex K 06), marketed as Wi-Fi 6, has created the possibility for multiple terminals to communicate simultaneously with the base device. This is true both in the downlink (i.e. for data transmission from the base to the end device, in this respect multiple use was possible as well as before Wi-Fi 6) and in the uplink (i.e. for data transmission from the end to the base device). This is called DL MU-MIMO (Downlink Multiuser Multiple Input Multiple Output) and UL MU-MIMO (Uplink Multiuser Multiple Input Multiple Output) (see Appendix K 06, No. 27.3.3) and is done using the so-called OFDMA technology (Orthogonal Frequency Division Multiple Access). The choice of a terminal for the MU-MIMO mode and the time of transmission in this mode is determined by the base device, not by the respective terminal.

### 35

Although an end device supports this new standard, it does not always operate in MU-MIMO mode, but continues to participate in the EDCA process. In addition, not all end devices in a network necessarily support Wi-Fi 6, which should also be able to work with older devices (backward compatibility). For these

two reasons, it is necessary to have a method for appropriately distributing channel access between the MU-MIMO mode and the EDCA method.

**36**

This is the task of the patent in suit. The core of the invention is that an end device selected by the base device for transmission in MU-MIMO mode should have worse EDCA parameters for a certain period of time after completion of this transmission than an end device not selected for transmission in MU-MIMO mode. This is the case in the case of the change claimed by feature 3 from the ordinary EDCA parameter set to a " worse" ; the feature calls the " second EDCA parameter set" , in the description it is also referred to as " MU EDCA parameter set" (see paragraph [0048]). Otherwise, the terminal, which has already been favored by the selection for MU-MIMO mode, could compete with the other terminals on the basis of the usual EDCA parameters for new channel access; instead, a balance should be created in favor of the other terminals.

**37**

B. The feature 4 at issue between the parties requires further clarification.

**38**

This feature requires " Setting a timer for the second EDCA parameter set based on whether a response to a MAC protocol data unit (MPDU) contained in the trigger-based PPDU is received."

**39**

(1) The starting point for understanding feature 4 is that the base device (typically the router) selects an end device for multi-user uplink transmission at a given time. In the words of the patent in suit: The base device triggers the multi-user uplink transmission (" trigger" , see para. [0046]). The terminal then sends a " trigger-based PPDU" according to feature 2. According to this feature, PPDU stands for " physical layer protocol data unit". This is the data packet that is sent wirelessly from the end device to the base device. This data packet contains the so-called MAC Protocol Data Unit (MPDU). The " Setting the Timer for the Second EDCA Parameter Set" then affects the time period within which the

"Worse" second EDCA parameter set applies to the end device that participated in a multi-user uplink transmission. The condition for setting the timer is regulated in feature 4.

**40**

(2) The defendants consider that feature 4 requires the actual receipt of a response from the base unit to the dispatch of the PPDU in order to set the timer for the second EDCA parameter set. The defendants substantiate this view with the wording of the feature and with Fig. 16a of the patent in suit and the corresponding description in para. [0091].

**41**

aa. The relevant English wording (" based on if a response … is received" ) suggests that the timer setting depends on whether a response is received or not.

**42**

bb. This understanding is supported by Fig. 16a and the accompanying para. [0091] (a picture of Fig. 16a, para. 14 of the duplicate, explained by the defendants, is taken below):



The change from the conventional parameter set to the parameter set for multi-user transmissions occurs after receiving the response from the base unit. Accordingly, para. [0091] with reference to Fig. 16a states:

" The first station STA1 receives the M-BA frame in response to the trigger-based PPDU HE TRIG PPDU from the base wireless communication terminal. When the first station STA1 completes reception of the M-BA frame, in relation to the first station STA1, the base wireless communication terminal applies the MU EDCA parameter to an AC which the M-BA frame indicates as an ACK. At this time, the first station STA1 sets the MU EDCA timer for an AC which the M-BA frame indicates as an ACK."

Where " STA1" (" Station" ) stands for a terminal, " M-BA frame" stands for a collective response, and " ACK" stands for an ordinary response from the base device to the data packet sent by the terminal. " AC" stands for a category of access to data.

(3) This interpretation is not convincing in the Board's view. Rather, feature 4 claims the constellation that the timer is set, depending on whether the PPDU requires a response from the base device or not, upon receipt of the response or already upon dispatch of the PPDU.

aa. The wording does not necessarily indicate the understanding of the defendant. In German and English, the wording " based on whether a response is received" or " based on if a response … is received" does not specify that the timer is set in the case of a response and not in the other. Rather, this formulation allows for an understanding that the timer is set to different scales depending on whether a response has been received or not.

bb. The description generates an understanding that the timer will be set when the response is received or when the PPDU is sent, depending on whether the PPDU requires a response from the base unit or not. In contrast, Fig. 16a and the corresponding description in para. [0091] do not lead to the view expressed by the defendants.

In para. [0095] it is stated that the terminal device in the embodiments described above (including those described in Fig. 16a) can adjust the timer taking into account what type of response is required by the MPDU; this is explained with reference to Figures 17 and 18. That

Type of response indicates that an MPDU can indicate whether or not it is waiting for a response from the base device. This is explained in detail in paragraph [0097]. For example, in data transmissions where repetition brings disadvantages (e.g. audio streaming), the requirement of a response is dispensed with. Paragraph [0091] therefore only considers the situation where the MPDU requires an answer.

Fig. 18 and the corresponding paragraph [102], on the other hand, explain in detail that the timer for the second EDCA parameter set (" MU EDCA timer" ) in the case of an MPDU that does not require a response (" does not request an ACK" ) can start at the moment when the data transmission ends in MU-MIMO mode.

Cc. This understanding of feature 4 is also supported by the existence of subclaim 5. The latter detects the constellation that the PPDU does not request a response and therefore the timer must be set when the sending of the trigger-based PPDU ends. However, this constellation of claim 1 must therefore be included. However, on the basis of the defendant's view, it would not be.

dd. The functional consideration provided also supports this result. There is no reason why the compensation between the terminals as intended by the patent in suit, depending on whether or not they have participated in the multi-user uplink transmission, should depend on whether or not the transmitted data is those for which the MPDU requires a response from the base unit.

ee. The defendant's argument that a setting of the above depending on which "response type" is requested by the MPDU is covered by claim 4 does not lead to any other result.

**53**

To what extent one can conclude from the version of a subclaim on the understanding of the main claim is a question of the individual case (BGH, X ZR 114/13, GRUR 2016, 1031 para. 15 – Heat exchanger). Even if the subject-matter of a sub-claim is regularly narrower than that of the underlying main claim, it is not necessarily possible to derive from its existence alone: that the main claim must cover another subject-matter and that its realization must also be possible in a manner that does not simultaneously meet the features of the sub-claim (BGH, X ZR 93/17, BeckRS 2019, 17249 para. 17 – side impact protection for head airbag).

**54**

In the present case, there is no evidence in the patent in suit – as shown – that feature 4 is to be understood in the sense of the defendant in such a way that the timer is to be set only upon receipt of a response from the base device.

II.

**55**

Taking into account the above interpretation of the feature at issue between the parties, it must be affirmed that claim 1 of the patent in suit is being implemented verbatim by the Wi-Fi 6 standard and thus also by the contested embodiments.

**56**

1.The attacked embodiments represent in each case in the sense of feature 1 wireless communication terminals, which communicate wirelessly with a base wireless communication terminal. This is assumed by Wi-Fi 6, which refers to wireless endpoints as " High Efficiency (HE) STA", where " STA" stands for " Station".

**57**

2.Feature 2 is realized because the terminals according to Wi-Fi 6 send to the base wireless communication terminal a trigger-based protocol data unit of the physical transmission layer (PPDU) using the send receiver.

