**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> v. <br><br> HP INC. | Case No. 2:24-cv-00752-JRG-RSP (Lead Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. | Case No. 2:24-cv-00746-JRG-RSP (Member Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> v. <br><br> ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP. | Case No. 2:24-cv-00753-JRG-RSP (Member Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> v. <br><br> HP INC. | Case No. 2:24-cv-00764-JRG-RSP (Member Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. | Case No. 2:24-cv-00765-JRG-RSP (Member Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> v. <br><br> ASKEY COMPUTER CORP., ASKEY INTERNATIONAL CORP. | Case No. 2:24-cv-00766-JRG-RSP (Member Case) |

**BRIEF OF *AMICUS CURIAE* ACCESS ADVANCE IN SUPPORT OF**
**WILUS' MOTION FOR ENTRY OF A PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

<u>**Page**</u>

I.    Background and Interest of *Amicus Curiae* ................................................................1

II.   Patent Holdout Upsets the Constitutional Bargain, Distorts the Patent Licensing
      Market, and Depresses Innovation ..........................................................................4

III.  Damages Alone Provide Inadequate Compensation and Are Insufficient to Alter the
      Incentives that Give Rise to Holdout ......................................................................7

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc.* v. *Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ..................................................................................................10

*Apple, Inc.* v. *Qualcomm Inc.*,
   2017 WL 3966944 (S.D. Cal. Sept. 7, 2017)................................................................................9

*G+ Commc'ns, LLC* v. *Samsung Elecs. Co.*,
   2024 WL 233222 (E.D. Tex. Jan. 22, 2024) .................................................................................9

**Statutes and Laws**

U.S. Const. art. I, § 8, cl. 8 .................................................................................................................5

35 U.S.C. § 154 ...................................................................................................................................5

**Other Authorities**

Bowen Heiden & Justus Baron, *The Economic Impact of Patent Holdout*,
   38 Harvard J. of L. & Tech. 637 (2024)..................................................................................7, 10

Colleen V. Chien, *Holding Up and Holding Out*,
   21 Mich. Telecomm. & Tech. L. Rev. 1 (2014) ..........................................................................5

Jeffrey Blumenfeld, *Should FRAND Excuse "Efficient Infringement"?*,
   5 Criterion J. on Innovation 143 (2020) ..................................................................................6, 8

John A. Squires, *Remarks at U.S. Chamber of Commerce
   International IP Index* (Mar. 12, 2016) ...................................................................................7, 10

Kirti Gupta & Urška Petrovčič, *Evidence of Systematic "Patent Holdout"*,
   38 Berkeley Tech. L. J. 575 (2023) .........................................................................................6, 9

Ltr. from M. Delrahim, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice,
   to M. Hamer, Esq., Baker & McKenzie (July 28, 2020).............................................................2

Ltr. from M. Murray, Acting Principal Deputy Assistant Att'y Gen., Antitrust
   Div., U.S. Dep't of Justice, to G. Beeney, Esq., Sullivan & Cromwell LLP
   (Jan. 13, 2021) .............................................................................................................................2

Norman V. Siebrasse, *Holdup, Holdout, and Royalty Stacking:
   A Review of the Literature*, PATENT REMEDIES AND COMPLEX PRODUCTS,
   Ch. 7 (July 4, 2019) ................................................................................................................8, 10

## TABLE OF AUTHORITIES
### (continued)

Richard A. Epstein & Kayvan B. Noroozi, *Why Incentives for "Patent Holdout" Threaten to Dismantle FRAND, and Why it Matters*, 32 Berkeley Tech. L. J. 1381 (2017) ....................................................................6

*Setting out the EU Approach to Standard Essential Patents*, § 2.3, COM (2017) 712 final (Nov. 29, 2017).........................................................2

Statement of Interest of the United States of America, *Collision Commc's, Inc.* v. *Samsung Elecs. Co., Ltd. et al.*, No. 2:23-cv-00587 (E.D. Tex.), ECF No. 386 ....................................................8, 10

