# Exhibit K

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

```
MULLEN INDUSTRIES LLC,        )(

     PLAINTIFF,               )(    CIVIL ACTION NO.

                             )(    2:24-CV-49-JRG-RSP

VS.                          )(    MARSHALL, TEXAS

                             )(

SAMSUNG ELECTRONICS CO.,     )(

LTD. ET AL.,                 )(    MARCH 6, 2026

     DEFENDANTS.             )(    9:00 A.M.
```

MOTION HEARING

BEFORE THE HONORABLE ROY S. PAYNE

UNITED STATES MAGISTRATE JUDGE


```
FOR THE PLAINTIFF:        Mr. Peter F. Snell
                          Mintz, Levin, Cohn, Ferris,
                          Glovsky & Popeo, PC
                          919 Third Avenue
                          New York, NY 10022

                          Mr. Stafford Davis
                          The Stafford Davis Firm, PC
                          815 S. Broadway Avenue
                          Tyler, TX 75701


FOR THE DEFENDANTS:       Mr. Darin W Snyder
                          O'Melveny & Myers LLP
                          Two Embarcadero Center
                          28th Floor
                          San Francisco, CA 94111
```

FOR THE DEFENDANTS:        Mr. Cason G. Cole
                          O'Melveny & Myers LLP
                          2801 North Harwood Street
                          Suite 1600
                          Dallas, TX 75201

                          Mr. G. Blake Thompson
                          Mann, Tindel & Thompson
                          112 E. Line Street
                          Suite 304
                          Tyler, TX 75702


COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
                          Honorable Robert W. Schroeder III
                          United States District Judge
                          Eastern District of Texas
                          Texarkana Division
                          500 North State Line Avenue
                          Texarkana, TX 75501
                          shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Good morning.  Please be seated.

For the record, we're here for the motion hearing in Mullen Industries versus Samsung Electronics, et al., which is our Case No. 2:24-49.

Would counsel state their appearances for the record?

MR. DAVIS:  Good morning, Your Honor.  Stafford Davis and Peter Snell on behalf of Mullen Industries.

THE COURT:  Thank you, Mr. Davis.

MR. THOMPSON:  Good morning, Your Honor.  Blake Thompson here for Samsung.  With me today is Darin Snyder and Cason Cole.  And we also have in-house counsel for Google, Elizabeth Wile, here, as well.  And we're ready to proceed.

THE COURT:  All right.  Thank you, Mr. Thompson.

We're here on the motion for sanctions filed by the Plaintiff, so I'll turn it over first to counsel for the Plaintiff.

MR. SNELL:  Thank you, Your Honor.  Peter Snell on behalf of the Plaintiff.

May I approach with my demonstratives?

THE COURT:  Yes.

MR. SNELL:  Your Honor, to begin, I'd like to start with the procedural history of the case, and that led

to the present motion is Interrogatory No. 29 to Samsung, which requested that Samsung identify and describe Samsung's agreements and relationship with Google, including Google's reported payment to Samsung to have Google Maps preloaded on Samsung devices.

From that point, Your Honor, there were a number of responses to this interrogatory, and I'll get into the details of those shortly in my argument.

But if we fast forward to the close of fact discovery, Samsung stated during discovery in the form of 30(b)(6) testimony and in its final supplemental response to Interrogatory No. 29 that there was no payment between Google and Samsung in relation to Google Maps.

And so this was not something that was contained and addressed in our damages expert report of Mr. Justin Blok, and that is because he was unaware of and Plaintiff was unaware of what we now know in terms of the RSA and the MSIA agreements that were produced by Samsung in response to the Court's order on the motion to compel.

At the October 6th, 2025 pretrial conference, again, there were a number of exchanges between the Court and Samsung's counsel on the topic of agreements in place between Samsung and Google and whether or not there were any payments that were made in relation to the preloading of Google Maps on Samsung devices.

In one particular exchange, the Court requested of counsel, are there payments by Google and Samsung that require, among other things, that Google Maps be downloaded, to which Samsung counsel responded:  No, there are no payments that relate to Google Maps, full stop.

At the pretrial conference, the Court had instructed Samsung counsel to conduct a further investigation as to agreements that may exist between Samsung and Google related to the requirement to load Google Maps on Samsung devices.

Subsequent and in response to that, on October 20th, 2025, Samsung first disclosed that the RSA required Samsung to be in compliance with an effective MADA.  RSA is the Revenue Sharing Agreement that was in place during the damages period in this case, 2021 through 2024.  And the MADA was a Mobile Application Distribution Agreement, and the amendments to that agreement.  But at that time, Your Honor, Samsung still refused to produce the RSA and related documents.  And so I want to pause there for a second, Your Honor.

This was a point in time where pursuant to the Court's guidance at the pretrial conference, Samsung did have an opportunity to produce the documents.  As we'll find out in a moment, it wasn't just the RSA, it was the MSIA.  But Samsung refused to produce those documents and

requires, as a prerequisite to revenue sharing for Google Search advertisements, a valid MADA, which, in turn, requires preinstallation of a suite of Google applications, including Google Maps.

