# Exhibit E

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC., <br> *Plaintiff,* <br><br> v. <br><br> HP INC. <br><br> *Defendant.* | Civil Action No. 2:24-cv-0752-JRG-RSP <br><br> **LEAD CASE** <br> **JURY DEMANDED** |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> *Plaintiff,* <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. <br><br> *Defendants.* | Civil Action No. 2:24-cv-00746-JRG-RSP <br><br> (Member Case) |
| WILUS INSTITUTE OF STANDARDS AND TECHNOLOGY INC. <br><br> *Plaintiff,* <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. | Case No. 2:24-cv-00765-JRG-RSP <br> (Member Case) |

**REBUTTAL REPORT OF PAUL NIKOLICH**

████████████████████

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................1

II.   SUMMARY OF OPINIONS ................................................................2

III.  QUALIFICATIONS AND EXPERIENCE .................................................3

IV.   THE IEEE STANDARDIZATION PROCESS & BYLAWS.....................4

V.    WILUS FULLY COMPLIED WITH ALL APPLICABLE POLICIES ....14

VI.   OTHER IEEE PRACTICES AND PROCEDURES ...............................21

VII.  PUBLIC AVAILABILITY OF IEEE 802.11AX DRAFT D1.0...............34

VIII. CONCLUSION .................................................................................47

i

802.11ax D1.0 is publicly accessible is existence (or lack thereof) of reasonable expectations that the material would not be copied or further disseminated. The specific formulation of the law, as I understand it, is as follows: "the ultimate question is whether the reference was available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it."

75.    My understanding of the legal principles here is further supplemented by the following examples provided by counsel for Wilus:

- (1) a student's written thesis that is stored in a college's main library amongst other student theses, which were collectively indexed using individual cards and searchable by student name, and which was orally presented only to faculty members, is not sufficiently publicly accessible to be prior art;

- (2) a resident doctor's various papers describing his work on stents, which he distributed to various supervisors and medical professional colleagues and also to two companies attempting to commercialize his stent technology, even without any formal confidentiality agreement, nonetheless did not establish public accessibility because academic, professional, and industry norms indicated that the distribution of the papers was done with an expectation of confidentiality.

- (3) a given article on file at the United States Copyright Office is not publicly accessible if its title cannot be searched for nor located by a subject matter search;

- (4) evidence that it was "general practice" at an industry conference to distribute article abstracts is insufficient evidence of actual evidence of distribution of a specific abstract for purposes of public accessibility.

35

76.     To assess whether Dr. Bims's assertions regarding 802.11ax D1.0 was "publicly accessible," I must also know the definition of "Person of ordinary skill in the art " (POSITA) as it stands in this case. I am informed that Dr. Bims has opined as follow in this case: "a POSITA would have had a Bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least three years of experience in the research, design or development of wireless communication devices, systems, and/or networks, or the equivalent, as of the 2015-2017 timeframe." For the purposes of this report, I do not disagree with this definition and adopt it for my analysis. As for the specific time frame to which the POSITA definition applies, I understand that the definition is meant to be applied at the time the relevant U.S. Patent has its priority date.

77.     In my opinion, 802.11ax D1.0 was not publicly accessible when it was distributed to the voting bloc of the 802.11 Working Group on December 1, 2016. As Dr. Bims acknowledges, the 802.11 Working Group is a specific subset of individual participants, all of whom are also members of the broader 802.11 organization. In order to become a voter of the Working Group member (which is sometimes described as a person with "Voter" status within the organization) in the 2016-2017 time frame, one must have satisfied a series of requirements which can be summarized as follows: the individual must attend three sessions of the IEEE 802.11 organization—two of which must be "plenary" sessions (which are typically more eventful and heavily attended than non-plenary sessions)—and also by "casting a vote in 2 of the last 3 letter ballots." Bims Decl. ¶ 111.