**58**

In Section 4.3.15a of Appendix K 06 concerning the components of the IEEE 802.11 architecture, with regard to the base wireless terminal, which is referred to there as " HE AP" (" high efficiency access point" ), it is stated:

An HE AP sends a Trigger frame to initiate UL MU operation using UL OFDMA or UL MU-MIMO transmissions or a frame containing a TRS Control subfield to initiate UL OFDMA transmissions. The frame initiating these transmissions in the uplink direction is a triggering frame. The triggering frame identifies non-AP STAs participating in UL MU operation and assigns RUs and/or spatial streams to these STAs. Multi-STA BlockAck frames can be used by the AP to acknowledge the frames transmitted by multiple non-AP STAs. The scheduling of these Trigger frames can be set up between a non-AP STA and the AP using TWT operation to save power and reduce collisions.

**59**

The basic wireless communication terminal thus triggers a multi-user uplink transmission (" UL MU-MIMO" ) through the terminal (" non-AP STA" ) by sending a " trigger frame".

**60**

This transfer specifically concerns a trigger-based physical layer protocol data unit (PPDU). Section 9.3.1.22.1 of Appendix K 06 concerning the "trigger frame format" states:

A Trigger frame allocates resources for and solicits one or more HE TB PPDU transmissions. The Trigger frame also carries other information required by the responding STA to send an HE TB PPDU.

**61**

3.Wi-Fi 6 also provides for 3 the switching of an enhanced distributed channel access (EDCA) parameter set, which is a set of parameters used for channel access, from a first EDCA parameter set to a second

EDCA parameter set based on: Whether the base wireless terminal triggers the wireless terminal to participate in a multi-user uplink transmission.

In Section 26.2.7 of Appendix K 06, under the heading " EDCA operation using MU EDCA parameters", it is stated:

> A non-AP HE STA that receives a Basic Trigger frame that contains a User Info field addressed to the STA shall update its CWmin[AC], CWmax[AC], AIFSN[AC], and MUEDCATimer[AC] state variables to the values contained in the dot11MUEDCATable, for all the ACs from which at least one QoS Data frame was transmitted successfully in an HE TB PPDU in response to the Trigger frame. A QoS Data frame is

The end device, which receives a trigger frame for participation in a multi-user-zer-uplink transmission, should update its EDCA parameters, namely the lower and upper CW value (i.e. the duration of the expiration timer), the arbitration interframe space (AIFS, i.e. the time period until the start of the timer) and the MU EDCA timer (i.e. the time period, for which the second EDCA parameter set applies). All this is to be done for all the access categories (" ACS" , " Access Categories" ) for which at least one data frame was successfully sent using the trigger-based PPDU.

Prior to the update, the usual EDCA parameters, as they already appear from the traditional 802.11 standard, i.e. before Wi-Fi 6, apply (see Appendix K 07, section 10.2.3.2 in conjunction with section 9.4.2.28).

4.Also feature 4 is realized by Wi-Fi 6. Setting a timer for the second EDCA parameter set is based on whether a response to a MAC protocol data unit (MPDU) contained in the trigger-based PPDU is received.

A. The defendants, on the other hand, hold that feature 4 was not implemented even on the basis of the interpretation found here, because the base unit always sends a reply according to the Wi-Fi 6 standard. But the feature could not be realized, since it requires two different options.

(1) The defendants base their opinion on Section 10.3.2.13.3 of Annex K 06, which reads under the heading " Acknowledgment procedure for UL MU transmission":

> An AP that receives frames from more than one STA that are part of an UL MU transmission (see 9.42.2) and that require an immediate acknowledgment (i.e., a QoS Data frame with Normal Ack or Implicit BAR ack policy or a Management frame other than an Action No Ack frame), shall send an immediate acknowledgment in either an SU PPDU (see 26.4.4.5) or an HE MU PPDU (see 26.4.4.6). The Multi-STA

The Wi-Fi-6 standard therefore defines that the basic terminal (AP) should always respond to the receipt of data frames by more than one terminal (STA) participating in a multi-user uplink transmission (UL MU Transmission) either in the form of an SU PPDU or in the form of a HE MU PPDU. No use is made of the principle of not requesting a reply. In this case, however, the feature will not be fulfilled, since it provides for the option that no response will be received due to its formulation (" whether an answer is received..." ).

(2) Furthermore, the feature is not realized because the start of the timer according to the Wi-Fi 6 standard depends on the respective access category; therefore, there are different timers for each of the four different access categories. This follows from section 26.2.7 of Appendix K 06, which is headed with " EDCA Operation using MU EDCA Parameters":

> corresponding to that AC shall be suspended until the MUEDCATimer[AC] reaches 0 or is reset to 0. The updated MUEDCATimer[AC] shall start at the end of the immediate response if the transmitted HE TB PPDU contains at least one QoS Data frame for that AC that requires immediate acknowledgment, and shall start at the end of the HE TB PPDU if the transmitted HE TB PPDU does not contain any QoS Data frames for that AC that require immediate acknowledgment.

The timer should therefore start after the response to the transmitted PPDU contains at least one data frame " of this access category " (" for that AC" ). Such a dependency of the start of the timer on a certain access category is not included in feature 4.

**71**

B. This interpretation of the Wi-Fi 6 standard is not convincing in the Board's view.

**72**

(1) Section 10.3.2.13.3 of the WiFi 6 standard quoted by the defendant makes it clear that the base unit only sends an answer (" immediate acknowledgment" ) if the data frames sent by the terminal unit require a response (" and that require an immediate acknowledgment" ). The addition of brackets also makes it clear that this excludes "No Ack" data frames. Section 26.2.7 quoted by the defendant also makes this clear: The timer for a certain access category (" MUEDCATimer[AC]" ) should only start after the reply if the PPDU sent by the terminal contained at least one frame of data from the access category, which required an immediate reply. Otherwise, the timer should start when the PPDU is stopped sending.

**73**

Contrary to the defendant's view, the Wi-Fi 6 standard actually provides for data frames that do not require a response from the base unit. This follows from the wording given in the previous paragraph. Because there is no need to establish the condition for sending a response that the data frame requires a response if it always required a response. In addition, it is also clear from section 26.5.2.4 that there are constellations in which the data frame sent by the terminal does not require a response:

— Otherwise, the S-MPDU shall be a QoS Data, QoS Null, or Management frame that does not solicit an immediate acknowledgment.

**74**

An S-MPDU is a single, non-aggregated MPDU. The opposite is the A-MPDU (aggregated MPDU). Contrary to the defendant's view, the patent in suit is not limited to A-MPDUs. Claim 1 does not make any specifications in this regard. The fact that Fig. 17 and the associated description refers to A-MPDUs cannot limit the claim.

**75**

(2) Nor does the reference to the access categories in Section 26.2.7 cited by the defendant lead to the infringement of the feature.

**76**

This reference is merely a clarification in such a way as to separate the timers for the respective access categories. However, each time it is about setting the timer for the " second EDCA parameter set" . The further subdivision of the "second EDCA parameter set" according to the access category used – according to the subdivision according to the first EDCA parameter set – is not excluded from feature 4.

**77**

5.Also feature 5 is realized. When the timer for the second EDCA parameter set expires, the second EDCA parameter set is terminated.

**78**

In Section 9.4.2.251 of Appendix K 06, under the heading " MU EDCA Parameter Set Element", it is stated:

In an infrastructure BSS, the MU EDCA Parameter Set element is used by the AP to control the use of EDCA by non-AP HE STAs following particular UL MU HE TB PPDU transmissions, as defined in 26.2.7. The most recent MU EDCA Parameter Set element received by a non-AP HE STA is used to update the appropriate MIB values.