Statement of Interest of the United States of America, *Disney Enters., Inc.* v. *InterDigital, Inc. et al.*, No. 1:25-cv-00996 (D. Del.), ECF No. 28 ...............................................................7

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST ENFORCEMENT AND INTELLECTUAL PROPERTY RIGHTS: PROMOTING INNOVATION AND COMPETITION, Ch. 3, § I (Apr. 2007)......................................2

## I.    Background and Interest of *Amicus Curiae*

Access Advance is an independent licensing administrator focused on patent pool management for essential patents for modern video codec technologies.  Access Advance makes licensing more efficient by, among other benefits, enabling technology implementers to obtain a single license from multiple patent owners rather than negotiating with each patent holder separately.  Since its inception over a decade ago, Access Advance has worked with hundreds of patent holders and implementers to create three industry-leading pools comprising tens of thousands of patents declared essential to implementing video compression standards.  These patent holders include leading media and technology companies, such as Warner Brothers, BlackBerry, and Dolby, who have developed important video encoding/decoding technology fundamental to high-quality video streaming.[1]  Access Advance has a long history of substantial experience in licensing patents, license negotiations, and the market disruptions caused by infringers of intellectual property who refuse to take a license.

In administering pools that aggregate patents essential to licensed technology, Access Advance has negotiated and executed license agreements with over 400 implementers on fair, reasonable, and non-discriminatory (FRAND) terms that balance the interests of licensors and licensees, and manages license reporting, compliance, royalty collection, and royalty distribution for the pools.  Specifically, Access Advance collects royalties from licensees on behalf of its patent holders, and then makes distributions from those royalties back to the patent holders, who frequently use such funds to reinvest in their research and development programs.  Licensees to

---

[1]  *See, e.g.*, *HEVC Advance Patent Pool:  HEVC List of Licensors*, Access Advance, https://accessadvance.com/hevc-advance-patent-pool-licensors/ (last visited Apr. 8, 2026).

Access Advance's pools include some of the largest technology companies in the world, such as Amazon, NVIDIA, Huawei, Xiaomi, LG Electronics, and Sony.[2]

Patent pools have been widely recognized as an efficient and procompetitive mechanism for patent licensing.  For example, the U.S. Department of Justice has repeatedly noted that patent pools:  (i) "create licensing efficiencies by 'integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation'"; (ii) "advance innovation" through a "simplified approach to licensing [that] can enable more rapid development and adoption of new technologies than could be achieved with cross-licensing alone"[3]; and (iii) reduce "the costs of bringing products to market" by eliminating "the transaction costs of negotiating multiple licenses" and the "greater cumulative royalty payments" that result from such piecemeal processes.[4]  Patent pools thus "offer 'one-stop shopping' to firms seeking to manufacture products using those patents" and are "critically important mechanisms for enabling widespread use of new technologies."[5]  The benefits of patent pools also extend to dissemination of standardized technologies.  As the European Commission recognized, "[m]easures to encourage the setting up of pools for key standardised technologies should be encouraged" because "[t]hey can address many of the SEP licensing challenges by offering better scrutiny on essentiality, more clarity on aggregate licensing fees and one-stop shop solutions."[6]

---

[2] *See, e.g.*, *HEVC Advance Patent Pool:  HEVC List of Licensees*, Access Advance, https://accessadvance.com/hevc-advance-patent-pool-licensees/ (last visited Apr. 8, 2026).

[3] Ltr. from M. Murray, Acting Principal Deputy Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice, to G. Beeney, Esq., Sullivan & Cromwell LLP, at 4 (Jan. 13, 2021).

[4] Ltr. from M. Delrahim, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice, to M. Hamer, Esq., Baker & McKenzie, at 8 (July 28, 2020).

[5] U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST ENFORCEMENT AND INTELLECTUAL PROPERTY RIGHTS: PROMOTING INNOVATION AND COMPETITION, Ch. 3, § I, at 65-66 (Apr. 2007).