So to summarize, Your Honor, there were additional sources of revenue that Samsung would receive, one under the RSA, one under the MSIA, that required as a prerequisite that Samsung load Google Maps on its smartphones and tablets.

And so pursuant to the bullet immediate above, Georgia-Pacific Factors 6 and 15 tell us that this is an appropriate consideration because it shows that at the hypothetical negotiation, there would have been additional revenues or sales that Samsung could derive by way of preloading Google Maps.  And by way of preloading Google Maps, they are infringing the asserted patents.

So there would have been an added incentive at the hypothetical negotiation for Samsung to engage in its acts of infringement, and that would have put upward pressure on a reasonable royalty rate.

The RSA and MSIA were not produced in discovery. And as I noted on the first slide, Samsung's witnesses and Samsung's interrogatory responses, as well as Samsung's counsel's statements at the pretrial conference deny that Google made payments to Samsung related to Google Maps.

applications, including but not limited to Google Maps on Samsung phones and tablets, Your Honor.

And we see at Docket 213, the pretrial conference transcript, at Pages 57 through 58, counsel for Samsung at the time, Ms. Simmons, stated in response to the Court's question:  No fact witness relied on this or discussed this other than to confirm that there were no payments.

This issue came up again, Your Honor, at Page 77 of the pretrial conference transcript where the Court identified for Samsung counsel the Court's recollection that there is some revenue sharing and asked of Samsung counsel:  Are you representing that, in fact, there is no revenue sharing between Google and Samsung?

At that time, again, Samsung counsel stated that what I've been informed of with respect to this case is that there is no payment or revenue sharing that is tied to Google Maps, none whatsoever.

This came up a third and I believe the final time at the pretrial conference at Pages 132 and 133 where the Court asked Samsung's counsel -- at that time at the podium, it was Mr. Pensabene:  In other words, are there payments by Google to Samsung that require, among other things, that Google Maps be downloaded?

Mr. Pensabene responded:  No, there are no payments that relate to Google Maps, full stop.

This is where the Court instructed Samsung to conduct a further investigation into the agreements and relationship between Samsung and Google, which is ultimately what resulted in the uncovering of the RSA and the MSIA that are applicable to the damages period in this case.

And so I think it's important to note for the purpose of this sanctions motion, Your Honor, what Plaintiff was told by Samsung before the Court's order and what we now know as a result of the motion practice.

And so, again, the 30(b)(6) testimony, the interrogatory responses, and the statements by Samsung's counsel at the pretrial conference all denied the existence any of payments that were related to Samsung's preloading of Google Maps, and we now know from the briefing -- and, again, this is the phrasing that I took right from Samsung's brief that I shared at the start of my argument. This is Docket 227 at 5, Samsung acknowledging that the -- now acknowledging that the RSA requires, as a prerequisite to revenue sharing for Google Search advertisements, a valid MADA, which in turn requires preinstallation of a suite of Google Applications, including Google Maps.  And this is not only the case with respect to the 2020 RSA but also the case with respect to the 2020 MSIA.

And so we seek leave, Your Honor, to add the RSA

THE COURT:  It's about -- and at that time -- throughout that time, Google Maps included this Location Services feature?

MR. SNYDER:  That is correct.

THE COURT:  And that was required to be downloaded under the MADA in order to get the benefits of the RSA?

MR. SNYDER:  That is correct.

THE COURT:  So how in the world are you standing there and telling me that it's not relevant?

MR. SNYDER:  I'm sorry, Your Honor.  I'm not saying that it's not relevant.  My point is that the dollars -- the amount of dollars, the dollars exchanged between Google and Samsung for revenue sharing related to Search do not give us an indication of the value of this particular allegedly infringing feature.

And even their experts agree with that.  They're not -- they don't -- they're not purporting to come up with some damages model that says this is the dollar value based on this relationship between Google and Samsung.  Based on these -- these agreements that they have, this is the amount I think you can assign to Location Sharing.

I'm not saying it's not relevant, Your Honor.

THE COURT:  Well, then why wasn't it produced?

MR. SNYDER:  So let me -- let me try and review that history, because there's a very good reason it wasn't

produced.

THE COURT:  All right.

MR. SNYDER:  They sent an interrogatory that says: Tell us about the amount of money that -- tell us about the payments between Samsung and Google for Google Maps.

Now, in all of their briefing on the motion for leave, on the motion, on this motion for sanctions in more than a half-hour of presentation, Mr. -- Mullen's counsel mentioned -- never mentioned Paragraph 4.1 of the MADA, which says -- this is Docket 217-5.

THE COURT:  Okay.

MR. SNYDER:  Unless the parties specifically agree in other agreements, including without limitation the RSA, Company and Google shall each retain any and all revenue generated from provision of their respective products and services.  For the sake of clarity, except as expressly as set forth in this agreement, neither party shall be required to account to the other or otherwise make any payment to the other regarding the applications, Google products and services, the devices, the service, or any revenue generated therefrom or any of the licenses granted by this agreement.

It says there are no payments for these applications.

THE COURT:  This is an absurdity.  It says except

as otherwise provided, and the otherwise provided is a payment of an enormous amount of money that depends upon, among other things, the downloading of Google Maps onto your devices.