78.     Thus, in order to be an individual who actually received a copy (or, more accurately, an email notifying the individual that the password-protected section of the Working Group website had been updated to include a ballot for 802.11ax D1.0 and a link to that draft) by

36

December 1, 2016, that individual must been a participant of the Working Group no later than December 1, 2016. And to be a member with voting privileges and the motivation to review D1.0 on December 1, 2016 to vote on it, that individual must have been a participant in the Working Group by August 15, 2016, which is the date on which ballot 223 was opened; ballot 224 was opened on September 10, 2016; and ballot 225, which concerns 802.11ax D1.0, was opened on December 1, 2016. If an individual did not vote in two of the three ballots (223, 224, and 225), they could not have been a voting member by December 1, 2016. If they had previously been a voting member and failed to vote in two of those three ballots, they would have had non-voter status on December 1, 2016.[84]

79.     At a high level, Dr. Bims's opinion is that a POSITA (that is, a new CS/EE graduate with 3 years of work experience by late 2016 or early 2017), would have been either a participant or a voting member of 802.11 Working Group by December 1, 2016. This is a dubious conclusion for many reasons.

80.     First, the membership of the 802.11 Working Group skews overwhelming towards individuals with many years (or decades, in some cases) of relevant industry experience. To illustrate my point, consider the oldest version of the 802.11 Working Group members list crawled and captured by the Internet Archive, which dates to early 2018.[85] By that time, there were 243 members with voting status within the Working Group (and that number may have been even lower in December 2016). Upon a skim of that list of voting members, I note that

---

[84]   *See, e.g.,* https://ieee802.org/PNP/approved/IEEE_802_WG_PandP_v19.pdf (IEEE policies and procedures in effect in 2016) (section 4.2.3: membership may be lost if two of the last three Working Group letter ballots are not returned"). As the rules also state, membership is lost also if one does not participate in at least two of the last four plenary sessions.

[85]   Available                                                        here: https://web.archive.org/web/20180131044637/https://www.ieee802.org/11/members.htm

virtually all of the names of these members belong to distinguished engineers with many years of experience and who hold (or held) senior roles at their respective technology companies. Take, for example, the alphabetically first four names on the list and the information readily available about them on the Internet (and I note that these individuals' specific and self-reported qualifications are accessible to Working Group members, including myself):

- Aboulmagd, Osama: Huawei-affiliated; began participating in 802.11 Working Group in 2003.[86] Served as chair of 802.11ax and 802.11ac.

- Adachi, Tomoko: Toshiba-affiliated; fellow at Toshiba since April 2000.[87]

- Ahn, Jinsoo: professor at Yonsei University since around 2014.

- Ahn, Woojin: Wilus-affiliated; a Wilus Senior Researcher by 2016, B.S. in EE from Yonsei University in 2006; M.S. in EE from Yonsei University in 2008.

81.     Virtually all of the voting members of 802.11ax as of 2016 have similar or more credentialed and experienced backgrounds. This is consistent with my decades of experience in the 802.11 organization: companies typically choose senior engineers with deep technical expertise as delegates to 802.11 organization, particularly where standards-setting activities are concerned, because it is these senior engineers and researchers who can be most expected to meaningfully contribute to the 802.11 organization's activities. It typically does not make sense for a company like Huawei or Intel to send a junior engineer (with, say 2 or 3 years of experience) as the company's representative at a standards setting organization. As for Dr. Bims's opinion that a junior engineer (with 2-3 years of experience) would be a Working Group voting member by December 1, 2016—that is generally inconsistent with my

---

[86]        *See,        e.g.,*        https://lyon.ecampus.com/wireless-local-area-networks-quality/bk/9780738156736.

[87] *See, e.g.,* https://www.linkedin.com/in/tomoko-adachi-61582293/.

understanding of the specific facts and characteristics about the 802.11 Working Group's membership and, more importantly, not supported by evidence I've seen, such as by any evidence described in Dr. Bims's declaration.