**79**

Thus, the base device (AP) uses the second EDCA parameter set to control the end devices following the multi-user uplink transmission, as defined in more detail in section 26.2.7. The timer specifies the time period within which the endpoints use the second EDCA parameter set for each access category, as defined in more detail in section 26.2.7.

**80**

In Section 26.2.7, the following is then performed:

In a non-AP HE STA, each MUEDCATimer[AC] shall uniformly count down without suspension to 0 when its value is nonzero.

**81**

So, if the timer is down to zero, the end device should update its EDCA parameters – back to the first EDCA parameter set.

**82**

6.The Wi-Fi 6 standard also violates characteristics 6 through 8. Within an access conflict window (CW), a random integer value is calculated (characteristic 6). A backoff timer is set based on the random integer value (characteristic 7). The channel is then accessed based on the backoff timer and a predetermined slot time (characteristic 8).

**83**

The competing access method covered by features 6 to 8, which corresponds to the state of the art, is referred to in the traditional 802.11-standard as a "random backoff procedure" and described as follows (see section 10.3.3 of Appendix K 07):

A STA desiring to initiate transfer of Data frames and/or Management frames using the DCF shall invoke the CS mechanism (see 10.3.2.1) to determine the busy/idle state of the medium. If the medium is busy, the STA shall defer until the medium is determined to be idle without interruption for a period of time equal to EIFS when the last transition to idle medium was a result of a frame detected on the medium that was not received correctly, or equal to DIFS otherwise. After this DIFS or EIFS medium idle time, the STA shall then generate a random backoff count [defined by Equation (10-1)] for an additional deferral time before transmitting, unless the backoff counter already contains a nonzero value, in which case the selection of a random number is not needed and not performed. This process minimizes collisions during contention between multiple STAs that have been deferring to the same event.

$$\text{Backoff Count} = \text{Random}() \hspace{5cm} (10\text{-}1)$$

where

Random() = Pseudorandom integer drawn from a uniform distribution over the interval [0,CW], where CW is an integer within the range of values of the PHY characteristics aCWmin and aCWmax, aCWmin ≤ CW ≤ aCWmax.

NOTE—It is important that designers recognize the need for statistical independence of the random number streams between STAs.

The contention window (CW) parameter shall take an initial value of aCWmin. Every STA shall maintain a STA short retry count (SSRC) as well as a STA long retry count (SLRC), both of which shall take an initial value of 0. The SSRC shall be incremented when any short retry count (SRC) associated with any MPDU with

**84**

The " predetermined slot time" referred to in feature 8 is covered by the wording " until the medium is determined to be idle without interruption for a period equal to EIFS" in the third line of the first paragraph quoted. As soon as this period of time has expired, the end device should generate the timer based on a random value (" the STA shall then generate a random backoff count [defined by equation (10-1) ] for an additional deferral time before transmitting" , lower half of the first paragraph quoted), as provided for in feature 7. The random value should be taken from the interval between zero and the value " CW", where CW represents an integer (" integer") as specified by characteristic 6 (see insert " where random() = … " in the quoted section).

**85**

The Wi-Fi 6 standard incorporates this procedure in Section 26.2.7 by referring to the " EDCA Backoff Procedure" regulated in Section 10.23.2.2:

The MUEDCATimer[AC] state variable is updated with the value contained in the MU EDCA Timer subfield of the MU EDCA Parameter Set element. The backoff counter maintenance corresponding to the updated state variables shall follow the rules in 10.23.2.2, except that if AIFSN[AC] is 0, then the EDCAF corresponding to that AC shall be suspended until the MUEDCATimer[AC] reaches 0 or is reset to 0. The

**86**

7.The Wi-Fi 6 standard also violates feature 9, since each of the first and second EDCA parameter sets has a minimum value (CWmin) of the CW and a maximum value (CWmax) of the CW.

**87**

In this respect, the following section of Section 26.2.7 of Appendix K 06 is reproduced again, which shows the existence of the minimum and maximum values for both EDCA parameter sets:

A non-AP HE STA that receives a Basic Trigger frame that contains a User Info field addressed to the STA shall update its CWmin[AC], CWmax[AC], AIFSN[AC], and MUEDCATimer[AC] state variables to the values contained in the dot11MUEDCATable, for all the ACs from which at least one QoS Data frame was transmitted successfully in an HE TB PPDU in response to the Trigger frame. A QoS Data frame is transmitted successfully by the STA in an HE TB PPDU for an AC if it requires immediate acknowledgment and the STA receives an immediate acknowledgment for that frame, or if the QoS Data frame does not require immediate acknowledgment.

**88**

8. Claims 4 and 5 are also infringed by the Wi-Fi 6 standard.

**89**

As discussed in more detail in the explanation of the violation of feature 4 (above marginal 72), the processor is designed to determine, based on a response type requested by the MPDU contained in the trigger-based PPDU, when the timer for the second EDCA parameter set is to be set (claim 4).

**90**

At the same place it was explained that if the MPDU contained in the trigger-based PPDU does not request an ACK, the processor is designed to set the timer for the second EDCA parameter set when the sending operation of the trigger-based PPDU ends (claim 5).

**91**

This also makes it clear that the Wi-Fi-6 standard already violates claim 1 of the patent in suit, without combining it with claims 4 and 5. This finding is important for the discussion of the infringement of Claim 12 (immediately afterwards), since that is structured like Claim 1.

III.

**92**

Claim 12 of the patent in suit is also indirectly infringed.

**93**

The challenged embodiments realize in the operation of claim 12. They are thus suitable for the use of the invention. They are also a means which refers to an essential element of the invention, since they carry out all the process steps according to the claim. The defendants have designed and programmed the forms of infringement in such a way that they infringe claim 12, and they also expressly advertise the contested embodiments as "Wi-Fi 6" capable. They therefore know that the challenged embodiments are suitable and intended to be used for the use of the invention according to claim 12.

IV.

**94**

The defendant party's objection to compulsory antitrust licensing does not prevail.

1. Preliminary summary

**95**

The applicant has offered two different types of licensing: On the one hand, a bilateral license for the Wi-Fi 6 portfolio of the two patent holders Wilus and SK Telecom (hereinafter referred to as the " Wilus" portfolio) and on the other hand a license for the Wi-Fi 6 pool " Sisvel" in which the two patent holders have filed their Wi-Fi 6 patents.

**96**

Most recently, the defendant primarily sought a bilateral license and submitted corresponding license offers. The applicant, on the other hand, has always submitted offers with regard to both licensing channels.

**97**

The antitrust illegality of the conduct of the defendant party already results from the fact that the defendant party has not deposited any security that is based on the last license claim of the claimant party, as it corresponds to the requirements of the Higher Regional Court of Munich (OLG München, judgment of 20 March 2025, 6 U 3824/22). On the other hand, the defendant did not pay the last amount of the license offered by the defendant as a non-recoverable (final) advance payment to the defendant (partial payment obligation), as requested in the published notice of the Board of 14 July 2025 (19196 O 64/25 and 7 O 2750/25, GRUR-RS 2025, 7).

**98**

Instead, the defendant party has deposited an amount corresponding to its last offer – which was rejected by the defendant party (in fact the penultimate offer) – as security. However, the deposit of its own offer as security does not meet the requirements of the Higher Regional Court of Munich nor the requirements of the Board regarding the behavior of a patent user willing to license. The Board does not understand why the defendant party has deposited an amount of the specified amount, since the provision of such a security is not relevant for the assessment of the case under German law.

**99**

Irrespective of the insufficient security and the lack of a partial payment, the board assumes that both bids (Bilateral License and Pool License) are FRAND, and that the claimant does not exploit the licensing potential contained in the respective portfolio for both bids.