[6] *Setting out the EU Approach to Standard Essential Patents* § 2.3, COM (2017) 712 final (Nov. 29, 2017).

A key to Access Advance's licensing is the complete transparency it provides to potential licensees. Access Advance provides on its website all the information implementers need for licensing discussions,[7] and then follows through on that transparency by working with potential licensees to address any additional questions and concerns they may have about the technology or the licensing program. These discussions can last months and even years. Unfortunately, notwithstanding Access Advance's considerable efforts, there are times when it is clear that a potential licensee infringing the relevant patents has no intention of taking a license or respecting its intellectual property obligations and is acting in bad faith. Patents, as intangible property, by themselves provide no ability for the patent holder to stop infringement. When it is clear that a bad faith infringer is engaged in what has become known as "holdout," the patent holders in the Advance pools have no option but to turn to the courts to stop the theft of their intellectual property.

These "holdouts" not only misappropriate the patent owners' intellectual property, but they cause other damage, including: (i) competing unfairly with those who are paying for the intellectual property they use; (ii) causing others to reject licenses because of unlicensed competition; (iii) depriving patent holders of revenue to drive further research; and (iv) ultimately

---

[7] This information includes: (i) an overview of the licensing program (https://accessadvance.com/licensing-programs/hevc-advance/); (ii) further information for prospective licensors (https://accessadvance.com/hevc-advance-patent-pool-key-licensor-terms/); (iii) further information for prospective licensees (https://accessadvance.com/hevc-advance-patent-pool-general-pool-terms/); (iv) detailed patent lists including references to relevant sections of the standard for each SEP (https://accessadvance.com/hevc-advance-patent-list/); (v) an illustrative patent landscape of worldwide SEPs (https://accessadvance.com/hevc-worldwide-patent-landscape/); (vi) a detailed rate chart, explanation of rates, and how they are applied, including lower rates in some regions of the world (https://accessadvance.com/topic-where-and-when-is-a-royalty-due/); (vii) a form to request white papers explaining why rates are FRAND (https://accessadvance.com/licensing-programs/frand-paper/); (viii) a full list of licensors (https://accessadvance.com/hevc-advance-patent-pool-licensors/); (ix) a full list of licensees (https://accessadvance.com/hevc-advance-patent-pool-licensees/); and (x) a form to request an exemplar of the actual license agreement for review (https://accessadvance.com/request-hevc-advance-patent-portfolio-license-agreement/).

depriving consumers of new and innovative products that result from further research and development. These injuries to the market and innovation cannot be recompensed by monetary damages. Indeed, the risk of monetary damages alone may encourage holdout, because those acting in bad faith achieve delay with the only consequence being paying the "reasonable royalty" they should have paid before litigation. Consequently, the availability of injunctive relief is critical to the proper functioning of the licensing market, innovation, fair competition, and consumer welfare.

The parties' briefing has focused on whether an injunction should issue under the particular facts of this case, addressing, for example, the history of negotiations between the parties and whether Wilus' licensing program and research and development efforts have been irreparably harmed by Askey's admitted infringement. Access Advance does not seek to repeat any of those arguments here. However, Access Advance believes that in assessing whether an injunction is appropriate, courts can and should take into account the pervasive nature of the holdout problem, particularly as it relates to the irreparable harm/inadequacy of monetary damages and public interest factors. Access Advance therefore submits this brief to provide the Court with unique industry perspectives on that issue and why effective remedies, like the injunction Wilus seeks here, are in the public interest, necessary to adequately protect patent holders and stem the tide of holdout, and required to allow a properly functioning licensing market.

## II. Patent Holdout Upsets the Constitutional Bargain, Distorts the Patent Licensing Market, and Depresses Innovation

The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective

Writings and Discoveries."[8]  Congress, in turn, enacted the Patent Act, which "grant[s] to the patentee . . . the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States."[9]  This Constitutional bargain thus exchanges public disclosure of an invention for a limited monopoly over the invention that only the judiciary can enforce.  Holdout, however, directly undermines these constitutional and statutory mandates, permitting "companies [to] ignor[e] patents and patent demands" simply "because they can get away with it."[10]  Rather than granting patent holders exclusive rights to their inventions, holdout sanctions free trespass on those intellectual property rights.  And, instead of promoting the progress of science, holdout distorts the patent licensing market and discourages innovation.