MR. SNYDER:  And so there is no dispute, Your Honor, and I'm not disagreeing --

THE COURT:  So why are you reading me this provision that says except as otherwise provided as though it doesn't otherwise provide?

MR. SNYDER:  I guess I have a -- we have a different understanding of what it means to be required to make a payment or what the basis for a payment is.

THE COURT:  We have a different understanding of what relevance is.  We could be having a delightful conversation about whether any of this is admissible, but we're not having a good-faith conversation about whether it should have been disclosed in discovery.

MR. SNYDER:  We produced the -- all of these MADAs.  We answered the interrogatory by referring to those MADAs.  When we understood Plaintiff's theory -- because their theory is very different now than it was then -- they pointed to The Hill article, which is a -- The Hill is the name of a publication, and said we think Google is paying $8 billion to Samsung.

Once we understood that that was the focus, we

some amount of money for having Google Maps preinstalled, which we stipulated to.

THE COURT: It doesn't say that. But it clearly -- it is not, in my opinion, a good-faith argument to say that those payments are unrelated to Google Maps.

MR. SNYDER: I understand that the Court disagrees with that, and that's why it issued the order that it did, and we complied with that order. But we relied on the statement in the MADA. I think we reasonably relied on the statement in the MADA that there are no payments for these applications, one of which is Google Maps.

THE COURT: And that -- the MADA says that with respect to all the applications, right?

MR. SNYDER: That is correct. All of the applications referenced in the MADA, you're correct.

THE COURT: So your position is that those payments -- those enormous payments have no relationship to any Google Apps?

MR. SNYDER: Not none, because the RSA identifies the apps -- the services that are the basis for that revenue sharing. Those are different from the ones that are described in the MADA.

THE COURT: It identifies the apps whose advertising generates the money that is shared.

MR. SNYDER: Correct.

details, including the expected dollar amounts associated with each part of the deal.

THE COURT:  And does it indicate anywhere that the downloading of the entire suite of Google Apps is required in order to share in the revenue of the RSA?

MR. SNYDER:  It does not because Google and Samsung don't connect any revenue to those apps consistent with Paragraph 4.1.  This describes the different agreements that generate the revenue and what dollar amounts it expects from each one of those.

THE COURT:  And, you know, I guess part of my frustration is the fact that in a prior case involving Samsung, I already ruled that that was discoverable.  And what I found out in this case was that not only had it not been produced, but its existence was, I believe, denied.

The fact that one of your partners, and my recollection was it was Ms. Simmons, not Mr. Pensabene, stood up there and said there are no payments related to Google Maps, full stop.  At that point, I said, okay, there has to be some explanation.  And I'm still looking for that explanation.

MR. SNYDER:  The only explanation I can give you, Your Honor, is that we were relying and continue to rely on the provision in the MADA that says there are no payments for those apps and the terms of the Revenue Sharing

Agreements that describe what those payments are based on that are not never based on Google Maps.

I understand this prerequisite theory. I don't agree with it, but I understand the Court's point. The Court granted the motion to compel, and we immediately produced all of those.

But we've never, never hid the existence of the RSA. It is specifically mentioned in the MADA in Paragraph 4.1. It is specifically referenced in this document, and we referred to both of those in our responses to the interrogatories.

THE COURT: And did you ever reveal to the Plaintiffs the portion of the MADA that requires the downloading of all of the Google Apps, including Google Maps, in order to share or as a prerequisite to participation in the RSA?

MR. SNYDER: We produced the entire MADAs, but the requirement that you're talking about, Your Honor, is not in the MADA. That is in the RSA. And we did not reveal -- we did not reveal that detail because we did not think that that was necessary or called for. I understand now that the Court disagrees with that.

THE COURT: Did you know about that?

MR. SNYDER: I did not.

THE COURT: So the decision not to reveal it was

made by Samsung, not by counsel?

MR. SNYDER:  We agreed with the -- we agreed with producing the MADA because it -- which says that there are no payments for these apps.  We were not aware of this prerequisite notion as a theory for damages until the later -- the briefing after the pretrial conference.

THE COURT:  So --

MR. SNYDER:  That had never been articulated to me or anybody on the team.

THE COURT:  So that -- that understanding, that information was withheld from you by Samsung?

MR. SNYDER:  I'm not comfortable with that characterization, Your Honor, but I will tell you that -- because I don't want to accuse my client of withholding something from me, but I was not aware of that.

THE COURT:  Uh-huh.  You know, it's ironic that I am the one to point out to Samsung's counsel the existence of these agreements that I assumed had been disclosed in discovery in this case.

MR. SNYDER:  I was aware of the Revenue Sharing Agreement.  I am aware of the relationship between Samsung and Google.  I was not aware of that specific provision or an interpretation of it that it connected the other payments between Google and Samsung for other activities to those individual apps.

CERTIFICATION


        I HEREBY CERTIFY that the foregoing is a true and

correct transcript from the stenographic notes of the

proceedings in the above-entitled matter to the best of my

ability.



  /S/ Shelly Holmes                          3/6/2026
SHELLY HOLMES, CSR, TCRR                      Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027