82.    In any event. Dr. Bims asserts: "Although draft D1.0 was initially posted to a password-protected area of the IEEE website, this posting in fact would have served to make draft D1.0 accessible to a broad swath of the interested public. As I explained above, many hundreds of individuals among the interested public were voting members in the IEEE 802 Working Group and would have had direct access to draft D1.0 from the member area website immediately upon its posting on December 1, 2016." Bims Decl. ¶ 108. This assertion fails as a matter of logic: as I understand it, the "interested public" of the legal test is not "some people who are interested in the subject matter." Rather, the "interested public" means: "persons interested and ordinarily skilled in the subject matter." Certainly, the various senior researchers, university professors, and other experienced industry professionals in the voting bloc and participants of the 802.11 Working Group are "interested" in a basic sense in the subject matter—they are the ones collectively drafting and voting on the draft standard, after all. But a POSITA, here, according to Dr. Bims, is simply a junior engineer or researcher with 2-3 years of work experience, with no special access to the password-protected materials distributed in the 802.11 Working Group balloting process. Such a POSITA would of course not have access to 802.11ax D1.0 draft, unless one were to presuppose (counterfactually and against both logic and evidence) that the POSITA is also a participant and/or a voting member as of December 1, 2016.

83.    Dr. Bims also asserts that:

> "On the contrary, voting members commonly shared draft standard amendments like draft D1.0 with non-active participants in industry and

39

academia, or other interested members of the public, upon their release on the members area of the IEEE website. There was, in practice, no expectation of confidentiality for draft standard amendments or other documents posted to the member area, and in my experience, voting members knew and expected that such documents would be shared with non-active participants for a variety of reasons." (Bims Decl. ¶ 108.)

84.    I disagree with this assertion, which I specifically note is unsupported by Dr. Bims with any examples, detailed explanation, or other evidence. It is also inconsistent with my understanding of the law, which provides that assertions concerning the "general practice" of the alleged distribution of a type of publication like a draft standard is insufficient to establish that a specific draft standard was publicly accessible for prior art purposes.

85.    In my experience, the IEEE 802.11 Working Group has always treated its confidential, password-protected materials with the expectation that their password-protected status conveys: that they be treated as confidential and used only for the purposes permitted by the policies and procedures of the IEEE 802.11 organization.

86.    This expectation of confidentiality is clearly and repeatedly spelt out to 802.11 Working Group members and the broader 802 organization. *See, e.g.,* https://1.ieee802.org/documents/ ("IEEE 802.1 working group documents are mostly public access, however, drafts under development are **private to working group participants**.").

87.    For example, the current landing page of the password-protected materials for the Working Group[88] (which would have needed to be accessed in December 2016 by a voting member to obtain a copy of 802.11ax D1.0) shows as follows:

---

[88] https://www.ieee802.org/11/private/index.shtml. The specific URL of the balloting webpage distributed on December 1, 2016, was https://www.ieee802.org/11/LetterBallots/LB225ax/LB225_instructions.html, which



88.     As the screenshot shows, literally the first sentence shown in the "Members Area" behind the password protection prompt reads that it is for: "**Documents whose circulation is restricted to members of IEEE 802.11**, and by reciprocal agreement, members of other IEEE 802 working groups." This written warning to Working Group members has been in place as long as I can recall.

89.     As a broader matter, Dr. Bims's assertions are also inconsistent with the broader IEEE organization's written policies and procedures regarding distribution of draft standards, which are currently available here https://standards.ieee.org/about/policies/opman/sect6/ and which have not significantly changed (for our purposes here) since at least 2016. Those rules provide the scenarios in which drafts may be distributed: it can be distributed to other IEEE members or external standards-setting organizations only upon approval by the relevant Working Group Chair and stakeholders, and with other IEEE working groups or standards committees.