2. The facts (insofar as there are no confidentiality interests)

**100**

The applicant is a founding member of Sisvel's Wi-Fi 6 patent pool. Therefore, Licensees of Sisvel's Wi-Fi 6 pool are automatically licensed to the Applicant's respective patents. In addition, the applicant offers to license its patents (and SK Telecom's patents) under a bilateral licensing agreement. The parties are arguing about a license for all devices that are Wi-Fi 6 enabled. There is agreement that the license includes backward compatibility and therefore all patents of the previous standards (Wi-Fi 5, Wi-Fi 4, etc.) should be covered. The latest offers of the parties have not included the devices that make use of the Wi-Fi 7 standard. These Wi-Fi 7-enabled devices should be completely exempted from license negotiations. There should also be no licensing of patents for these devices that affect Wi-Fi 6 and down. Rather, these devices are to be the subject of a separate and subsequent agreement.

**101**

The applicant has submitted offers for a bilateral license which require confidentiality. The license rates for the Sisvel Wi-Fi 6 pool, on the other hand, are published on the Internet on the Sisvel homepage. They are:

Standard rate: 0.60 Euro Compliant rate: 0.50 Euro Enterprise rate: 3 Euro

**102**

According to the plaintiff, the standard rate is relevant until the time of the conclusion of a license agreement. The Compliant Rate is valid for the period after a contract is concluded. The unit price rate does not distinguish between the specific unit for which the person willing to use the standard would like to use the standard. It is therefore irrelevant whether it is a very cheap technical product, such as a toy, or a more expensive product, such as a personal computer (PC). For the present decision, the requirements of the enter-pry rate are irrelevant.

**103**

Finally, the parties negotiated a term of the license agreement until the end of 2028. For the bilateral license, the term should apply from 1 January 2021, for the pool license from 1 June 2021. Due to the different periods resulting from the different beginning of the license period, the quotations differ in terms of the number of units used.

**104**

At the time of the conclusion of the oral proceedings, both parties used in their calculations the quantities quoted by the applicant in an e-mail dated 6 February 2025 and based on information provided by the defendant party. This email is not available to the court, but excerpts from the defendant party were provided. In their bids, both parties have multiplied these quantities by perunit prices they consider

appropriate. The average per-unit price set by the claimant and the defendant was different by a low single-digit factor at the end of the oral proceedings (factor requiring confidentiality).

3. Examination standard

The starting point is the decision of the ECJ in Huawei v ZTE (C-170/13, GRUR 2015, 764) in the interpretation found by the Federal Court of Justice in the decisions FRAND objection I (KZR 2021/17, GRUR 2020, 961) and FRAND objection II (KZR 35/17, GRUR 36, 585). Furthermore, the board takes into account the decision of the Higher Regional Court of Munich in proceedings 6 U 3824/22 of 20 March 2025.

The examination of whether the proprietor of a standard essential patent can claim injunctive relief against an unlicensed user of that patent, or whether the user can oppose the injunctive relief that he has not been offered a license on FRAND terms, is governed by a multi-stage examination procedure. The 5th step of the case-law of the Munich Higher Regional Court, named below, follows.

Step 1: Notice of infringement by the patent proprietor

Step 2: Explanation of the license consent of the patent user

Step 3: Submission of a license offer by the patent holder

Step 4: Examination of the license offer by the patent user; in the event of non-acceptance, submission of an own offer within a short period of time (continuous license consent)

Step 5: If the patent proprietor rejects the patent user's offer, the patent user must provide security in accordance with " recognized business practices".

According to the OLG Munich, as a rule, a qualified security must be provided in the amount of the last license offer of the patent proprietor – an exception may apply if the offer of the patent proprietor is clearly and obviously excessive. In the view of the Higher Regional Court of Munich, the court seised does not normally have to examine the antitrust objection if no sufficient security has been provided. The patent user would then have to be ordered to refrain from doing so in the event of an established infringement (even if the proceedings are not to be suspended with regard to pending nullity proceedings).

In its published decision of guidance in Procedures 7 O 64/25 and 7 O 2750/25 (GRUR-RS 2025, 19196), the board gave its opinion on the exact requirements. Reference is made to these explanations. In summary, it is considered to be particularly important for the assessment of the license willingness whether the license seeker makes a partial payment. This partial payment obligation applies in a situation where there is no dispute between the parties that the license seeker is to make a payment and that the amount alone is in dispute. In any event, the undisputed amount between the parties must then be paid to the patent proprietor in such a way that he remains permanently with the patent proprietor. This is a deposit on the later license amount. The amount is based on the offer of the patent seeker and is therefore – if the parties negotiate a worldwide license – not limited to the territory of the Federal Republic of Germany.

In addition to the then advisory decision, the board states that, in addition to the obligation to pay an undisputed portion, there may be an obligation to provide supplementary security. When this is the case is determined by the individual case and depends on the amount of the difference between the two offers in a.) absolute numbers and b.) percent.

Specifically, supplementary security will be required if the defendant's offer is less than 60% of the claimant's claim and the difference amounts to more than US$10 million. In such a case, the defendant party shall provide a security corresponding to the amount corresponding to a license year, as far as a lump sum license is concerned (this means: If the claimant claims 100 for a period of 5 years and the defendant

offers 30, then an amount of 30 shall be paid definitively as a partial amount and a further amount of 20 shall be deposited as security).

**111**

However, the same applies if a defendant party has obtained or wishes to obtain an installment in another court in another jurisdiction. The Board has already referred to this case in the note of 14 July 2025 (page 13), where it reads:

According to the case-law of the board, the party requesting an installment abroad must adhere to the fact that the amount proposed by it is then already paid to the other party. So far, there have only been decisions dealing with the impact of decisions already taken abroad. However, it can be assumed that corresponding obligations could already arise with the corresponding application.

**112**

This requirement is made more specific by requiring a party who has requested the fixing of installments to provide the amount fixed by the court seised as security in addition to the installment, irrespective of: Whether or not the defendant in the other jurisdiction has consented to the proposal of the court in that jurisdiction. The following is a concrete example: If a defendant party in a dispute, where the positions of the parties under a 5-year license are 30 and 100 and, in accordance with a decision on an interim license, an amount of 10 is to be paid as a permanent holding and a further amount of 50 as a security, In the Board's view, the procedure must be such that the fixed amount to be paid is 30 and, on the basis of the determination of the foreign court, there is an additional amount of security of 30.

4. Application of these principles to the specific case

**113**

In the opinion of the Higher Regional Court of Munich, the defendant party is not to be considered to be willing to license because it has not deposited a security deposit in the amount of the last plaintiff offer. It is irrelevant that the defendant has provided a lower security based on its last offer, which was formally rejected by the defendant. In this respect, the Higher Regional Court of Munich has left no doubt as to the amount to be deposited. These prerequisites do not exist.

**114**

In the Board's view, the defendant's consent to a license must also be denied for formal reasons. In order to express your willingness to license, it is generally necessary that the undisputed amount is actually paid to the claimant. This has not happened, so the question of whether a security is to be paid in addition does not arise in the present case.

5. FRAND assessment of the offers of the claimant

**115**

In addition, it can be assumed that both the pool offer " Sisvel Wi-Fi 6" and the bilateral license offer are within the permissible FRAND corridor. This is based on a comparative top-down analysis in which all assumptions have been assumed in favor of the defendant party. The starting point is the concrete case situation, in which a pool offer exists and the concrete product portfolio of the defendant party predominantly includes high-priced PCs and laptops. The board assumes that pool offers are practically never exploiting the licensing potential inherent in its patent portfolio, as they have been established in numerous proceedings.