In its most immediate effect, holdout enables an unwilling licensee to shift costs from itself to the patent holder.  By taking and implementing patented technology in its products without paying a royalty, the unwilling licensee obtains a "free ride" on the innovations of others that directly reduces its own costs of production and allows unfair competition with those who honor their intellectual property obligations.

Encouraging or facilitating holdout by rejecting injunctive relief distorts competition in the market as the unwilling licensee uses intellectual property without the cost incurred by those who respect intellectual property.  Moreover, holdout by one potential licensee invites others to do the same as they seek to compete in the market.  By eliminating the costs associated with licensing intellectual property and thereby reducing its own production costs, the unwilling licensee secures an advantage vis-à-vis its competitors.  "Any firm that is normally willing to purchase a license

---

[8] U.S. Const. art. I, § 8, cl. 8.

[9] 35 U.S.C. § 154(a)(1).

[10] Colleen V. Chien, *Holding Up and Holding Out*, 21 Mich. Telecomm. & Tech. L. Rev. 1, 20 (2014).

from a patentee may well refuse to do so if noncompliant firms gain a competitive advantage over compliant firms."[11]

These issues compound and ultimately "hinder[] a patent holder's ability to be compensated for the use of its technologies in a timely manner" and "undermine[] the inventor's ability and incentives to continue making risky investments in R&D."[12]  In other words, reduced licensing royalties lead to reduced funds available for reinvestment in research and development, which in turn decreases innovation and deprives the public of the benefit of new technologies. These market injuries are all the more prevalent for patent holders who participate in the efficiencies created by patent pools.  Access Advance seeks to offer fair terms to all who would benefit from the licenses it offers.  All licensees in Access Advance patent pools execute the same license and pay royalties from the same rate tables to ensure non-discrimination.  If an implementer is holding out from signing a license to an Access Advance patent pool in the hopes of obtaining different rates and terms, that implementer is attempting to achieve discrimination in its favor, and will not succeed.  But if the only repercussion of holdout is paying later the royalty that should be paid and that others are paying today, holdout is encouraged.

Moreover, as noted above, monetary damages cannot fully compensate a patent holder for the reduction in income that would be devoted to further research and development over the years of litigation.  Similarly, when holdouts depress licensing income and patent holders are unable to enforce their intellectual property rights, it discourages patent holders from investing in

---

[11] Richard A. Epstein & Kayvan B. Noroozi, *Why Incentives for "Patent Holdout" Threaten to Dismantle FRAND, and Why it Matters*, 32 Berkeley Tech. L. J. 1381, 1407 (2017); *see also* Jeffrey Blumenfeld, *Should FRAND Excuse "Efficient Infringement"?*, 5 Criterion J. on Innovation 143 (2020).

[12] Kirti Gupta & Urška Petrovčič, *Evidence of Systematic "Patent Holdout"*, 38 Berkeley Tech. L. J. 575, 591 (2023).

development of the innovations that fuel standard development organizations in the first instance, because patent holders may begin to view SEPs as unlikely to provide sufficient return on their investment. As the Director of the U.S. Patent & Trademark Office explained, "[s]tandards essential patents represent significant investment, ingenuity, and risk-taking by American inventors," but "the SEP ecosystem has become increasingly hostile amidst widespread efforts to devalue contributions, unclear rules about rights, and systematic suppression of licensing rates."[13] Any further weakening of the SEP ecosystem would deprive consumers and the public of the "most innovative new technologies" that "help[] fuel dynamic competition" and "make products less costly for firms to produce and more valuable to consumers."[14] Although the precise extent of holdout damage is difficult to quantify, the costs to industry are likely staggering, with estimates suggesting that the cellular SEP market alone lost royalties of approximately $7 billion to $28 billion from patent holdout in a single year.[15]