90.     Indeed, IEEE SA Standards Board Operations Manual 6 provides as follows:

---

provided a link to the "members only" portion of the website for downloading draft 1.0 at this URL: http://www.ieee802.org/11/private/Draft_Standards/11ax/Draft%20P802.11ax_D1.0.pdf.

### 6.1.3.2.1 Sharing drafts with Working Group participants

Participants in an active IEEE standards development project are entitled to receive a copy of draft standards produced by that project without charge. The Working Group Chair of the project determines whether an individual (for individual projects) or entity (for entity projects) meets the requirements for participation.

### 6.1.3.4 Draft distribution to recognized organizations external to IEEE

If a Working Group intends to distribute a draft to a recognized standards-developing organization or technical organization external to IEEE involved in the technology covered by that project for technical review and comment, the Standards Committee and Working Group Chair shall work with the IEEE Standards Department to establish the draft sharing relationship. A recognized organization is one that has been accepted and is listed on the IEEE SA Working Group Draft Sharing for Coordination List.

Once the draft sharing relationship has been established, the Working Group Chair may share stable drafts. A stable draft is one that has

   a. been voted on by the Working Group as being ready to be shared, and
   b. undergone an IEEE SA editorial review and has been deemed without issue (e.g., the draft is absent any open or unresolved required editorial review items prior to draft distribution).

All drafts submitted to organizations external to IEEE shall have as the cover page the IEEE SA draft sharing cover letter. The cover letter outlines the IEEE copyright and permitted uses and is available from the IEEE Standards Department. When sharing the draft with the organization external to IEEE, the Working Group Chair shall inform the IEEE Standards Department.

The IEEE Standards Committee Chair or Working Group Chair shall immediately inform the IEEE Standards Department when the draft sharing relationship is no longer needed.

### 6.1.3.5 Other draft distribution

Requests for drafts other than described in subclauses 6.1.3.2 – 6.1.3.4 shall be directed to the IEEE Standards Department.

91.    In sum, drafts of standards cannot be freely distributed as Dr. Bims suggests. Persons not authorized by default to receive copies of drafts may of course request access, like through the provisions of the policies and procedures shown above—but whether such requests are granted is committed to the discretion of the Chair of the relevant Task Group or Working Group that owns the draft. And I am aware of no instance, and Dr. Bims has provided no example, of where 802.11ax D1.0 (or earlier drafts such as D0.5) were circulated to anyone at specific time in the 2016 or early 2017 time period other than those within IEEE 802 permitted to see them in the first place.

42

92.     Any other form of distribution other than that specifiedin the policies and procedures must be approved by the IEEE Standards Department. In view of the policies and procedures of the IEEE and IEEE 802 LMSC, it is incorrect to conclude that a given draft would have been freely distributed without any expectation of confidentiality. Perhaps Dr. Bims believes that, despite the written policies and procedures that governed IEEE 802.11's work, individuals would have freely violated those policies and procedures. If so, I am not aware of any instance where an individual did so with respect to 802.11ax D1.0, and Dr. Bims has identified none. In reality, the strong expectation is that participants in IEEE 802 LMSC standards activities shall rigorously follow the rules of the organization, and it is my general experience that participants do, in fact, follow the rules. I am aware of no instance where an IEEE 802 LMSC participant, in violation of those rules, distributed 802.11ax D1.0 to someone else outside of the organization without obtaining proper approval with the expectation they adhere to the copyright restrictions, and certainly not on December 1, 2016 or shortly thereafter.

93.     Dr. Bims then asserts there are two ways "of how an interested member of the public—who was not already a voting member of the 802.11 Working Group—could have accessed draft D1.0, for example, by (1) following the straightforward process for becoming a voting member of the Working Group or (2) obtaining the document as a non-voting member." Bims Decl. ¶ 109; *see id.* ¶¶ 109-121.