A. The subject matter of the license

**116**

Both the Sisvel Wi-Fi 6 pool and the bilateral offer are licensed under patents based on the Wi-Fi 6 standard, including all patents based on previous standards, in order to ensure backward compatibility. Whether a device is covered by the license is determined by the best technically implemented Wi-Fi standard. Devices capable of implementing Wi-Fi 7 are not covered by the license. For the avoidance of doubt, this means that, even if the Wi-Fi 6 portfolio is closed, the applicant may take action against the defendant's Wi-Fi 7-enabled products under a Wi-Fi 6 patent.

B. on the structure of the license offers (unit pricing concept)

In principle, a licensing program that does not distinguish between the product categories to be licensed carries an increased risk of being classified as not FRAND-compliant. An informed licensor takes into account the interests of the licensees in his offer and acknowledges that license payments must be refinanced via the selling price. Taking the same price for high-value and high-priced products as for low-cost products may indicate an unbalanced licensing program. However, if the required licenses are generally very cheap, this may be the case. If a licensee has different product categories in his offer, an overall consideration must be made (if the license is offered only uniformly). It is therefore not possible for a quote to be considered FRAND for one product category and non-FRAND for another product category.

C. Comparison license agreements

**118**

In the Board's view, the preferred and most accurate way to determine whether a patent proprietor's offer is within the FRAND corridor is to compare it with the patent proprietor's licenses that have already been completed. The principle applies that contracts concluded in a timely manner with other customers, which are of approximately the same size and have a comparable product portfolio, have a very strong indicative effect that the rate set there is within the FRAND corridor.

**119**

(1) This applies in particular if the conclusion of the contract was concluded without the pressure of infringement proceedings. The fact that there was an infringement procedure before the conclusion of the contract, which may also have resulted in a judgment, must not be overestimated. Indeed, it must be noted that, without the appropriate pressure from infringement proceedings, a not insignificant part of the market participants are not prepared to conclude license agreements. In this respect, the initiation of an infringement procedure is a normal and acceptable part of the negotiations in order to find a license rate suitable for both sides. A pending infringement procedure does not appear to have such a threat effect that free negotiations would no longer be possible under the resulting pressure.

**120**

It is the patent proprietor's responsibility to submit the contracts in a procedure which he needs to support his claims. When submitting contracts for a lump sum payment, the amount, duration and the number of units used in the calculation should generally be mentioned. If this is an initial contract between the parties, information should also be provided on how the past has been settled.

**121**

There is no obligation to submit all contracts entered into by the claimant concerning the subject matter of the license. The experience of previous proceedings has shown that this can lead the defendant to select and combine the arguments most favorable to it from various contracts in order to be able to claim low license amounts for itself. It has also been shown that, following the submission of comparison license agreements, it is almost always required that further contracts be submitted and that, with regard to the contracts submitted, they are not comparable. Therefore, the board considers it a matter for the claimant to decide whether and, where appropriate, which comparison license agreements it wishes to submit in order to substantiate the claim.

**122**

The board does not fail to recognize that the defendant's stated arguments can be quite accurate and are not per se an argument in favor of a so-called "hold out". Rather, in each individual case an evaluation based on the concrete overall circumstances is required.

**123**

(2) The following principles apply with regard to the payment of the past, which has already been mentioned:

**124**

In calculating license rates, past uses should be treated differently from current or future uses. The background is that manufacturers of products must be able to refinance the costs incurred for license payments by passing these costs on to the buyers or users. In the case of past uses, refinancing is excluded, as the sales have already been completed and the levy is no longer possible. In this respect, there is a certain degree of protection, at least until the time when the specific patent proprietor has issued

the first unequivocal request for the payment of the license. This was already stated by the Board in the order of reference of 14 July 2025. The following statements are intended to clarify the situation.

**125**

It is likely that market participants will know that they will have to take licenses. Therefore, it can generally be required that accruals are formed if use is started without licensing. The other may apply if certain technologies are not licensed for a long time or licenses are not consistently enforced in the market. In this respect, it is always necessary to give concrete talk about how a sponsor has behaved in the past. For example, it seems necessary to explain if a product manufacturer builds up a portfolio over a long period of time, but does not take action against other manufacturers first and then, after restructuring, takes action against other manufacturers, also asserting claims that concern the past lived differently.

**126**

It is also to be assumed that potential licensees do not have to proactively approach licensors. It is up to the patent proprietors to enforce their rights. If such a long time passes, it can be assumed, at least in the past, that a certain confidence can develop that one will no longer be used. This applies at least if the specific patent holder has not made it clear through public actions (e.g. publications in specialist publications or trade fair appearances) that licensing is desired and is being enforced. In such a case, a patent user cannot invoke legitimate expectations because he is one of many patent users who do not take a license and the patent proprietor's capacity is insufficient to make simultaneous use of all patent users. Instead, the patent user must assume that he will also be called on (and also for the past) in due course.

**127**

In order to avoid misunderstandings, a patent proprietor should therefore send a clear and unambiguous request for payment to a patent user. Otherwise, it could be lost in whole or at least in part of past claims.

**128**

In the light of this interest, the board considers that, as a rule, license payments cannot be fully recovered for the period prior to a qualifying call for payment and a reasonable period of time necessary to adjust the selling prices. Depending on the duration of the retroactive effect, however, reasonable partial amounts can be claimed. How much and for what periods this is the case is a matter of the individual case.

**129**

(3) The question of whether claims can be asserted for the past must be separated from the question of whether claims must be asserted for the past. This is particularly important for the calculation of comparative license agreements.

**130**

The board considers that it is an acceptable business decision of each patent proprietor whether claims are asserted for the past. This decision must be accepted unless there is exceptional evidence of abuse.

**131**

From many proceedings, the board is aware that the conclusion of an initial license agreement is very difficult. In such a situation, if the patent proprietor waives all or part of claims from the past, this is generally due to the fact that a business relationship with a view to the future is to be started. There is no presumption that waiving claims from past uses is solely intended to set an excessive future rate in order to create comparative license agreements with high licensing fees. This assumption is regularly presented in patent infringement proceedings. However, there is no actual evidence to support this. It also appears to be remote for the reasons given. Rather, the reality of licensing seems to be that patent holders are facing such a large number of companies that are not readily willing to license, that significant concessions are also made for a quick conclusion of a license agreement.

D. Settlement contracts in the present procedure

**132**

In the present case, although the applicant submitted settlement agreements, the amounts paid were blacked out and no information on the underlying quantities was provided. Insofar as the perunit rates alone were mentioned in the contracts, this was not sufficient because the comparability of these contracts could not be verified.

E. Control calculation using the top-down analysis

**133**

Therefore, the board has carried out a control calculation based on a top-down analysis.

(1) Considerations of principle

**134**

In doing so, the board understands the underlying approach by asking what amount is appropriate for the use of a given standard. On the basis of such a determination, the proportion of a specific patent proprietor in the standard must then be determined. In individual cases, such a view raises numerous questions, for example:

- Which initial value is to be assumed?

- What is the value of the standard per product? Does this need to be a fixed amount or in relation to the specific product or product category (i.e. is the same amount appropriate for the use of a particular standard per product, whether it is a cheap mobile phone or a high-end laptop)?

- What influence do other standards have on a possible starting value (Total Royalty Burden)?

**135**

A control calculation via a top-down analysis is possible at least whenever the patent proprietor has a significant share of the standard. For the very extensive mobile communications standard, a share of one percent is sufficient to the Board's conviction. Smaller standards may require a higher percentage. In this case, the required dimension has been exceeded.