## III.    Damages Alone Provide Inadequate Compensation and Are Insufficient to Alter the Incentives that Give Rise to Holdout

Litigation is generally the only path for patent holders to protect their intellectual property rights, but without injunctions, litigation will not provide sufficient relief or mitigate patent holdout. *First*, damages are often an inadequate remedy to compensate patent holders for the unauthorized use of their inventions. As the U.S. Patent & Trademark Office and the U.S. Department of Justice noted in a Statement of Interest filed in another case pending before this

---

[13] John A. Squires, *Remarks at U.S. Chamber of Commerce International IP Index* (Mar. 12. 2026).

[14] Statement of Interest of the United States of America, *Disney Enters., Inc.* v. *InterDigital, Inc. et al.*, No. 1:25-cv-00996 (D. Del.), ECF No. 28 at 4.

[15] *See* Bowen Heiden & Justus Baron, *The Economic Impact of Patent Holdout*, 38 Harvard J. of L. & Tech. 637 (2024).

Court, "patents can be hard to value" and "damages can be difficult to calculate."[16]  And even where damages in the form of a reasonable royalty or lost profits can be calculated with reasonable certainty, they do not account for the full extent of the harm caused by holdout-related disruptions to the broader licensing market described above including, for example, encouraging other potential licensees to similarly hold out.  Furthermore, the research and development opportunities that patent holders must forgo as a result of lost royalties from unwilling licensees can never be recouped or otherwise compensated for with monetary damages.

*Second*, damages alone are insufficient to motivate unwilling licensees to cease engaging in holdout.  "[W]hen damages are compensatory, the threat of an order to pay damages (and costs) does not act as an effective deterrent, because the implementer will be no worse off if it resists and is ultimately held liable than if it licenses *ex ante*."[17]  This issue is particularly acute in the SEP context, where if a SEP holder in an Access Advance patent pool successfully sues for infringement "the only consequence the implementer will face is that it will be required to pay a FRAND price, the same FRAND price it would have paid if it had negotiated *before* taking and using the technology."[18]  In other words, by delaying payment of the FRAND rate until they are found liable following years of litigation and appeals, the unwilling licensee has, in effect, obtained a subsidy for itself.  "Thus, in a world where injunctions are unlikely to be granted or are avoided by agreeing *ex post* to the payment of a FRAND royalty, a rational implementer is more likely to be strictly better off by infringing and delaying royalty payments" and "'patent holdout' becomes

---

[16] Statement of Interest of the United States of America, *Collision Commc's, Inc.* v. *Samsung Elecs. Co., Ltd. et al.*, No. 2:23-cv-00587 (E.D. Tex.), ECF No. 386 at 8.

[17] Norman V. Siebrasse, *Holdup, Holdout, and Royalty Stacking:  A Review of the Literature*, PATENT REMEDIES AND COMPLEX PRODUCTS, Ch. 7 at 284 (July 4, 2019).

[18] Blumenfeld, *supra* note 11, at 151.

a rational business decision for implementers."[19]    This reality makes injunctions particularly important in the SEP context.

Moreover, the obligation of patent holders or licensors to engage in good-faith negotiations and license SEPs on FRAND terms does not preclude a court from issuing injunctions in cases of holdout.  As with any other patent, "SEP holders . . . have the right to exclude others from practicing their intellectual property."[20]  And the obligation to negotiate in good faith is a *bilateral* obligation.  By refusing to engage in such good-faith negotiations and instead opting to hold out, the unwilling licensee loses the benefits of any obligation the patent holder may have had to offer a license, and "the SEP owner is . . . free to pursue lawful remedies."[21]  Indeed, as this Court previously explained, "[i]t is both practical and logical that the obligations of a party acting in good faith be suspended when a counterparty to a negotiation for a FRAND license is acting in bad faith" because "it is impossible for negotiations for a 'fair' and 'reasonable' and 'non-discriminatory' contract to proceed" under such circumstances.[22]  In fact, by holding out, the unwilling licensee jeopardizes the patent holders' goal to license SEPs on "non-discriminatory" terms because it pays nothing while good-faith implementers pay the FRAND rate.[23]  The Federal

---

[19] Gupta, *supra* note 12, at 580.