94.     In Dr. Bims's first argument here, he says that it would have been simple for a POSITA (having graduated from college 2-3 years earlier) to follow "straightforward" procedures for "becoming a voting member of the Working Group." Importantly, those procedures required an interested person to attend three IEEE working group meetings ***in person***, two of which

must be week-long "plenary" meetings. Dr. Bims' opinions themselves show why the argument is weak. Under Dr. Bims's argument, a junior engineer (with 2-3 years of experience), fresh out of college in 2015 or 2016, would have needed to do the following:

- Attend at least two "plenary" IEEE meetings in the following locations and dates: (1) Macau, March 2016; (2) San Diego, California, July 2016, and (3) San Antonio, Texas, November 2016.

- If attending only two "plenary" meetings, also attend at least one of the following non-plenary IEEE meetings: (1) Waikoloa, Hawaii, May 2016, (2) Warsaw, Poland, September 2016.

95.     In other words, Dr. Bims requires this new EE/CS graduate (with 2-3 years of experience) to either self-fund travel and hotel costs to at least one far-flung location for a full week of meetings (i.e., in Macau, Poland, or Hawaii), or have been selected by their employer to attend. This strains credulity.

96.     Dr. Bims' theory that a POSITA would have just "joined" the voting bloc of the Working Group fails for numerous reasons. First, a POSITA could not have been meaningfully motivated to do so beginning in December 2016 if they had (hypothetically) been informed of the existence of 802.11ax_D1.0 at that time, because they would not had time to do so before the relevant priority dates of the Wilus patents (which includes, as I understand it, a January 2017 priority date for U.S. Patent 11,159,210).

97.     Even taking a junior software engineer in January 2016 with 2-3 years of experience (to go along with Dr. Bims's theory that such a person could have begun attending IEEE 802.11 meetings in early 2016), it defies common sense and logic to conclude that this engineer, even acting with reasonably diligence, would have (whether self-funded or

44

sponsored by an employer) strategically attended multiple IEEE meetings throughout 2016, some in far-flung locations, just to become a voting member of the Working Group for the chance to learn about and access 802.11ax_D1.0 by December 2016. And, as I've noted above, the reality is that voters and other Working Group members plainly were not, and are not, junior engineers with 2-3 years of experience.

98.    As for Dr. Bims's second argument that a POSITA would obtained it "indirectly from a voting member" by a member of the Working Group (or some intermediary who knows a Working Group member). But this presupposes, without evidence, that a POSITA would have known of the existence of 802.11ax_D1.0 on December 1, 2016, is a factually dubious scenario given Dr. Bims's own definition of a POSITA and also totally unsupported by any evidence.

99.    Finally, Dr. Bims asserts that drafts are "commonly shared" with "non-voting members" as well as others. Bims Decl. ¶ 119. He says that "it was common for voting members to share draft standards with academic colleagues or industry engineers from their respective companies who were not voting members and, in some instances, were not even IEEE members." *Id.* He even says: "Based on the roughly 600 IEEE 802 Working Group members with direct access to the document, I estimate that draft D1.0 would have been disseminated to thousands of additional interested members of the public apart from just voting members by the earliest claimed priority date of the '210 patent (e.g., January 9, 2017). In other words, there was not an expectation of confidentiality with respect to draft D1.0." *Id.*

100.    Dr. Bims's assertion here is straightforward to unpack. First, he provides no evidence of any distribution of 802.11ax D1.0 to any non-Working Group or non-IEEE member on December 1, 2016 or immediately thereafter—which is important shortcoming, because his

opinion is that the 802.11ax D1.0 was "publicly accessible" on specifically December 1, 2016 and, at latest, by January 9, 2017. It may be the case that the draft was distributed by someone to some other person outside of IEEE on, say, February 1, 2026 (which perhaps Dr. Bims believes is correct), but that does not provide any logical support for Dr. Bims's opinion because that does not speak to whether the draft was publicly accessible in the relevant 2016-2017 time frame. And it may well be the case that 802.11ax D1.0 was downloaded by some non-Working Group member from the session intranet at the March 2017 IEEE 802 session in Vancouver, BC—but, again, that is not evidence that it was publicly accessible on December 1, 2016 or January 8, 2017. This total lack of evidence is fatal, in my view, to Dr. Bims's argument, because the specific date and manner of the alleged distribution logically determines the date on which a given publication is publicly accessible—and Dr. Bims has provided no specifics at all.