**136**

Values submitted to the board in other proceedings which appear realistic were taken as the basis. As a starting point, the mobile communications standard is of particular importance. This is partly due to the fact that the majority of the cases before the Board concerned mobile communications. In addition, it is a standard that is largely out-licensed and has already been subject to numerous renewals of existing license agreements, so that there are a sufficient number of agreements that do not raise the often disputed question of remuneration for past uses.

(2) Building the Sisvel Wi-Fi 6 pool

**137**

The starting point for the control calculation is the Sisvel Wi-Fi 6 pool with the rates of 0.60 euros as standard fare and 0.50 euros as a reduced fare. According to Sisvel's website, this pool includes patents from

- Huawei Technologies Co., Ltd.

- Mitsubishi Electric Corporation

- Orange S.A.

- Panasonic Holdings Corporation

- Koninklijke Philips N.V.

- SK Telecom Co., Ltd.

- Wilus Inc.

**138**

According to the publicly available figures, Huawei is the company with the most patents regarding the Wi-Fi 6 standard, including the previous standards (see the publicly available document: LexisNexis, Who is Leading the Wi-Fi 6 Patent R… , submitted as Appendix HE23). Panasonic, Philips, SK Telecom and Wilus are among the 40 companies that have the most patents on the Wi-Fi 6 standard.

**139**

Publicly available figures show that the pool comprises a total of 245 patent families and approximately 2,000 patents. This is in line with the undisputed figures submitted in this procedure.

**140**

It is difficult to determine the number of patents or patent families that make up the Wi-Fi 6 standard (including all previous standards). The publicly available figures fluctuate greatly. However, it can be concluded that the patent pool " Sisvel Wi-Fi 6" comprises at least 10% of the total patent volume. Because it cannot be assumed that the Wi-Fi 6 standard covers more than 2,450 patent families or 20,000 patents.

**141**

According to publicly available figures from the Internet, the defendant group is the fifth largest PC manufacturer in the world. In 2024, 17.39 million PCs were shipped. Other product groups may not be of great importance in the defendant's business.

(3) Methodology of calculation

**142**

The board was involved in numerous proceedings, in particular in the field of mobile communications. There, experts' opinions were partly discussed on the question of the maximum load associated with mobile communications (aggregate royalty burden), i.e. the question of how many percent of the unit price of a product is accounted for by the license to use the mobile communications standard. The positions of patent proprietors and patent users were not so far

Disparate what might be suspected if we look at the bipartisan offers. It has been shown that the position of patent proprietors was approximately 8%% and the position of patent users was approximately 4%. In other words, the parties agreed that between 4% and 8% of the purchase price of a device would be appropriate as license fees for the use of all patents of all mobile communications standards. However, this does not mean that this is also the area of FRAND-compliant license fees.

**143**

Based on this value for the most important standard (mobile communications), the total load on a mobile phone for all the standards required for meaningful operation (mobile communications, Wi-Fi, streaming, etc.) is approximately 10% to 18%.

**144**

The board has already stated in the decision of 14 July 2025 that it is imperative that an average value for certain product categories be taken into account. This means that, for certain categories, a product of a medium nature and quality should be used. Because there are considerable price differences for the end products, which are not due to improved standard functionality, but rather due to a particularly attractive brand, a particularly high-quality camera or particularly functional software. It would not be compatible with the idea of a fair balance of interests if the manufacturer of high-quality branded products had to pay a higher price for the same functionality than the manufacturer of cheaper or cheapest products. If this would lead to an increase in the price of the cheapest products, it would be acceptable.

**145**

Specifically, the board states that in determining the product category, a differentiated consideration is sometimes required. For example, it may be necessary to differentiate between maximum performance (e.g. 4G and 5G-capable mobile phones) or special additional functions (tablets/laptops without mobile communications (as standard) and with mobile communications capability (as a higher-priced premium segment).

**146**

In the Board's view, the average value for a mobile phone capable of 5G is within a range of US$ 150 – 200 (unit price), which is a consideration for the benefit of patent users. Thus, even if all the assumptions (low ARB of 4% of the selling price and low unit price claimed by the defendant) are taken into account for the benefit of the patent users, a total charge of US$6 will be incurred. The holder of a patent portfolio can therefore, even if all the assumptions are made in the sense of the patent user, charge an amount of 6 US cents for each percent he holds at the standard.

**147**

It must be made clear that this amount is in all likelihood well below an allowable FRAND amount, because all figures were assumed to be in favor of patent users. In court practice, this is only important because most owners of large patent portfolios do not exploit the license potential. In the mobile sector in particular, it

appears possible to accept higher unit prices if the parties to the claim make a more specific statement about the technical capabilities of the patent users' devices.

(4) Applying this methodology to Wi-Fi 6

**148**

The board understands the applicant's offer as meaning that Wi-Fi 6 and all previous standards would be licensed. All devices that are Wi-Fi 7 enabled have been exempted from licensing. Therefore, there is no need to divide a license amount between the individual standards. If a division had to be made, the board would consider the following to be useful for a standard that is often significantly improved, such as Wi-Fi:

If a new standard is introduced, it will account for 20% in the first two years, 30% in the third year and 40% from the fourth year onwards. The best two standards together account for a total of 70% and the remaining standards for a total of 30%.

**149**

Wi-Fi is used in many products. Typical product groups are mobile phones, tablets, laptops, desktops and routers. Although, for example, kitchen appliances and toys also make use of the technology, this is to be left out. For the first product groups, the board assumes the following initial prices for an average equipped appliance:

- Mobile phones: 150 – 200 US$

- Tablets: 150 – 200 US$

- Laptops/Desktop PCs 500 – 550 US$

- Router: 130 – 150 US$

**150**

The Board considers the Maximum License Charge (ARB) to be different depending on the functionality and importance of Wi-Fi for each product group. The figures below reflect this. In this case, the low amount is the burden that would be borne by the patent user in the appropriate application of the arguments set out above.

| - Mobile phones: | 2 – 6% |
|---|---|
| - Tablets: | 3 – 7% |
| - Laptops/Desktop PCs | 2 – 7% |
| - Router: | 6 – 10% |

**151**

Based on the two figures, the following hypothetical maximum license burdens (ARB) result for the individual product groups, which ultimately reflect extreme positions and are probably both outside a FRAND corridor:

- Mobile phones: 3 – 12 US$

- Tablets: 4.5 – 14 US$

- Laptops/Desktop PCs 10 – 38.5 US$

- Router: 7.8 – 15 US$

**152**

This means that for a patent portfolio that covers one percent of the standard, the minimum amount may be:

- Mobile phones: 3 US$ cents

- Tablets: 4.5 US$ cents

- Laptops/Desktop PCs 10 US$ cents

- Router: 7.8 US$ cents

**153**

Since the applicant has not provided any information on the defendant's product portfolio, the board estimates the proportion of products in the defendant group (which is one of the largest manufacturers of PCs in the world) in its favor: That 50% of the units fall into the product group Laptops / Desktop PCs and 50% into the cheapest product group (mobile phones). As stated above, Sisvel's Wi-Fi 6 pool covers at least 10% of all relevant patents, assuming this maximum load (ARB), the average value is $0.65 per device. If you convert this amount into euros, it will be 0.56 euros. This lies exactly between the standard rate and the compliant rate of the Sisvel pool and is therefore to be considered a FRAND.

**154**

The board does not fail to recognize that this result was achieved, in particular, because the defendant produces products from an expensive product group. For other product groups, this result cannot be easily represented. This would require a substantiated presentation by the claimant. This was not available.

**155**

Ultimately, the same considerations can also be applied to the bilateral licensing offer. However, since the exact offer is not public, it will be dealt with in the following section, which is subject to confidentiality. As a result, it should be noted that both offers of the claimant were FRAND.