[20] *Apple, Inc.* v. *Qualcomm Inc.*, 2017 WL 3966944, at *2 (S.D. Cal. Sept. 7, 2017).

[21] *G+ Commc'ns, LLC* v. *Samsung Elecs. Co.*, 2024 WL 233222, at *6 (E.D. Tex. Jan. 22, 2024) (Gilstrap, J.).

[22] *Id*.

[23] In this regard, an injunction is not a "coercive" threat to extract "supra-FRAND" rates from an unwilling licensee; it is a legal remedy in response to an unwilling licensee's failure to participate in the FRAND licensing process.  Injunctions would issue only to prevent the ongoing infringement of a valid and enforceable patent.  It is then up to the unwilling licensee to determine whether to participate in the licensing process or forgo use of the patented technology.  Indeed, from the patent pool perspective, there is no such thing as a "supra-FRAND" rate because all implementers can license the patents subject to the published terms.

Circuit accordingly saw "no reason to create . . . a separate rule or analytical framework for addressing injunctions for FRAND-committed patents" and recognized that "an injunction may be justified where an infringer unilaterally refuses a FRAND royalty or unreasonably delays negotiations to the same effect."[24]

In sum, injunctions are not only effective, but necessary, to address the holdout problem and secure for patent holders their right to exclude others as guaranteed by the Constitution and Congress.  As "an increasing numbers of voices suggest," courts' reluctance to issue injunctions and the general "weakening of remedies of patent infringement has led to holdout behavior,"[25] or otherwise "exacerbated" the issue.[26]  Indeed, "[n]early every major technological breakthrough of the past century . . . has been supported by strong intellectual property frameworks that reward invention and encourage investment," but "[w]hen IP systems weaken, investment slows, uncertainty grows, and innovation migrates to jurisdictions where protection is stronger."[27] Consequently, "[t]he incentive to innovate at the heart of the Patent Act," including innovations relating to technological standards, "is undermined when the availability of injunctions to block infringement is unduly limited."[28]

## CONCLUSION

For the foregoing reasons, *amicus curiae* Access Advance respectfully submits that the pervasive holdout problem and its negative consequences for the patent licensing market should

---

[24] *Apple Inc.* v. *Motorola, Inc.*, 757 F.3d 1286, 1331-32 (Fed. Cir. 2014).

[25] Heiden, *supra* note 15, at 642.

[26] Siebrasse, *supra* note 17, at 287.

[27] Squires, *supra* note 13.

[28] Statement of Interest of the United States of America, *Collision Commc's, Inc.* v. *Samsung Elecs. Co., Ltd. et al.*, No. 2:23-cv-00587 (E.D. Tex.), ECF No. 386 at 2.

be taken into account in assessing Wilus' motion for a permanent injunction, and weigh in favor of granting that relief.

Dated:  April 20, 2026

OF COUNSEL:
Garrard R. Beeney
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
T:  (212) 558-4000
beeneyg@sullcrom.com

Navraj S. Dhillon
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
T:  (310) 712-6600
dhillonn@sullcrom.com

Respectfully submitted,

*/s/ Gregory P. Love*
Gregory P. Love (Texas Bar No. 24013060)
CHERRY JOHNSON SIEGMUND
JAMES PC
104 East Houston Street, Suite 115
Marshall, Texas 75670
T:  (903) 212-4444
glove@cjsjlaw.com

*Counsel for Access Advance LLC*

11

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 20, 2026, a true and correct copy of the foregoing document was served electronically through this Court's CM/ECF system on all counsel of record who are registered to receive notices by e-mail of electronic filings in this case.

/s/ Gregory P. Love
Gregory P. Love