101.    Second, Dr. Bims cites only his "experience" to support his conclusion. But this is insufficient and only suggests that there is no evidence to support his conclusion. Perhaps there is evidence within the IEEE 802.11 Working Group's listserv/email activity—which is recorded and made publicly available—of a voting member sending 802.11ax D1.0 to someone else—but Dr. Bims didn't present any such evidence.

102.    Third, Dr. Bims says there were "roughly 600" "Working Group members with direct access" to the document, and based on that number, he "estimates" the draft was distributed to "thousands" of other people by January 9, 2017. This assertion, like many others, is unsupported by any evidence. It is clear from the available records that there were not "roughly 600" Working Group members by January 2017. There were only 450 members in

January 2018,[89] and (to my recollection) fewer than that in January 2017. With even the basic numbers in this part of Dr. Bims's declaration materially incorrect, it is clear to me that Dr. Bims's opinion is not only unsupported by any evidence, it relies on unsupported assumptions.

103.    Finally, I have been asked also to review Dr. Bims's declaration to determine if it contains an opinion about or any support for a conclusion that an earlier version of 802.11ax draft, D0.5, was publicly accessible on any particular date and thus "prior art" to any particular Wilus patent. I understand that Samsung's experts have asserted that 802.11ax D0.5 draft is prior art to certain Wilus patents. In reviewing the Bims Declaration, while I see 802.11ax D0.5 is mentioned, I see no opinion or analysis of whether 802.11ax D0.5 was publicly accessible to a POSITA on any particular date.

104.    I understand that Dr. Bims or Samsung may only assert, in relevant part, that 802.11ax D0.5 was published in September 2016, which is the date reflected on the front page of the document. If this is the case, I disagree that the publication date on the cover page of 802.11ax D0.5 is evidence of its public accessibility. As I explained above, drafts are "published," yes, but they are distributed internally within IEEE subject to the policies and procedures of the organization. I am aware of no evidence or analysis, provided by Dr. Bims or otherwise, establishing that 802.11ax D0.5 was "publicly accessible" to a POSITA on any given date, at least for all the reasons that 802.11ax D1.0 would not have been in the relevant time frame.

## VIII.  CONCLUSION

105.    Based on my knowledge, professional experience, expertise, and review of the materials cited in this report, it is my opinion that Wilus' disclosure of IPR related to the IEEE 802.11ax standard fully complied with all obligations, policies, and requirements put in place

---

[89] *See, e.g.,* https://web.archive.org/web/20180131044637/https://www.ieee802.org/11/members.htm.

47

by the IEEE. More specifically, it is my opinion that Wilus' submission of a Custom LOA for the IEEE 802.11ax standard satisfied Wilus' obligations under the IEEE IPR Policy, and I am not aware of any conduct by Wilus in the standardization context that would support finding the Asserted Patent unenforceable.

106.    It is also my opinion that Wilus is entitled to seek injunctive relief based on Samsung infringement and there is nothing in the IEEE Bylaws that prohibits such relief when taking into account the parties' negotiation history, since it appears Wilus's good faith negotiation attempts have not been successful.

107.    Also, as detailed above, I disagree with various statements and characterizations of IEEE practice and procedure stated by Mr. Djavaherian and Dr. Perryman.

108.    Further, as explained above, it is my opinion that Dr. Bims has not demonstrated that drafts 0.5 and 1.0 of 802.11ax were "publicly accessible" on December 1, 2016 or January 2017, or at any other date.

109.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001.

Executed on February 13, 2026

_Paul Nikolich_
Paul Nikolich, Owner of Nikolich Advisors LLC