F. Analysis of the applicant's bilateral offer (in need of confidentiality)

**156**

The claimant has submitted several offers for a pool license and for a bilateral license.

(1) Offer dated 7 November 2024

**157**

The applicant's last three offers are to be considered. The earliest of these offers was the offer shown below on 7 November 2024. The specific figures are shown in the overview.

**158**

With regard to the pool offer, the amount claimed is derived from the following calculation:

- Units of 0.60 US$ = US$ each ███████████████

- Units of 0.50 US$ = US$ each ███████████████

- Total: US$

**159**

There is a discount on the published license rate insofar as US dollars have been used instead of euros.

**160**

For the bilateral license, the average license amount per unit is US$ ( US$ for units).



**161**

A comparison calculation, in which a similarly calculated average value is also calculated for the pool offer ( ████████████████ US$ for units = US$), results in a ratio of 1.████████████

**162**

According to the undisputed information of the plaintiff, the Sisvel pool comprises a total of 244 patent families with 1,864 patents. The share of Wilus/SKT (i.e. the plaintiff's patents) is 57 patent families with 542 patents. The ratio of patent families is therefore 4.281 to 1 and patents 3.439 to 1.

**163**

On the basis of the figures submitted, it can be concluded that the claimant has largely maintained its published rate in this offer. The conversion of the payment amount from Euro to US$ represents a discount of approximately 10% (depending on the exchange rate).

(2) Comparison license agreements

**164**

Although the claimant has submitted comparison licensing agreements, they were so blackened that they have no significance. It is not clear what amounts have been paid nor what quantity the contracts were based on. This makes it impossible for the board or the other side to check.

**165**

It is therefore not possible to verify, on the basis of the contracts submitted by the claimant, whether the claimant offers are FRAND.

(3) Plausibility calculation via the top-down analysis

**166**

It has already been explained that the pool rate of the Sisvel Wi-Fi 6 pool is at least within the specific product portfolio of the defendants within the FRAND corridor. For the same reasons, the bilateral offer is within the FRAND corridor. The following considerations apply:

**167**

It can be assumed that the number of patents of the claimant is more than 2% on the entire Wi-Fi 6 standard, so that the prerequisites for a top-down consideration are met.

**168**

The pool license and the bilateral offer differ slightly in relative terms, if the shares of the patents in the pool are taken into account. It is assumed – in favor of the defendants – that the relationship between the patent families should be taken into account and not the sheer number of patents.

- From the above, it appears that an amount of US$0.65 per licensed device is FRAND.

- The average pool rate is US$

- The bilateral license is US$. If this amount is multiplied by the ratio of the patent families (4.281 to 1), the comparison value is US$

**169**

It is therefore clear that both offers were FRAND.

(4) The applicant's offer of 6 February 2025

**170**

The penultimate offer made by the claimant on 6 February 2025 differs from the offer made on 7 November 2025 in the quantities used. The figures were adjusted on the basis of the information provided by the defendant party. In addition, the parties have agreed that they will completely remove all devices that are Wi-Fi 7-enabled from licensing. The following figures were therefore used:

**171**

On the basis of these figures, the claimant claimed an amount of US$ for the pool license and an amount of US$ for the bilateral license.

**172**

This results in the following average unit prices (which are higher for the pool than for the previous calculation, because the proportion of past units is higher for this calculation):

- Pool license: US$ for units: US$

- Bilateral license: US$ For units: US$

Since these unit prices are lower than the amount calculated in favor of the defendant when all the values were accepted, this offer is also made by the defendant FRAND.

(5) The applicant's offer of 16 December 2025

174

The last offer of 16 December 2025 provided for a further reduction of the fees. The plaintiff offered the following:

Sisvel Pool:

- Standard rate: 0.60 US$/ running royalty

- Compliant rate: 0.50 US$/ running royalty

Wilus:

175

Since these offers were below the previous ones, they are FRAND.

(6) The offers of the defendant party

176

The defendant recently offered an amount of US$ for the bilateral license. In doing so, it based its calculation on the unsubstantiated claim that a competitor is paying a rate of US$. This rate is well below what is paid for comparable licenses and is therefore an expression of the defendant's unwillingness to take a license on FRAND terms.

V.

177

The defendants offer the contested embodiments in the Federal Republic of Germany, distribute them and thus – insofar as claims 1, 4 and 5 of the patent suit are concerned – make unlawfully use of the teaching of the patent suit within the meaning of § 9 p. 2 No. 1 PatG.

178

In addition, the defendants offer the contested embodiments in the Federal Republic of Germany for use in Germany, whereby – as the defendants know – the method claimed by claim 12 of the patent in suit is applied. Thus, the defendants also commit an indirect patent infringement within the meaning of § 10 para. 1 PatG.

179

The plaintiff is therefore entitled to claims for omission, information and invoicing, determination of the obligation to pay damages on the basis of the reason and for recall under §§ 139 para. 3 and 2, 140a para. 1, 140b PatG, 242, 259 BGB.

180

As co-proprietor of the patent suit, together with SK Telecom Ltd., the plaintiff can claim the claims for omission, recall and destruction as well as the claims for information and accounting in accordance with the principles of the community of fractions (§§ 741 et seq. BGB) in their own name. Insofar as it claims damages on the ground, it must be stated that SK Telecom Ltd. Has assigned its claims for damages to the plaintiff.

B.

181

There is no reason for a suspension of the negotiation, § 148 ZPO.

I.

182

According to the settled case law of the Chambers of the Regional Court of Munich I (cf. GRUR-RS 2023, 26656 marg. 93; GRUR-RS 2019, 31034 marg. 66; GRUR-RS 2019, 31037 marg. 63; BeckRS 2018, 41093 marg. 147) an opposition or the filing of an action for annulment does not, as such, constitute a reason to stay the infringement proceedings, because this would in fact amount to giving the attack on the patent in suit an effect that hinders the protection of the patent. But that is foreign to the law. Rather, the interests of the parties must be weighed against each other, with priority being given to the patent proprietor's interest in enforcing his granted patent. The suspension is therefore only possible if it is most likely that the patent in suit will be revoked or destroyed.

183

On the basis of the defendant's submissions, it is unlikely that the patent in suit will be declared null and void.

II.

184

In any case, the patent in suit validly claims the priority of South Korean patent application KR 20160147189 of 6 November 2016.

185

1.The defendants consider that the only patent application that could be considered for effective use of priority is the South Korean patent application KR 20160147189 of 6 November 2016 (Annex HE 2 with machine translation into English in Annex HE 2a, hereinafter referred to as "patent application" 189). However, the applicant could not claim the priority of the patent application ' 189 either, since feature 4 does not clearly emerge from it.

186

Claim 1 of the patent in suit relates only to the embodiments set out in Figures 16 to 18 of the patent in suit, which must be combined in order to realize the teaching of the patent in suit. Figures 16 to 18 of the patent in suit correspond to Figures 6 to 8 of the patent application '189. However, feature 4 is not clear from this, since it is not disclosed that Figures 6 to 8 can be combined. In particular, the patent application ' 189 contains no claims and also no generalization of the embodiments shown in Figures 6 to 8.

187

2.Contrary to the defendant's view, the applicant may in any event claim the priority of South Korean patent application KR 20160147189 of 6 November 2016.

188

Whether a patent application can effectively claim the priority of an earlier patent application depends on whether the earlier patent application discloses the invention claimed by the later patent application. The term of disclosure relevant in this context is identical to the term of disclosure as it applies to the examination of novelty; Accordingly, it also applies here that the skilled person must be able to directly and unambiguously derive the technical teaching described in the claim from the original documents as a possible embodiment of the invention so that priority can be effectively claimed (BGH, X ZR 112/13, GRUR 2016, 50 para. 29 – Partial reflective film). However, it is not necessary for the teaching to be taken from the claims of the first application; rather, the disclosure content of the first application is to be determined from the totality of the application documents (BGH, aaO).

189

On the basis of this scale, feature 4 is clearly disclosed by the patent application ' 189. In the replica, the applicant has provided a German translation of the description belonging to Figs. 6 to 8 of the patent application ' 189, which has a considerably better quality than that presented as Annex HE 2a, Gap translation in English; the defendants have not objected to the translation. In this description, it is stated – in accordance with paragraphs [0091], [0097] and [0102] of the patent in suit – that the timer for the " MU-EDCA parameter set" (i.e. the second EDCA parameter set in the language of feature 4 of the patent in suit), depending on the Whether or not the transmitted frame requires a response from the base device, starts when the response is received, or when the frame is terminated. From the juxtaposition of these variants in text and image, it is clear to the skilled person that he can combine the variants.

III.

None of the defendant's documents preclude the existence of the patent in suit, which is detrimental to novelty. Therefore, the Board exercises the discretion it has to refrain from suspending the proceedings.

1.In order to assess whether the subject-matter of a patent has been affected by a prior publication, it is decisive which technical information is disclosed directly and unambiguously to the skilled person (BGH, X ZR 113/20, GRUR-RS 2022, 35280 para. 87 – Wound cleaning cloth).

2.Citation HE3 does not preclude the existence of the patent in suit from damaging novelty.

Document HE3 (Annex HE3) is the international patent application WO 2018/073171 A1 of 16 October 2017, published on 26 April 2018. It claims improved management of access categories in a multi-user EDCA transmission mode in a wireless network.

For this purpose, the HE3 also knows how to switch from the traditional competing EDCA access mode to another EDCA mode in the multi-user context (" MU EDCA Mode" ) and back, separately for each access category used.

In HE3, however, this change does not take place according to feature 4 on the basis of whether a response to a MAC protocol data unit (MPDU) contained in the trigger-based PPDU is received, i.e. according to the design found here on the basis of whether the PPDU sent by the terminal requires a response from the base device or not. Instead, the change takes place in the HE3 in the case of the, preferably successful, transfer of the data, whereby a successful transfer is signaled by a response of the base device.

A. In support of their view that HE3 discloses feature 4, the defendants refer to the fact that the timer according to HE3 is discontinued after the PPDU has been sent on the one hand and after receiving a response from the base unit on the other. This follows from page 35, line 38, to page 36, line 2:

> Next, once the transmission has been performed, and preferably upon successful transmission (i.e. an acknowledgment is received from the AP), step 1170 determines the new

On page 25, lines 27 to 36, it is further disclosed that the timer can also be set in parallel with the sending of the data:

> Thus, node 502 transmits AC_VI data 511 and AC_VO data 512 to the AP using the scheduled RU. The corresponding two transmitting traffic queues, AC_VI and AC_VO, thus switch to the MU EDCA mode (symbolized by white figures in black boxes), in which node 502 now uses MU EDCA parameters for each of these transmitting traffic queues. Particularly, higher values for the AIFSN parameter may be used, and optionally for the $CW_{min}$ and $CW_{min}$ parameters.
>
> In parallel, the HEMUEDCATimer 590 is launched to count down when node 502 will be allowed to switch back to the legacy EDCA mode with legacy EDCA parameters. The switch back may occur after a predetermined duration expires, i.e. when the HEMUEDCATimer reaches 0.

B. Contrary to the defendant's view, HE3 does not disclose feature 4. According to the invention disclosed in HE3, the timer can also start without receiving a response from the base device, Although the successful transmission of the data is the preferred condition for setting the timer (this can be seen from the section cited in marginal 197 and even more so from page 11, lines 8 to 13, where only successful transmission is mentioned as a necessary condition for setting the timer). However, if the timer starts without receiving a

response, there is already no successful data transfer. This results from the contrast between "transmission" and " successful transmission" . At the same time, there is no mention of data packets that do not require a response at any point in the HE3. The absence of a response does not result from the fact that the PPDU did not request a response after the HE3, but from the fact that the data transfer failed.

**199**

The text passports cited by the defendants in paragraph 198 do not refer to the invention claimed by HE3 but to the state of the art (this is a description of Fig. 5a, which reflects the state of the art, see page 15, line 15 f. of HE3), without being informed in that regard whether this prior art discloses the other features of the patent in suit. However, even if the disclosure of the timing was taken into account in parallel with the sending of the data, feature 4 of the patent in suit would not be affected in a way that would be harmful to novelty. This is because it is different if the timer is automatically set in parallel with the sending of the data or if it is set – as according to feature 4 of the patent suit – after sending the data, either immediately after sending (in the case of that the data packet does not request a response) or only after receiving a response (in case the data packet requests such a response).

**200**

3.Citation HE4 also does not preclude the existence of the patent in suit, which is detrimental to novelty.

**201**

Document HE4 (Annex HE4) is the IEEE 802.11-16/0998r3 contribution to the IEEE 802.11ax Task Group. The entry was made public on September 12, 2016.

**202**

The defendants themselves acknowledge that after HE4, the timer will only be set when a response is received; otherwise, it will not be set. However, this type of dependency on the timer setting does not correspond to characteristic 4.

**203**

4.Even document HE5 does not preclude the existence of the patent in suit from damaging novelty.

**204**

Document HE5 (Annex HE5) is the contribution of IEEE 802.11-16/1425r0 to the IEEE 802.11ax Task Group. However, it was not published until November 7, 2016 at 09:29 ET. The abbreviation " ET" probably stands for " Eastern Time", the time on the US East Coast. Even on the basis of this understanding, the publication was carried out downstream of the priority of the patent in suit.

**205**

5.Citation HE6 also does not preclude the existence of the patent in suit, which is detrimental to novelty.

**206**

Document HE6 (Annex HE6) claims an adjustment of the transmission time (TXOP) for the multi-user uplink transmission. It concerns European patent application 3 270 646 A1 of 2 March 2017, which claims the priority of a Japanese patent application of 15 July 2016.

**207**

Like the HE3, the HE6 also knows a switch between two EDCA parameter sets in the context of a terminal's participation in a multi-user uplink transmission. However, the timer, which determines the duration of the second EDCA parameter set, will only be set after HE6, as the defendants themselves argue, if a response has been received from the base unit, otherwise not. However, this type of dependency on the timer setting does not correspond to characteristic 4.

C.

**208**

The cost decision follows from § 91 ZPO.

**209**

The decision on provisional enforceability has its basis in § 709 ZPO. The amount of the guarantee had to be taken into account that the guarantee was intended to cover the risk that either the assessment of the infringement would be different in a higher instance or that the patent in suit would be destroyed in the nullity

proceedings. In both cases, the applicant would have to pay compensation for the consequences of the enforcement. The amount of security must therefore be calculated in such a way that the damage that the defendants may suffer through the enforcement of a judgment that was subsequently overturned is covered (§ 717 para. 2 ZPO).

**210**

In the present case, the guarantee is not based on the defendant's threat of loss of revenue, but on the costs that the defendant may incur because the defendant may have to claim several patents against them, Until finally a patent in suit has been found, which is legally regarded as infringed and legally stable. For the purposes of deriving this approach, reference is made to the judgment of the Board of 10/30/2025 (7 O 1297/25, GRUR-RS 2025, 31966).

**211**

This additional cost was set at EUR 3,500,000.00 by the Board. A further need for security on the part of the defendant is not apparent.

**212**

With regard to the obligation to provide information and to provide invoices, a security of a total of EUR 50,000.00 was sufficient, but also necessary.